## Nos. 22-2370 & 22-2413

# In the United States Court of Appeals for the Seventh Circuit

MOTOROLA SOLUTIONS, INC. AND
MOTOROLA SOLUTIONS MALAYSIA SDN. BHD.,

Plaintiffs-Appellees / Cross-Appellants,

v.

HYTERA COMMUNICATIONS CORPORATION LTD.,

Defendant-Appellant / Cross-Appellee.

Appeal from the U.S. District Court
for the Northern District of Illinois
Case No. 1:17-cv-01973 | The Honorable Charles R. Norgle Sr.
_____

Corrected Opening Brief and Required Short Appendix of
Defendant-Appellant Hytera Communications Corporation
Ltd.
_____

Boyd Cloern
    *Counsel of Record*
Alice E. Loughran
Mark C. Savignac
John William Toth
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, NW
Washington, DC 20036
(202) 429-3000
(202) 429-3902 (fax)
bcloern@steptoe.com

Attorneys for Defendant-Appellant
Hytera Communications Corporation Ltd.

# CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No.:   Nos. 22-2370 & 22-2413

Short Caption:  Motorola Solutions, Inc. v. Hytera Communications Corporation Ltd.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first.  Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

   Hytera Communications Corporation Ltd.

(2)    The names of all law firms whose partners or associates have appeared for the party in this case (including proceedings in the district court or before any administrative agency) or are expected to appear for the party in this court:

   Steptoe & Johnson LLP; Calfee, Halter & Griswald LLP; Finnegan LLP; Duane Morris

(3)    if the party or amicus is a corporation:

a.    identify all of its parent corporations, if any; and

   n/a

b.    list any publicly held company that owns 10% or more of the  party's or amicus' stock:

   n/a

Attorney's Signature:   /s/  Boyd Cloern          Date:  November 14, 2022

Attorney's Printed Name:   Boyd Cloern

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).  Yes      X         No

Address:   1330 Connecticut Ave. NW

   Washington, DC  20036

Phone Number:  (202) 429-3000          Fax Number:    (202) 429-3902

E-mail Address:    bcloern@steptoe.com

# CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No.:    Nos. 22-2370 & 22-2413

Short Caption:  Motorola Solutions, Inc. v. Hytera Communications Corporation Ltd.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1

The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first.  Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

(4)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

     Hytera Communications Corporation Ltd.

(5)    The names of all law firms whose partners or associates have appeared for the party in this case (including proceedings in the district court or before any administrative agency) or are expected to appear for the party in this court:

     Steptoe & Johnson LLP; Calfee, Halter & Griswald LLP; Finnegan LLP; Duane Morris

(6)    if the party or amicus is a corporation:

a.    identify all of its parent corporations, if any; and

     n/a

b.    list any publicly held company that owns 10% or more of the  party's or amicus' stock:

     n/a

Attorney's Signature:    /s/  Alice E. Loughran           Date:   November 14, 2022

Attorney's Printed Name:   Alice E. Loughran

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).  Yes _____        No   X

Address:   1330 Connecticut Ave. NW

         Washington, DC  20036

Phone Number:  (202) 429-3000          Fax Number:    (202) 429-3902

E-mail Address:    aloughran@steptoe.com

# CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No.:     Nos. 22-2370 & 22-2413

Short Caption:  Motorola Solutions, Inc. v. Hytera Communications Corporation Ltd.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1

The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first.  Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

(7)     The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

    Hytera Communications Corporation Ltd.

(8)     The names of all law firms whose partners or associates have appeared for the party in this case (including proceedings in the district court or before any administrative agency) or are expected to appear for the party in this court:

    Steptoe & Johnson LLP; Calfee, Halter & Griswald LLP; Finnegan LLP; Duane Morris

(9)     if the party or amicus is a corporation:

a.     identify all of its parent corporations, if any; and

    n/a

b.     list any publicly held company that owns 10% or more of the  party's or amicus' stock:

    n/a

---

Attorney's Signature:     /s/  Mark C. Savignac                    Date:   November 14, 2022

Attorney's Printed Name:   Mark C. Savignac

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).  Yes _____     No   X

Address:   1330 Connecticut Ave. NW

          Washington, DC  20036

Phone Number:  (202) 429-3000          Fax Number:   (202) 429-3902

E-mail Address:   msavignac@steptoe.com

# CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No.:    Nos. 22-2370 & 22-2413

Short Caption:  Motorola Solutions, Inc. v. Hytera Communications Corporation Ltd.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first.  Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

(10)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Hytera Communications Corporation Ltd.

(11)    The names of all law firms whose partners or associates have appeared for the party in this case (including proceedings in the district court or before any administrative agency) or are expected to appear for the party in this court:

Steptoe & Johnson LLP; Calfee, Halter & Griswald LLP; Finnegan LLP; Duane Morris

(12)    if the party or amicus is a corporation:

a.    identify all of its parent corporations, if any; and

n/a

b.    list any publicly held company that owns 10% or more of the  party's or amicus' stock:

n/a

---

Attorney's Signature:    /s/  John William Toth                Date:   November 14, 2022

Attorney's Printed Name:    Boyd Cloern

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).  Yes _____    No   X

Address:   1330 Connecticut Ave. NW

Washington, DC  20036

Phone Number:  (202) 429-3000            Fax Number:    (202) 429-3902

E-mail Address:    btoth@steptoe.com

## TABLE OF CONTENTS

**Page(s)**

Jurisdictional Statement ................................................................. 1

Statement of Issues ...................................................................... 2

Introduction .................................................................................. 3

Statement of the Case .................................................................. 6

      A.    Statutory background ................................................... 6

      B.    The parties and the DMR technology ............................ 7

      C.    Motorola's lawsuit and the jury's verdict ...................... 9

      D.    Post-trial motions and rulings ..................................... 11

Standard of Review ...................................................................... 15

Summary of Argument ................................................................. 15

Argument ..................................................................................... 23

I.    The district court erred as a matter of law in failing to
apportion the award of Hytera's profits and awarding a
commensurate ongoing royalty ............................................. 23

      A.    The legal standard for apportionment of profits ........... 24

      B.    Hytera's profits were not entirely attributable to the
infringement and misappropriation ............................. 26

      C.    Hytera proffered numerous rational methodologies
for conducting a proper apportionment ....................... 31

      D.    The district court violated its duty to make *some*
apportionment .............................................................. 36

E.    The district court repeated its errors in setting the royalty rates for ongoing sales .......................................39

II.   The district court erred in awarding Hytera's profits from extraterritorial sales ..............................................................41

A.    The presumption against extraterritoriality ..................41

B.    The Copyright Act does not authorize the district court's award of extraterritorial profits .........................43

C.    The DTSA does not authorize the district court's award of extraterritorial profits.....................................51

III.   This Court should substantially reduce the punitive damages award ...............................................................................62

IV.   This Court should limit the copyright damages to the three years before the claims were added ......................................67

Conclusion ...................................................................................72


Statutory Addendum

Certificate of Compliance with Rule 32(a)

Certificate of Compliance with Circuit Rule 30

Certificate of Service

Circuit Rule 30(a) Appendix

**TABLE OF AUTHORITIES**

**Page(s)**

**CASES**

*Allarcom Pay Television, Ltd. v. Gen. Instrument Corp.,*
   69 F.3d 381 (9th Cir. 1995)................................................45, 46

*Amyndas Pharmaceuticals, S.A. v. Zealand Pharma A/S,*
   48 F.4th 18 (1st Cir. 2022)................................................58, 59

*BMW N. Am., Inc. v. Gore,*
   517 U.S. 559 (1996)....................................................62, 63, 66

*Bucklew v. Hawkins, Ash, Baptie & Co.,*
   329 F.3d 923 (7th Cir. 2003)....................................................25

*Carucel Invs., L.P. v. Novatel Wireless, Inc.,*
   No. 16-CV-118-H-KSC, 2017 WL 1215838 (S.D. Cal.
   Apr. 3, 2017), *aff'd,* 730 F. App'x 938 (Fed. Cir. 2018)..............32

*Chi. Bldg. Design, P.C. v. Mongolian House, Inc.,*
   770 F.3d 610 (7th Cir. 2014)....................................................69

*Cream Recs. Inc. v. Jos. Schlitz Brewing Co.,*
   754 F.2d 826 (9th Cir. 1985)....................................................26

*Data Gen. Corp. v. Grumman Sys. Support Corp.,*
   36 F.3d 1147 (1st Cir. 1994)............................................*passim*

*EEOC v. Arabian Am. Oil Co.,*
   499 U.S. 244 (1991)................................................................42

*Epic Systems v. Tata Consultancy Services,*
   980 F.3d 1117 (7th Cir. 2020)..........................................*passim*

*Frank Music Corp. v. Metro-Goldwyn-Mayer Inc.,*
   886 F.2d 1545 (9th Cir. 1989)....................................................33

*Gabelli v SEC,*
   568 U.S. 442 (2013)................................................................67

*Glass v. Kemper Corp.*,
  133 F.3d 999 (7th Cir. 1998) ....................................................41

*Guerrero v. BNSF Ry. Co.*,
  929 F.3d 926 (7th Cir. 2019) ....................................................44

*Honda Motor Co. v. Oberg*,
  512 U.S. 415 (1994) ................................................................62

*IMAPizza, LLC v. At Pizza Ltd.*,
  334 F. Supp. 3d 95 (D.D.C. 2018) ...........................................49

*IMAPizza, LLC v. At Pizza Ltd.*,
  965 F.3d 871 (D.C. Cir. 2020) ................................ 45, 46, 49, 60

*Impression Prods., Inc. v. Lexmark Int'l, Inc.*,
  137 S. Ct. 1523 (2017) ......................................................43, 55

*John G. Danielson, Inc. v. Winchester-Conant Properties, Inc.*,
  322 F.3d 26 (1st Cir. 2003) .....................................................37

*Kellogg Brown & Root Servs., Inc. v. United States ex rel. Carter*,
  575 U.S. 650 (2015) ...................................................20, 53, 54

*Kiobel v. Royal Dutch Petroleum Co.*,
  569 U.S. 108 (2013) ............................................. 15, 41, 42, 45

*L.A. News Serv. v. Reuters Television Int'l, Ltd., L.A. News Serv. v. Reuters Television Int'l, Ltd.*,
  149 F.3d 987 (9th Cir.1998) (9th Cir.1998) ........................48, 49

*LaserDynamics, Inc. v. Quanta Comput., Inc.*,
  694 F.3d 51 (Fed. Cir. 2012) ..............................................37, 38

*Leigh v. Engle*,
  727 F.2d 113 (7th Cir. 1984) ..............................................24, 25

*Litecubes, LLC v. N. Light Prods., Inc.*,
  523 F.3d 1353 (Fed. Cir. 2008) ................................................45

*Metaswitch Networks Ltd. v. Genband US LLC,*
  No. 2:14-cv-744-JRG-RSP, 2016 WL 874737 (E.D. Tex.
  Mar. 5, 2016) ............................................................................33

*Microsoft Corp. v. AT&T Corp.,*
  550 U.S. 437 (2007) ...............................................................55

*Morrison v. Nat'l Austl. Bank Ltd.,*
  561 U.S. 247 (2010) ...............................................................59

*Nestlé USA, Inc. v. Doe,*
  141 S. Ct. 1931 (2021) ...........................................................50

*Orgel v. Clark Boardman Co,*
  301 F.2d 119 (2d Cir. 1962) ..................................................26

*Perfect 10, Inc. v. Amazon.com, Inc.,*
  508 F.3d 1146 (9th Cir. 2007) ...............................................50

*Petrella v. Metro-Goldwyn-Mayer, Inc.,*
  572 U.S. 633 (2014) .......................................................*passim*

*Petrella v. Metro-Goldwyn-Mayer, Inc.,*
  695 F.3d 946 (9th Cir. 2012) .................................................68

*RJR Nabisco, Inc. v. European Community,*
  579 U.S. 325 (2016) .......................................................*passim*

*Robert Stigwood Grp. Ltd. v. O'Reilly,*
  530 F.2d 1096 (2d Cir. 1976) ................................................47

*Rotkiske v. Klemm,*
  140 S. Ct 355 (2019) ..............................................................68

*SCE Hygiene Products Atkiebolag v. First Quality Baby
  Products, LLC,*
  137 S. Ct. 954 (2017) .............................................. 4, 19, 41, 69

*Sheldon v. Metro–Goldwyn Pictures Corp.,*
  106 F.2d 45 (2d Cir.1939) .....................................................30

*Sheldon v. Metro-Goldwyn Pictures Corp.*,
309 U.S. 390 (1940) .......................................................*passim*

*Sohm v. Scholastic Inc.*,
959 F.3d 39 (2d Cir. 2020) ...............................................69, 70

*Starz Ent. v. MGM Domestic Television Distrib. LLC*,
39 F.4th 1236 (9th Cir. 2022) ...............................................70

*State Farm Mut. Auto. Ins. Co. v. Campbell*,
538 U.S. 408 (2003) ..............................................................62

*Superama Corp. v. Tokyo Broad. Sys. Television, Inc.*,
830 F. App'x 821 (9th Cir. 2020) ..........................................47

*Taylor v. Meirick*,
712 F.2d 1112 (7th Cir. 1983) ...............................................70

*Tire Eng'g v. Shandong Linglong Rubber Co.*,
682 F.3d 292 (4th Cir. 2012) ...........................................43, 48

*Ty, Inc. v. Publ'ns Intern., Ltd.*,
292 F.3d 512 (7th Cir. 2002) ................................................25

*United States v. Thayer*,
40 F.4th 797 (7th Cir. 2022) .................................................15

*Univ. Computing Co. v. Lykes-Youngstown Corp.*,
504 F.2d 518 (5th Cir. 1974) ................................................25

*Update Art, Inc. v. Modiin Publishing, Ltd.*,
843 F.2d 67 (2d Cir. 1988) .........................................48, 49, 51

*Zegers v. Zegers, Inc.*,
458 F.2d 726 (7th Cir. 1972) ...........................................15, 40

## STATUTES

17 U.S.C. § 102(a) ..................................................................6

17 U.S.C. § 106 ...............................................................19, 50

17 U.S.C. § 504(b) .................................................4, 6, 16, 24

17 U.S.C. § 507(b) ...................................................................*passim*

18 U.S.C. § 1836(b)(1) ............................................................6

18 U.S.C. § 1836(b)(3)(A)(ii) .........................................39

18 U.S.C. § 1836(b)(3)(B)(i)(II) ........................... 4, 6, 16, 24

18 U.S.C. § 1837................................................................*passim*

18 U.S.C. § 1837(2) ........................................... 20, 52, 59

18 U.S.C. § 1839(5) ..........................................................60

28 U.S.C. § 1291................................................................2

28 U.S.C. § 1331 ...............................................................1

28 U.S.C. § 1367(a) .........................................................1

## Legislative Materials

H.R. Rep. No. 104-788 (1996) *reprinted in* 1996
   U.S.C.C.A.N. 4021 ...................................................58

S. Rep. No. 104-359 (1996) ............................................53

S. Rep. No. 104-359 (1996) ............................................58

## GLOSSARY

| Short Form | Description |
|---|---|
| A. | Appendix under Circuit Rule 30(a) |
| Copyright Act | Copyright Act, 17 U.S.C. § 101 *et seq.* |
| DMR | Digital Mobile Radio |
| DTSA | Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836 *et seq.* |
| Hytera | Defendant Hytera Communications Corp. Ltd. |
| Motorola | Plaintiffs Motorola Solutions, Inc. and Motorola Solutions Malaysia Sdn. Bhd. |
| R. | Record number in the district court (PACER) |
| R&D | Research and development |
| SA | Separate Appendix under Circuit Rule 30(b) |
| Tr. | Trial transcript |

## JURISDICTIONAL STATEMENT

The district court had federal-question jurisdiction under 28 U.S.C. § 1331 because Plaintiffs (collectively, "Motorola") advanced claims under the federal Defend Trade Secrets Act of 2016 (DTSA), 18 U.S.C. § 1836 *et seq.*, and the federal Copyright Act, 17 U.S.C. § 101 *et seq.* The district court had supplemental jurisdiction over Motorola's state-law claim under the Illinois Trade Secrets Act, 765 ILCS 1065/1 *et seq.*, because that claim concerns the same transactions and is so related to the federal claims that it forms part of the same case or controversy. *See* 28 U.S.C. § 1367(a).

On March 5, 2020, the district court entered judgment against defendants. (A1-4; R.947, 948.)[1] On April 2, 2020, Hytera filed post-judgment motions under Federal Rules of Civil Procedure 50(b), 52(b), and 59. (R.953, 954, 965, 966.) On the same date, Motorola filed a Rule 59 motion, seeking to alter the judgment to add

---

[1] This brief uses the prefix "A" for citations to the Circuit Rule 30(a) appendix, bound with this brief, and "SA" for citations to the separate appendix under Circuit Rule 30(b). Items filed in the district court are cited as "R.[docket number]:[page number]." Admitted trial exhibits are cited as "PTX-[number]" or "DTX-[number]." The trial transcript is "Tr."

supplemental damages as well as prejudgment and post-judgment interest. (R.957, 958.) Motorola also sought a permanent injunction or, in the alternative, an ongoing royalty award. (R.960, 961, 962.) The district court disposed of the post-judgment motions in a series of orders over the next two years. (R.1088, 1099, 1100, 1101, 1156, 1224, 1225, 1250, 1289, 1338, 1348, 1349.) On July 5, 2022, the district court disposed of the final motion, approving the final terms for the award of ongoing royalties (A147-55; R.1349), and entered a final order that disposed of all parties' claims.

On August 2, 2022, Hytera filed a timely notice of appeal. (R.1356.) Motorola filed a cross-appeal on August 5, 2022. (R.1364.) This Court has jurisdiction pursuant to 28 U.S.C. § 1291.

## STATEMENT OF ISSUES

**1.** Whether the district court erred in awarding Motorola 100% of Hytera's profits from sales of the accused products, when the DTSA and Copyright Act limit disgorgement only to those profits attributable to the infringed copyrights and misappropriated trade secrets.

**2.** Whether the district court erred in awarding Motorola profits from Hytera's non-U.S. sales in the absence of the clearly

expressed congressional intent required by *RJR Nabisco, Inc. v. European Community*, 579 U.S. 325 (2016).

**3.** Whether the award of punitive damages should be substantially reduced consistent with this Court's opinion in *Epic Systems v. Tata Consultancy Services*, 980 F.3d 1117 (7th Cir. 2020).

**4.** Whether 17 U.S.C. § 507(b), as construed by *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 633 (2014), limits retrospective relief for copyright infringement to three years prior to the commencement of the action.

## INTRODUCTION

Hytera and Motorola are global competitors in the market for two-way radios based on an international communications standard called Digital Mobile Radio ("DMR"). Motorola sued Hytera for trade-secret misappropriation and copyright infringement in connection with some of Hytera's DMR products. (R.1, 265.) After a jury found Hytera liable, the district court awarded Motorola 100% of Hytera's profits from worldwide sales of the accused products from 2010 through the present, plus punitive damages. (A67-68 R.1099; R.1100, 1289.) The total award exceeds $590 million. This

appeal does not challenge the jury's liability finding but seeks reversal of the bulk of the massive damages award, on several independent grounds.

*First*, the district court erred by awarding Motorola 100% of Hytera's profits from sales of the accused products, when only a portion flowed from Motorola's intellectual property. (A83, A90, A93, A107.) The governing statutes expressly limit profit disgorgement to the profits attributable to the copyright infringement or the misappropriation at issue. 17 U.S.C. § 504(b); 18 U.S.C. § 1836(b)(3)(B)(i)(II). The district court did not acknowledge its duty to apportion or attempt to apportion profits. It failed to credit any of Hytera's contributions and investments in the development and support of the accused products, resulting in a windfall for Motorola.

*Second*, the district court erred by including in the damages award Hytera's *extraterritorial* profits—that is, profits from selling outside the United States products made in China to Chinese and other non-U.S. customers. (A100-07.) The Copyright Act and the DTSA do not provide the clear indications of extraterritorial application that Supreme Court precedent requires. "When a

4

statute gives no clear indication of an extraterritorial application, it has none." *RJR Nabisco*, 579 U.S. at 335.

*Third*, the award of punitive damages should be reduced. Where, as here, there is a substantial compensatory award based on the defendant's disgorged profits, the Constitution prohibits punitive damages exceeding a 1:1 ratio based on harm to the plaintiff. *Epic Sys.*, 980 F.3d at 1141-45. The district court failed to acknowledge this binding precedent and instead awarded a 2:1 ratio based on Hytera's profits. (A65, A68, A107.)

*Finally*, the district court erred in permitting Motorola to recover for acts of copyright infringement committed more than three years before it filed its copyright claim. (A46.) "[A] successful [copyright] plaintiff can gain retrospective relief only three years back from the time of suit. No recovery may be had for infringement in earlier years." *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 633, 677 (2014). Motorola's copyright damages must be limited to the three years preceding the filing of its copyright claims.

## STATEMENT OF THE CASE

### A.     Statutory background

The Copyright Act, 17 U.S.C. 101 *et seq.*, grants copyright protection "in original works of authorship … includ[ing] … literary works." 17 U.S.C. § 102(a). Computer code is a literary work because it is "expressed in words, numbers, or other verbal or numerical symbols." *Id.* § 101. A plaintiff is entitled to recover only those profits "attributable to" the copyright infringement (17 U.S.C. § 504(b)), and damages are limited to acts of infringement committed "within three years after the claim accrued" (*id.* § 507(b)). The Copyright Act does not authorize punitive damages.

The DTSA provides a private civil remedy for misappropriation of trade secrets if the trade secret is related to a product used in interstate commerce. 18 U.S.C. § 1836(b)(1). The DTSA only covers misappropriations "occurring on or after the date of the enactment of this Act (*i.e.*, May 11, 2016.)." Pub. L. No. 114-153, § 2. A plaintiff may recover damages for unjust enrichment "caused by" the misappropriation. 18 U.S.C. § 1836(b)(3)(B)(i)(II). Punitive damages may be authorized "in an amount not more than 2 times the amount of the damages awarded under subparagraph (B)." *Id.*

§ 1836(b)(3)(C). The court may condition "future use of the trade secret upon payment of a reasonable royalty …." *Id.* § 1836(b)(3)(A)(iii).

Hytera has reproduced the relevant statutory provisions in an addendum to this brief.

### B.    The parties and the DMR technology

Defendant Hytera designs, manufactures, and sells two-way DMR radio products worldwide. (R.895:3-4.) Plaintiff Motorola competes with Hytera in these markets. (R.895:3.)

DMR is a telecommunications standard designed for business mobile radios. (R.783 at Tr. 154.) The DMR standards are publicly available. (*Id.* at 154-46.) They provide baseline requirements that enable radios to communicate with other devices that practice the DMR standard even when they are manufactured by different companies—a trait called "interoperability." (*Id.*; SA24, SA47, SA55; R.795 at Tr. 2283, 2293.) Each manufacturer enhances its DMR radios by adding unique hardware and software features. (SA24; R.783 at Tr. 156.)

Motorola owns patents on technology that has been incorporated into the DMR standard. (SA24-25, SA47, SA55; R.920

at 3695-96.) These are known as standard-essential patents. (SA24.) Because Motorola needed multiple manufacturers to make DMR the common standard by moving from analog to digital, Motorola made a commitment to license these standard-essential patents to all companies in the industry. (SA24, SA28; R.794 at 2075; R.795 at 2283-89; R.924 at Tr. 4591-92.) The industry has since coalesced around the DMR standard. (SA24, SA47.)

Since 2010, Hytera has paid Motorola millions of dollars in license fees for the patented inventions incorporated into the DMR standard. (SA24-27, SA42; R.801 at Tr. 3106-08; DTX-3058 (SA118-31); DTX-3608 (SA132-47.) Hytera manufactures and sells different tiers of DMR devices, including commercial and professional. (SA66-67; R.803 at Tr. 3333.) The differences in tiers pertain to quality, performance, and enhanced features. (SA4-6; R.786 at Tr. 667-68.) All devices contain the basic DMR technology that is licensed from Motorola and contributes to the value of the product. (SA4, SA6, SA25, SA66-67; R.791 at Tr. 1656-57.)

The accused products in this case are Hytera's professional-tier DMR devices. These devices and the communication systems that use them are essential tools used world-wide by governmental

8

and public-safety entities. (R.798 at Tr. 3346; R.986 at 11-16.) Those users typically invest in entire Hytera systems—including the hardware (*e.g.*, radios, handsets), infrastructure equipment (*e.g.*, base stations, repeaters), and support services (*e.g.*, repair, maintenance, technical support). (R.986-11 at ¶ 18.) Hytera sells the professional-tier DMR radios at a premium compared to the non-infringing commercial-tier radios. (SA67; DXT-4057.)

### C.    Motorola's lawsuit and the jury's verdict

In March 2017, Motorola filed this action alleging misappropriation of trade secrets. (R.1.) In August 2018, Motorola amended its complaint to include copyright-infringement claims. (R.265.) A jury trial was held on Motorola's claims for misappropriation of twenty-one trade secrets and infringement of four copyrights. (A35, A70.)

Motorola presented evidence that, in 2008 and 2009, several Motorola employees working at its subsidiary in Malaysia left to work for Hytera in China. (A37.) Before departing, these employees downloaded Motorola source code and thousands of confidential Motorola documents onto their personal laptops or thumb drives in Malaysia. (A37-38; R.925 at Tr. 4790; R.927 at 5157.) Motorola

intellectual property was then incorporated into Hytera's professional-tier DMR radios. According to Motorola's expert, approximately 10% of Hytera's source code was copied "directly" from Motorola's source code and incorporated into Hytera's professional-tier DMR radios. (SA19-20, SA50-51, SA69-70; *see also* PTX-2090, PTX-2091.) And approximately 5% of Hytera's source code for its DMR repeater products was copied "directly" from Motorola's source code. (SA19.)

Hytera presented evidence that the products benefited from inputs other than the infringing technology. Those inputs included the basic DMR technology licensed from Motorola, Hytera's own proprietary features, and Hytera's sales and distribution networks. (*E.g.*, SA20, SA32-40, SA40-44.) Since 2007, hundreds of Hytera engineers have developed customized features to meet the needs of customers in various industries and countries. (SA43.) Hytera employs thousands of other people—from sales and marketing to manufacturing—all of whom contribute to the profits from the accused products. (SA44.)

Hytera manufactures the accused products in China, and the bulk of its sales of accused products were in foreign countries.

(R.803 at Tr. 3311-12; R.926 at Tr. 4874.) Motorola's expert testified that Hytera's total profits for U.S. sales of the accused products from 2010 through July 2019 (the damages-period at issue in the trial) were $28.7 million. (SA61; R.795 at Tr. 2244; R.926 at Tr. 4875-76.) During trial, Hytera moved to exclude evidence of the non-U.S. sales, arguing that the DTSA and Copyright Act do not extend to extraterritorial conduct. (R.758.) The district court rejected Hytera's arguments. (R.758, 834.) With respect to the DTSA, the court held that Motorola could argue for extraterritorial damages from any misappropriation, but "only those damages that occurred after the effective date of the statute—May 11, 2016." (A27; R.834.)

The jury rendered a verdict for Motorola. (R.898.) It awarded Motorola all of the damages it had requested—$345.8 million in disgorgement and $418.8 million in punitive damages, for a total of $764 million. (A58, A70; R.1088:24.)

### D.    Post-trial motions and rulings

Hytera filed timely post-trial motions, raising several arguments relevant to this appeal. (R.953, 954.) First, Hytera argued that the monetary damages awarded by the jury were

equitable in nature and thus had to be independently determined by the court. (R.954:1.) Second, Hytera argued that awarding 100% of its profits was improper because a substantial portion of those profits were attributable to legitimate factors. (R.954:10-11, 35-36.) Third, Hytera renewed its extraterritoriality and statute-of-limitations arguments. (R.954:10-11, 15-16.) Finally, Hytera argued that the punitive damages award was excessive and should be reduced. (R.954:18-21.)

The district court agreed with Hytera that the jury's disgorgement award should be treated as advisory. (A58-60, A66; A67-68; R.1088:24-26, 32; R.1099.) As the court explained, the disgorgement damages were not tied directly to Motorola's losses but rather represented the benefit Hytera unjustly received. (A60;

R.1088:26.)[2] The court nonetheless stated its intent to adopt the jury's entire award. (*Id.*) The court rejected Hytera's arguments that the award should be reduced.[3] By separate order, the court directed the parties to submit proposed findings of fact and conclusions of law on the disgorgement award. (R.1089, 1094.)

The district court adopted verbatim Motorola's proposed findings of fact and conclusions of law, with one exception. (R.1099, 1100.) That exception concerned a double-counting in the jury's award for Hytera's avoided R&D costs. (A67-68; R.1099.) The district court reduced the DTSA disgorgement award by $73.6

---

[2] In an October 19, 2020 order, the district court incorrectly stated that a portion of the DTSA damages were based on "actual" losses to Motorola. (A59-60, R.1088:25-26.) The court later acknowledged that this was erroneous and concluded that the entire DTSA award was equitable. *See* A67, R.1099:1 ("It is clear, as the parties agree, that the Court took an incorrect view as to the nature of the $135.8 million award under the DTSA."); A72, R.1100:4 (explaining that the court had "initially misapprehended the nature of the $135.8 million award in its October 19, 2020 Order").

[3] *See* A64, R.1088:30 (court "stands by its previous orders" on extraterritoriality); A46, R.1088:12 ("the Court stands by its decision to allow copyright damages to extend more than three years prior to the addition of the claim"); A65, R.1088:31 (refusing to reduce the punitive damages award on due process grounds, stating that the award is "legally valid under the DTSA as it was not more than 2 times the amount awarded" in monetary damages).

million (to eliminate this duplication) and reduced the punitive damages under the DTSA to the statutory 2:1 cap. (*Id.*) Otherwise, the court adopted Motorola's submission and awarded 100% of Hytera's worldwide profits from 2010 through July 2019, plus punitive damages. (A107; R.1100:39.) The court did not address apportionment of profits, despite significant briefing from Hytera on this issue. (R.1096-1 at 34-73.)

The court's total award was $543.7 million, broken down as follows: (1) $136.3 million in disgorged profits under the Copyright Act for sales from 2010 to May 2016; (2) $135.8 million in disgorged profits under the DTSA for sales from May 2016 through June 2019; and (3) $271.6 million in punitive damages under the DTSA. (A107; R.1100:39.)

The parties then briefed ongoing royalties. (R.1119, 1131.) The district court had denied Motorola's motion for a permanent injunction but granted the alternative request for royalties on ongoing sales of the accused products. (R.1097, 1289.) Hytera reasserted its apportionment arguments in the royalty briefing, adding that this Court had held it is a "basic error" to award a royalty equivalent to 100% of a defendant's profits. (R.1131:1, 4, 7

14

(quoting *Zegers v. Zegers, Inc.*, 458 F.2d 726, 728 n.8 (7th Cir. 1972) (Stevens, J.)).) Hytera also renewed its extraterritoriality arguments. (R.1131:7.)

The district court awarded Motorola a royalty amounting to 100% of Hytera's profits for worldwide sales of the accused products starting in July 2019 and going forward. (A148, R.1289:41; R.1349.) The court separately awarded Motorola attorney fees, costs, and interest. (R.1224, 1225, 1250.) This appeal followed.

## STANDARD OF REVIEW

This Court reviews legal conclusions, including the interpretation of statutes, *de novo*. *See Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108, 115-16 (2013); *United States v. Thayer*, 40 F.4th 797, 801 (7th Cir. 2022). The district court's findings of fact are reviewed for clear error. *See* Fed. R. Civ. P. 52(a)(6).

## SUMMARY OF ARGUMENT

Motorola received a windfall in damages due to multiple legal errors by the district court. The court awarded Motorola 100% of Hytera's disgorged profits instead of apportioning profits. It awarded profits on Hytera's worldwide sales instead of limiting them to

Hytera's U.S. sales. The court then magnified the size of the DTSA damages by awarding a 2:1 ratio of punitive damages instead of the constitutional limit of 1:1 or less in these circumstances. And it refused to limit Motorola's copyright damages to the three years before Motorola added the copyright claims. Each error independently requires reversal.

**I.**    The district court ignored governing precedent on apportionment. Where, as here, there is proof that the defendant's profits are not generated entirely by the infringement or misappropriation, and the evidence suggests some division that may be rationally used as a springboard, the court has a duty to make some apportionment. *Sheldon v. Metro-Goldwyn Pictures Corp.*, 309 U.S. 390, 408 (1940) (*Sheldon II*); *see also* 17 U.S.C. § 504(b); 18 U.S.C. § 1836(b)(3)(B)(i)(II).

It is undisputed that there were inputs contributing to the value of Hytera's professional-tier devices in addition to the misappropriated Motorola technology: Hytera pays Motorola for the standard-based DMR technology, and its devices contain unique, customized features not included in Motorola's devices. In fact, Hytera employs thousands of workers—including hundreds of

16

engineers—to develop, market, and sell the professional-tier devices. Motorola never argued that Hytera's source code was solely a cut-and-paste of Motorola's source code. Its witnesses admitted that Motorola's source code was 10% of Hytera's source code.

Hytera offered numerous methods for calculating the profits attributable to its legitimate contributions and investments. For example, Hytera offered evidence of the price differential between its professional-tier devices and its non-infringing commercial-tier devices. Motorola's expert admitted that the value of a lump-sum, fully-paid, perpetual license for the Motorola intellectual property at issue was $73.6 million. This and other evidence provided a rational basis for apportioning profits. Thus, Hytera established its right to apportionment.

The district court did not apportion Hytera's profits. In awarding Motorola 100% of Hytera's profits from 2010 through the present, the court stated only that Hytera's accused devices would not function without the misappropriated technology. More than eight decades of precedent holds that "but for" causation is not a proper basis for failing to apportion. Hytera's professional-tier DMR

devices are not copycats of Motorola's devices. Hytera was entitled to credit for its contributions.

**II.**    The vast majority of the money awarded in this case represents Hytera's extraterritorial profits—the profits derived by a Chinese company from selling Chinese-made products to non-U.S. customers in China and other foreign nations. The district court's award of those extraterritorial profits under the Copyright Act and the DTSA contravenes the "presumption against extraterritoriality," which holds that, "[a]bsent clearly expressed congressional intent to the contrary, federal laws will be construed to have only domestic application." *RJR Nabisco*, 579 U.S. at 335.

**a.**    It is well established that the Copyright Act does not apply extraterritorially. The district court nonetheless awarded extraterritorial profits under the "predicate-act doctrine." Courts have allowed recovery of extraterritorial profits for copyright violations under this doctrine where (1) the defendant committed a "predicate act" of copyright infringement in the United States; and (2) the extraterritorial profits flowed from that domestic infringement. Here, Hytera's foreign sales do not flow from any predicate act of infringement in the United States.

18

The district court pointed to supposed predicate acts, but none satisfies the predicate-act test as a matter of law. *First*, the court reasoned that the former Motorola employees acted in the United States when they downloaded Motorola files onto their laptops in Malaysia because the files supposedly were downloaded from U.S.-based Motorola servers. But substantial authority establishes that downloading a copyrighted file from a U.S.-based server onto a computer abroad is *not* a domestic act of copyright infringement. And, in any event, the record contains no facts supporting the notion that the files were downloaded from a U.S.-based server. Motorola has servers in Malaysia and other Asian locations as well as in the United States. Motorola had no evidence that the files at issue were downloaded from U.S.-based servers. Motorola bears the burden, so its failure of proof is fatal.

*Second*, the district court said that Hytera acted in the United States when it advertised infringing products at a trade show in the United States and sold the products in the United States. But merely advertising an infringing product is not a copyright violation. *See* 17 U.S.C. § 106 (listing actionable violations). And there is no

evidence that Hytera's extraterritorial profits flowed from the U.S. trade show or U.S. sales in any event.

**b.**    Like the Copyright Act, the DTSA says nothing about extraterritorial application. The district court held otherwise by relying on a provision of an earlier criminal statute—the Economic Espionage Act of 1996—that "applies to conduct occurring outside the United States if … an act in furtherance of *the offense* was committed in the United States." 18 U.S.C. § 1837(2) (emphasis added). The district court held that the term "offense" in § 1837 includes civil violations.

The district court was wrong. When § 1837 was enacted in 1996, the term "offense" in § 1837 could only have referred to crimes since the Economic Espionage Act is a criminal law. When the DTSA was enacted twenty years later, Congress did not expand or alter the established meaning of the term "offense." And by the time of the DTSA's enactment, the Supreme Court had squarely held that "offense" in Title 18 applies only to criminal conduct, not violations of civil prohibitions like the DTSA's ban on trade secret misappropriation. *See Kellogg Brown & Root Servs., Inc. v. United States ex rel. Carter*, 575 U.S. 650, 658-59 (2015). The Supreme

Court has also held that, even if a criminal law applies extraterritorially, this does not imply that a corresponding private right of action for civil claims does. Thus, Congress' use of the term "offense" in § 1837 falls far short of the clear indication necessary to apply the DTSA extraterritorially.

Even if § 1837 did apply here, it would require Motorola to show that an act in furtherance of Hytera's extraterritorial sales was committed in the United States. 18 U.S.C. § 1837. The district court pointed to the former Motorola employees' initial downloading of the Motorola files. But there is no evidence that the files were downloaded from U.S.-based servers, and accessing U.S.-based files from Malaysia would not be a domestic act in any event. The district court also pointed to Hytera personnel's participation in U.S. trade shows, but, again, that participation did not further Hytera's extraterritorial sales.

**III.** The district court's punitive damages award is unconstitutionally excessive under federal law. In *Epic Systems*, this Court ruled in a trade secret case that a 1:1 ratio is the constitutional limit for punitive damages where the compensatory damages are substantial and calculated based on the benefit

21

defendant received rather than the harm to plaintiff. *Epic Sys.*, 980 F.3d at 1142-44. This case resembles *Epic Systems* in every relevant respect.

The district court calculated the monetary award based on Hytera's profits—and not any actual harm to Motorola. (A67-68, A100; R.1099, R.1100:32.) The harm to Motorola should be presumed to be "significantly smaller" than the amount of disgorgement awarded, and this "in turn drastically change[s] the relevant ratio." 980 F.3d at 1143. The *Epic Systems* court held that a $140 million compensatory award is "substantial" (*id.* at 1144)— and the disgorgement damages awarded in this case under the DTSA was $135.8 million plus ongoing royalties (which exceed $49 million). Under *Epic Systems*, the ratio must be 1:1 or substantially less.

**IV.**    The Copyright Act, as construed by Supreme Court, limits a plaintiff's damages to three years before the claim is filed. 17 U.S.C. § 507(b); *Petrella*, 572 U.S. at 663. The district court nevertheless held that Motorola could recover damages beyond the three-year window because the discovery rule tolls accrual of the

22

claim. The Copyright Act as construed in *Petrella* does not permit this result.

In *Petrella*, the Supreme Court held that laches is no longer available as a defense to copyright infringement claims, overturning years of well-established law in this and other circuits. Central to that holding was the Court's pronouncement that 17 U.S.C. § 507(b) already takes account of delay by limiting retrospective relief to three years preceding the filing of the complaint. That holding is binding and bars Motorola from recovering damages outside the three-year look-back period.

ARGUMENT

## I.    The district court erred as a matter of law in failing to apportion the award of Hytera's profits and awarding a commensurate ongoing royalty

Hytera's DMR radios were not clones of Motorola's. On the contrary, only a limited portion of the technology in Hytera's accused devices was derived from Motorola's intellectual property. The parties disputed the quantum, but there was no meaningful dispute that Hytera's DMR radios also benefited from numerous other factors. The district court erred as a matter of law when it failed to tailor its damages award to this reality and awarded

23

Motorola 100% of Hytera's profits from sales of accused products, past and future.

### A.    The legal standard for apportionment of profits

Both copyright law and trade secret law provide for disgorgement of a defendant's unjust enrichment. 17 U.S.C. § 504(b); 18 U.S.C. § 1836(b)(3)(B)(i)(II). But, under either intellectual property regime, a plaintiff can only recover the portion of the defendant's profits attributable to the tortious conduct. 17 U.S.C. § 504(b) (specifying recovery is limited to profits "attributable to the infringement"); 18 U.S.C. § 1836(b)(3)(B)(i)(II) (permitting recovery for unjust enrichment "caused by the misappropriation of the trade secret"). The process of allocating the profits between those attributable to the accused conduct and those attributable to other factors is called "apportionment."

The law does not require "mathematical exactness" in apportioning profits between tortious and non-tortious factors. *Sheldon II*, 309 U.S. at 408. Rather, "a reasonable approximation" is sufficient. *Id.* And this Court has explained that "justice *requires* that courts make estimates" of apportionment where profits are attributable both to tortious conduct and other factors. *Leigh v.*

*Engle*, 727 F.2d 113, 138 (7th Cir. 1984) (emphasis added).[4] This avoids "two unfair results." *Leigh*, 727 F.2d at 139. On one hand, reasonable approximation ensures that a plaintiff receives an appropriate recovery. *Id.* On the other hand, it avoids "depriving defendants of the profits earned by their own efforts" and giving a plaintiff an unearned windfall. *Id.*; *see also Bucklew v. Hawkins, Ash, Baptie & Co.,* 329 F.3d 923, 932 (7th Cir. 2003) (where some of "infringer's profits . . . are due to features of his work that do not infringe; those profits belong to him and not the copyright owner").

Defendant bears the initial burden of establishing entitlement to apportionment. *See Ty, Inc. v. Publ'ns Intern., Ltd.,* 292 F.3d 512,

---

[4] Although the law of apportionment is most thoroughly developed in the context of copyright law, this Court has recognized that the equitable principles of apportionment are generally applicable across legal regimes. *Leigh*, 727 F.2d at 138 (analogizing apportionment in ERISA context to the law of copyrights, patents, and trusts). Indeed, *Sheldon II* recognized that patent-law apportionment principles applied to apportionment of copyright infringement damages. 490 U.S. at 402. Other circuits have recognized that the same principles apply in copyright, patent, and trade secret cases, and have treated the case law interchangeably. *Data Gen. Corp. v. Grumman Sys. Support Corp.,* 36 F.3d 1147, 1175-76 (1st Cir. 1994) (trade secret and copyright decisions); *Univ. Computing Co. v. Lykes-Youngstown Corp.,* 504 F.2d 518 (5th Cir. 1974) (trade secret and patent). No court of appeals has held otherwise.

524 (7th Cir. 2002). To meet its burden, the defendant must show that (1) its profits are not entirely due to the offending intellectual property and (2) there is a reasonable basis for the approximation of such apportionment. *Sheldon II*, 309 U.S. at 408. Where a defendant meets this burden, "it is *the duty* of the court to make some apportionment." *Orgel v. Clark Boardman Co,* 301 F.2d 119, 121 (2d Cir. 1962) (emphasis added); *accord Cream Recs. Inc. v. Jos. Schlitz Brewing Co.*, 754 F.2d 826, 828-29 (9th Cir. 1985). The court must do so in order "to avoid the one certainly unjust course of giving the plaintiffs everything, [merely] because the defendants cannot with certainty compute their own share." *Sheldon II*, 309 U.S. at 398.

### B.    **Hytera's profits were not entirely attributable to the infringement and misappropriation**

Hytera proved its right to apportionment by showing that its profits were attributable to factors other than Motorola's copyrights and trade secrets. (R.1906, 1906-1 at 34-73.)

**1.**    For starters, both sides' technical experts agreed that only a portion of the code for Hytera's radios had been copied from Motorola's code. *See* SA19 (Motorola's expert acknowledging that

Motorola's copying applications implicated at most 10% of Hytera's code on a file-by-file basis); SA50 (Hytera's expert testifying that Motorola's copying accusations related to 4-5% of Hytera's code on a line-by-line basis); *see also* SA20 (Motorola's expert admitting that not every line in Hytera's code is copied from Motorola's code); SA68-70. Thus, Hytera's source code was not entirely a cut-and-paste of Motorola's source code.

The balance of the code for Hytera's professional-tier radios includes Hytera's contributions and investments. (*E.g.*, SA20.) Motorola's technical expert conceded there was "no question" Hytera did not need Motorola's intellectual property to build a DMR radio. (SA67.) And he admitted that Hytera offered a suite of DMR radios that "did not use Motorola's trade secrets ...." (SA66.) *See also* SA20 (Motorola's expert admitting Hytera's code contains other lines that have Hytera's information).

**2.**  The record is replete with evidence that Hytera made contributions to the development of the accused products. Even Motorola's technical expert acknowledged, for example, that various parts of Hytera's software reflected "Hytera's information" among "other things going on besides the copying code." (SA19-20.) And he

27

acknowledged that Hytera "did write some applications" for its radios. (SA15.)

Hytera's engineers brought features to the market before Motorola—features not disclosed in Motorola's trade secrets. (R.1096-1 ¶¶ 116-133.) For example, Hytera was the first manufacturer to launch a dustproof and waterproof DMR radio, a DMR radio with a color screen, and a compact DMR repeater. (SA40-42.) Hytera also designed and developed a covert DMR radio with encryption technology for use by special police and executive protection units. (SA36; R.986-10 at ¶ 3.) Further, Hytera designed and developed an intrinsically safe DMR radio for use in explosion-risky environments, such as mining. (SA36-37.)[5]

These Hytera proprietary features—which do not implicate the trade secrets or copyrights at issue here—are important draws for Hytera's customers. (R.986 Exs. 6-11; R.1096-1 ¶¶ 116-33.) Even Motorola's Vice President of Engineering identified features such as

---

[5] Hytera also developed a customized life-saving function for underground coal mines (R.986-10 at ¶¶ 27-28) and a unique positioning format to show GPS coordinates on the subscriber's display—a feature sought by public safety entities. (R.986 at 13.)

ruggedness as a significant draw for Motorola's customers. (SA3-6.) Hytera's radios receive higher marks on such characteristics than Motorola's. (R.1096-1 ¶ 130, citing R.986-8 ¶ 28; R.986-11 ¶ 14.)

**3.** In addition, Hytera made significant investments in its business that contributed to its profits from sales of the accused products. For example, Hytera invested in building an extensive global network of dealers and distributors.[6] The size of a company's dealer network correlates to its success in sales. (SA33-34.) This is because the strength and geographical reach of a radio manufacturer's distribution network and its ability to provide reliable local service is critical to end users. (R.804 at Tr. 3401.) Hytera also employs "thousands of people from sales, marketing, human resource, legal, finance, supply chain, [and] manufacturing," all of whom contribute to the success of its DMR business. (SA44.) Hytera has provided world-wide DMR users with technical support, maintenance, and on-site repair services—in

---

[6] SA32; R.1096-1 ¶ 137 (citing Tr. 3393-94 (SA34-35), Tr. 3453-54 (SA39-4), Tr. 3468 (SA43), 4945-46 (SA62)); *see also* R.986-10 at ¶¶ 6, 8, 10, 11, 2; R.986-8 at ¶¶ 16-18; R.986-11 at ¶ 9; R.986-9 at ¶¶ 12-14; R.986-7 at ¶¶ 8–9, 15-16, 37.

some instances for more than a decade. *E.g.*, R.986-7 at ¶ 5; R.986-7 at ¶ 22.

Hytera employees also spent substantial time learning the unique needs and challenges of DMR users. For instance, Eurotunnel—the operator of the tunnel between the United Kingdom and France—relies on Hytera's DMR radios for its emergency communications. (R.986-11.) Installing this system was onerous due to the underground environment. (*Id.* at ¶ 12; *see also* R.986-8 at ¶¶ 49-53.)

Hytera was entitled to a share of the profits based on all of its contributions—technical and non-technical—to the accused radios. *See Sheldon v. Metro-Goldwyn Pictures Corp.*, 106 F.2d 45, 48-49 (2d Cir.1939) (L. Hand, J.) (*Sheldon I*) (despite defendant's illicit lifting from copyright owner's play for a movie, court attributed 80% of the film's profits to advertisements, reputation, scenery and costumes, and the work of actors, directors, and producers); *id.* at 51 ("we often make the best estimate we can, even though it is really no more than a guess ...."); *Data Gen. Corp. v. Grumman Sys. Support Corp.*, 36 F.3d 1147, 1172-73 (1st Cir. 1994) (identifying lower prices, superior service, breadth of service, and customer

satisfaction as relevant grounds for apportionment).

## C. Hytera proffered numerous rational methodologies for conducting a proper apportionment

Motorola's technical expert described the contribution of Motorola's intellectual property as a performance enhancement when comparing Hytera's accused devices to non-infringing DMR radios. He likened it to the difference between a "fancy sports car" and an economy car. (R.927 at Tr. 5121-24.) Consistent with the views of Motorola's expert, Hytera proffered metrics that isolated the premium consumers paid for the performance enhancement attributable to Motorola intellectual property in Hytera's accused radios. (R.1096-1 ¶¶ 191-221.) Each methodology had both factual and legal support.

**1**.     The primary metric that Hytera offered isolated the value of the premium attributable to the Motorola intellectual property in the accused devices. Hytera compared the average sales prices of Hytera's non-accused commercial-tier DMR radios with the average sales prices of its accused professional-tier DMR radios. *Id.* Both product lines used the same backbone DMR technology, for which Hytera paid Motorola under a standard-essential patent license.

(SA23-27; R.791 at Tr. 1656.) The difference between Hytera's product lines, as Motorola's expert explained, was that the accused professional-tier DMR radios offer certain advanced features and higher performance. (R.927 at Tr. 5122-23.) According to Motorola's expert, that higher performance was the benefit Hytera gained from using Motorola's intellectual property. (SA66-67; R.927 at Tr. 5121-24.)

Hytera's professional-tier devices sold for approximately 12% more than the non-infringing Hytera commercial-tier devices. (R.1096-1 at ¶¶ 211-13.)[7] Because the market was willing to pay a premium for the benefits attributable to Hytera's use of Motorola's intellectual property, Hytera suggested that the district court use that premium as a benchmark for apportionment. *See id.* Courts have found methodologies that compare the prices of infringing and

---

[7] Hytera's non-infringing commercial-tier devices are valued by consumers and enjoy success in the market. For example, between 2015 and 2019, Hytera sold over 100,000 units of its PD40X line of non-accused commercial-tier DMR radios, for over RMB 100 million in revenue. DTX-4057; PTX-2226 (translation). RMB is the official currency in China.

non-infringing products to be reliable mechanisms for isolating the value of the misappropriated intellectual property.[8]

    **2.**    As an alternative metric, the evidence was undisputed that at most 10% of the files in Hytera's software included indicia of direct copying from Motorola's intellectual property. (SA19.) And Motorola identified only a single file that indicated some influence from Motorola trade secrets without direct copying. (SA71-72.) Apportionment based on such a quantitative comparison is

---

[8] *See Carucel Invs., L.P. v. Novatel Wireless, Inc.,* No. 16-CV-118-H-KSC, 2017 WL 1215838, at *6 (S.D. Cal. Apr. 3, 2017) (permitting expert opinion apportioning patent royalty "based on the ratio of the first accused device … divided … by the observed average sales price over time …. This allows for removal of noninfringing functionality that has been added to the products over time, which improve the products['] value but do not relate to the patents-in-suit."), *aff'd,* 730 F. App'x 938 (Fed. Cir. 2018); *see also Metaswitch Networks Ltd. v. Genband US LLC,* No. 2:14-cv-744-JRG-RSP, 2016 WL 874737, at *3 (E.D. Tex. Mar. 5, 2016) (allowing expert to offer opinion that "attempts to isolate the incremental value that [the defendant] would ascribe to the patented features, and not more").

appropriate, at least where all the elements are of roughly equal value.[9]

Here, Motorola's fact witnesses used the number of source code files and lines of source code for a given feature as an indicator of that feature's significance. (R.784 at Tr. 359; R.786 at Tr 607, 675; R.787 at Tr. 794-95, 814; R.788 at Tr. 1011-12; R.789 at Tr. 1246.) The only time Motorola's technical expert compared the importance of copied and non-copied code in Hytera's product, he ascribed comparable importance to both. (R.928 at Tr. 5253-57.) Thus, the quantity of infringing or misappropriated materials as a proportion of the total is a meaningful indicator of the additional value that material contributes to Hytera's accused devices. Hytera suggested this as an alternative basis for calculating apportionment.

**3.**   Hytera offered further alternative methodologies for apportionment. *See, e.g.*, R.1096-1 ¶ 236 (applying Motorola's

---

[9] *Frank Music Corp. v. Metro-Goldwyn-Mayer Inc.*, 886 F.2d 1545, 1548 (9th Cir. 1989) ("[T]he district court's apportionment based on comparative durations would be appropriate if the district court implicitly concluded that all the acts of the show were of roughly equal value.").

expert opinion on royalty rates to past sales would have resulted in a damages figure of $64.4 million to $107.3 million, or between 23% and 40% of Hytera's total profits); R.1096-1 (citing R.955, Malackowski Dep. 221:24-222:18) (Motorola's expert testified in his deposition—included in the apportionment record below—that the value of a lump-sum, fully paid, perpetual license for the Motorola intellectual property at issue is $73.6 million).[10]

Any of the proffered methodologies is sufficient to satisfy Hytera's burden of showing that a rational apportionment is possible, thus shifting the burden to Motorola to prove the apportionment ratio. *See Sheldon II*, 309 U.S. at 403, 408. Importantly, these are the *only* methodologies in the trial court record. Motorola did not propose any apportionment methodologies of its own.

---

[10] Hytera believes that the first two methodologies more reasonably estimate the proper apportionment, although that is an issue for the district court to address on remand.

### D.   The district court violated its duty to make *some* apportionment

Apportionment was required. Hytera established that its profits are not entirely due to the offending intellectual property and pointed to a reasonable basis for calculating such an apportionment. (R.1096-1 at ¶¶ 95-285.) The district made *no* finding that Hytera had failed to meet its burden as to apportionment.

The court did state that the accused products "would not function" without the Motorola copyrights and trade secrets (A93, A83; R.1100:25, R.1100:15)—although it is not clear that this was intended to justify awarding Motorola 100% of Hytera's profits. But if it was, the district court erred as a matter of law. Apportionment cannot turn on "but for" causation alone. Rather, the question is the extent to which the accused component drove the market for the device and the resulting profits.

The landmark *Sheldon* decision confirms that an apportionment should be made even when the sales are the direct result of a "deliberate" copyright violation. *Sheldon II*, 309 U.S. at 397-409. Even though the defendant would have had no movie

36

without the copyrighted storyline, the Court affirmed an apportionment that credited the contributions of the actors, director, and producers, as well as other material in the movie to which plaintiff had no legitimate claim. *See id.* at 405-09. "The purpose is thus to provide just compensation for the wrong, not to impose a penalty by giving to the copyright proprietor profits which are not attributable to the infringement." *Id.* at 399.

This has been the rule for more than eighty years. Even if infringement or misappropriation are "but for" causes of profits, a defendant can still satisfy its burden by showing that "the existence and amount of its profits are not the natural and probable consequences of the infringement alone, but are also the result of other factors which either add intrinsic value to the product or have independent promotional value." *Data Gen. Corp.*, 36 F.3d at 1174-76; *see also* 4 Roger M. Milgrim, Milgrim on Trade Secrets § 15.02[3][c][i] (2022) ("[T]he 'but for' approach to unjust enrichment damages actually ignores any portion of defendant's profit that may have been attributable to something other than the misappropriation."). Nor can a failure to apportion be justified based on a showing that the intellectual property is "valuable,

important, or even essential to the use of" the accused product, or that a product without the intellectual property would be "commercially unviable." *LaserDynamics, Inc. v. Quanta Comput., Inc.*, 694 F.3d 51, 68 (Fed. Cir. 2012).[11]

It is of no moment that, as the district court found, Hytera's professional-tier radios "would not work" without the benefit of Motorola's intellectual property. (A83, A90, A93.) A car would not work without its wheels; but that does not justify attributing 100% of the value of the car to the wheels, because the car *also* would not work without an engine. The Federal Circuit elaborated on this point in the patent context:

> It is not enough to merely show that the disc discrimination method is viewed as valuable, important, or even essential to the use of the laptop computer. * * * Were this sufficient, a plethora of features of a laptop computer could be deemed to drive demand for the entire product. To name a few, a high resolution screen, responsive keyboard, fast wireless network receiver, and extended-life battery are all in a sense important or essential features to a laptop computer; take away one of

---

[11] *See also John G. Danielson, Inc. v. Winchester-Conant Properties, Inc.*, 322 F.3d 26, 49 (1st Cir. 2003) (holding that components of a product need not be "wholly separate" from infringing components in order to warrant apportionment).

38

these features and consumers are unlikely to select such a laptop computer in the marketplace.

*Laser Dynamics*, 694 F.3d at 68.

In short, Hytera satisfied its burden of showing entitlement to apportionment. Motorola had the opportunity to respond to Hytera's methodologies or present its own. Motorola declined. The case should be remanded with instructions to apportion profits, using the methodologies offered in the record.

### E.    The district court repeated its errors in setting the royalty rates for ongoing sales

The district court repeated the same error in setting the rates of the perpetual royalty to be applied to Hytera's ongoing sales of accused devices. Following the jury verdict, the district court ruled that Motorola was entitled to an ongoing royalty under the DTSA. (R.1097.) The DTSA provides that "in exceptional circumstances that render an injunction inequitable," the court may "condition[] future use of the trade secret upon payment of a *reasonable* royalty for no longer than the period of time for which such use could have been prohibited." 18 U.S.C. § 1836(b)(3)(A)(ii) (emphasis added).

The district court ordered Hytera to pay a royalty equivalent to 100% of Hytera's expected profits. (A108, A148, A149-57.) Like the

damages award following trial, the district court's perpetual royalty rates were unapportioned.[12] The court reiterated its prior ruling that the Motorola trade secrets and copyrights "are critical to the functionality of the Hytera products ...." (A144; R.1289:37.) The royalty rates therefore suffered from the same erroneous failure to apportion as the overall damages award.

These rates left Hytera with no prospect of making any profit. Hytera thus does the work and takes the risk but gains nothing from it. As Judge (later Justice) Stevens explained, a licensee would not be willing to pay 100% of his profits in exchange for a license. *Zegers*, 458 F.2d at 728 n.8. It is thus a "basic error" to set a royalty that would not allow the defendant to make any reasonable profit. *See id.* A 100% royalty is neither a royalty nor reasonable.

The royalty rates should therefore be vacated, and the case remanded with direction to set a new royalty rate with proper

---

[12] Motorola had proffered slightly higher rates, which had been "derived directly from the Court's $272 million award" discussed above. (A116, R.1289:9.) The district court reduced the rate from Motorola's proposal to account for Hytera's management costs—not based on any profit apportionment. (A25, R.1289:18.)

consideration of apportionment, using the methodologies already offered in the record.

## II. The district court erred in awarding Hytera's profits from extraterritorial sales

The district court awarded Motorola profits from Hytera's total worldwide sales of the accused products starting in 2010. The award included disgorgement damages and ongoing royalties. (A107, A149; R.1100:39; R.1349). But the vast bulk of these worldwide sales—at least 80%—were purely foreign. (SA61.) The district court's ruling conflicts with controlling Supreme Court authority and circuit decisions.[13]

### A.    The presumption against extraterritoriality

Federal statutes are presumed not to apply extraterritorially. This bedrock canon of statutory construction "reflects the 'presumption that United States law governs domestically but does not rule the world.'" *RJR Nabisco*, 579 U.S. at 335 (quoting *Microsoft Corp. v. AT&T Corp.*, 550 U.S. 437, 454 (2007)). The presumption

---

[13] Hytera had challenged the jury instructions on extraterritoriality. (R.954 at 35-36.) That challenge is not relevant on appeal because the district court ultimately treated disgorgement as equitable and decided the extraterritoriality issues itself. (R.1099, 1100.)

"serves to protect against unintended clashes between our laws and those of other nations which could result in international discord." *Kiobel*, 569 U.S. at 108 (internal quotation marks omitted). Thus, "[a]bsent clearly expressed congressional intent to the contrary, federal laws will be construed to have only domestic application." *Id.*; *see also, e.g., Glass v. Kemper Corp.*, 133 F.3d 999, 1000 (7th Cir. 1998).

The Supreme Court prescribes a two-step framework for determining whether a statute may be applied extraterritorially. *First*, the Court asks "whether the presumption against extraterritoriality has been rebutted—that is, whether the statute gives a clear, affirmative indication that it applies extraterritorially." *RJR Nabisco*, 579 U.S. at 337. If a statute is ambiguous regarding extraterritoriality, then it necessarily contains no "clear indication of extraterritorial application." *Kiobel*, 569 U.S. at 108.

*Second,* if the statute contains no clear indication of extraterritoriality, the Court considers whether "the conduct relevant to the statute's focus occurred in the United States" or "in a foreign country." *RJR Nabisco*, 579 U.S. at 337; *see also EEOC v. Arabian Am. Oil Co.*, 499 U.S. 244, 248 (1991) (question under Title

VII is location of alleged wrongful employment practices, even though the case involved U.S. citizens employed by American employer). If the relevant conduct occurred abroad, "then the case involves an impermissible extraterritorial application regardless of any other conduct that occurred in U.S. territory." *RJR Nabisco*, 579 U.S. at 337.

Evaluated under this two-step inquiry, including Hytera's foreign sales in calculating damages is impermissibly extraterritorial.

### B. The Copyright Act does not authorize the district court's award of extraterritorial profits

The district court awarded Motorola Hytera's profits from extraterritorial sales from 2010 to May 2016 under the Copyright Act. (A70, A107; R.1100:2, 39.) The court recognized that the Copyright Act does not contain a clear indication of extraterritorial application and thus fails to satisfy the first step in the *RJR* analysis. (A29, R.834:25.) Indeed, the Supreme Court has held that "copyright protections ... do not have any extraterritorial operation." *Impression Prods., Inc. v. Lexmark Int'l, Inc.*, 137 S. Ct. 1523, 1536-37 (2017). Nevertheless, the district court found that Motorola had

satisfied the second step of the *RJR* analysis, suggesting that there were infringing acts in the United States. (A106; R.1100:38.) This ruling conflicts with decisions of the D.C. and Ninth Circuits.

**1.**    The district court accepted Motorola's argument that there were predicate acts of copyright infringement in the United States. (A106, R.1100:38.) For the predicate-act doctrine to apply, however, the predicate act in question must be a "domestic violation of the Copyright Act." *Tire Eng'g v. Shandong Linglong Rubber Co.*, 682 F.3d 292, 306 (4th Cir. 2012). The court relied on the fact that the former Motorola employees' copied Motorola materials onto their computers in Malaysia. *See* A25-29, R.1100:25-26 (¶¶ 93-94). According to the district court, these acts were committed in the United States, because the servers from which the code was copied supposedly were located in Chicago. (*Id.*) This is wrong on both the facts and the law.

As a factual matter, there is no evidence that the code was downloaded from U.S.-based servers. To the contrary, the undisputed evidence showed that the entire Motorola source code

was stored on local servers in Malaysia. (SA72-78, SA81-93).[14] The district court found that the "main servers" were located in Illinois (A25-26, R.1100:25-26), but this is beside the point. As Motorola's expert admitted, "there's no evidence of the actual downloads from" the main server in Illinois. (SA77 at 5153:22-24; *see also* SA9, SA73-74.) Motorola bears the burden of proof. *Guerrero v. BNSF Ry. Co.*, 929 F.3d 926, 929 (7th Cir. 2019) ("extraterritorial reach … describes an element of the case").[15] Motorola's failure of proof is fatal.

But, regardless of the facts, downloading from a U.S.-based server is *not* a domestic copyright infringement as a matter of law. "[E]ven where the claims touch and concern the territory of the United States, they must do so with sufficient force to displace the presumption against extraterritorial application." *Kiobel*, 569 U.S. at 124-25. And when it comes to copyright, this means there must

---

[14] *See also* DTX-5614 (SA96-110); DTX-5616 (SA111-17); DTX-5617 (SA94-95).

[15] *See also Litecubes, LLC v. N. Light Prods., Inc.,* 523 F.3d 1353, 1363 (Fed. Cir. 2008) ("[A] limitation on the extraterritorial scope of a statute is no different than any other element of a claim which must be established before relief can be granted.").

be "an act of 'domestic infringement.'" *IMAPizza, LLC v. At Pizza Ltd.*, 965 F.3d 871, 876 (D.C. Cir. 2020); *see also Allarcom Pay Television, Ltd. v. Gen. Instrument Corp.*, 69 F.3d 381, 387 (9th Cir. 1995) ("[A]t least one alleged infringement must be completed entirely within the United States."). A Malaysia-based individual who uses the internet to copy code from a U.S.-based server to a Malaysia-based laptop has not committed copyright infringement *in the United States*. This is because downloading from abroad creates no infringing copy in the United States. *IMAPizza*, 965 F.3d at 877. As a matter of law, using the internet in Malaysia to access files stored on a U.S.-based server—even if proven—would not clear the bar.

*IMAPizza* is squarely on point. A U.S. restaurant sued a U.K. restaurant for allegedly violating its copyright. *Id.* at 874. The alleged infringement occurred when defendant had downloaded files from plaintiff's U.S.-based server onto defendant's computer in Scotland. *Id.* at 877. The D.C. Circuit held that neither the "ephemeral transmission of a picture across the internet" nor downloading files from a U.S.-based server onto a computer abroad constituted copyright infringement in the United States and,

therefore, the presumption against extraterritoriality precluded the imposition of liability for such copying. *See id.* at 877-79 & n.2.

*IMAPizza* makes clear that Motorola's "allegations concerning [files] downloaded from U.S. servers … do not implicate the Copyright Act—even under the predicate act test." *Id.* at 878-79. This ruling is consistent with a wealth of precedent in other courts. *See Allarcom Pay Television,* 69 F.3d at 387 (Copyright Act did not apply to satellite television signals broadcast from the United States into Canada because infringement was not complete until the signals were received in Canada); *Robert Stigwood Grp. Ltd. v. O'Reilly*, 530 F.2d 1096, 1100-01 (2d Cir. 1976) (Copyright Act did not apply to performances in Canada of copyrighted opera although "the defendants assembled and arranged in the United States all the necessary elements," because the predicate-act doctrine applies only where an actual copyright violation occurs in the United States, not merely where "an integral part" of a foreign violation is done here); *Superama Corp. v. Tokyo Broad. Sys. Television, Inc.*, 830 F. App'x 821, 823-24 (9th Cir. 2020) (rejecting proposition that "a download occurs where material is stored" and finding predicate-act doctrine "inapplicable" because "the only asserted predicate act

47

of infringement—the download of copyrighted material—occurred outside the United States").

Thus, even if the former Motorolans had downloaded files from a U.S.-based Motorola server, there still would be no act of domestic copyright infringement and therefore no basis for holding Hytera liable under U.S. law for the subsequent use of those files abroad. There is no predicate act of domestic copyright infringement here.

**2.** The district court also suggested that Hytera committed an act of domestic copyright infringement because it "promoted, advertised, marketed, and sold its DMR products containing Motorola's copyrighted source code in the United States, including at trade shows." A106, R.1100:38 (¶ 36).

Hytera does not dispute that its sales of the infringing devices in the United States violate the Copyright Act and Motorola may recover for those sales. But a domestic violation of the Copyright Act cannot be leveraged to sweep in extraterritorial infringements unless those foreign sales "are directly linked to the U.S. infringement" or constituted "exploitation of [the domestic] infringing conduct." *Tire Eng'g*, 682 F.3d at 307. Put somewhat differently, "a plaintiff is required to show a domestic violation of

48

the Copyright Act and *damages flowing from foreign exploitation of that infringing act* to successfully invoke the predicate-act doctrine." *Id.* (emphasis added). Or, as the Ninth Circuit explained, recovery for extraterritorial infringement is permitted where "the predicate act of infringement occurring within the United States enabled further reproduction abroad." *L.A. News Serv. v. Reuters Television Int'l, Ltd.,* 149 F.3d 987, 990-92 (9th Cir.1998) (9th Cir.1998). *Accord Update Art, Inc. v. Modiin Publishing, Ltd.,* 843 F.2d 67, 73 (2d Cir. 1988) (the "infringement permits further reproduction abroad").

In *Tire Engineering*, *Update Art,* and *L.A. News,* such exploitation of the domestic infringement was shown because in each case the infringing copies made in the United States were then used to make further infringing copies abroad. Nothing like this happened here. Hytera sold products in the United States that it had produced abroad. In no sense were sales of the same products abroad "enabled" by the infringing sales in the United States, nor were they an "exploitation" of the U.S. sales. Indeed, this case is the precise converse of the Second, Fourth and Ninth Circuit cases: It was the infringements abroad that "enabled" the domestic sales.

49

The burden to show that the domestic infringements "enabled further reproduction abroad," lays with Motorola. *See Update Art,* 843 F.2d at 72; *IMAPizza, LLC v. At Pizza Ltd.*, 334 F. Supp. 3d 95, 120 (D.D.C. 2018) (plaintiff bears the burden of showing domestic infringement as a necessary element of its copyright claim), *aff'd*, 965 F.3d at 877. Motorola made no such showing, nor could it. Thus, there is no support in the record or the law for a finding that the U.S. sales were predicate acts for any of the extraterritorial infringements. "[T]he presumption against extraterritorial application would be a craven watchdog indeed if it retreated to its kennel whenever some domestic activity is involved in the case." *Nestlé USA, Inc. v. Doe*, 141 S. Ct. 1931, 1937 (2021) (quoting *Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247, 266 (2010)).

In addition to sales, the district court also referred to advertising or promotion of the products at U.S. trade shows. But advertising and promotion of infringing products is not itself a copyright infringement. *See* 17 U.S.C. § 106 (listing copyright holder's exclusive rights); Paul Goldstein, Goldstein on Copyright § 7.5.1 (3d ed. 2005) (to infringe the "distribution" right conferred under copyright law, "an actual transfer must take place; a mere

offer for sale will not infringe the right"); 4 Patry on Copyright § 13:11 (rejecting notion "that a mere offer to distribute a copyrighted work gives rise to liability under section 106(3)"); *see also Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1162 (9th Cir. 2007) (holding that the term "distribution" in § 106 requires "actual dissemination"). And in any event, there is no showing that these acts "enabled further reproduction abroad." *See Update Art,* 843 F.2d at 72.

The district court erred by including extraterritorial sales in the copyright award. The copyright damages should be reduced by $121,739,487—representing the extraterritorial sales of the accused products from 2010 to May 2016.

## C. The DTSA does not authorize the district court's award of extraterritorial profits

The district court separately awarded extraterritorial profits under the DTSA for sales from May 2016 through June 2019. (A70, A107; R.1100:2, 39.) The court also awarded ongoing royalties for Hytera's worldwide sales starting in July 2019 under the DTSA. (A109, A146; R:1289:2, 39; A149-54; R.1349:1-5.) These awards, which do not rest on any clear indication of intent in the DTSA, are

incompatible with the strong presumption against extraterritorial application of federal statutes.

**1.**     The DTSA says nothing about extraterritorial application. *See* Pub. L. 114-153. It thus fails to satisfy the first step in the *RJR* analysis. The court below decided otherwise on the basis of 18 U.S.C. § 1837, which is not a section of the DTSA but rather of the Economic Espionage Act of 1996. Section 1837 says:

> **Applicability to conduct outside the United States**. This chapter also applies to conduct occurring outside the United States if—
>
> **(1)** the offender is … organized under the laws of the United States or a State … ; or
>
> **(2)** an act in furtherance of the offense was committed in the United States.

18 U.S.C. § 1837; *see* R.834:10-11 (A14-15).

**a.**     The district court focused on the term "offense" in § 1837(2) and wrongly held that it could include civil wrongs. (A101; R.1100:33.) The term "offense" was adopted by Congress in 1996 and at that time could only have referred to criminal conduct

because the federal statute provided for no civil remedy.[16] Criminal matters are all that Congress covered in the Economic Espionage Act in 1996.[17] Thus, the term "offense" in § 1837 can only have been meant to refer to those acts that the Economic Espionage Act made criminal, which it codified in §§ 1831-1833. These include various methods of engaging in trade secret theft but—importantly—do not include the manufacture or sale of products incorporating misappropriated trade secrets.

Twenty years after Congress enacted § 1837 and the rest of the Economic Espionage Act, the DSTA amended § 1836 by adding a new private right of action dealing specifically with "product[s] or service[s] used in, or intended for use in, interstate or foreign commerce" that relate to a misappropriated trade secret. 18 U.S.C. § 1836. Congress did not amend § 1837 or re-define its operative

---

[16] The Economic Espionage Act does contain a civil remedy, codified in § 1836(a), but it is limited to authorizing the Attorney General to seek an injunction against *criminal* violations of the Economic Espionage Act. It does not modify the meaning of "offense" in § 1837.

[17] *See* S. Rep. No. 104-359, at 12 (1996) ("a Federal criminal law is needed because of the international and interstate nature of this activity").

term "offense." Rather, it used a new term for the conduct prohibited by the DSTA: "misappropriation."

Before the DTSA added a civil remedy in 2016, the Supreme Court had interpreted the term "offense" when used in Title 18 as "referr[ing] to crimes"—not civil misconduct. *Kellogg Brown*, 575 U.S. at 658-59. The Court recognized that "the term 'offense' is sometimes used more broadly" in the sense that "[a]ll crimes are offenses but some offenses are not crimes," but "that is not how the word is used in Title 18." *Id.* at 659. The Court was unable to find a single instance in Title 18 when Congress used the term "offense" to refer to a non-criminal violation of law. *Id.* The Court concluded, just a year before Congress passed the DTSA, that the term "offense" in Title 18 uniformly refers to criminal offenses. *Id.* Congress enacted the DTSA against the backdrop of the Supreme Court's narrow interpretation of the term "offense" in Title 18.

The district court erred by misconstruing the Supreme Court's command that it consider "whether the *statute* gives a clear, affirmative indication that it applies extraterritorially." *RJR Nabisco*, 579 U.S. at 337 (emphasis added). To determine congressional intent as to the extraterritorial application of a particular remedy,

the court was required to look at the statute adopting the remedy, not to another statute codified in a neighboring provision. The criminal enforcement authority created in 1996 by the Economic Espionage Act (§§ 1831-32) and the private right of action created in 2016 by the DSTA (§ 1836) define different types of conduct and enforcement mechanisms: Only the latter extends to products incorporating the stolen trade secrets. The Economic Espionage Act creates criminal liability that is enforced by the government; the DTSA creates a private remedy.

And the two statutes seek to remedy different wrongs: The Economic Espionage Act seeks to punish "offenses" consisting of the theft of trade secrets while the DTSA provides a remedy for "misappropriation," which includes selling products that embody trade secrets. The Economic Espionage Act's narrow authorization for *the government* to enforce the criminal law extraterritorially by seeking to prosecute "offenses" cannot extend to a different statute, passed much later, authorizing *private parties* to bring civil actions for a much broader range of conduct. It would be anomalous for private trade secret claims to reach extraterritorially when other intellectual-property rights generally do not. *See, e.g.*, *Impression*

55

*Prods.*, 137 S. Ct. at 1536-37 (copyright); *Microsoft*, 550 U.S. at 454-55 ("The presumption that United States law … does not rule the world applies with particular force in patent law.").

Congress could have expressly given the DTSA extraterritorial application. Yet it did not do so—despite the established rule that the presumption against extraterritoriality can only be rebutted by a "clear, affirmative indication that [the statute] applies extraterritorially." *RJR Nabisco*, 579 U.S. 337. Indeed, even if § 1837's use of the term "offense" is merely ambiguous, such inconclusive language cannot show that "Congress has affirmatively and unmistakably instructed" that the DTSA will operate extraterritorially. *Id.* at 335.

**b.** *RJR Nabisco* further confirms that the DTSA's private right of action lacks extraterritorial reach. The Court there expressly rejected the intuition that a private right of action must apply extraterritorially simply because an underlying prohibition does. *Id.* at 339.

*RJR Nabisco* provides the governing framework for analyzing extraterritoriality in this context. That case dealt with the RICO statute, which—like federal trade secret law—provides both criminal

and civil remedies. The Court held that "the presumption against extraterritoriality must be applied separately to RICO's substantive prohibitions and its private right of action." *Id.* at 350. In other words, "[t]he question of RICO's extraterritorial application really involves two questions. First, do RICO's substantive prohibitions … apply to conduct that occurs in foreign countries? Second, does RICO's private right of action … apply to injuries that are suffered in foreign countries?" 579 U.S. at 335.

Starting with the first question, the Court held that RICO's criminal prohibitions indeed rebut the presumption against extraterritoriality, permitting the government to prosecute some extraterritorial RICO offenses. *See id.* at 338-45. On the second question, however, the Court reached the opposite conclusion, holding that RICO's private right of action does not rebut the presumption: Even where the government could prosecute an offender for extraterritorial criminal conduct, a private plaintiff could not pursue a civil claim against the same wrongdoer for the same wrongful conduct. *See id.* at 346-54.

Analogous reasoning controls here. The criminal prohibitions on trade-secret theft include an express rebuttal of the presumption

against extraterritoriality, permitting the government to prosecute extraterritorial offenses that fall within § 1837's scope. But the DTSA's private right of action for trade-secret misappropriation does not provide the clear indication necessary to rebut the presumption. Indeed, it provides no indication at all.

Congress intended § 1837 to "rebut the general presumption against the extraterritoriality of U.S. *criminal* laws …." H.R. Rep. No. 104-788 at 14 (1996) (emphasis added), *reprinted in* 1996 U.S.C.C.A.N. 4021, 4033; S. Rep. No. 104-359 at 17 (1996) (same). But "providing a private civil remedy for foreign conduct" creates the "potential for international friction" beyond that of applying criminal substantive laws. *RJR Nabisco*, 579 U.S. at 346-48. For example, foreign nations have noted that it would "upset[] a balance of competing considerations that their own domestic laws embody" if foreign citizens could "bypass their own less generous remedial schemes" in favor of U.S. laws. *Id.* Nothing in the DTSA provides a clear indication that Congress meant to create a private right of

action for conduct occurring abroad despite risks of international friction.[18]

**2.** Even if § 1837 did apply to private civil actions under the DTSA, it would not support the award of extraterritorial profits in this case because any rebuttal of the presumption against extraterritoriality must be "limit[ed] … to its terms." *Morrison*, 561 U.S. at 265. To capture non-U.S. sales, the district court relied upon § 1837(2), which extends to foreign conduct where "an act in furtherance of the offense was committed in the United States."

---

[18] The First Circuit recently stated in passing that "Congress was concerned with the theft of American trade secrets abroad and intended the DTSA to have extraterritorial reach." *Amyndas Pharmaceuticals, S.A. v. Zealand Pharma A/S*, 48 F.4th 18, 35 (1st Cir. 2022). This statement is *dictum*: The question in *Amyndas* was whether to enforce a contractual forum-selection clause calling for the dispute to be resolved in Denmark, and the court noted that whether the DTSA applies extraterritorially does not affect that analysis. *See id.* at 35; *id.* at 29-36. There was virtually no briefing to the First Circuit on DTSA extraterritoriality. *See* Opening Br. 45 in *Amyndas*, First Circuit No. 21-1781 (filed Feb. 10, 2022) (setting forth a single quotation from Judge Norgle's decision in this case and offering no analysis); Answering Br. in *Amyndas* (filed Mar. 31, 2022) (not addressing DTSA extraterritoriality at all). For the reasons given herein, which the First Circuit did not consider, the *dicta* in *Amyndas* was incorrect.

18 U.S.C. § 1837(2). But there was no such "act in furtherance" here.

The district court relied on evidence that Hytera employees participated in trade shows in Las Vegas. (A25, A84-85, A102-03; R.834:21; R.1100:16-17, 34-35.) Without any analysis, the district court concluded that these acts "satisfied" the requirements of § 1837. (A102-03; R.1100:34-35.) But, as explained above, Hytera's participation U.S. trade shows certainly was not an "act in furtherance" of the purely extraterritorial sales whose profits the district court awarded to Motorola.

The district court alternatively concluded that the original acquisition of the trade secrets a decade earlier was itself a domestic act: "The theft occurred in the United States when [Malaysia-based] employees stole Motorola's trade secrets from the Compass and ClearCase systems because those systems are *accessible* at Motorola's Schaumburg office." (A103; R.1100:35) (emphasis added). But Motorola's systems were "accessible" from Motorola offices all over the world, including in Malaysia, where the information was stored and the acquisition actually occurred. There is no evidence that the trade secrets or the copyrighted code were

downloaded from *U.S.*-based servers rather than a server in the very country where the download occurred. *See supra* p. 44-45; SA9-12. And, even if the trade secrets were downloaded from U.S.-based servers, the former Motorola employees did not acquire them until the trade secrets arrived on their laptops in Malaysia, so there still would have been no domestic misappropriation. 18 U.S.C. § 1839(5) (defining misappropriation); *cf. IMAPizza, LLC*, 965 F.3d at 879 (making the same point in the copyright context).

Even if the intellectual property *had* been copied from within the United States, that would not provide a basis for DTSA liability because the acts occurred years before the DTSA went into effect in 2016. The district court originally recognized this (*see* R.834 at 18) but later reversed course. The court stated that "the DTSA applies to continuing misappropriations, so long as 'any act occurs on or after the date of the enactment.'" A104, R.1100:36 (quoting Pub. L. 114-153 § 2(e)). At the time of the downloading, however, there was no DTSA, so the concept of "misappropriation" as later defined by the DSTA did not exist. Whatever happened after the downloading and before enactment of the DSTA could not be a continuation of

anything. It was first defined as a wrong in 2016. There cannot be a "continuing" wrong that did not exist prior to the DTSA.

*          *          *

In short, Hytera's extraterritorial sales are not subject to the Copyright Act or the DTSA. Motorola is not entitled to Hytera's profits from extraterritorial sales under that U.S. statutes, either as disgorgement damages or ongoing royalties.

## III.  This Court should substantially reduce the punitive damages award

Whether or not this Court disturbs the compensatory damages award, it should reduce the punitive damages to, at most, a 1:1 ratio of whatever compensatory award it deems appropriate. The Due Process Clause of the Fifth Amendment imposes substantive limits on the size of punitive damages awards. *E.g., Honda Motor Co. v. Oberg*, 512 U.S. 415, 420-21 (1994). In determining whether a punitive damages award violates due process, the Supreme Court has articulated three guideposts. *BMW N. Am., Inc. v. Gore*, 517 U.S. 559, 575-85 (1996); *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 418-19 (2003). A punitive damages award of $271.6 million cannot stand.

62

The most authoritative guidance on this issue comes from this Court's recent opinion in *Epic Systems*, 980 F.3d at 1117. In that trade secret case, the defendant's "conduct consisted of a repeated course of wrongful actions spanning multiple years." *Id.* at 1141. An employee of defendant gained access to plaintiff's private web portal by disguising himself as a customer. *Id.* at 1124. He then shared his credentials with other defendant employees, who accessed and downloaded over 6,000 confidential documents over many years. *Id.* at 1125. These documents included plaintiff's trade secrets. *Id.* Defendant used the downloaded information to create a "comparative analysis" in an attempt to enter the U.S. market, steal plaintiff's largest customer, and address key gaps in defendant's own software. *Id.* at 1126. Defendant's employees tried to thwart the plaintiff's investigation by lying to the investigators and failed to preserve relevant evidence once litigation had started. *Id.* at 1127. Plaintiff was awarded $140 million in compensatory damages and $280 million in punitive damages. *See id.*

On appeal, this Court agreed with defendant that a 2:1 ratio violates due process. 980 F.3d at 1144. "Instead, the ratio relative to the $140 million compensatory award should not exceed 1:1." *Id.*

In reaching this conclusion, this Court applied the familiar *BMW v. Gore* guideposts. *See id.* at 1141-43. This Court's reasons for requiring a reduction apply with equal force here.

On the first guidepost—reprehensibility of defendant's conduct—the Court looked at five factors. In both *Epic Systems* and this case, although the misconduct is serious, there was no physical harm inflicted, no disregard for safety of others, and no financially vulnerable victim. With three of the five factors in the defendant's favor, this Court concluded that defendant's "conduct was not reprehensible 'to an extreme degree,'" 980 F.3d at 1142 (quoting *Saccameno v. U.S. Bank Nat'l Ass'n*, 943 F.3d 1071, 1088 (7th Cir. 2019)), and does not justify "a $280 million punitive-damages award." *Id.* at 1140.

On the second guidepost—the relationship of the punitive damages award to the "actual or potential harm" inflicted on plaintiff—*Epic Systems* emphasized that the $140 million of disgorgement damages did not represent the harm to plaintiff. As this Court explained, the harm to the plaintiff is the true measure by which punitive damages should be determined. 980 F.3d at 1143. Absent a ruling in the record on the plaintiff's actual losses,

the plaintiff's economic harm is presumed to be significantly smaller, which in turns drastically changes the relative ratio. *Id.*[19] In *Epic Systems*, the $140 million compensatory award was "high" and "far exceed[ed] what other courts have considered 'substantial.'" *Id.* at 1142. "[N]either party points us to any comparable cases in which any court has upheld a 2:1 or higher ratio resulting in over $200 million in punitive damages." *Id.* at 1143. This Court therefore concluded that "a 2:1 ratio exceeds the outermost limit of the due process guarantee." *Id.* at 1144.

The same is true here. The district court calculated the monetary award based on Hytera's profits—and not any actual harm to Motorola. *See* A100; R.1100:32 ("Hytera's profits are not a proxy for Motorola's actual loses in this case."). The district court did not quantify Motorola's lost profits under the DTSA. Because the award was based on the benefit to Hytera, the harm to Motorola should be presumed to be "significantly smaller" than the amount

---

[19] The Court nevertheless felt constrained to use the benefit to defendant as the benchmark because plaintiff did not argue "that we should compare any number besides compensatory damages to the punitive-damages award" and "underdeveloped arguments are waived." 971 F.3d at 1143.

of disgorgement awarded, thereby drastically changing the relevant ratio. 980 F.3d at 1143. The total disgorgement of profits award was equivalent to or more than what the *Epic Systems* court considered "substantial" (980 F.3d at 1144)—$135.8 million for trade secret misappropriation for sales from May 2016 to June 2019 period, plus ongoing royalties of over $49 million. (A107; R.1100:39; R.1349.) This is apart from the $136.3 million in disgorgement damages for copyright infringement, for which Congress has not authorized punitive damages. (A107; R.1100:39.)

Just as this Court held in *Epic Systems*, the ratio relative to the disgorgement damages should not exceed a 1:1 ratio. 980 F.3d at 1144-45. As the *Epic* court noted, "[m]any courts have … found awards 'substantial' and imposed a 1:1 ratio based on significantly lower compensatory awards." 980 F.3d at 1144. Indeed, it should be far less: Because the harm to Motorola should be presumed to "substantially smaller," this Court should limit the punitive damages award to a 1:1 ratio based on Hytera's domestic profits, which themselves are far from trivial.

On the final guidepost—analogous civil penalties—this Court in *Epic Systems* recognized that the amended judgment complied

66

with the 2:1 statutory ratio. *Id.* at 1143. Nevertheless, *Epic* held that this was not dispositive, and cut the award in half. *See id.* By contrast, the district court held that the DTSA's statutory cap of 2:1 was dispositive of the *BMW* analysis. (A65; R.1101:31; *see also* Motorola's Opp. to Hytera's New Trial Motion, R.968:20-21 & n.44). The district court's conclusion disregards this Court's binding guidance in *Epic Systems.*

In short, the Court should vacate the punitive damages award as it exceeded the outermost limit of federal due process and remand with instructions that the district court significantly reduce the punitive award.

## IV. This Court should limit the copyright damages to the three years before the claims were added

The district court erred by permitting Motorola to recover damages for copyright violations committed more than three years before the copyright claims were added to this suit.[20] The court

---

[20] Hytera renewed its statute of limitations argument in its Rule 50(b) motion. (R.954:10-11.) The district court stood "by its decision to allow copyright damages to extend more than three years" prior to Motorola's amendment to add the copyright claims in this case. (A.46; R.1088:12; *see also* A105; R.1100:37.)

relied upon the discovery rule but such a rule is nowhere to be found in the text of the Copyright Act. Section 507 states that "[n]o civil action shall be maintained … unless it is commenced within three years after the claim accrued." 17 U.S.C. § 507(b); *see also Gabelli v SEC*, 568 U.S. 442, 448 (2013) (recognizing the "standard rule" that a claim accrues when the injury occurs). Thus, the statute's plain text indicates that § 507(b) is governed by the injury rule, not the discovery rule. *Rotkiske v. Klemm*, 140 S. Ct 355, 360 (2019) ("[i]f there are two plausible constructions of a statute of limitations, [the Court] generally adopt[s] the construction that starts the time limit running when a cause of action … accrues," not when the plaintiff discovers the cause of action).

In *Petrella,* the Supreme Court recognized that "[a] copyright claim … 'accrue[s]' when an infringing act occurs." 572 U.S. at 670. The plaintiff in *Petrella* filed suit 19 years after becoming aware of her potential rights. That delay prejudiced the defendants, which had made significant investments in exploiting the work (the motion picture *Raging Bull*). The Ninth Circuit affirmed summary judgment on laches. *See Petrella v. Metro-Goldwyn-Mayer, Inc.*, 695 F.3d 946, 956 (9th Cir. 2012).

68

The Supreme Court reversed, holding that laches may not be invoked in copyright actions. *Petrella*, 572 U.S. at 677. In lieu of a laches defense, the Court interpreted 17 U.S.C. § 507(b) to include a strict three-year damages bar, which it held was the proper mechanism for protecting defendants against stale infringement claims. *Id.* It reasoned that § 507(b) "itself takes account of delay" because "a successful plaintiff can gain retrospective relief only three years back from the time of suit. *No recovery may be had for infringement in earlier years.*" *Id.* (emphasis added). The Court found laches was unnecessary to address the prejudice to defendants because the plaintiff "will miss out on damages for periods prior to the three-year look-back." *Id.* at 683. And *Petrella* consistently tied the limitations period for damages to the time a suit is *filed*—not when a claim is *discovered*. *See id.* at 672, 677, 685; *see also SCE Hygiene Products Atkiebolag v. First Quality Baby Products, LLC*, 137 S. Ct. 954, 962 (2017) (noting that *Petrella* "described the Copyright Act's statute of limitations as 'a three year look back limitations period."); *Chi. Bldg. Design, P.C. v. Mongolian House, Inc.*, 770 F.3d 610, 616 (7th Cir. 2014) ("[I]n light of *Petrella*, we now know that the right question to ask in copyright cases is

whether the complaint contains allegations of infringing acts that occurred within the three-year look-back period from the date on which the suit was filed."); *see id.* at 618.

The Second Circuit recently followed *Petrella*'s three-year lookback period for damages. *Sohm v. Scholastic Inc.*, 959 F.3d 39, 51 (2d Cir. 2020). There, the defendant moved for summary judgment on plaintiff's copyright infringement claims, arguing that claims occurring more than three years prior to suit were barred. *See id.* at 42, 44. The Second Circuit held that the district court "erred in allowing [plaintiff] to recover damages for more than three years prior to when he filed his copyright infringement suit." *Id.* at 51. As the Second Circuit explained, *Petrella* "explicitly delimited damages to the three years prior to the commencement of a copyright infringement action" *Id.* Accordingly, damages must be limited to three years before suit. *Id.*; *but see Starz Ent. v. MGM Domestic Television Distrib. LLC*, 39 F.4th 1236 (9th Cir. 2022) (disagreeing with *Sohm*'s reading of *Petrella*).[21]

---

[21] In *Taylor v. Meirick*, 712 F.2d 1112 (7th Cir. 1983), this Court made an alternative holding that the discovery rule would allow the
(footnote continues on next page)

Motorola added the copyright claims to this suit on August 2, 2018. Under *Petrella*, Motorola's copyright damages are limited to three years prior to this date—i.e., August 2, 2015. Yet the district court permitted Motorola to recover copyright damages back to 2010. (A105-06; R.1100:37-38.) The judgment should be reversed and remanded with instructions that the copyright damages be limited to three years preceding the filing of the copyright claim in this lawsuit.

---

plaintiff to reach back more than three years before he filed copyright suit in 1980 because he could not have been expected to discover the violations until 1979. *See id.* at 1119. This holding is inconsistent with *Petrella* and therefore no longer good law. If the Court concludes that it is still bound by *Taylor*, Hytera seeks to preserve for further review whether a plaintiff's damages are limited to the three-year period preceding the filing of the copyright claims.

## CONCLUSION

Appellant respectfully asks that this Court reverse the damages award and remand for further proceedings. The Court should remand with instructions to apportion profits, exclude extraterritorial sales, and limit copyright damages to three years prior to the dated the copyright claims were filed. In addition, the award for punitive damages under the DTSA should be reduced to a 1:1 ratio or far less.

/s/ Boyd Cloern
Boyd Cloern
    *Counsel of Record*
Alice E. Loughran
Mark C. Savignac
John William Toth
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, NW
Washington, DC 20036
(202) 429-3000
(202) 429-3902 (fax)
bcloern@steptoe.com


*Attorneys for Hytera
Communications Corp. Ltd.*


November 14, 2022

# Statutory Addendum

# Table of Contents

## *Sections of the U.S. Code*

17 U.S.C. § 504 ........................................................................ 1

17 U.S.C. § 507 ........................................................................ 4

18 U.S.C. § 1836 ...................................................................... 5

18 U.S.C. § 1837 ...................................................................... 8

# 17 U.S.C. § 504

§ 504. Remedies for infringement: Damages and profits

(a) In General.--Except as otherwise provided by this title, an infringer of copyright is liable for either—

> (1) the copyright owner's actual damages and any additional profits of the infringer, as provided by subsection (b); or

> (2) statutory damages, as provided by subsection (c).

(b) Actual Damages and Profits.--The copyright owner is entitled to recover the actual damages suffered by him or her as a result of the infringement, and any profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages. In establishing the infringer's profits, the copyright owner is required to present proof only of the infringer's gross revenue, and the infringer is required to prove his or her deductible expenses and the elements of profit attributable to factors other than the copyrighted work.

(c) Statutory Damages.—

(1) Except as provided by clause (2) of this subsection, the copyright owner may elect, at any time before final judgment is rendered, to recover, instead of actual damages and profits, an award of statutory damages for all infringements involved in the action, with respect to any one work, for which any one infringer is liable individually, or for which any two or more infringers are liable jointly and severally, in a sum of not less than $750 or more than $30,000 as the court considers just. For the purposes of this subsection, all the parts of a compilation or derivative work constitute one work.

(2) In a case where the copyright owner sustains the burden of proving, and the court finds, that infringement was committed willfully, the court in its discretion may increase the award of statutory damages to a sum of not more than $150,000. In a case where the infringer sustains the burden of proving, and the court finds, that such infringer was not aware and had no reason to believe that his or her acts constituted an infringement of copyright, the court in its discretion may reduce the award of statutory damages to a sum of not less than $200. The court shall remit statutory damages in any case where an infringer believed and had reasonable grounds for believing that his or her use of the copyrighted work was a fair use under section 107, if the infringer was: (i) an employee or agent of a nonprofit educational institution, library, or archives acting within the scope of his or her employment who, or such institution, library, or archives itself, which infringed by reproducing the work in copies or phonorecords; or (ii) a public broadcasting entity which or a person who, as a regular part of the nonprofit activities of a public broadcasting entity (as defined in section 118(f)) infringed by performing a published nondramatic literary work or by reproducing a transmission program embodying a performance of such a work.

(3)(A) In a case of infringement, it shall be a rebuttable presumption that the infringement was committed willfully for purposes of determining relief if the violator, or a person acting in concert with the violator, knowingly provided or knowingly caused to be provided materially false contact information to a domain name registrar, domain name registry, or other domain name registration authority in registering, maintaining, or renewing a domain name used in connection with the infringement.

(B) Nothing in this paragraph limits what may be considered willful infringement under this subsection.

(C) For purposes of this paragraph, the term "domain name" has the meaning given that term in section 45 of the Act entitled "An Act to provide for the registration and protection of trademarks used in commerce, to carry out the provisions of certain international conventions, and for other purposes" approved July 5, 1946 (commonly referred to as the "Trademark Act of 1946"; 15 U.S.C. 1127).

(d) Additional damages in certain cases.--In any case in which the court finds that a defendant proprietor of an establishment who claims as a defense that its activities were exempt under section 110(5) did not have reasonable grounds to believe that its use of a copyrighted work was exempt under such section, the plaintiff shall be entitled to, in addition to any award of damages under this section, an additional award of two times the amount of the license fee that the proprietor of the establishment concerned should have paid the plaintiff for such use during the preceding period of up to 3 years. (a) National uniformity of regulation.—

# 17 U.S.C. § 507

§ 507.  Limitations on actions

(a) Criminal Proceedings.--Except as expressly provided otherwise in this title, no criminal proceeding shall be maintained under the provisions of this title unless it is commenced within 5 years after the cause of action arose.

(b) Civil Actions.--No civil action shall be maintained under the provisions of this title unless it is commenced within three years after the claim accrued.

# 18 U.S.C. § 1836

1836.  Civil proceedings

(a) The Attorney General may, in a civil action, obtain appropriate injunctive relief against any violation of this chapter.

(b) Private civil actions.—

(1) In general.--An owner of a trade secret that is misappropriated may bring a civil action under this subsection if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce.

(2) Civil seizure.—

\* \* \*

(3) Remedies.--In a civil action brought under this subsection with respect to the misappropriation of a trade secret, a court may—

(A) grant an injunction—

> (i)   to   prevent   any   actual   or   threatened misappropriation described in paragraph (1) on such terms as the court deems reasonable, provided the order does not--
> > (I) prevent a person from entering into an employment relationship, and that conditions placed on such employment shall be based on evidence of threatened misappropriation and not merely on the information the person knows; or
> > (II) otherwise conflict with an applicable State law prohibiting restraints on the practice of a lawful profession, trade, or business;

> (ii) if determined appropriate by the court, requiring affirmative actions to be taken to protect the trade secret; and
> (iii) in exceptional circumstances that render an injunction inequitable, that conditions future use of the trade secret upon payment of a reasonable royalty for no longer than the period of time for which such use could have been prohibited;

(B) award—

> (i)(I) damages for actual loss caused by the misappropriation of the trade secret; and
>
> (II) damages for any unjust enrichment caused by the misappropriation of the trade secret that is not addressed in computing damages for actual loss; or
>
> (ii) in lieu of damages measured by any other methods, the damages caused by the misappropriation measured by imposition of liability for a reasonable royalty for the misappropriator's unauthorized disclosure or use of the trade secret;

(C) if the trade secret is willfully and maliciously misappropriated, award exemplary damages in an amount not more than 2 times the amount of the damages awarded under subparagraph (B); and

(D) if a claim of the misappropriation is made in bad faith, which may be established by circumstantial evidence, a motion to terminate an injunction is made or opposed in bad faith, or the trade secret was willfully and maliciously misappropriated, award reasonable attorney's fees to the prevailing party.

(c) Jurisdiction.--The district courts of the United States shall have original jurisdiction of civil actions brought under this section.

(d) Period of limitations.--A civil action under subsection (b) may not be commenced later than 3 years after the date on which the misappropriation with respect to which the action would relate is discovered or by the exercise of reasonable diligence should have been discovered. For purposes of this subsection, a continuing misappropriation constitutes a single claim of misappropriation.

## 18 U.S.C. § 1837

§ 1837. Applicability to conduct outside the United States

This chapter also applies to conduct occurring outside the United States if--

(1) the offender is a natural person who is a citizen or permanent resident alien of the United States, or an organization organized under the laws of the United States or a State or political subdivision thereof; or

(2) an act in furtherance of the offense was committed in the United States.

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

I certify that this corrected brief complies with the word limit imposed by Circuit Rule 32(c) because it contains 13,516 words, including the glossary but excluding material exempted by Federal Rule of Appellate Procedure 32(f).

I further certify that the brief complies with the typeface and type-style requirements of Federal Rule of Civil Procedure 32(a)(5) and (6) because it has been prepared in proportionally spaced, 14-point Bookman Old Style typeface using Microsoft Word 2019.

   /s/  Boyd Cloern
Boyd Cloern
      *Counsel of Record*
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, NW
Washington, DC 20036
(202) 429-3000
bcloern@steptoe.com

## CERTIFICATE OF COMPLIANCE WITH CIRCUIT RULE 30(d)

The Rule 30(a) appendix bound with this brief and the separate Rule 30(b) appendix submitted with this brief contain all the materials required by parts (a) and (b) of Circuit Rule 30.

/s/  Boyd Cloern
Boyd Cloern
    *Counsel of Record*
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, NW
Washington, DC 20036
(202) 429-3000
bcloern@steptoe.com

**CERTIFICATE OF SERVICE**

I certify that on November 15, 2022, I caused a true and correct copy of the foregoing corrected brief and short appendix to be served via the Court's ECF system upon all counsel of record. I also certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

    /s/  Boyd Cloern
        Boyd Cloern
          *Counsel of Record*
    STEPTOE & JOHNSON LLP
    1330 Connecticut Avenue, NW
    Washington, DC 20036
    (202) 429-3000
    bcloern@steptoe.com

# REQUIRED SHORT APPENDIX
## TABLE OF CONTENTS

**PAGE**

Final Judgment
March 5, 2020 (R.947) .................................................... .....A1

Judgment in Civil Case,
March 5, 2020 (R.948) ........................................................ A3

Order Regarding Defendants' Motion to Preclude Motorola from
Relying on Extraterritorial Damages
January 31, 2020 (R.834) .................................................... A5

Order Regarding Defendants' Rule 50(b) Motion for Judgment as a
Matter of  Law and Rule 59 Motion for a New Trial and/or
Remittitur
October 19, 2020 (R.1088) ..................................................A35

Order Regarding Parties' Findings of Fact and Conclusions of Law
January 8, 2021 (R.1099) ..................................................A67

Findings of Fact and Conclusions of Law in Relation to the Court's
October 19  and November 10, 2020 Orders
January 8, 2021 (R.1100) ..................................................A69

Order and Memorandum Opinion Regarding Parties' Reasonable
Royalty Submission
December 14, 2021 (R.1289) .............................................A108

Order Approving the Final Agreement for the Award of Ongoing
Royalties
July 5, 2022 (R.1349) .....................................................A149

PIC

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

MOTOROLA SOLUTIONS, INC., and       )
MOTOROLA SOLUTIONS MALAYSIA          )
SDN. BHD.,                           )
                                     )
          Plaintiffs,                )
                                     )
     v.                              )     Civil Action No.: 1:17-cv-01973
                                     )
                                     )     Honorable Charles R. Norgle Sr.
HYTERA COMMUNICATIONS                )
CORPORATION LTD.,                    )
HYTERA AMERICA, INC., AND            )
HYTERA COMMUNICATIONS               )
AMERICA (WEST), INC.,                )
                                     )
          Defendants.                )
_____    )

**FINAL JUDGMENT**

**A1**

A jury trial commenced in this case on November 6, 2019, and the jury reached a verdict on February 14, 2020. In accordance with the jury verdict, FINAL JUDGMENT is hereby ENTERED in favor of Plaintiffs and against Defendants for $345,761,156 in compensatory damages and $418,800,000 in punitive damages.

SO ORDERED this _____ 5TH _____ day of _____ MARCH _____, 2020.

The Honorable Charles R. Norgle Sr.
United States District Judge

1

**A2**

PK

ILND 450 (Rev. 10/13) Judgment in a Civil Action

# IN THE UNITED STATES DISTRICT COURT
## FOR THE
## NORTHERN DISTRICT OF ILLINOIS

Motorola Solutions, Inc and Motorola Solutions
Malaysia,

Plaintiff(s),

v.

Hytera Communications Corporation Ltd, Hytera
America, Inc. and Hytera Communications
America (West), Inc.,

Defendant(s).

Case No.  17 C 1973
Judge Charles R. Norgle

## JUDGMENT IN A CIVIL CASE

Judgment is hereby entered (check appropriate box):

☐      in favor of plaintiff(s)
and against defendant(s)
in the amount of $            ,

which ☐ includes        pre–judgment interest.
☐ does not include pre–judgment interest.

Post-judgment interest accrues on that amount at the rate provided by law from the date of this judgment.

Plaintiff(s) shall recover costs from defendant(s).

---

☐      in favor of defendant(s)
and against plaintiff(s)

Defendant(s) shall recover costs from plaintiff(s).

---

☒      other: .  In accordance with the jury verdict, FINAL JUDGMENT is hereby ENTERED in favor
of Plaintiffs and against Defendants for $345,761,156 in compensatory damages and $418,800,000 in punitive
damages.

---

This action was *(check one)*:

☒ tried by a jury with Judge Charles Norgle presiding, and the jury has rendered a verdict.
☐ tried by Judge      without a jury and the above decision was reached.
☐ decided by Judge      on a motion

**A3**

Date:   3/5/2020

Thomas G. Bruton, Clerk of Court

Eric Fulbright , Deputy Clerk

**A4**

PK

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| MOTOROLA SOLUTIONS, INC., et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Civil Action No. 1:17-cv-1973 |
| v. | ) | |
| | ) | |
| HYTERA COMMUNICATIONS CORP. | ) | |
| LTD., et al., | ) | Hon. Charles R. Norgle |
| | ) | |
| Defendants. | ) | |

## ORDER

Defendants' motion to preclude Motorola from relying on extraterritorial damages [758] is granted in part and denied in part.

## STATEMENT

On Monday, December 2, 2019, more than two years after this case was initially filed, Hytera Communications Corporation Ltd., Hytera America, Inc., and Hytera Communications America (West), Inc. (collectively, "Defendants,") filed a motion "to preclude Motorola from relying on extraterritorial damages." Dkt. 758. The motion was filed shortly after midnight, only hours before the thirteenth day of the ongoing jury trial. On that same day, Motorola Solutions, Inc. and Motorola Solutions Malaysia Sdn. Bhd. (collectively, "Plaintiffs") intended to call an expert to testify on damages, including extraterritorial damages. The Court, after a brief colloquy with defense counsel, exercised its discretion to provisionally allow testimony regarding extraterritorial damages, subject to the understanding that after the Court analyzed the motion and issued a ruling the jury would be instructed as to what damages it could properly consider or a limiting instruction if the Court ruled in Defendants' favor.

For the following reasons, Defendants' motion is granted in part and denied in part.

**A5**

## I. BACKGROUND

By way of brief background, Plaintiffs have brought three claims against Defendants: trade secret misappropriation under the recently enacted Defend Trade Secrets Act of 2016, 18 U.S.C. §§ 1836(b), 1839 *et seq.*, trade secret misappropriation under the Illinois Trade Secret Act, 765 ILCS 1065 *et seq.*, and copyright infringement under the Copyright Act, 17 U.S.C. §§ 106, 501 *et seq.* In essence, Plaintiffs allege that Defendants hired three engineers away from Plaintiffs' Malaysian office, that those engineers stole and brought with them thousands of Plaintiffs' technical, confidential documents, and that Defendants used those documents, which contained trade secrets and lines of source code, to develop a state-of-the-art digital radio that is functionally indistinguishable from Plaintiffs' radios. Defendants then sold those radios all around the world, including in the United States.

Put simplistically, Defendants argue that none of these three statutes have extraterritorial effect and all damages should be limited only to domestic applications of the respective statutes. Plaintiffs respond by arguing that Defendants have waived this challenge, and even if they have not, the statutes should reach extraterritorially in this case—either because the statutes apply extraterritorially or because the conduct being regulated by the statutes was domestic in this case and thus this case represents a proper domestic application of the statutes, which in turn allows Plaintiffs also to recover for damages extraterritorially.

This issue of what the statutes authorize, in the Court's view, is not a defense and has not been waived by Defendants. The Court exercises its discretion to reach the merits of the motion rather than to hold that this important issue has been waived. No prejudice will accrue to Plaintiffs and an instruction on what damages may properly be considered will not destroy Plaintiffs' credibility with the jury. The Court thus turns to each statute in turn.

**A6**

## II. ANALYSIS

### A. The Federal Claims under the Defend Trade Secrets Act and the Copyright Act

#### 1. The Extraterritoriality Analysis, Generally

The Supreme Court has promulgated a two-step framework for analyzing extraterritoriality issues,[1] discussed in depth below. At the first step, a court asks whether the presumption against extraterritoriality "has been rebutted—that is, whether the statute gives a clear, affirmative indication that it applies extraterritorially." RJR Nabisco, Inc. v. European Cmty., 136 S. Ct. 2090, 2101, 195 L. Ed. 2d 476 (2016). If no clear, affirmative indication exists, the statute is not extraterritorial and the court proceeds to a second step, in which it determines whether the case involves "a domestic application of the statute." Id. This determination is made by determining the statute's focus. "If the conduct relevant to the statute's focus occurred in the United States, then the case involves a permissible domestic application even if other conduct occurred abroad; but if the conduct relevant to the focus occurred in a foreign country, then the case involves an impermissible extraterritorial application regardless of any other conduct that occurred in U.S. territory." Id.

#### a. The Presumption Against Extraterritoriality

The first step of the extraterritoriality analysis deals with the presumption against extraterritoriality. The baseline principles underlying this canon of statutory construction are well developed by the Supreme Court. To begin, it is a "basic premise" of our legal system that, in general, United States law "governs domestically but does not rule the world." RJR Nabisco, Inc., 136 S. Ct. at 2101 (citing Microsoft Corp. v. AT & T Corp., 550 U.S. 437, 454, 127 S. Ct. 1746,

---

[1] See Morrison v. National Australia Bank Ltd., 561 U.S. 247, 130 S. Ct. 2869, 177 L. Ed.2d 535 (2010) and Kiobel v. Royal Dutch Petroleum Co., 569 U.S. 108, 133 S. Ct. 1659, 185 L. Ed. 2d 671 (2013).

167 L. Ed.2d 737 (2007)) (internal quotations omitted).  This principle is expressed as the "presumption against extraterritoriality," which governs a court's interpretation of whether a statute reaches beyond the United States.  Id.  Specifically, "[a]bsent clearly expressed congressional intent to the contrary, federal laws will be construed to have only domestic application." Id. (citing Morrison v. National Australia Bank Ltd., 561 U.S. 247, 255, 130 S. Ct. 2869, 177 L. Ed.2d 535 (2010)).  This presumption rests on the "commonsense notion that Congress generally legislates with domestic concerns in mind. . . . And it prevents unintended clashes between our laws and those of other nations which could result in international discord." WesternGeco LLC v. ION Geophysical Corp., 138 S. Ct. 2129, 2136, 201 L. Ed. 2d 584 (2018) (internal citations and quotations omitted).

As to this first step of the extraterritorial analysis, RJR Nabisco cautions that "[t]he question is not whether we think Congress would have wanted a statute to apply to foreign conduct if it had thought of the situation before the court, but whether Congress has affirmatively and unmistakably instructed that the statute will do so." Id. (internal quotations omitted).  When interpreting a statute, a court thus looks for a "clear indication" of extraterritorial application; if none is found, the statute applies only domestically, and the analysis shifts to the second step.  See Morrison, 561 U.S. at 255.

In determining whether a "clear indication" exists, courts use traditional tools of statutory interpretation.  Specifically, courts analyze the plain language of the statute and the statutory provisions at issue, e.g. Morrison, 561 U.S. at 261, the surrounding context, Morrison, 561 U.S. at 265 ("[a]ssuredly context can be consulted as well[]"), and, relatedly, how that plain language interacts with the general statutory structure, RJR Nabisco, 136 S. Ct. 2101-03 (holding that, because certain predicate acts incorporated by reference into the RICO statute criminalized

conduct occurring abroad, the criminal RICO provisions based on those violations had extraterritorial reach as well). The Supreme Court has cautioned, however, that the presumption against extraterritoriality is not a "clear statement rule" if "by that it is meant a requirement that a statute say 'this law applies abroad.'" Id.

In the wake of RJR Nabisco, it is clear that just because a federal statute establishes extraterritorial reach in a criminal context, a private right of action based on similar acts does not necessarily also have extraterritorial reach. In RJR Nabisco, the Court found that although certain criminal RICO actions could be applied extraterritorially (where the underlying predicate acts clearly incorporated extraterritorial-reaching crimes), the private right of action did not extend extraterritorially, even when based on the same predicates. This holding was based on what the Court held to be limiting language in the provision creating the private right of action, bolstered by the idea that:

> The creation of a private right of action raises issues beyond the mere consideration whether underlying primary conduct should be allowed or not, entailing, for example, a decision to permit enforcement without the check imposed by prosecutorial discretion. Sosa v. Alvarez–Machain, 542 U.S. 692, 727, 124 S. Ct. 2739, 159 L. Ed.2d 718 (2004). It is not enough to say that a private right of action must reach abroad because the underlying law governs conduct in foreign countries. Something more is needed[.]

RJR Nabisco, 136 S. Ct. at 2108 (internal quotation omitted); see also id. ("The statute's reference to injury to 'business or property' also does not indicate extraterritorial application. If anything, by cabining RICO's private cause of action to particular kinds of injury—excluding, for example, personal injuries—Congress signaled that the civil remedy is not coextensive with § 1962's substantive prohibitions.").

Thus, the language of the statute is key in determining whether the presumption against extraterritoriality has been rebutted.

5

**A9**

b. The Focus of the Statute

Absent the clear indication discussed above, a party may in certain circumstances still recover damages from outside of the United States if "the conduct relevant to the statute's focus occurred in the United States[.]" WesternGeco, 138 S. Ct. at 2137 (citing RJR Nabisco, 136 S. Ct. at 2101). This is the case "even if other conduct occurred abroad." Id. WesternGeco dealt specifically with the private right of action for infringement contained in the Patent Act, 35 U.S.C. § 281. Id. In analyzing the statute, the Court opted to forego the first step of the extraterritorial analysis and instead contained its examination to the second step dealing with the focus of the statute.

WesternGeco advises that the "focus" of a statute is the "object of its solicitude, which can include the conduct it seeks to regulate, as well as the parties and interests it seeks to protect or vindicate." Id. (citations and internal quotations omitted). "When determining the focus of a statute, we do not analyze the provision at issue in a vacuum. . . . If the statutory provision at issue works in tandem with other provisions, it must be assessed in concert with those other provisions. Otherwise, it would be impossible to accurately determine whether the application of the statute in the case is a 'domestic application.'" Id. (citation omitted).

Discerning the focus of a statute involves an interpretation of what the legislature was concerned with when it enacted the law. See Morrison, 561 U.S. at 266 (Section 10(b) of the Securities Exchange Act "focus[e]d . . . upon purchases and sales of securities in the United States. Section 10(b) does not punish deceptive conduct, but only deceptive conduct 'in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered.' 15 U.S.C. § 78j(b)."). The Court came to this conclusion by analyzing what the statute sought to regulate and the parties it sought to protect, as divined from the language of the

**A10**

statute itself.  See also Kiobel v. Royal Dutch Petroleum Co., 569 U.S. 108, 126, 133 S. Ct. 1659, 1670, 185 L. Ed. 2d 671 (2013) ("We also reiterated that a cause of action falls outside the scope of the presumption—and thus is not barred by the presumption—only if the event or relationship that was 'the "focus" of congressional concern' under the relevant statute takes place within the United States.")

With the structure of this analysis and these background principles in mind, this opinion will now turn to a discussion of the two relevant federal statutes.

### 2. The Defend Trade Secrets Act of 2016

#### a. The DTSA Overcomes the Presumption Against Extraterritoriality

The Defend Trade Secrets Act of 2016, 18 U.S.C. § 1831 *et seq.* ("DTSA") became effective in May 2016.  The statute amended sections of the previously enacted Economic Espionage Act of 1996, Pub. L. 104-294 ("EEA").  The EEA had criminalized the theft of trade secrets in certain contexts.  The DTSA, again, which amended the EEA, created a private right of action, codified in 18 U.S.C. § 1836(b), and included other amendments to the EEA including, among others, the addition of a definition of the term "misappropriation" which mirrors that within the Uniform Trade Secrets Act.  18 U.S.C. § 1839; see Pub. L. 114-153, § 2(a), (d)(1), May 11, 2016.

In certain contexts, the fact that Congress has amended a statute sheds light on how the statute is to be interpreted.  E.g., Gross v. FBL Fin. Servs., Inc., 557 U.S. 167, 174-75, 129 S. Ct. 2343, 2349, 174 L. Ed. 2d 119 (2009) ("We cannot ignore Congress' decision to amend Title VII's relevant provisions but not make similar changes to the ADEA. When Congress amends one statutory provision but not another, it is presumed to have acted intentionally."); Firstar Bank, N.A. v. Faul, 253 F.3d 982, 988 (7th Cir. 2001) ("[A] statute's longstanding meaning forms the

background against which Congress legislates when it amends the law. The courts presume that Congress will use clear language if it intends to alter an established understanding about what a law means; if Congress fails to do so, courts presume that the new statute has the same effect as the older version."); McClure v. United States, 95 F.2d 744, 750 (9th Cir. 1938), aff'd, 305 U.S. 472, 59 S. Ct. 335, 83 L. Ed. 296 (1939) ("In Conrad v. Nall, 24 Mich. 275, a section in the chapter of the Code was amended, and it was held that it was not intended to operate independently of the other provisions of the chapter, but that the whole chapter, is its present form, must be read as one act.").

On this issue, because Congress was not acting to change an existing interpretation of the EEA, but rather was creating a private right of action in the statutory chapter, the chapter amended through the DTSA should be read as a cohesive whole. In other words, Congress was not reacting to an interpretation of the EEA that it disagreed with and amending to clarify its intent on a provision. Rather, Congress was introducing a new right. This suggests to the Court that the entire chapter is to be read as intertwined, and the pronouncements cited above relating to the interpretation of non-amended provisions do not carry weight in this circumstance. Chapter 90 of the U.S. Code is made up of 18 U.S.C. §§ 1831-1839. The proper context in considering the relevant DTSA provisions is thus within Chapter 90 of the U.S. Code, not simply by reference to the provisions included in the text of the DTSA itself.

With the above in mind, a court's interpretation of a statute must begin with the plain language of the statute. Middleton v. City of Chicago, 578 F.3d 655, 658 (7th Cir. 2009) ("After all, when interpreting a statute, we must begin with its text and assume that the ordinary meaning of that language accurately expresses the legislative purpose.") (citation and internal quotations

**A12**

omitted).  Turning then, to the statute at issue, the private right of action is codified in Section

1836 and is written as follows:

> (b) Private civil actions.--
> (1) In general.--An owner of a trade secret that is misappropriated
> may bring a civil action under this subsection if the trade secret is
> related to a product or service used in, or intended for use in,
> interstate or foreign commerce.

18 U.S.C.A. § 1836(b).  Misappropriation, as relevant, is defined within the statute as follows:

> (5) the term "misappropriation" means--
>> (A) acquisition of a trade secret of another by a
>> person who knows or has reason to know that the
>> trade secret was acquired by improper means; or
>> (B) disclosure or use of a trade secret of another
>> without express or implied consent by a person who-
>>> (i) used improper means to acquire
>>> knowledge of the trade secret;
>>> (ii) at the time of disclosure or use, knew or
>>> had reason to know that the knowledge of the
>>> trade secret was--
>>>> (I) derived from or through a person
>>>> who had used improper means to
>>>> acquire the trade secret;
>>>> (II) acquired under circumstances
>>>> giving rise to a duty to maintain the
>>>> secrecy of the trade secret or limit the
>>>> use of the trade secret; or
>>>> (III) derived from or through a person
>>>> who owed a duty to the person
>>>> seeking relief to maintain the secrecy
>>>> of the trade secret or limit the use of
>>>> the trade secret; . . .

18 U.S.C.A. § 1839(5).  As an initial matter, Section 1836 does not contain any explicit reference

to extraterritorial conduct or application.  Nor does the defined term "misappropriation."  This

does not end the inquiry, however, as the statute as a whole must be consulted in determining the

proper interpretation of these specific provisions.

**A13**

The interpretation of Section 1837 is the cornerstone for the extraterritorial analysis of the DTSA. Section 1837 provides:

> This chapter also applies to conduct occurring outside the United States if-
>
>> (1) the offender is a natural person who is a citizen or permanent resident alien of the United States, or an organization organized under the laws of the United States or a State or political subdivision thereof; or
>>
>> (2) an act in furtherance of the offense was committed in the United States.

18 U.S.C.A. § 1837. Section 1837 does provide a clear indication that the presumption against extraterritoriality has been rebutted. The question, however, is whether Section 1837 limits that rebuttal only to criminal matters—in other words, whether Section 1837 also creates an extraterritorial application of the private right of action codified in Section 1836.

This is not an easy question, particularly in the wake of RJR Nabisco's holding with respect to the distinction between extraterritorial criminal application and private application of the RICO statute. Neither the parties nor the Court have identified directly controlling precedent on this issue, which appears never to have been directly addressed by the Seventh Circuit or any others. Some district courts have assumed that Section 1836's private right of action can apply extraterritorially when reciting what conduct the DTSA regulates. These opinions do not provide any detailed analysis of the reason for assuming that Section 1837 applies to a private right of action. See Luminati Networks Ltd. v. BIScience Inc., No. 2:18-CV-00483-JRG, 2019 WL 2084426, at *9-10 (E.D. Tex. May 13, 2019) ("The DTSA 'applies to conduct occurring outside the United States if . . . an act in furtherance of the offense was committed in the United States.' 18 U.S.C § 1837(2)."); Austar Int'l Ltd. v. AustarPharma LLC, No. CV198356KMMAH,

10

**A14**

2019 WL 6339848, at *11 (D.N.J. Nov. 27, 2019) (same); ProV Int'l Inc. v. Lucca, No. 8:19-CV-978-T-23AAS, 2019 WL 5578880, at *3 (M.D. Fla. Oct. 29, 2019) (same); MACOM Tech. Sols. Inc. v. Litrinium, Inc., No. SACV19220JVSJDEX, 2019 WL 4282906, at *4 (C.D. Cal. June 3, 2019) (same); Vendavo, Inc. v. Price f(x) AG, No. 17-CV-06930-RS, 2018 WL 1456697, at *3 (N.D. Cal. Mar. 23, 2018) (same); Micron Tech., Inc. v. United Microelectronics Corp., No. 17-CV-06932-MMC, 2019 WL 1959487, at *8 (N.D. Cal. May 2, 2019) ("Micron has a substantial interest in trying the case in the United States, as federal law provides for jurisdiction over misappropriation occurring outside the United States, see 18 U.S.C. § 1837[.]").

The Court has identified no court that has held that the DTSA does not apply extraterritorially to private rights of action.  It would be ill-advised to simply join the chorus of district courts that have held, without discussion, that the private right of action applies extraterritorially.  The Court will thus turn to a discussion first of Section 1837 and to the notes that Congress included in the piece of legislation passed as the DTSA.

The biggest indicator that Congress did intend for the private right of action of the DTSA to apply extraterritorially is the fact that Section 1837 refers broadly to "this chapter," which includes within it Section 1836.  18 U.S.C. § 1837 ("*This chapter* also applies to conduct occurring outside the United States if . . .") (emphasis added).  From this language, which Congress did not amend when it amended the chapter, the Court could draw the inference that Congress intended Section 1837 to apply to Section 1836.

Moreover, the actual law passed by Congress, Pub. L. 114-253, includes numerous references to extraterritorial conduct that were absent in the previous versions of the statute.  For example, Pub. L. 114-153 states:

11

**A15**

It is the sense of Congress that—
(1) trade secret theft occurs in the United States and around the world;
(2) trade secret theft, wherever it occurs, harms the companies that own the trade secrets and the employees of the companies;
(3) chapter 90 of title 18, United States Code (commonly known as the "Economic Espionage Act of 1996"), applies broadly to protect trade secrets from theft; and
(4) it is important when seizing information to balance the need to prevent or remedy misappropriation with the need to avoid interrupting the—
    (A) business of third parties; and
    (B) legitimate interests of the party accused of wrongdoing.

Pub. L. 114-153, § 5. Additionally, Pub. L. 114-153, § 4(b) contains new reporting requirements for the Attorney General, absent in either the original EEA or in an earlier amendment in 2012, requiring the Attorney General prepare reports on a biannual basis about, *inter alia*:

(1) The scope and breadth of the theft of the trade secrets of United States companies occurring outside of the United States.
(2) The extent to which theft of trade secrets occurring outside of the United States is sponsored by foreign governments, foreign instrumentalities, or foreign agents.
(3) The threat posed by theft of trade secrets occurring outside of the United States.
(4) The ability and limitations of trade secret owners to prevent the misappropriation of trade secrets outside of the United States, to enforce any judgment against foreign entities for theft of trade secrets, and to prevent imports based on theft of trade secrets overseas.

Pub. L. 114-153, § 4(b); compare with Pub. L. 104-294, Title I and Pub. L. 112–269. Taken together, it is clear that Congress was concerned with actions taking place outside of the United States in relation to the misappropriation of U.S. trade secrets when it passed the DTSA. And, again, Section 1837 applies by its terms to the "chapter" to which the private right of action was added.

    On the other hand, RJR Nabisco drew a line between criminal extraterritorial application and private extraterritorial application. There, the Supreme Court found that limiting language as

**A16**

to what damages were available civilly (that is, only damages to business or property) distinguished the civil reach of RICO from the criminal reach, which the Court held did apply extraterritorially in certain criminal circumstances.

Here, there does not appear to be such limiting language in Section 1836, which broadly creates a private right of action. See 18 U.S.C 1836(b) ("An owner of a trade secret that is misappropriated may bring a civil action under this subsection if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce.").

Section 1837, however, could be viewed as containing such limiting language. Specifically, Section 1837 provides for extraterritorial application based on qualities related to the "offender" or the "offense." Broadly, and in everyday usage, an "offender" could simply mean one who has taken unlawful action and would include a suable entity such as a corporation. Sometimes in legal terminology, however, an "offender" falls more squarely within the realm of criminal law. Black's Law Dictionary, for example, defines offender as:

> offender (15c) *Criminal law.* Someone who has committed a crime;
> esp., one who has been convicted of a crime.

OFFENDER, Black's Law Dictionary (11th ed. 2019). No parallel definition within a civil context is included in Black's Law Dictionary. Similarly, the word "offense" has some criminal connotation noted:

> offense (ə-fents) (14c) 1. A violation of the law; a crime, often a minor one. — Also termed *criminal offense.* See crime. Cf. misbehavior.
> > "The terms 'crime,' 'offense,' and 'criminal offense' are all said to be synonymous, and ordinarily used interchangeably. 'Offense' may comprehend every crime and misdemeanor, or may be used in a specific sense as synonymous with 'felony' or with 'misdemeanor,' as the case may be, or as signifying a crime of lesser grade, or an act not indictable, but punishable summarily or by the forfeiture of a penalty."
> > 22 C.J.S. *Criminal Law* § 3, at 4 (1989).

13

**A17**

OFFENSE, Black's Law Dictionary (11th ed. 2019). Additionally, one could argue it is unclear whether Congress intended the interpretation of Section 1837 to remain consistent with its interpretation prior to the 2016 amendment, when Congress decided not to amend Section 1837. See Firstar Bank, N.A. v. Faul, 253 F.3d 982, 988 (7th Cir. 2001) ("a statute's longstanding meaning forms the background against which Congress legislates when it amends the law. The courts presume that Congress will use clear language if it intends to alter an established understanding about what a law means; if Congress fails to do so, courts presume that the new statute has the same effect as the older version."). On the other hand, Congress also did not amend the introductory language of Section 1837, which states that Section 1837 applies to "this chapter"—a chapter which now includes Section 1836's private cause of action. See McClure v. United States, 95 F.2d 744, 750 (9th Cir. 1938), aff'd, 305 U.S. 472, 59 S. Ct. 335, 83 L. Ed. 296 (1939).

With the above in mind, then, the Court returns to the principle question of extraterritoriality, whether Congress has given a clear indication that it intended extraterritorial application of the private cause of action of Section 1836. The clearest precedent on this issue appears to be RJR Nabisco. As referenced throughout the above, RJR Nabisco distinguished between the extraterritorial reach of the criminal provisions of RICO and the extraterritorial reach of the private right of action. RJR Nabisco, 136 S. Ct. at 2108. In addition to relying on the private right of action's limiting language with respect to damages, the Supreme Court additionally outlined concerns with extending a private right of action extraterritorially. Specifically, RJR Nabisco instructed:

> Allowing recovery for foreign injuries in a civil RICO action, including treble damages, presents the . . . danger of international friction. . . . This is not to say that friction would necessarily result

14

**A18**

> in every case, or that Congress would violate international law by
> permitting such suits. It is to say only that there is a potential for
> international controversy that militates against recognizing foreign-
> injury claims without clear direction from Congress. Although "a
> risk of conflict between the American statute and a foreign law" is
> not a prerequisite for applying the presumption against
> extraterritoriality, <u>Morrison</u>, 561 U.S., at 255, 130 S. Ct. 2869 where
> such a risk is evident, the need to enforce the presumption is at its
> apex.

<u>RJR Nabisco</u>, 136 S. Ct. at 2107; <u>see also id.</u> at 2106 ("The creation of a private right of action

raises issues beyond the mere consideration whether underlying primary conduct should be

allowed or not, entailing, for example, a decision to permit enforcement without the check imposed

by prosecutorial discretion. <u>Sosa v. Alvarez–Machain</u>, 542 U.S. 692, 727, 124 S. Ct. 2739, 159 L.

Ed.2d 718 (2004). Thus, as we have observed in other contexts, providing a private civil remedy

for foreign conduct creates a potential for international friction beyond that presented by merely

applying U.S. substantive law to that foreign conduct. <u>See</u>, <u>e.g.</u>, <u>Kiobel</u>, 133 S. Ct., at 1665 (Each

of th[e] decisions involved in defining a cause of action based on conduct within the territory of

another sovereign carries with it significant foreign policy implications.") (internal quotations

omitted).  The Court takes very seriously <u>RJR Nabisco</u>'s directive that "the need to enforce the

presumption is at its apex" where a risk of conflict between laws is evident.  This case, and

certainly the DTSA, may implicate such risks.

Considering all of the above, the Court holds that although Section 1837 contains what

might be construed as limiting language, the clear indication of Congress in amended Chapter 90

of Title 18 of the U.S. Code was to extend the extraterritorial provisions of Section 1837 to Section

1836, meaning Section 1836 may have extraterritorial reach subject to the restrictions in Section

1837.  First, although Black's Law Dictionary attaches a criminal connotation to the words

"offenders" and an "offense," these words should be construed more broadly than simply to the

15

**A19**

criminal context in light of the other language of the DTSA. Moreover, an "offense," even in the Black's Law Dictionary definition, is a "violation of the law." This encompasses a violation of a civil statute. Moreover, in practical terms, "offense" is commonly used to refer to unlawful actions that are not criminal. E.g. Sabreliner Corp. v. Int'l Bhd. of Teamsters, Local No. 600, No. 1:08CV151 SNLJ, 2009 WL 1383278, at *3 (E.D. Mo. May 14, 2009) (discussing non-criminal "offenses" within an employment policy). This broader reading of "offense" is bolstered by the other legislative statements in Pub. L. 114-153, which reference extraterritorial conduct and the need for the DTSA to address trade secret theft "wherever it occurs." Pub. L. 153.

Moreover, concerns that animated the RJR Nabisco's distinction between criminal and private action are more muted in a case involving the DTSA because Section 1837 does require a nexus to the United States before the DTSA applies extraterritoriality. The RICO private right of action, on the other hand, could have theoretically applied to solely extraterritorial conduct where the predicate acts dealt with solely extraterritorial conduct. RJR Nabisco, 136 S. Ct. at 2101 ("At least one predicate—the prohibition against 'kill[ing] a national of the United States, while such national is outside the United States'—applies only to conduct occurring outside the United States. § 2332(a).").

Additionally, unlike in the RICO statute, which the Supreme Court read to be criminally extraterritorial only through principles related to the incorporation by reference of the extraterritorial predicate acts, the DTSA includes an explicit reference within the Act to its extraterritorial application. Compare with id. at 2103 ("Th[e] unique structure makes RICO the rare statute that clearly evidences extraterritorial effect despite lacking an express statement of extraterritoriality."). As RJR Nabisco instructed, "[i]t is not enough to say that a private right of action must reach abroad because the underlying law governs conduct in foreign countries.

Something more is needed[.]" RJR Nabisco, 136 S. Ct. at 2108. Here, "something more" is present in the plain language of the statute because of the plain language of Section 1837—a reading which is bolstered by the broad pronouncements of Congress of the need to protect against trade secret theft wherever it occurs.

Thus, for the reasons discussed above, the Court holds that the DTSA may apply extraterritorially in a private cause of action if either of the requirements of Section 1837 are met.

b. Extraterritorial Application Is Proper in this Case under Section 1837

Holding that the statute may apply extraterritorially does not end the analysis. The next question is whether this case may meet the requirement of Section 1837. Returning, then, to the language of Section 1837, the provision states:

> This chapter also applies to conduct occurring outside the United States if-
>
> > (1) the offender is a natural person who is a citizen or permanent resident alien of the United States, or an organization organized under the laws of the United States or a State or political subdivision thereof; or
> >
> > (2) an act in furtherance of the offense was committed in the United States.

18 U.S.C. § 1837. The parties have not directly addressed this point. The Court holds, however, that Plaintiffs have presented evidence sufficient to support a finding that an act in furtherance of the offense has been committed in the United States.

The offense, in the context of the DTSA private cause of action, is the misappropriation of a trade secret. This is clear through the plain language of the statute. See 18 U.S.C. § 1836(b). In briefing this motion, the parties have focused on the "acquisition" of the trade secrets as the relevant misappropriation. However, misappropriation, by its terms, is not limited to the

17

**A21**

acquisition of the secret.  As courts have recognized, misappropriation can occur through any of three actions: (1) acquisition, (2) disclosure, or (3) use. E.g. Zaccari v. Apprio, Inc., 390 F. Supp. 3d 103, 112–13 (D.D.C. 2019) (the DTSA permits plaintiffs to bring private causes of action if they 'own[] a trade secret that is misappropriated.' 18 U.S.C. § 1836(b)(1). Misappropriated means either '(A) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or (B) disclosure or use of a trade secret of another without express or implied consent by a person' who meets one of several conditions. 18 U.S.C. § 1839(5)(A)–(B). As some courts have put it, the DTSA thus authorizes suits alleging three theories of trade secret misappropriation: (1) acquisition, (2) disclosure, and (3) use. See, e.g., AUA Private Equity Partners, LLC v. Soto, Civil No. 1:17-8035-GHW, 2018 WL 1684339, at *4 (S.D.N.Y. Apr. 5, 2018); Camick v. Holladay, 758 F. App'x 640, 645 (10th Cir. 2018).").

Plaintiffs have argued that the acquisition of the trade secrets took place in the United States because, *inter alia*, the information was stored on servers that are housed in the United States and were accessible from its headquarters in Illinois.  The Court need not reach the merits of this argument in this context, however, because it is clear from the record that even if this constitutes acquisition within the United States, any acquisition took place before the effective date of the DTSA.

Specifically, the "effective date" provision in the DTSA states:

> The amendments made by this section shall apply with respect to any misappropriation of a trade secret (as defined in section 1839 of title 18, United States Code, as amended by this section) for which any act occurs on or after the date of the enactment of this Act.

Pub. L.114-153, May 11, 2016 (18 U.S.C. § 1833 Note).  From the undisputed evidence presented during the trial, it is clear that any improper acquisition of the alleged trade secrets occurred before the effective date of the DTSA.

**A22**

However, as noted above, misappropriation can also be premised on a theory of "disclosure" or "use." 18 U.S.C.A. § 1839(5). "Use" is not defined in the DTSA, but has been interpreted by other courts applying similarly-defined state law. The Fifth Circuit, for example, has analyzed what constitutes "use" for purposes of Texas trade secret law, which contains an element of "use." Gen. Universal Sys., Inc. v. HAL, Inc., 500 F.3d 444, 450 (5th Cir. 2007). There, the court pointed to the definition of "use" in the Restatement (Third) of Unfair Competition, which reads:

> As a general matter, any exploitation of the trade secret that is likely to result in injury to the trade secret owner or enrichment to the defendant is a "use" under this Section. Thus, marketing goods that embody the trade secret, employing the trade secret in manufacturing or production, relying on the trade secret to assist or accelerate research or development, or soliciting customers through the use of information that is a trade secret (see § 42, Comment f) all constitute "use."

Restatement (Third) of Unfair Competition § 40, cmt. c (1995). The Seventh Circuit has not explicitly adopted this this definition of "use," but has cited to this section of the Restatement approvingly. Salton, Inc. v. Philips Domestic Appliances & Pers. Care B.V., 391 F.3d 871, 878 (7th Cir. 2004). One other court in this district has considered the definition of "use" when interpreting the ITSA, which has an identical definition of "misappropriation" as the DTSA. Cognis Corp. v. CHEMCENTRAL Corp., 430 F. Supp. 2d 806, 812 (N.D. Ill. 2006). There, the court wrote:

> The Seventh Circuit and the Illinois state courts also do not define what it means to "use" a trade secret . . . However, Illinois courts have noted that:
>
> > . . . The idea of "use" as embodied in this language indicates that the third party's actions have to be improper and damage the owner of the secret to some extent. This suggests that "use" is a very broad concept. Such a construction is consistent with the Restatement (Third) of Unfair

19

**A23**

Competition, which is often relied on by the Seventh Circuit in analyzing trade secret claims. See, for example, <u>Learning Curve Toys, Inc. v. PlayWood Toys, Inc.</u>, 342 F.3d 714, 728 (7th Cir. 2003) (relying on the Restatement (Third) of Unfair Competition and the Uniform Trade Secret Act to determine the criteria for trade secret protection); <u>Salton</u>, 391 F.3d at 878 (relying on the same to determine the scope of legal protection of trade secrets); <u>see also</u> <u>Peaceable Planet, Inc. v. TY, Inc.</u>, 362 F.3d 986, 989 (7th Cir. 2004). The Restatement states:

> There are no technical limitations on the nature of the conduct that constitutes "use" of a trade secret . . . As a general matter, any exploitation of the trade secret that is likely to result in injury to the trade secret owner or enrichment to the defendant is a "use" . . . Thus, marketing goods that embody the trade secret, employing the trade secret in manufacturing or production, relying on the trade secret to assist or accelerate research or development, or soliciting customers through the use of information that is a trade secret . . . all constitute "use." The nature of the unauthorized use, however, is relevant in determining appropriate relief. [Restatement (Third) of Unfair Competition, § 40 cmt. c (1995)].

The Court agrees that "use" should be interpreted consistently with the above.  For example, "marketing goods that embody the trade secret, employing the trade secret in manufacturing or production, relying on the trade secret to assist or accelerate research or development, or soliciting customers through the use of information that is a trade secret . . . all constitute use." <u>Id.</u>

The question under Section 1837, then, becomes whether "an act in furtherance" of the "use" of the alleged trade secrets has occurred in the United States.  The statute does not define what constitutes "an act in furtherance of the offense."  In <u>Luminati</u>, 2019 WL 2084426, at *9, a Texas district court case analyzing Section 1837 wrote, "this language is not foreign to the common law but is regularly used in the area of federal conspiracy law." <u>Id.</u> (citing <u>Yates v. United States</u>, 354 U.S. 298, 334 (1957) ("[T]he overt act must be found . . . to have been in furtherance of a

conspiracy...."); <u>Findlay v. McAllister</u>, 113 U.S. 104, 114 (1885) ("[T]o sustain the action it must be shown not only that there was a conspiracy, but that there were tortious acts in furtherance of it....").

"[W]here Congress borrows terms of art in which are accumulated the legal tradition and meaning of centuries of practice, it presumably knows and adopts . . . the meaning its use will convey to the judicial mind unless otherwise instructed." <u>Morissette v. United States</u>, 342 U.S. 246, 263 (1952). As a result, as did the <u>Luminati</u> court, this Court looks to the established common law meaning of "in furtherance of" when interpreting the extraterritoriality provision of the DTSA. 18 U.S.C. § 1837(2). In this respect, the Court agrees with <u>Luminati</u>'s analysis on this point:

> Applied to the DTSA, <u>Yates</u> makes clear that the act in furtherance of the offense of trade secret misappropriation need not be the offense itself or any element of the offense, but it must "manifest that the [offense] is at work" and is not simply "a project in the minds of the" offenders or a "fully completed operation." [<u>Yates</u>, 354 U.S. at 334.] Put another way, an act that occurs before the operation is underway or after it is fully completed is not an act "in furtherance of" the offense.

2019 WL 2084426, at *10. Thus, if Plaintiffs have shown that Defendants have taken actions that "manifest that the offense is at work"—the offense being the misappropriation—then Section 1837 has been satisfied and the chapter also applies to acts occurring outside the United States.

Plaintiffs have introduced evidence in this case sufficient to support a finding that "use" of the alleged trade secrets has occurred domestically. Specifically, it has been undisputed throughout trial that Defendants have advertised, promoted, and marketed products embodying the allegedly stolen trade secrets domestically at numerous trade shows. This constitutes "use." <u>See</u> <u>Gen. Universal Sys., Inc. v. HAL, Inc.</u>, 500 F.3d 444, 450 (5th Cir. 2007) (relying on the

**A25**

Restatement (Third) of Unfair Competition, § 40 cmt. c (1995)); Cognis Corp. v. CHEMCENTRAL Corp., 430 F. Supp. 2d 806, 812 (N.D. Ill. 2006) (same).

An additional point must be discussed now in the interest of completeness. The fact that the "use" in this case started before the DTSA was enacted is not a barrier for Plaintiffs. Nothing suggests that the DTSA forecloses a use-based theory simply because the trade secret being used was acquired or used before the DTSA's enactment. In this regard, the Court agrees with two other district courts that have noted that Congress omitted from the DTSA language included in Section 11 of the Uniform Trade Secret Act. That UTSA language states, "[w]ith respect to a continuing misappropriation that began prior to the effective date, the [Act] also does not apply to the continuing misappropriation that occurs after the effective date.'" Cave Consulting Grp., Inc. v. Truven Health Analytics Inc., No. 15-CV-02177-SI, 2017 WL 1436044, at *4 (N.D. Cal. Apr. 24, 2017); Adams Arms, LLC v. Unified Weapon Sys., Inc., 16-1503, 2016 WL 5391394, at *6 (M.D. Fla. Sept. 27, 2016) (quoting Unif. Trade Secrets Act, § 11).

The omission of this language suggests that the DTSA applies to a "use"-based private cause of action even if the acquisition occurred before effective date of the statute or if the use began before the effective date. Indeed, the plain language of the "effective date" provision of Pub. L. 114-153 further supports this interpretation. Pub. L.114-153, May 11, 2016 (18 U.S.C. § 1833 Note) ("The amendments made by this section shall apply with respect to any misappropriation of a trade secret . . . for which any act occurs on or after the date of the enactment of this Act."). This broad language, coupled with the omission of the provision in the Uniform Trade Secret Act limiting such recovery, support the position that "use" in this case occurring after effective date serve as a proper basis for this action.

**A26**

Finally, although Plaintiffs have briefly argued that they are entitled to research and development costs stretching back into the past prior to the effective date of the DTSA, Plaintiffs have failed to sufficiently support or explain this position. However, unjust enrichment may be recovered after the law came into effect if Plaintiffs can show such unjust enrichment. 18 U.S.C. § 1836(b)(3)(B)(II).

In summation, the Court holds that the DTSA may apply extraterritorially in this case because the requirement of Section 1837(b)(2) has been met. Plaintiffs thus may argue for extraterritorial damages resulting from the misappropriation, but only those damages that occurred after the effective date of the statute—May 11, 2016.

> c. Alternatively, This Case Nonetheless Consists of a Permissible Domestic Application of the DTSA.

Even if the DTSA private right of action did not have extraterritorial reach, this case would still present a proper domestic application of the statute. As stated above, if no clear, affirmative indication exists, the statute is not extraterritorial and the court proceeds to a second step of the extraterritoriality analysis, in which it determines whether the case involves "a domestic application of the statute." RJR Nabisco, Inc. v. European Cmty., 136 S. Ct. 2090, 2101, 195 L. Ed. 2d 476 (2016). This determination is made first by finding the statute's focus. "If the conduct relevant to the statute's focus occurred in the United States, then the case involves a permissible domestic application even if other conduct occurred abroad; but if the conduct relevant to the focus occurred in a foreign country, then the case involves an impermissible extraterritorial application regardless of any other conduct that occurred in U.S. territory." Id.

The parties argue from the basic premise that focus of the DTSA is on "misappropriation." See Dkt. 774 at 10; Dkt. 806 at 13-14. "When determining the focus of a statute, we do not analyze the provision at issue in a vacuum." WesternGeco, 138 S. Ct. at 2137. "If the statutory provision

**A27**

at issue works in tandem with other provisions, it must be assessed in concert with those other provisions. Otherwise, it would be impossible to accurately determine whether the application of the statute in the case is a 'domestic application.'" Id.

WesternGeco advises that the "focus" of a statute is the "object of its solicitude, which can include the conduct it seeks to regulate, as well as the parties and interests it seeks to protect or vindicate." Id. (citations and internal quotations omitted). Discerning the focus of a statute involves an interpretation of what the legislature was concerned with when it enacted the law. See Morrison, 561 U.S. at 266. This is divined from the language of the statute itself. See Kiobel v. Royal Dutch Petroleum Co., 569 U.S. 108, 126, 133 S. Ct. 1659, 1670, 185 L. Ed. 2d 671 (2013) ("We also reiterated that a cause of action falls outside the scope of the presumption—and thus is not barred by the presumption—only if the event or relationship that was 'the "focus" of congressional concern' under the relevant statute takes place within the United States.").

With respect to the DTSA, the Court finds that the focus of the statute is on the misappropriation of a trade secret. Specifically, Section 1836, as discussed at length above, fashions the private right of action around misappropriation and provides a civil remedy for the owner of that trade secret. 18 U.S.C. § 1836 ("An owner of a trade secret that is misappropriated may bring a civil action under this subsection if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce."). Additionally, both the "owner" and what constitutes "misappropriation" are defined in Section 1839. Indeed, the title of the chapter of the U.S. Code in which the DTSA was implemented is entitled "Protection of Trade Secrets" and the language in Pub. 114-153 further supports the conclusion that the statute is focused on misappropriation.

24

**A28**

Thus, the focus of the DTSA is on creating a remedy for a trade secret's owner for misappropriation, and misappropriation can take place through "use." Therefore, "[i]f the conduct relevant to the statute's focus occurred in the United States, then the case involves a permissible domestic application even if other conduct occurred abroad[.]" RJR Nabisco, 136 S. Ct. at 2101. In other words, if the relevant misappropriation of the alleged trade secrets occurred domestically, then this case involves a permissible domestic application of the statute.

In the present case, Plaintiffs have provided evidence that "use" of the alleged trade secrets has occurred domestically. The tricky issue, however, is what damages would be proper under a use-based theory under this second step of the extraterritorial analysis. Because the Court has found that the statute applies extraterritorially, however, it is unnecessary to attempt to discern what damages in this alternative context would be proper.

### 3. The Copyright Act

The parties have provided considerably less argument with respect to damages under the Copyright Act, 17 U.S.C. §§ 106, 501 *et seq*. Dkt. 774 at 11-12 (Plaintiffs' argument); Dkt. 758 at 2 & Dkt. 806 at 14-15 (Defendants' argument). Defendants have pointed to clear pronouncements from the Supreme Court indicating that the Copyright Act has no extraterritorial application. Impression Products, Inc. v. Lexmark International, Inc., 137 S. Ct. 1523, 1528, (2017) ("The territorial limit on patent rights is no basis for distinguishing copyright protections; those do not have extraterritorial effect either."); id. at 1536-37 ("The territorial limit on patent rights is, however, no basis for distinguishing copyright protections; those protections 'do not have any extraterritorial operation' either. 5 M. Nimmer & D. Nimmer, Copyright § 17.02, p. 17–26 (2017).")

25

**A29**

Plaintiffs agree that the Copyright Act does not have extraterritorial application but argue this lack of extraterritoriality does not foreclose recovering foreign profits. Dkt. 774 at 11. To support this claim, Plaintiffs cite to Tire Eng'g & Distribution, LLC v. Shandong Linglong Rubber Co., 682 F.3d 292, 307 (4th Cir. 2012) ("Shandong"). In Shandong, the Fourth Circuit outlined "the predicate-act" doctrine. Id. In essence, the doctrine states that "[o]nce a plaintiff demonstrates a domestic violation of the Copyright Act, . . . it may collect damages from foreign violations that are directly linked to the U.S. infringement." Id. The Fourth Circuit noted that the Second Circuit, Ninth Circuit, Sixth Circuit, and the Federal Circuit have adopted this doctrine. Id. (citing Update Art, Inc. v. Modiin Pub., Ltd., 843 F.2d 67, 73 (2d Cir. 1988); Los Angeles News Serv. v. Reuters Television Int'l, Ltd., 149 F.3d 987, 992 (9th Cir. 1998), as amended on denial of reh'g and reh'g en banc (Aug. 25, 1998); Liberty Toy Co. v. Fred Silber Co., 149 F.3d 1183 (6th Cir. 1998) (unpublished); Litecubes, LLC v. N. Light Prod., Inc., 523 F.3d 1353, 1370 (Fed. Cir. 2008).

The thrust of this doctrine is that if an infringing act occurred within the United States, then the plaintiff may recover for foreign violations that are directly linked to the domestic infringement. Although not explicitly adopted by the Seventh Circuit, the Court agrees with the analysis by these five other Circuit Courts. Although Defendants argue that modern extraterritorial jurisprudence displaces the predicate-act doctrine, the Court disagrees, and the predicate-act doctrine holds similarities to the Supreme Court's recent analysis in WesternGeco. WesternGeco, 138 S. Ct. at 2137.

Thus, the Court holds that Plaintiffs are entitled to recover damages flowing from exploitation abroad of the domestic acts of infringement committed by Defendants. Given the undeveloped nature of the arguments on this point, the Court will not throw itself into the bramblebush and analyze whether Defendants have shown that no such act has occurred. The

**A30**

burden is on the movant to make its point in this regard and Defendants' roughly three paragraphs

of argument have not met this burden.

### B. Misappropriation under the Illinois Trade Secret Act

This opinion now turns to Plaintiffs' claim under Illinois Trade Secret Act, 765 ILCS

1065/1 *et seq.* ("ITSA"). As an initial matter, principles surrounding the interpretation of whether

an Illinois statute applies extraterritorially are similar to those in the federal context. "Our past

decisions have established the rule that when a statute . . . is silent as to extraterritorial effect, there

is a presumption that it has none." Graham v. Gen. U.S. Grant Post No. 2665, V. F. W., 43 Ill. 2d

1, 6, 248 N.E.2d 657, 660 (1969). An Illinois statute "should not be given extraterritorial effect

[if] it does not clearly appear therefrom that such was the intention of the legislature." Butler v.

Wittland, 18 Ill. App. 2d 578, 583, 153 N.E.2d 106, 109 (Ill. App. Ct. 1958).

With respect to the ITSA, the Court has located no controlling precedent as to the statute's

extraterritorial application. Aside from one provision within the ITSA, the statute is silent as to

geographic reach. That one provision, Section 1065/8(b)(1), reads as follows:

> (b) This Act does not affect:
> (1) contractual remedies, whether or not based upon misappropriation of a trade secret, provided however, that a contractual or other duty to maintain secrecy or limit use of a trade secret shall not be deemed to be void or unenforceable solely for lack of durational or geographical limitation on the duty[.]

765 Ill. Comp. Stat. Ann. 1065/8. Plaintiffs argue that this provision indicates extraterritorial reach

for the ITSA. At least one case from the Northern District of Illinois supports this reading. In

Miller UK Ltd. v. Caterpillar Inc., a court considered the extraterritorial reach of the ITSA:

> Avery invoked the general rule of statutory construction under Illinois law that denies extraterritorial effect to a statute unless its language appears to provide for such application. 835 N.E.2d at 852. Avery interpreted the Illinois Consumer Fraud Act, 815 ILCS 505,

and its construction of the intended scope of that statute found significance in a provision that defined its coverage to include "any trade or commerce directly or indirectly affecting the people of this State." 835 N.E.2d at 850 (citing 815 ILCS 505/1(f)). ITSA contains no similar language and Caterpillar cites no precedent construing it to have any geographic limitation. In contrast to the consumer fraud statute at issue in Avery, ITSA's "Legislative intent" provision states that "a contractual or other duty to maintain secrecy or limit use of a trade secret shall not be deemed to be void or unenforceable solely for lack of durational or geographical limitation on the duty." 765 ILCS 1065/8(b)(1). It is thus apparent that ITSA not only lacks a geographic limitation, it authorizes broad geographic application for purposes of trade secret protection that would be invalid in other contexts. Caterpillar's duty to avoid misappropriation of Miller's trade secrets cannot be considered unenforceable merely because some of its employees and Miller were located beyond the borders of Illinois.

Miller UK Ltd. v. Caterpillar Inc., No. 10-CV-03770, 2017 WL 1196963, at *7 (N.D. Ill. Mar. 31, 2017). In coming to the conclusion that "[i]t is thus apparent that ITSA not only lacks a geographic limitation, it authorizes broad geographic application for purposes of trade secret protection that would be invalid in other contexts[,]" id., it appears to this Court that the Miller court drew an inference that the lack of limiting language supported the extraterritorial application of the statute. The question is not whether the ITSA contains language limiting the statute to Illinois, but whether extraterritoriality "clearly appear[s]" within the text of the statute. Butler, 18 Ill. App. 2d at 583.

As to that question, the Miller court found Section 1065/8 to contain such a clear indication. This Court disagrees. By its terms, Section 1065/8 clarifies that a duty to maintain secrecy, such as that in a restrictive covenant, should not be invalidated because of the lack of "lack of durational or geographical limitation on the duty[.]" The fact that Section 1065/8 twice references contractual duties supports this reading. Moreover, as Defendants point out, Dkt. 806 at 9, the Miller reading would create internal conflict within the statute because Section 765 ILCS 1065/7 expressly does set a durational limit for bringing actions under the statute. See 765 ILCS 1065/7 ("An action for

28

**A32**

misappropriation must be brought within 5 years after the misappropriation is discovered or by the exercise of reasonable diligence should have been discovered. For the purposes of this Act, a continuing misappropriation constitutes a single claim.").

If Section 1065/8 was read broadly to remove durational and geographic limits on ITSA claims, one of the "durational" provisions would be rendered superfluous. "A fundamental principle of statutory construction is to view all provisions of a statutory enactment as a whole. Accordingly, words and phrases should not be construed in isolation, but must be interpreted in light of other relevant provisions of the statute." DeLuna v. Burciaga, 223 Ill. 2d 49, 60, 857 N.E.2d 229, 236 (2006). Moreover, courts should not adopt strained readings that render one aspect of a statute superfluous. Panarese v. Hosty, 104 Ill. App. 3d 627, 628–29, 432 N.E.2d 1333, 1335 (1982) ("It is a general rule of construction that where a statute can be reasonably interpreted so as to give effect to all its provisions, a court will not adopt a strained reading which renders one part superfluous. Jarecki v. G. D. Searle & Co., 367 U.S. 303, 81 S. Ct. 1579, 6 L. Ed.2d 859 (1961))".

Finally, this reading of Section 1065/8 is consistent with the Seventh Circuit's application of Section 1065/8 in PepsiCo, Inc. v. Redmond, 54 F.3d 1262, 1272 n.10 (7th Cir. 1995). There, the court, citing to Section 1065/8(b)(1), wrote that "[t]he confidentiality agreement is also not invalid for want of a time limitation." Id.; see also Coady v. Harpo, Inc., 308 Ill. App. 3d 153, 161, 719 N.E.2d 244, 250 (1999) ("The reasonableness of some types of restrictive covenants, such as nonsolicitation agreements, also is evaluated by the time limitation and geographical scope stated in the covenant. . . . However, a confidentiality agreement will not be deemed unenforceable for lack of durational or geographic limitations where trade secrets and confidential information are involved.") (citations omitted).

29

**A33**

In sum, the Court agrees with Defendants that the statutory language contained in Section 1065/8(b)(1) does not clearly express an intent by the legislature for extraterritorial reach of the ITSA. The clearer reading of the provision is that the legislature was concerned with courts' analysis of the reasonableness of restrictive covenants and sought to clarify that duties arising from such covenants should not be held to be unenforceable due to a lack of a geographic or temporal limitation. Thus, the Court holds that the ITSA does not have extraterritorial reach.

IT IS SO ORDERED.

ENTER:

_____
CHARLES RONALD NORGLE, Judge
United States District Court

DATE: January 31, 2020

**A34**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| MOTOROLA SOLUTIONS, INC., et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Civil Action No. 1:17-cv-1973 |
| v. | ) | |
| | ) | |
| HYTERA COMMUNICATIONS CORP. LTD., et al., | ) | Hon. Charles R. Norgle |
| | ) | |
| Defendants. | ) | |

## ORDER

Defendants' Rule 50(b) motion for judgment as a matter of law and Rule 59 motion for a new trial and/or remittitur [953] is denied. The Court agrees with Defendants that the Copyright Act disgorgement and the DTSA unjust enrichment awards were equitable in nature, and the Court's findings of fact and conclusions of law on those issues will be set out in a separate Order consistent with the below. On those issues, the Court agrees with the jury's advisory verdict.

## STATEMENT

On November 6, 2019, a jury was selected for trial in this matter. Over the course of the next three-and-a-half months, the trial dealt with complex technological, factual, and legal issues. On February 14, 2020, the jury returned a verdict in favor of the Plaintiffs, Motorola Solutions Inc. and Motorola Solutions Malaysia SDN. BHD. (hereinafter "Motorola"), against the Defendants, Hytera America, Inc., Hytera Communications America (West), Inc., Hytera Communications Corporation Ltd. (hereinafter "Hytera"). The jury awarded to Motorola the full amount for which it had been permitted to argue—$345,761,156 in compensatory damages and $418,800,000 in punitive damages, for a total of $764,561,156. The jury deliberated for roughly two hours.

Both parties have filed numerous post-trial motions. The scheduling and ability for the parties to appear in court on these motions was and has been complicated by the COVID-19 pandemic. Hytera's motion pursuant to Fed. R. Civ. P. 50(b) and Rule 59 is the subject of this

Opinion. In its motion, Hytera argues that the Court made numerous errors related to the trial, ranging from actions taken at jury selection (which allowed the empanelment of an allegedly biased jury), substantive evidentiary decisions, administrative and procedural rulings, and others. Simply put, the Court disagrees, and Hytera has not met the high standard for judgment as a matter of law, or for a new trial, or for reconsideration of previous orders or remittitur under Rule 59(e). The jury and the Court were not biased, the procedures in this case were proper, the legal decisions were correct, the legal elements of Motorola's claims were met, and the jury returned a verdict and award that are proper under the law and supported by overwhelming evidence that was submitted at trial—evidence, the Court notes, which was robustly and meticulously challenged by skilled counsel for Hytera at each and every turn.

### I. BACKGROUND

Before engaging the substantive issues, a brief, high level background based on the evidence presented is provided. By no means does this background capture, or even attempt to capture, the full scope of the evidence presented at trial. Rather, the context is helpful in evaluating the more specific facts discussed in the analysis section of this Opinion.

For decades, dating back to the late 1980's and into the 2000's, Motorola developed technology to create certain specific digital radios. In 2006, internal Hytera documents submitted by Motorola showed that Hytera was having difficulty in creating comparable radios. In June 2007, the president of Hytera Chen Qingzhou reached out to Motorola engineer G.S. Kok, who worked for Motorola in Malaysia. Chen told Kok that he was looking to set up a potential research and development center for Hytera in Malaysia. In those discussions, Chen made clear to Kok that he was hoping to make Hytera a public company and have it listed on a stock exchange— referencing the NASDAQ in an early email. Shortly thereafter, Chen and Kok negotiated Kok's

2

**A36**

departure from Motorola for Hytera. In one email, Chen offered Kok 600,000 shares in Hytera, which Chen referred to as "really a great amount of money."[1]

Shortly after Kok joined Hytera, Kok expressed in an email that he was surprised that even after Hytera had been working on the relevant digital radio project for three years, Hytera did "not even have a prototype." Kok then stated in an email that Hytera needed an "injection of subject matter experts" in order to leapfrog Motorola in that market. Shortly thereafter, Hytera hired two additional Motorola Malaysia engineers—Y.T. Kok and Sam Chia. The evidence at trial showed that Y.T. Kok and Sam Chia, between them, downloaded more than 10,000 technical documents from Motorola's secure database and brought them to Hytera. At the time of trial, Motorola argued that more than 1,600 of those documents were still within Hytera's databases. When Y.T. Kok was hired by Hytera, he initially maintained his employment with Motorola[2] while surreptitiously also working for Hytera.

In June 2008, shortly after the addition of Y.T. Kok and Sam Chia, several emails circulated within Hytera which the entire digital mobile radio ("DMR radio") group was copied on, including one with a list of questions about issues that needed to be resolved in order for Hytera to create a DMR radio. Chia forwarded one of those emails to Y.T. Kok and stated that he should focus on some of the specific questions. The same day, Y.T. Kok downloaded 50 technical documents from Motorola's database; the next day, he downloaded an additional 83; the third day, he downloaded 40 more. Again, in all, more than 10,000 technical documents were downloaded and brought to Hytera from Motorola.

---

[1] One Motorola expert witness quantified that amount as $2.5 million USD at the time Hytera eventually did go public.
[2] Y.T. Kok submitted a resignation letter to Motorola on September 4, 2008 with a resignation date of October 3, 2008.

3

**A37**

Broadly, among the files taken were Motorola's source code for the DMR radio project. Segments of Motorola's source code were later directly inserted into Hytera's product. One exhibit at trial illustrated that in some cases misspelled words (which had no impact on the functionality of the code) appeared in both the Motorola code and the Hytera code. Additional evidence showed that at times Hytera re-wrote Motorola's code to conceal that it had been used. Motorola presented testimony and exhibits showing the code and Motorola technical documents being circulated among Hytera engineers, at times with the Motorola logo removed and replaced with a Hytera logo, and at times still labeled with Motorola's logo.

Eventually, Hytera developed a radio that was, as described at trial, functionally indistinguishable from the DMR radio developed by Motorola. Hytera sold that radio for years and, according to Motorola, continues selling the misappropriated trade secrets and infringing products to this day.

During trial, Hytera raised several factual defenses. First, Hytera argued that Motorola had not brought suit within the statute of limitations. Second, Hytera argued that G.S. Kok, Chia, and Y.T. Kok had essentially acted as rogue agents within Hytera and, instead of building off of the work Hytera had independently done, scrapped that work and used Motorola's technical information without wider knowledge of its use within the company. Throughout the trial, both Hytera and Motorola were very well represented by thorough and competent counsel, with dozens of lawyers present in court for both companies and specific lawyers handling specific witnesses or aspects of the case.

In the end, as noted above, the jury returned a verdict in favor of Motorola in all respects and awarded the maximum amount that Motorola had been allowed to argue for (a number dealt

**A38**

with in greater detail below). The jury's verdict followed testimony by more than 40 witnesses, a handful of expert witnesses, and hundreds of exhibits admitted into evidence .

With the above high-level background in mind, the Court now turns to the arguments raised by Hytera in its motion.

## II. STANDARD OF REVIEW

Based on the Court's reading of Hytera's motion, Hytera raises three types of challenges to the trial: (1) matters it argues should result in judgment as a matter of law in its favor pursuant to Fed. R. Civ. P. 50(b); (2) matters it argues rendered the trial unfair and should result in a new trial pursuant to Fed. R. Civ. P. 59(a); and (3) challenges to previous legal rulings which it argues were incorrect and should result in a reduction of damages or other relief pursuant to Rule 59(e). Hytera also argues that the damages award should be reduced or reconsidered for several reasons.

Fed. R. Civ P. 50(a) provides that "[i]f a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue, the court may: (A) resolve the issue against the party; and (B) grant a motion for judgment as a matter of law against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue." Pursuant to Rule 50(b), the Court took Hytera's previous Rule 50(a) motions under advisement and now addresses the legal issues raised in the renewed, joint motion together with its Rule 59 motion. Hytera's renewed motion was thus brought under Fed. R. Civ. P. 50(b).

With respect to the Rule 50 motion, the Court must "determine whether the evidence presented, combined with all reasonable inferences permissibly drawn therefrom, is sufficient to support the verdict when viewed in the light most favorable to the party against whom the motion is directed." Clarett v. Roberts, 657 F.3d 664, 674 (7th Cir. 2011). The Court will overturn a jury

5

**A39**

verdict "only if no reasonable juror could have found in the [prevailing party's] favor." Id. (citing

Erickson v. Wis. Dep't of Corr., 469 F.3d 600, 601 (7th Cir. 2006).

Fed. R. Civ. P. 59(a)(1) provides that "[t]he court may, on motion, grant a new trial on all

or some of the issues—and to any party—as follows:  (A) after a jury trial, for any reason for

which a new trial has heretofore been granted in an action at law in federal court[.]"

As to Rule 59(a), "[a] new trial should be granted only when the record shows that the

jury's verdict resulted in a miscarriage of justice or where the verdict, on the record, cries out to

be overturned or shocks our conscience." Clarett, 657 F.3d at 674.

Fed. R. Civ. P. 59(e) states simply that a "motion to alter or amend a judgment must be

filed no later than 28 days after the entry of the judgment."  Rule 59(e) motions "must clearly

establish either a manifest error of law or fact or must present newly discovered evidence." LB

Credit Corp. v. Resolution Tr. Corp., 49 F.3d 1263, 1267 (7th Cir. 1995) (citing FDIC v. Meyer,

781 F.2d 1260, 1268 (7th Cir. 1986)).

**III. ANALYSIS**

The analysis of Hytera's claims will proceed first with the Rule 50 arguments, second with

the Rule 59(a) arguments, and third with the Rule 59(e) arguments.  At times, arguments blend

together or are presented as a ground for judgment as a matter of law or new trial, but the Court

notes that even under the most deferential standard available to Hytera, its arguments would still

be denied for the reasons stated below.

**A. Hytera's Rule 50 Motion for Judgment as a Matter of Law**

Hytera raises three distinct arguments claiming it is entitled to judgment as a matter of law:

1. Motorola has failed to satisfy the elements of a trade secret claim; 2. Motorola's trade secret

claims are barred by the statute of limitations; and 3. Motorola has failed to state a copyright claim

6

**A40**

for several reasons. Hytera cannot overcome its high burden on any of these arguments, as the evidence presented supports the verdict. The Court will not overturn the jury verdict unless no reasonable juror could have found in favor of Motorola, and Hytera cannot meet this burden given the evidence presented in this case.

### 1. Motorola has satisfied the elements of a trade secrets claim.

Hytera first argues that Motorola has failed to satisfy the elements of a trade secret claim. Hytera argues that Motorola has not proven the existence of protectable trade secrets because Motorola has not identified the trade secrets with sufficient specificity and because Motorola has failed to show that the materials were "sufficiently secret." Dkt. 954 at 11-12 (citing IDX Systems Corp. v. Epic Sys. Corp., 285 F.3d 581 (7th Cir. 2002) and Mangren Research and Dev. Corp. v. Nat'l Chem. Co., 87 F.3d 937, 942 (7th Cir. 1996)).

The Court disagrees. Motorola proceeded on a theory of a theft of 21 distinct trade secrets at trial. For each alleged trade secret, Motorola tied certain documents to that specific trade secret and explained those documents through five fact witnesses and numerous experts across more than 25 hours of testimony. Motorola's witnesses explained that these documents constituted the "playbook" by which the engineers built its two-way radio devices. E.g. Tr. 723:16-724:5. The fact witnesses and experts went into detail when explaining what was contained in each document and how the processes contained therein combined into a coherent whole to create the digital radio functionalities at issue in the trial. E.g., Tr. 615:8-621:25, 625:7-626:19, 630:14-631:14, 706:6-707:2, 709:1-715:12, 716:10-717:2, 718:13-719:3, 739:9-740:15, 741:15-747:4.

In its presentation, Motorola has complied with and exceeded the standard set out in 3M v. Pribyl, 259 F.3d 587, 595-96 (7th Cir. 2001), which explains:

> In order to be considered a trade secret, a pattern, technique, or
> process need not reach the level of invention necessary to warrant

7

**A41**

patent protection. A trade secret can exist in a combination of characteristics and components, each of which, by itself, is in the public domain, but the unified process, design and operation of which, in unique combination, affords a competitive advantage and is a protectable secret. See Syntex Ophthalmics Inc. v. Tsuetaki, 701 F.2d 677, 683 (7th Cir. 1983).

3M further instructs:

> [T]he [plaintiff] is seeking to prevent [defendant] from using and disclosing a process which it took the company six years and considerable income to perfect. These manuals and processes, even if comprised solely of materials available in the public domain, have been created by combining those materials into a unified system which is not readily ascertainable by other means. Thus, viewing the evidence in the light most favorable to [plaintiff], we believe there was sufficient evidence to support the jury's finding that [plaintiff] has a trade secret in the operating procedures, quality manuals, trade manuals, process standards and operator notes for using [plaintiff's] equipment that makes resin sheeting.

Id.

Moreover, IDX does not compel a contrary finding. The documents at issue in this case no doubt contained some public information, but the issue is not whether there "are a host of materials which would fall within the public domain[,]" but rather, when the documents are "collected and set out as a unified process, that compilation, if it meets the other qualifications, may be considered a trade secret[.]" Id.

Motorola illustrated at trial that the stolen confidential materials were the compilation of decades of engineering work that laid out the specific specifications as to how Motorola implemented types of functions within its radios. For example, as Motorola argues, the confidential testing specifications include excerpts from public radio standards before setting out in confidential detail the steps that Motorola takes to exceed those standards. PTX-127; Tr. 5119:14-5121:5. As Motorola points out, that document was one that was circulated within Hytera rebranded as a Hytera document.

8

These details are not akin to those the Seventh Circuit was concerned with in IDX, where the court noted that the claimed trade secrets included clearly observable features such as the appearance of data entry screens that "ordinary users of the software could observe without reverse engineering." IDX, 285 F.3d at 584. Rather, the documents at issue in this case dealt with highly complex and technical specifications, circuit diagrams, testing plans, and product source code. Essentially, the bundle of documents stolen and used by Hytera showed a step-by-step method to build Motorola's digital radios. This is akin to the theft alleged in 3M and is removed from the concerns raised in IDX. At trial, Motorola additionally discussed how those secrets combined to create a state-of-the-art digital radio that surpassed those of competitors.

Hytera argues that statements made about the superiority of Motorola's radios were puffery, citing to various statements by Motorola engineers. Those puffing statements, however, were made in the context of a specific discussion about the aspect of the technology being identified and often accompanied by a description of what specifically made Motorola's implementation of the technology better than the competitors. And in light of Motorola's market share, the jury could reasonably have drawn the inference that the implementation of these highly technical specifications—specifications which were stolen and circulated within Hytera—made the radios better.

Returning, then, to the standard under which a Rule 50 motion must be reviewed, Hytera cannot meet its high burden, and Motorola has provided a legally sufficient evidentiary basis to support the jury verdict on its trade secret claims.

Hytera next argues that Motorola failed to use reasonable security measures to protect its secrets. Hytera argues that Motorola allowed the stolen documents to be available to "everyone." Dkt. 954 at 14 (citing Tr. 521:18-524:14). This assertion is belied by the record at trial. Motorola's

**A43**

Chief Information Officer testified, and was subject to rigorous cross examination, on this point, and his testimony was sufficient to support a finding by the jury that Motorola took sufficient steps to safeguard its technical documents. Motorola employees were subject to a confidentiality agreement. The database that contained the technical documents and source code was accessible only to certain Motorola employees. That certain internal documents did not contain the specific words "trade secret" on them was repeatedly raised at trial, and the jury was entitled to give appropriate weight to that argument and the others raised by Hytera. As such, the Court will not overturn the jury verdict on this point.

Next, Hytera argues that no reasonable jury could find that Hytera (beyond the former Motorolans) knew or should have known that it was selling misappropriated trade secrets in its DMR products. Hytera further argues that no evidence was presented that the two U.S. entities had any knowledge of the misappropriation. Evidence in the record, however, supports the jury's verdict on this point. First, the former Motorolans were senior management in the DMR development for Hytera. Moreover, emails suggested that Hytera's CEO and Vice President of Research and Development knew of the theft. See, e.g., Tr. 1848:5-1866:1, 1866:24-1868:15, 1869:21-25, 1870:12-1872:1, 1875:4-1876:21; PTX- 233, PTX-404, PTX-416, PTX-426, PTX-429; see also VP of R&D Pengfei Sun (Tr. 2480:8-2481:25); Jue Liang (PTX-100; Dkt 766, Ex. D (Liang Dep. Desig.) at 68:3-11); Yang (PTX-654; Tr. 5089:19- 5095:20); Qin Jun (PTX-573); Huang Ni (PTX-806); and others (PTX-47; PTX-530; Tr. 1359:13- 1363:22; id. 4153:9-22).

With respect to the American entities, Motorola presented evidence to suggest that after it became known that Hytera's DMR radios used stolen Motorola source code, Hytera's U.S. president stated that Hytera was not going to leave the DMR marketplace until it was "number one

10

**A44**

in the DMR market." Tr. 3539:5-17, 3541:18-23. Hytera has not met its burden to be entitled to judgment as a matter of law on this point and the jury verdict will not be disturbed in the regard.

Finally, Hytera argues that it is entitled to judgment as a matter of law on its statute of limitations defense. Hytera incorporates by reference its previous arguments on this point and argues "Motorola had numerous reasons to suspect before March 2012 that its former employees had taken confidential materials with them to Hytera, and Motorola could have confirmed the existence of its claims before March 2014 by pulling Compass logs." Dkt. 954 at 23. Hytera argues that Motorola's fraudulent concealment argument fails as a matter of law.

Motorola argues, citing Sokol Crystal Prod., Inc. v. DSC Commc'ns Corp., 15 F.3d 1427, 1430 (7th Cir. 1994) that "concerns and suspicions . . . do not start the clock on the statute of limitations." The Court agrees. Moreover, Motorola presented evidence related to the investigation it conducted, after which it concluded that no issue existed. Motorola provided sufficient facts to allow this question to go to the jury, and the jury was well informed of both party's arguments and found that it believed Hytera had concealed the theft. The legal instruction on this issue was correct, and Hytera has failed to show that no reasonable jury could find for Motorola on this point.

### 2. Motorola's copyright claim is supported by substantial evidence.

Hytera contends that it is entitled to judgment as a matter of law on Motorola's copyright claim for several reasons. First, Hytera argues that Motorola has failed to prove substantial similarities between the accused work and the copyrighted work. Specifically, Hytera argues that Motorola did not make any attempt to distinguish between protected and unprotected similar elements. Moreover, according to Hytera, Motorola offered no evidence "mapping the alleged

copying to a particular asserted work, leaving the jury with no basis to assess substantiality of similarities to any asserted copyright work." Dkt. 954 at 16.

Hytera's argument on this point is contradicted by the record. Motorola identified the code that Hytera copied from each version of Motorola's DMR and mapped the copying to the asserted work. As Motorola points out in its response, Hytera solely points to its expert's testimony related to several lines of code that are allegedly similar to third party code. This ignores other code that was shown to the jury—including, notably, code which contained identical misspellings at points.[3] From the exhibits and testimony presented to the jury, the Court cannot overturn the verdict.

Next, Hytera argues that Motorola is barred by the statute of limitations from recovering any damages allegedly suffered more than three years before adding its copyright claim in its Amended Complaint on August 2, 2018. However, Taylor v. Meirick, 712 F.2d 1112, 1119 (7th Cir. 1983) guides the analysis in this case. As Judge Posner wrote, "When the final act of an unlawful course of conduct occurs within the statutory period, these purposes are adequately served, in balance with the plaintiff's interest in not having to bring successive suits, by requiring the plaintiff to sue within the statutory period but letting him reach back and get damages for the entire duration of the alleged violation." Id. In light of the similar circumstances with Taylor, the Court stands by its decision to allow copyright damages to extend more than three years prior to the addition of the claim. Moreover, Motorola provided to the jury evidence by which the jury determined damages for the particular time period. PTX-2071. Thus, Hytera has not met its burden either for a new trial or for judgment as a matter of law on this point.

Finally with respect to the copyright claim, Hytera argues that it was improper for the copyright claim related to Copyright Reg. Nos. TXu 1-572-947 and TX 8-654-512 to proceed.

---

[3] PTX-2090, PTX-2091; Tr. 1433:1-1436:8.

**A46**

The Court stands by the previous orders issued on this point, Dkts. 597, 885, and agrees with Motorola that Hytera has waived any argument arising from <u>Fourth Estate Public Benefit Corp. v. Wall-Street.com, LLC</u>, 139 S. Ct. 881 (2019) by first raising this non-jurisdictional argument through a summary judgment reply brief filed late during trial. The Court will not overturn the jury verdict based on a waived and already decided issue.

### B. Hytera's Rule 59 Issues

Next, Hytera argues that it is entitled to a new trial because of various legal rulings made during trial. Hytera argues that prejudicial evidence was admitted and relevant evidence was excluded. Hytera also argues that the Court made remarks during trial that prejudiced it, that the jury was biased, and that Motorola was permitted to attempt to stir up alleged anti-China sentiment during closing argument by stating that Hytera had "blatant disregard [of] the laws of this country."

A party seeking a new trial based on alleged errors in evidentiary rulings bears a heavy burden to show that the result reached was inconsistent with substantial justice. <u>Johnson v. Gen Bd. of Pension & Health Benefits of United Methodist Church</u>, 2012 WL 638731, at 84 (N.D. Ill. Feb 23, 2012), <u>aff'd</u> 733 F.3d 722 (7th Cir. 2013). With this burden in mind, Hytera's arguments will be addressed in turn.

#### 1. Motorola's expert testimony was proper.

Hytera argues that Motorola experts Dr. Rangan and Dr. Wicker were permitted to testify about the mental impressions of Hytera employees. Specifically, Hytera argues that these experts were allowed to testify about the meaning of certain parts of emails that Motorola could have asked the percipient witnesses about. Hytera's characterization of this expert testimony is incorrect, however. In each instance cited by Hytera, the Motorola experts were simply using their scientific and technical expertise to explain technical meanings within otherwise difficult (for a lay person)

to understand contexts. *E.g.* <u>United States v. Vallone</u>, 2008 WL 516715, at *4 (N.D. Ill. Feb 21, 2008). No prejudice accrued from these explanations, as the testimony was proper and Hytera's experts were given the opportunity to rebut these points.

Second, Hytera argues that the two above-mentioned experts gave overlapping testimony. No prejudice accrued from any alleged brief overlap.

Third, Hytera argues that two exhibits prepared by Dr. Wicker which showed where admitted Hytera code was identical to admitted Motorola code were improperly admitted. Those exhibits were proper under Fed. R. Evid. 1006, as Dr. Wicker described his methodology and identified the exhibits as summaries. Tr. 599:25-601:8. These exhibits were proper.

Fourth, Hytera argues that Dr. Wicker was allowed to give improper rebuttal testimony. The Court disagrees. The testimony related to testimony proffered by Hytera's experts and involved accused products.

None of the above alleged errors, alone or in concert, resulted in an outcome that was inconsistent with substantial justice.

> 2. Hytera was not prejudiced by the treatment of certain fact witnesses.

Hytera next argues that the Court improperly sua sponte qualified three Motorola fact witnesses—Scott Shepherd, Mark Boerger, and Jesus Corretjer—as expert witnesses on certain limited issues. Given the totality of the testimony and the cross examination of each witness, no prejudice accrued to Hytera with respect to any potential improper speculation. The witnesses each testified using their specialized knowledge to give context to the factual questions that they were answering throughout their lengthy testimony.

> 3. Testimony by Hytera's experts as to the information contained in patents was properly excluded.

Hytera next argues that the Court improperly limited its expert Ms. Frederickson-Cross from testifying about Motorola's copyright registrations and publicly disclosed materials in a Motorola patent. Matters related to the interpretation of copyrights and patents were outside the scope of Ms. Frederickson-Cross's expertise and this decision was well within the Court's gatekeeping function under Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 589-97 (1993). Copyrights and patents are complex and distinct disclosures that should have been dealt with by specific experts qualified to testify about those issues, which Ms. Frederickson-Cross was not.

Even if these limitations were improper, Hytera still submitted the copyrights and patents as exhibits and other testimony was given relating to these materials. Moreover, no prejudice accrued because, as the Court discussed above, including publicly available information within documents that reflect a "playbook," does not invalidate a trade secret claim. 3M v. Pribyl, 259 F.3d 587, 596 (7th Cir. 2001). The jury was also instructed as to Hytera's public disclosures. Jury Instruction 23.

> **4. The Court properly excluded Mr. Grimmett's legal conclusion related to the statute of limitations.**

Next, Hytera argues that the Court improperly instructed the jury to disregard testimony including legal conclusions by a non-lawyer expert related to when the statute of limitations began to run in this case. The Court only limited the expert, Mr. Grimmett, from testifying that Motorola should have filed this lawsuit before 2017. This was a proper exclusion. Mr. Grimmett's other testimony related to the measures Motorola took to investigate the theft and protect its data were heard and considered by the jury (and argued about during closing argument). No error was made in this regard.

> **5. Any exclusion of comparisons to non-party products was proper.**

15

**A49**

Hytera next argues that the Court improperly excluded testimony from Hytera's expert Dr. Wicker related to the comparisons between the sound suppression technology implemented by Motorola and the technology used by other, non-Hytera manufacturers. The Court disagrees that this limitation, which came after Mr. Grimmett was given the opportunity to testify about other reasons he believed that Motorola's technology was "nothing special." The Court disagrees with Hytera that comparisons between Motorola's products with products not at issue in this case was relevant. First, as Motorola argues, whether Motorola's technology was actually the best on the market or whether other companies implemented similar technologies was not relevant to whether Hytera stole and implemented Motorola's secret processes. Moreover, even if this testimony should have been allowed, this omission does not warrant a new trial, as Hytera was given ample opportunity to rebut Motorola's claims that the implementations of the technology at issue did not involve trade secrets. Given the totality of the evidence presented at trial, an error related to this omission would be harmless.

> 6. The Court's discretionary ruling to disallow sur-rebuttal after nearly four months of trial was not improper.

Hytera next argues that the Court erred by not allowing Hytera to present a sur-rebuttal case. The Court disagrees with Hytera's assessment of this discretionary ruling. Moreover, Hytera had ample opportunity to challenge Motorola's damages expert on cross examination during the rebuttal case. Motorola also points out that Hytera made no proffer as to what different testimony its expert would give during a sur-rebuttal. In light of the length of the trial and the fact that it was unclear what changes Hytera would make with respect to its damages argument (which itself was well developed during the earlier days of the trial), the Court sees no error in its discretionary ruling to move the trial forward and disallow sur-rebuttal.

**A50**

7. The Court's administration of the trial and demand for formality did not prevent Hytera from presenting its defense.

Next, Hytera argues that the Court made a litany of errors in its treatment of witnesses, and Hytera specifically argues that the Court treated Motorola's witnesses with deference while challenging Hytera's experts. See Dkt. 954 at 28-29. The Court will not list every instance that Hytera has included in its briefing, but, having reviewed these alleged improper statements, disagrees that any of these statements made in the administration of this lengthy trial were improper or prejudicial. The Court was evenhanded in the administration of this three month trial, and the Court uniformly required the parties to conduct the case with the requisite formality demanded in federal court. As such, the Court will not disturb the jury's verdict on account of these alleged errors, as the jury was given a fair, thorough presentation by both sides in this matter and reached a result that is supported by the evidence presented, even after rigorous challenges by Hytera.

8. The Court did not make evidentiary errors warranting a new trial.

Hytera additionally makes several arguments related to evidentiary rulings that it claims warrant a new trial. Specifically, Hytera argues: (a) the Court improperly admitted Fifth Amendment testimony in violation of Fed. R. Evid. 403; (b) the Court admitted evidence without proper foundation; (c) the Court erred by admitting evidence related to visa applications; (d) the Court allowed Motorola to give an inflammatory closing argument; and (e) the Court did not allow Hytera to properly vet jurors during voir dire. Either alone, or in conjunction, these arguments fail to show that the result of the trial resulted in an outcome inconsistent with substantial justice. Johnson, 2012 WL 638371, at *4.

(a) The Court properly admitted Fifth Amendment testimony.

17

**A51**

Hytera argues that the more than 100 invocations[4] of the Fifth Amendment by G.S. Kok, Y.T. Kok, and Sam Chia, which were presented in the form of videotaped depositions to the jury, should not have been allowed at trial (and the adverse inference jury instruction should not have been given) because the prejudicial effect far exceeded the probative value of these statements. "[T]he party urging the use of the inference must show that the circumstances of the particular case justify the imputation of the negative inference." State Farm Mut. Auto. Ins. Co. v. Abrams, No. 96-cv-6365, 2000 WL 574466, at *6 (N.D. Ill. May 11, 2000). Motorola met this burden, as those three individuals were central to the litigation and their invocations advanced their interest and Hytera's by shielding facts from discovery. Moreover, the jury was instructed that it could draw inferences if justified by independent corroborating evidence" and that it "may, but need not" draw adverse inferences based on the Fifth Amendment invocations.

In light of the highly relevant nature of these witnesses' knowledge and the other evidence that was presented and admitted during trial, this testimony was properly admitted. Hytera cannot show that the result reached was inconsistent with substantial justice.

(b) Hytera's foundation-related objections are meritless.

Hytera argues that the Court erred by admitting documents without foundation through witnesses that lacked personal knowledge in violation of Fed. R. Evid. 602. Specifically, Hytera argues that various exhibits were admitted over objection. See Dkt. 954 at 31. These internal Hytera documents should have been admitted through Hytera fact witnesses, Hytera argues, rather than through Motorola's expert witnesses. Rule 602 states that it "does not apply to a witness's expert testimony under Rule 703." Fed. R. Evid. 602. Rule 703 states that "[a]n expert may base

---

[4] See Dkt 968 at 31 n. 58. Certain invocations dealt with whether the former Motorolans stole Motorola's files, whether they used Motorola's confidential files to create Hytera's DMR products, whether they deleted stolen files to conceal their theft, and whether Hytera's chairman and other management knew of the theft. Motorola presented independent corroborating evidence on each of these points.

**A52**

an opinion on facts or data in the case that the expert has been made aware of or personally observed." Fed. R. Evid. 703. The Court is satisfied that the admission of these documents through Motorola's expert witness was proper. Hytera has not otherwise challenged the authenticity or admissibility of the documents admitted during expert testimony—documents that helped to form the basis of the expert's opinions.

With respect to DTX-5145, the Court agrees with Motorola that Hytera has waived this objection, and in any event, the document was properly admitted through Mr. Luo based on his knowledge of the contents of the document.

Hytera also argues that the Court improperly admitted deposition testimony and documents from other litigation between the parties. The Court agrees with Motorola that the parties agreed that evidence from the related Ohio case could be presented in this case. Moreover, the Court disagrees with Hytera's argument that Motorola violated the joint trial stipulation, as cross exhibits were excluded from disclosure requirements. Dkt. 729 at 5. Moreover, given the totality of the evidence in this case, Hytera was not prejudiced even if any of these documents was admitted in error.

(c) The probative value of the visa application was not substantially outweighed by unfair prejudice.

Hytera argues that the Court erred under Rule 403 by allowing testimony relating to Hytera advising its employees to act in a dishonest manner with U.S. agents. The Court allowed the admission of PTX-1075 and certain very limited testimony related to the issue of dishonesty with U.S. officials by Hytera employees. Even if this evidence was admitted in error, the admission was harmless given the totality of the evidence in the case.

(d) Motorola's closing argument was not improper.

19

**A53**

Hytera argues that Motorola, during closing, argued for an amount of copyright damages that contradicted Motorola's expert's previous statement as to what the proper copyright damages in this case were. The Court disagrees. Evidence in the record supported the closing argument figure and Hytera had every opportunity to draw the jury's attention to any potential inconsistency by Motorola's witnesses.

Hytera also argues that Motorola's reference to the laws of the United States was improper, writing that the statement that Hytera has "blatantly disregarded the laws of this country" incited the jury to take up an anti-China sentiment. This argument is meritless and a mere passing reference to the laws of the United States was not inflammatory. No common theme of nationalistic pride ever arose during the trial, and this brief, un-objected-to reference did not rise to the level of being inflammatory or improper.

(e) Voir dire was properly conducted.

Hytera next attacks the jurors in this case, who patiently and diligently observed this lengthy trial. Hytera argues that it was not able to adequately vet whether any jurors harbored anti-China sentiment. This assertion is false. The parties were allowed to conduct the voir dire. When asked general questions about this topic, one juror stated that he felt that Chinese companies tended to steal from United States companies. That juror was then dismissed. Shortly thereafter, a second juror stated that he held a similar opinion, and he was also dismissed. No other jurors responded to that line of inquiry, and each empaneled juror stated that they had no belief which would render them unable to fairly evaluate the case before them.

At no point before this brief has Hytera stated that it believed this action by the Court was improper. Hytera now argues that the brief deliberations by the jurors is evidence of bias on the part of the jury. The brief deliberations, however, are better explained by the voluminous evidence

**A54**

presented by Motorola in proving its claims and a trial with a pride of competent counsel performing at commendable levels.

(f) No new trial is warranted.

Hytera argues that the cumulative effect of these errors justifies a new trial. For the reasons set out above, the Court disagrees because the legal rulings made were justified. Even if certain errors were made, Hytera has not met its burden to show that the result in this case was inconsistent with substantial justice.

9.  The jury was properly instructed.

Hytera next argues that several jury instructions were erroneous: first, as to fraudulent concealment; second, as to spoliation; third as to extraterritoriality; fourth as to the statute of limitations; fifth as to respondeat superior; and sixth as to equitable issues.

(a) The fraudulent concealment instruction was proper.

The Court stands by its previous rulings on the issue of fraudulent concealment, which the jury was properly instructed on.

(b) The spoliation instruction was proper.

Hytera argues that the jury should not have been instructed on spoliation of evidence because the Court did not make a finding that Hytera acted intentionally in bad faith in destroying evidence. Evidence in the record supports such a bad faith finding, however. In June 2008, for example, G.S. Kok wrote to Sam Chia that they "needed to re-write softwares to look different from Motorola" in order to "protect the company from impending lawsuits." PTX-19. Huang and Chia deleted evidence of misappropriation to conceal their theft. E.g. Tr. 1365:7-19.

This is sufficient to justify providing the jury with a spoliation instruction.

(c) The extraterritorial instructions were proper.

21

**A55**

Hytera again challenges the Court's ruling with respect to the extraterritoriality of the relevant statutes. See Motorola Sols., Inc. v. Hytera Commc'ns Corp., 436 F. Supp. 3d 1150, 1154 (N.D. Ill. 2020). The Court stands by its previous reasoning on this issue along with the propriety of the instructions given in relation to this ruling. Other courts have reviewed and agreed with this Court's reasoning or come to similar conclusions as to the reach of the DTSA and the ITSA. E.g. Inventus Power, Inc. v. Shenzhen Ace Battery Co., No. 20-CV-3375, 2020 WL 3960451, at *7 (N.D. Ill. July 13, 2020) (J. Dow); vPersonalize Inc. v. Magnetize Consultants Ltd., 437 F. Supp. 3d 860, 878 (W.D. Wash. 2020).

(d) The statute of limitations instruction accurately stated the law.

Hytera next argues that the statute of limitations argument misstated the law because, although properly quoting Seventh Circuit precedent, it should have included language from a subsequent Seventh Circuit case and clarified the burdens. The Court disagrees. The language contained in the instruction was an accurate representation of the law. Hytera argued strenuously to the jury that the information available within Motorola created more than "concerns and suspicions" within the company. The jury was entitled to weigh the evidence within this proper legal framework and reasonably concluded that Motorola brought its claims within the statute of limitations. With respect to the burden on the parties, Hytera objected to the inclusion only of the Sokel language, but the parties otherwise agreed to the form of the instruction. As such, the Court will not disturb the jury verdict on this issue.

Hytera repeatedly returns to the idea that Motorola should have checked the logs of who downloaded what documents throughout the time that Motorola became concerned about potential theft by Hytera. Hytera argues that Motorola should have used this "easy" means to determine that improper downloading had occurred. This became a key aspect of the case and it was within

22

**A56**

the province of the jury to determine, having been fully informed of both party's arguments and properly instructed, whether Hytera's argument about the ease of such a search was correct. This was a decision for the jury, and the jury's verdict on that issue was supported by adequate evidence in the record. The jury instruction correctly advised the jury of the law and allowed them to weigh the competing theories of the parties.

(e) The instructions on respondeat superior were correct.

Hytera argues that the Court erred by using Motorola's instruction on the issue of respondeat superior. Motorola responds by arguing that its proposed instruction actually imposed a higher standard on itself than Hytera's proposed instruction. The Court agrees and as such will not disturb the verdict on this theory.

(f) The additional alleged jury instruction errors are meritless.

Hytera additionally argues that various instructions were incorrect because they flowed from earlier incorrect rulings throughout the case. By force of the other portions of this opinion addressing those issues, the Court also rejects these additional arguments. Specifically, these relate to: the equitable issues (to be addressed below); the Fifth Amendment issue; and the copyright amendment issue. See Dkt. 954 at 38.

## C. Damages

Finally, Hytera raises several challenges related to the ultimate damages figure awarded by the jury. Hytera argues: (1) that disgorgement is an equitable remedy to which the Court must exercise its independent judgment; (2) the verdict awarded a double recovery by allowing disgorgement along with avoided research and development costs; (3) the disgorgement figure itself was too high (for various reasons); and (4) the verdict was "monstrously excessive" and must be reduced in accordance with case law.

23

**A57**

(1) In this case, Motorola's actual lost profits award under the DTSA was a legal determination for the jury, but the unjust enrichment award for avoided research and development costs and the copyright award were equitable in nature.

With respect to damages, Hytera first argues that disgorgement in this case is an equitable remedy to which Motorola has no Seventh Amendment right to a jury trial. Hytera argues that determining the correct amount of disgorgement then becomes a question on which the Court must exercise its independent judgment. Hytera relies on <u>Texas Advanced Optoelectronic Sols., Inc. v. Renesas Elecs. Am., Inc.</u>, 895 F.3d 1304, 1326 (Fed. Cir. 2018), cert. denied, 139 S. Ct. 2741, 204 L. Ed. 2d 1132 (2019) ("<u>TAOS</u>"). In <u>TAOS</u>, the Federal Circuit provides a detailed discussion of the nature of the remedies available under Texas trade secret law and concluded that the prevailing plaintiff in that case had "no right to a jury decision on its request for disgorgement of [the defendant's] profits as a remedy for trade secret misappropriation." <u>Id.</u>

Hytera specifically argues that the jury's award of $136.3 million under the Copyright Act, $135.8 million under the DTSA for actual losses, and $73.6 million for savings on avoided research and development costs (also under the DTSA) are advisory to the Court because that relief is equitable in nature in each instance. On the jury form, these categories of damages were combined into one question, with the jury awarding $345,761,165 among these three categories.[5]

<u>TAOS</u> does not categorically hold that awards in a trade secret case are equitable relief. Rather, consistent with other courts that have analyzed the fine line between equitable and legal relief, it analyzed the nature of the remedy being awarded in that case. <u>See Reich v. Cont'l Cas. Co.</u>, 33 F.3d 754, 756 (7th Cir. 1994) ("restitution is a legal remedy when ordered in a case at law and an equitable remedy . . . when ordered in an equity case.")

---

[5] The specific amounts attributed to each category can be inferred from Motorola's closing argument (and the evidence presented throughout the case), as the award corresponded with the highest amount Motorola had been permitted to argue for after various legal rulings on the issue.

24

**A58**

Indeed, TAOS instructs that "[i]n some cases, a plaintiff seeking disgorgement as a remedy for trade secret misappropriation might prove that this measure of relief, though focused on the defendant's gains, is good evidence of damages in the form of the plaintiff's losses or of a reasonable royalty for use of the secret." TAOS, 895 F.3d at 1320. In determining that the disgorgement in TAOS was equitable in nature, the Federal Circuit noted that "nothing in the jury instructions required that, to award [defendant's] profits, the jury had to find that those profits were related in any way to either TAOS's lost profits or a reasonable royalty." Id. TAOS continues: "To be sure, monetary relief in the form of disgorgement, like other monetary relief, has been labeled a form of 'compensation' where awarded to a wronged plaintiff for an injury." Id. at 1321 (citing Kokesh v. S.E.C., 137 S. Ct. 1635, 1644, 198 L. Ed. 2d 86 (2017)). In TAOS, the Federal Circuit clarified, the question was "whether disgorgement of the defendant's profits, considered on its own terms, without proof that it was a sound measure of the plaintiff's harm, was available at law in 1791 for this sort of wrong." Id. The jury instruction in TAOS dealt with disgorgement "for the harm that was proximately caused by the Defendant as a result of the misappropriation of the Plaintiff's trade secrets." Id.

In the present case, the awards relating to lost profits under the DTSA were tied directly to economic losses by Motorola by virtue of the jury instructions given and the expert testimony related to those damages. See Jury Instruction 30 (Dkt. 895) ("To recover its actual loss, Motorola must prove: 1. A reasonable probability that, if Hytera had not misappropriated trade secrets, Motorola would have made additional sales of DMR products that Hytera made; and 2. The amount of profit Motorola would have made on those sales.").

25

**A59**

Given this instruction and the evidence presented, the jury award for actual losses pursuant to the DTSA is properly categorized as a "case-specific proxy for . . . losses" and as such a legal remedy. TAOS, 895 F.3d at 1320-22.

With respect to the copyright award, however, Hytera is correct that the jury's award was equitable in nature and thus an advisory verdict. As to copyright, the award was measured not as a direct proxy for Motorola's damages, but rather as the benefit Hytera unjustly received. See Jury Instruction 39 ("Motorola is entitled to recover the profits that Hytera made through June 30, 2019, because of Hytera's copyright infringement. Hytera's profits are revenues that Hytera made because of the infringement, minus Hytera's expenses in producing and selling the infringing DMR radios. Motorola must prove Hytera's revenues and a causal relationship between the infringement and those revenues. Hytera must prove its own expenses and any portion of its profits that resulted from factors other than infringement of Motorola's copyright."). In this respect, the copyright award was simply disgorgement of Hytera's profits—not, like with the DTSA actual loss award, a measure of what sales Motorola would have made if Hytera had not stolen its materials.

With respect to the avoided research and development costs award under the DTSA, the Court agrees with Hytera that this award for unjust enrichment also takes on an equitable nature, as it is not tied directly to Motorola's loss. Although the jury awards as to Hytera's profits under the Copyright Act and the avoided research and development costs awarded under the DTSA were equitable in nature and thus advisory verdicts, the Court agrees with the amounts awarded and will issue a separate order with the Court's findings of fact and conclusions of law on this issue. That separate order will be consistent with the reasoning set forth below as to why the award was proper, despite Hytera's several objections raised in the motion presently before the Court.

(2) Motorola's recovery of lost profits and of Hytera's avoided research and development costs does not constitute a double recovery.

26

**A60**

Hytera next argues that the award of Motorola's lost profits under the DTSA is duplicative of the award to Motorola for Hytera's avoided research and development savings for the cost avoided in creating those trade secrets. Specifically, Hytera argues that once the avoided research costs are awarded to Motorola, it puts Motorola in the position it would have been in had Hytera never stolen its trade secrets and copyrights because, hypothetically, once Hytera spent that money, it would have been able to develop and sell the trade secrets itself. Hytera cites to various non-binding cases to support this position. The Court disagrees, as the primary case cited by Hytera, <u>Salisbury Labs., Inc. v. Merieux Labs., Inc.</u>, 908 F.2d 706 (11th Cir. 1990), dealt not with the actual losses to the plaintiff in that case, but the benefit conferred on the defendant, as discussed further below. The DTSA uses a different methodology to determine damages, and the award of both Motorola's lost profits (not measured simply as a disgorgement of Hytera's profits) and Hytera's avoided research and development costs is not duplicative.

The text of the DTSA states the Court may award: "(i)(I) damages for actual loss caused by the misappropriation of the trade secret; and (II) damages for any unjust enrichment caused by the misappropriation of the trade secret that is not addressed in computing damages for actual loss[.]" 18 U.S.C.A. § 1836(3)(B). The question is whether the avoided research and development costs (roughly $73.6 million) was addressed in the computation of Motorola's actual losses (calculated by the jury as lost profits worth $136.6 million).

Hytera argues that Motorola is only entitled to the avoided research and development costs. Based on the statutory language, however, it appears that if either of the awards should be reduced, it is the unjust enrichment portion, because the jury instructions make clear that the lost profits were contemplated as the actual loss to Motorola. See Jury Instruction 30. With respect to unjust enrichment, the jury was instructed that it could also award to Motorola "the amount Hytera

27

**A61**

benefited to the extent it exceeds Motorola's actual loss." Jury Instruction 31. Thus, Motorola is only entitled to recover for unjust enrichment to the extent that the enrichment is not captured in the actual losses award.

On this point, the jury and the Court heard arguments from both parties related to this exact issue. Motorola's expert explained that it was Motorola's position that Hytera could never have developed the specific technology at issue without stealing Motorola's confidential materials. The jury credited this argument, as evidenced by the full award to Motorola on the actual losses issue. The Court agrees with the jury's finding. Motorola's damages expert, Mr. Malackowski, testified that the proper figure to be awarded encompasses both Motorola's actual losses and the unjust enrichment Hytera received in the form of the avoided research and development costs. On this point, Motorola argues that Hytera continues to retain the benefit of the stolen trade secrets and continues to sell misappropriating products, thus Hytera will continue to retain an improper benefit unless required to also pay for its avoided costs.

Hytera argues that simple accounting principles show that Motorola is recovering doubly. In support of this position, Hytera cites to Salisbury Labs., Inc. v. Merieux Labs., Inc., 908 F.2d 706 (11th Cir. 1990). In Salisbury, the Eleventh Circuit upheld the district court's reduction of a jury award where the district court held that it constituted a double recovery. Id. at 714-15. There, the courts were dealing with Texas trade secret law, and the measure of damages being discussed uniformly dealt with the benefit that had been conferred on the defendant, not on the actual losses that had been suffered by the plaintiff. Id. As such, both courts held that allowing the plaintiff to recover the avoided development costs and the *defendant's* profits constituted a double recovery, as those profits were a function of the avoided costs. Id. In other words, because the defendant's profits were inflated by the avoided costs—as profits are revenue minus costs—it was improper to

28

**A62**

award both.  And because the court there credited the argument that that defendant could have developed the trade secrets in the same time that the plaintiff had if it had expended the avoided research costs, the proper measurement of damages was the avoided research and development costs.

This case presents a different issue.  Here, as testified to by Motorola's damages expert in testimony the Court has re-reviewed, and as required by the DTSA, the first measure of damages in this case is the actual losses to Motorola.  This is reflected in the award of Motorola's lost profits of $136.6 million.  This number was not simply based off of a disgorgement of Hytera's profits, but rather was a market share analysis prepared by Motorola's expert that was meant to predict what share of Hytera's sales Motorola would have captured if Hytera had never sold the trade secrets, and the profit Motorola would have made on those sales.  The jury credited Motorola on this entirely.

The second measure relates to whether Hytera has been unjustly enriched to an extent not captured in Motorola's actual losses.  In this respect, the Court agrees with Motorola that Hytera still possesses the trade secrets, and as such is continuing to benefit from the avoided research and development costs.  This benefit to Hytera is distinct from the award of Motorola's lost profits. And unlike in Salisbury, this is not a simple calculation that because Hytera avoided development costs its profits were higher.  Rather, this award measures the benefit that Hytera has received separate from the profits that Motorola lost.

As such, the Court ratifies the jury's advisory award of the avoided research and development costs as will be set out further in the Court's findings of fact and conclusions of law.

(3) The actual loss figure was supported by evidence and the Court will not reduce it.

**A63**

Hytera next argues that based on Mr. Malackowski's testimony and because IDX has invalidated certain Motorola trade secrets, Motorola's actual losses should be reduced to account for only a four-year head start period, not the indefinite period that Motorola argued for and the jury credited. As discussed above, the Court has rejected Hytera's IDX argument and rejects this argument as well.

In the same vein, Hytera argues that Motorola's calculation related to its lost profits improperly excluded Hytera's legitimate research and development costs. This calculation became a question for the jury, and Mr. Malackowski explained his reasoning for excluding certain costs provided by Hytera, noting that he did not find them to be reliable. E.g. Tr. 2258 (Malackowski stating that he did not find Hytera cost estimates to be reliable because they fluctuated between years and showed a Hytera engineer labor rate, at one point in time, of less than $5 an hour). Hytera argued and had the burden to show its data was credible and reliable, and it was a duty for the jury to weigh credibility in this respect, as this went to the actual losses award. As such, the Court will not disturb the jury's verdict on this point and agrees with its conclusion.

Hytera next argues that any extraterritorial recovery was improper in this case. The Court stands by its previous orders on this issue.

Hytera also argues that it was improper to consider Hytera's mobile products in the damages awards. Motorola argues that it introduced testimony related to those products, which Hytera did not object to, and that Hytera challenged that testimony through its fact and expert witnesses, but that the jury credited Motorola's theory as to the mobile products. The Court agrees with Motorola and, to the extent it is an equitable issue, with Motorola's theory.

(4) The exemplary damages award was proper.

30

**A64**

Finally, Hytera argues that the evidence presented in this case did not support an instruction related to exemplary damages, and that even if it was proper to allow the consideration of exemplary damages, that the ultimate award should be reduced because it is excessive as a matter of due process.

Section 1836(b)(3)(C) of the DTSA states that a court may, "if the trade secret is willfully and maliciously misappropriated, award exemplary damages in an amount not more than 2 times the amount of the damages awarded under subparagraph (B). 18 U.S.C.A. § 1836. For the reasons in the record set out in Motorola's briefing on this first issue, it was proper for the issue of exemplary damages to go to the jury. See Dkt. 968 at 20 (citing to various portions of the trial record to show intentional bad faith acts within Hytera).

With respect to the amount of the exemplary damages, this amount, as an initial matter, was legally valid under the DTSA as it was not more than 2 times the amount awarded under Subsection B of the damages provision. In light of this statutory provision and the conduct discussed at trial, the Court disagrees with Hytera that this award must be reduced as a matter of due process. See BMW of N. Am., Inc. v. Gore, 517 U.S. 559, 583 (1996) (advising that a reviewing court should "accord substantial deference to legislative judgments concerning appropriate sanctions for conduct at issue") (internal quotations omitted).

The final argument that the Court addresses is Hytera's argument that the award is monstrously excessive, has no connection to the evidence in the case, and is not comparable to other awards made in similar cases. Dkt. 954 at 39 (citing Riemer v. Ill. Dep't of Transp., 148 F.3d 800, 808 (7th Cir. 1998)). This argument builds off and incorporates several other alleged errors that have been addressed throughout this Opinion. The Court has addressed these arguments (i.e. whether IDX invalidates Motorola's trade secret claims, whether Motorola is receiving a

31

**A65**

double recovery, etc.) and as such will not repeat that analysis here. The damages award was supported by substantial evidence and proper under that evidence presented. Moreover, the Court disagrees that no cases have resulted in similar recovery. See, e.g., E.I. DuPont de Nemours & Co. v. Kolon Indus., Inc., No. 3:09CV58, 2012 WL 1202485, at *1 (E.D. Va. Apr. 10, 2012) ($919.9 million in compensatory damages awarded in a trade secrets case).

As such, the Court will not order a new trial on the issue of damages.

## IV. CONCLUSION

Consistent with the above, the Court rejects each and every argument raised by Hytera in its renewed Rule 50(b), Rule 59(a), and Rule 59(e) motion and denies the motion in its entirety, except as to the issue of the advisory jury verdict on the equitable issues. The Court reiterates that Hytera has been represented by highly skilled, specialized counsel that has meticulously challenged Motorola on nearly every aspect of this case. On the jury issues, Hytera has not met its burden to succeed given the standards under which this motion is reviewed. On the equitable issues, the Court will submit its findings of fact and conclusions of law in a separate Order which will reflect its decision consistent with the above on the equitable issues.

Simply put, Hytera's motion is denied except to the extent that certain monetary awards are properly considered equitable in nature, but the substantive arguments as to the awards are denied as to be reflected in the Court's findings of fact and conclusions of law, and the ultimate figure awarded by the jury, and to be further found by the Court, will not be disturbed,

IT IS SO ORDERED.

ENTER:

_____
CHARLES RONALD NORGLE, Judge
United States District Court

DATE:  October 19, 2020

32

**A66**

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| MOTOROLA SOLUTIONS, INC., et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Civil Action No. 1:17-cv-1973 |
| v. | ) | |
| | ) | |
| HYTERA COMMUNICATIONS CORP. | ) | |
| LTD., et al., | ) | Hon. Charles R. Norgle |
| | ) | |
| Defendants. | ) | |

## ORDER

With a cool head and a keen eye, the Court has reviewed the hundreds of pages of submissions by the parties with respect to the findings of fact and conclusions of law relating to the disgorgement awards in this case. It is clear, as the parties agree, that the Court took an incorrect view as to the nature of the $135.8 million award under the DTSA.

The Court's legal reasoning relating to the framework by which it determines whether an award is equitable in nature, and whether the $135.8 million and the $73.6 million in avoided research and development costs would constitute double recovery, remains unchanged. However, when taking account of the correct nature of the $135.8 million as Hytera's profits (not Motorola's actual losses), a different outcome is demanded than that which was submitted in the Court's October 19, 2020 Order at Docket 1088.

Specifically, because the $135.8 million figure was Hytera's profits to be disgorged, not a market share analysis of Motorola's lost profits, this disgorgement figure should be treated as equitable in nature. Moreover, with respect to the Court's reasoning as to Hytera's argument about double recovery, the Court now agrees that allowing Motorola to recover Hytera's profits and Hytera's avoided costs on research and development would constitute a double recovery. See Salisbury Laboratories, Inc. v. Merieux Laboratories, Inc., 908 F.2d 706 (11th Cir. 1990); see also In re Mud King Prods., Inc., 514 B.R. 496, 523–24 (Bankr. S.D. Tex. 2014) (rejecting trade secret owner's request to recover both disgorgement of debtor's profits and "hypothetical development costs" because "no case allows development costs where defendant's profits are shown"); Hallmark Cards, Inc. v. Monitor Clipper Partners, LLC, No. 08-0840-CV-W-ODS, 2012 WL 3047308, at *3 n.4 (W.D. Mo. July 25, 2012) ("Most of the authorities cited indicate that the defendant's cost savings may be used to value gain instead of, and not as well as, profits earned from the misappropriation. This is undoubtedly based on the need to avoid double counting of gains.").

The Court thus finds it improper for Motorola to recover both the $135.8 million in disgorged profits and the $73.6 million in avoided research and development costs. For the reasons

1

**A67**

stated in <u>McRoberts Software, Inc. v. Media 100, Inc.</u>, 329 F.3d 557, 568 (7th Cir. 2003), the proper award among these two alternatives is the $135.8 million disgorgement of Hytera's profits.

Because the punitive damages award under the DTSA was based on a calculation of the compensatory award, the Court will follow the jury in awarding the maximum available exemplary damages under the statute, which in this case is now $271.6 million.

The reduced award, then, is comprised of disgorgement of $135.8 million under the DTSA, disgorgement of $136.3 million under the Copyright Act, and exemplary damages of $271.6 million. This totals $543.7 million.

The Court has prepared and will file findings of fact and conclusions of law consistent with this Order, and to the extent the Court's October 19, 2020 Order conflicts with the findings, this Order and the findings shall control.

IT IS SO ORDERED.

ENTER:

CHARLES RONALD NORGLE, Judge
United States District Court

DATE: January 8, 2021

**A68**

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| MOTOROLA SOLUTIONS, INC., et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Civil Action No. 1:17-cv-1973 |
| v. | ) | |
| | ) | |
| HYTERA COMMUNICATIONS CORP. LTD., et al., | ) | Hon. Charles R. Norgle |
| | ) | |
| Defendants. | ) | |

## <u>FINDINGS OF FACT AND CONCLUSIONS OF LAW IN RELATION TO THE COURT'S OCTOBER 19 AND NOVEMBER 10, 2020 ORDERS</u>

1

## FINDINGS OF FACT

### I.     BACKGROUND

1.     Following a nearly four-month trial, the jury returned a verdict for Motorola and awarded $345,761,165 in compensatory damages for Hytera's misappropriation of Motorola's trade secrets and infringement of Motorola's copyrights. Dkt. 898 at 5.

2.     With respect to the DTSA, the jury was properly instructed that Motorola was seeking damages from May 11, 2016 to June 30, 2019. Dkt. 895 at Instruction No. 32. With respect to copyright infringement the jury was properly instructed that Motorola was entitled to recover profits Hytera made through June 30, 2019 because of Hytera's copyright infringement. *Id.* at Instruction No. 40.

3.     The jury was properly instructed regarding lost profits under the DTSA. The jury was instructed: "Instruction No. 30: To recover its actual loss, Motorola must prove: 1. A reasonable probability that, if Hytera had not misappropriated trade secrets, Motorola would have made additional sales of DMR products that Hytera made; and 2. The amount of profit Motorola would have made on those sales." Dkt. 895 at Instruction No. 30. Hytera did not object to this instruction. Tr. at 5575:23-5578:5.

4.     The jury was similarly appropriately instructed that it could award Motorola's actual loss and Hytera's unjust enrichment to the extent it exceeds Motorola's actual loss: "Instruction No. 31: Unjust enrichment is the amount Hytera benefited as a result of any misappropriation to the extent it exceeds Motorola's actual loss. If you find that Motorola has proven by a preponderance of the evidence the amount that it is entitled to unjust enrichment damages in excess of its actual loss, you must deduct the costs and expenses that Hytera proves by a preponderance of the evidence that it incurred related to that benefit." Dkt. 895 at Instruction No. 31. Hytera did not object to this instruction. Tr. at 5575:23-5578:5.

5.    The jury was also instructed on damages for Motorola's claim for copyright infringement: "Instruction No. 40: Motorola is entitled to recover the profits that Hytera made through June 30, 2019, because of Hytera's copyright infringement. Hytera's profits are revenues that Hytera made because of the infringement, minus Hytera's expenses in producing and selling the infringing DMR radios. Motorola must prove Hytera's revenues and a causal relationship between the infringement and those revenues. Hytera must prove its own expenses and any portion of its profits that resulted from factors other than infringement of Motorola's copyright." Dkt. 895 at Instruction No. 40. Hytera did not object to this instruction, other than with respect to the temporal scope of copyright damages. Tr. at 5575:23-5578:5.

6.    The jury was properly instructed not to award double recovery to Motorola: "Instruction No. 42 - No Double Recovery: If you award Motorola damages for both its trade secret misappropriation claims and its copyright claims, you must not award damages in a manner that results in double recovery for the same injury." Dkt. 895 at Instruction No. 42. Hytera did not object to this instruction. Tr. at 5575:23-5578:5.

## II.    THE TRADE SECRET MISAPPROPRIATION DAMAGES AWARDED TO MOTOROLA BY VIRTUE OF THE ADVISORY JURY VERDICT CONTAINED DOUBLE RECOVERY

7.    Motorola proved that Hytera stole 21 distinct trade secrets at trial (collectively, "Misappropriated Trade Secrets"). For each trade secret, Motorola presented highly confidential technical and engineering materials relevant to that specific trade secret and explained those materials through five fact witnesses and numerous experts across more than 25 hours of testimony. Motorola's witnesses explained that these stolen materials constituted the "playbook" by which Motorola engineers built its two-way radio devices. Tr. at 723:16-724:5. Motorola's fact witnesses and experts testified in detail when explaining what was contained in each confidential technical and engineering material and how the processes contained therein combined into a

coherent whole to create the digital radio functionalities at issue in the trial. Tr. at 615:8- 621:25, 625:7-626:19, 630:14-631:14, 706:6-707:2, 709:1-715:12, 716:10-717:2, 718:13-719:3, 739:9-740:15, 741:15-747:4.

8.    The Court denied Hytera's motion for judgment as a matter of law or new trial with respect to Motorola's trade secret misappropriation claim. Dkt. 1088 at 7-11.

9.    The jury awarded $209.4 million for Hytera's trade secret misappropriation under the DTSA. Tr. at 2191:23-2192:7; 2198:9-17; PTX-2071, PTX-2226, DTX-4057; Tr. at 2184:20- 2189:20; PTX-2070.2-.4, .8; PTX-2077. The $209.4 million was comprised of $73.6 million in Hytera's avoided R&D costs and $135.8 million in Hytera's profits. Tr. at 5365:10-18 (avoided R&D); PTX-2071.2-.4; DTX-4057, PTX-2071.18-19.

10.    The $209.4 million exceeds Motorola's $86.2 million in Motorola's lost profits due to Hytera's trade secret misappropriation under the DTSA. Tr. at 2205:15-20; 5396:16-20; PTX-2068.2, PTX-2069.2, PTX-2067.5; DTX-4057.

11.    The disgorgement of Hytera's profits is an equitable remedy.  See Dkt. 1088 and Order accompanying these findings.

12.    The Court initially misapprehended the nature of the $135.8 million award in its October 19, 2020 Order, but the parties agree that that number reflects a measure of Hytera's profits in the relevant time period, not the actual losses suffered by Motorola (though Hytera disputes the substantive accuracy of that number). The $135.8 million figure does not reflect Motorola's actual losses, despite the Court characterizing them as such in Dkt. 1088.


A.    **Hytera Needed Motorola's Trade Secrets to Enter the DMR Market**

13.    In 2004, the FCC announced new regulations requiring companies and users around the world, including in the United States, to move from analog products to digital products. Tr. at

2159:25-2160:7. Mr. Malackowski testified that this provided a business incentive for Hytera to enter the digital radio market quickly in order to develop a digital radio before the regulation took effect. *Id.* at 2160:8-12. Hytera discussed this incentive in a presentation, explaining that Hytera needed to create new business and replace analog radios in line with the FCC mandate. *Id.* at 2160:20-2161:2; PTX-1129.

14.    Hytera's CEO recognized Hytera's need to develop a DMR product quickly. Tr. at 1849:3-14, PTX-416 (2007 Hytera slideshow with statement from Chairman Chen shows "that Mr. Chen has identified DMR as critical and has recognized Motorola as a key competitor in that segment of the market and wants to leapfrog Motorola.").

15.    Mr. Malackowski testified that email communications between Chairman Chen and G.S. Kok highlighted the importance entering the DMR market quickly, as shown by the fact that the project was being dealt with at the senior-most level within Hytera. Tr. at 2166:22-2167:2.

16.    About two weeks after G.S. Kok joined Hytera, he emailed Chairman Chen to say that he was "surprised also to find out that we do not have a prototype after three years. In addition, that each circuit block needs to be merged and a new board layout." PTX-421; PDX-9.57; Tr. at 1885:9-1886:20.  He stated that Hytera's DMR "team will need injection of Subject Matter Expert; (SME) from Motorola Penang and Motorola Chengdu. This will be most important if we want to leap frog onto the DMR business." *Id.*

17.    Hytera entered the DMR market in 2010, making Hytera the second to the DMR market behind Motorola. Tr. at 2167:10-2168:10. According to Mr. Malackowski, there is a significant advantage to being the second to enter the market. Tr. at 2163:1-6. Hytera's witnesses confirmed this competitive advantage, noting that being late to the market is difficult because competitors will have a lead so Hytera would always be playing catchup. Tr. at 2167:23-2168:5.

18.    Mr. Malackowski testified that Hytera's access to Motorola's copyrights and trade secrets

allowed Hytera to accelerate their entry to the market, which allowed them to enter the market sooner than they otherwise would have. Tr. at 2161:12-18.

19.    Dr. Rangan described "four high-level reasons" why Hytera would not have been able to independently without using or accessing Motorola's trade secrets. These reasons include: "there's no architecture or framework for this. That's the overall way that the whole product would have been architected. The protocol stack was not complete. In fact, it was extremely limited. There was no demonstration of interoperability. And the source code, the way it was structured, was fundamentally flawed and would prevent any further progress." Tr. at 1888:19-1889:7; PDX-9.58.

20.    Specifically, Dr. Rangan testified that he saw a "complete absence" of "architectural framework components," such as an operating system, in Hytera's development documents and materials prior to February 2008, despite Hytera's claim that it had a prototype for a DMR radio that was 75 percent complete by that time. Tr. at 1890:19-1892:5.

21.    Dr. Rangan also testified that Hytera's DMR development lacked a protocol stack, which "defines the sequence of operations that the transmitter or receiver would have to do to communicate." Tr. at 1892:6-1893:20. Dr. Rangan did not see any evidence in Hytera's development documents as of February 2008 that Hytera "was able to send a group call, short message, or data service message" as it claimed. DTX-3219; Tr. at 1894:8-1896:24. Hytera also lacked the ability to perform basic functions like emergency calls, showing that "Hytera, prior to 2008, was still very far from coming close to a 75 percent complete protocol stack." Tr. at 1900:6-1901:22; PTX-1987 at 29-30; Tr. at 1902:5-1903:12, PTX-1085 (email from Roger Zhang to Sam Chia stating that "Our group has been engaged in protocol development for a period of time" and has "met many problems which have troubled us for a long time."); PTX-203, PTX-204, Tr. at 1904:12-1906:17 (Hytera engineer Yu Yang stating that "When we were doing the work" prior to the arrival of G.S. Kok, Y.T. Kok, and Sam Chia, "most of the requirements [in PTX-204 listing

protocol stack requirements] cannot be met," and the DMR project "has grown up in an unhealthy situation").

22.     Dr. Rangan further explained that Hytera's purported prototype "did not demonstrate interoperability, meaning "the ability of a device from one manufacturer to communicate to the device of another manufacturer," which is "absolutely essential" for DMR radios. Tr. at 1907:5-1908:5. While Hytera relied upon PTX-1988 to "demonstrate interoperability," Dr. Rangan explained that this document does not show that Hytera had the ability to complete a group call, and instead described a "debugging hardware platform" that is "a version of the system that's in a much earlier stage of development [than a prototype] where you're still trying to build up basic features." Tr. at 1908:6-1909:16. The "debugging platform" "doesn't have that man/machine interface, the interface between the keypad and the screen. So that's being simulated here on this PC," and did not allow a call with a question and response but instead "[w]e just have a portion of the sound, and it's just echoing back." Tr. at 1910:7-1913:6.

23.     Additionally, Dr. Rangan explained that in reviewing the source code directories Hytera produced, he "found really that there were two fundamental flaws in the way that the source code was written in a manner that would prevent the developers from continuing development. First of all, the source code files were unfinished but also what you would say that the code was monolithic spaghetti code." Tr. at 1916:1-17. "Essential" source code files were classified by Hytera as "unfinished," and there was no indication that they were ever completed by Hytera prior to G.S. Kok's arrival in February of 2008 or prior to the arrival of Y.T. Kok and Sam Chia. Tr. at 1916:18-1919:8; PTX-2031, PTX-2025.

24.     Hytera also had "monolithic spaghetti code" prior to the arrival of G.S. Kok, Y.T. Kok, and Sam Chia. Tr. at 1919:9-25; PTX-607.6. An internal Hytera presentation given by Y.T. Kok in July 2008, titled "HYT common platform architecture," describes Hytera's DMR development

as a "monolithic, spaghetti system." *Id.* Dr. Rangan explained that "monolithic" code is not well organized because it "just appears as one large piece of code," and a "spaghetti system" is "a highly problematic way of software and refers to the following, that any one part of the code can affect other parts of the code. So when you're trying to analyze the code, looking how one part of the code affects another is like trying to find two ends of a strand of spaghetti in a big bowl of pasta." Tr. at 1920:1-15. Y.T. Kok identified in his presentation problems caused by the monolithic spaghetti system, including that "it's difficult to isolate components and reuse them" because "they're completely intertwined with one another," and also because "it's poorly portable. So if you want to take one piece of software out and use it in another piece of software or in another hardware platform, it becomes very, very difficult to do that." Tr. at 1921:2-23. Additionally, both Dr. Rangan and Y.T. Kok's presentation recognized that "once you get spaghetti code, it becomes harder to change and the development becomes more and more laborious. It costs more and it takes longer. But also what's very important is the problem of debugging or fixing errors. It's very hard to trace errors because of the spaghetti problem. And any time you try to fix one part of the code, you generally introduce bugs in other parts of the code." Tr. at 1921:25-1922:15; PTX-607.7.

25.    Dr. Rangan testified that Hytera never released a DMR product based on its pre-February 2008 development efforts, and instead Hytera "abandoned those efforts and ended up following a development path based on Motorola misappropriated code." Tr. at 1925:6-1926:2 ("Two and a half years since this lawsuit has began, ... Hytera continues to use Motorola confidential and proprietary information for its development," which "indicates that Hytera is still not possible to independently develop [a] DMR product without Motorola confidential and proprietary information.")

26.    As Dr. Rangan explained, Hytera "would actually have never conceived of these or implemented these trade secrets in any commercially reasonable period of time, but even if they

were to, the time for Motorola took to develop these trade secrets would be an absolute minimum or baseline for that time." Tr. at 1950:13-1951:7. Because Hytera still has not, to this day, developed a comparable DMR product without use of Motorola's trade secrets and source code, the sales of its accused DMR products are due to its misappropriation and ongoing use of Motorola's trade secrets.

### B.     Hytera Avoided Spending $76.3 Million in Research and Development by Misappropriating the 21 Trade Secrets

27.     As a result of Hytera's theft of Motorola's trade secrets, Hytera was able to significantly reduce the amount of money that it spent on developing the accused DMR products. Tr. at 2156:21-24 (Mr. Malackowski testifying that "Hytera benefited from use of the Motorola trade secrets and copyrights, and they were able to reduce their own R&D expense accordingly").

28.     Motorola spent $117.8 million to develop the Misappropriated Trade Secrets, which was only a portion of the research and development that Motorola invested to launch its DMR radios. Tr. at 2155:9-2156:14 (citing PDX-10.6). By contrast, Hytera spent $12.6 million in R&D before launching its DMR radios, confirming the substantial savings Hytera realized from its theft. Tr. at 2156:2-9; PDX-10.6.

29.     Motorola's expert, Mr. Malackowski, testified that Motorola should be awarded $73.6 million in Hytera's avoided R&D costs. Tr. at 5365:10-18.

### a.  Mr. Malackowski Properly Relied on Development Times for the Misappropriated Trade Secrets

30.     Motorola presented extensive testimony concerning the amount of time it took Motorola to develop the Misappropriated Trade Secrets in staff months, i.e., the amount of work an engineer could perform in one month. Tr. at 193:18-194:7, 2185:18–2189:20. Staff months is a common way to perform engineering project management. *Id.* at 1928:4-13.

9

**A77**

31.    Motorola presented testimony from Motorola engineers Russ Lund, Mark Boerger, Jesus Corretjer, Dan Zetzl, and Sanjay Karpoor, who developed and oversaw development of the trade secrets at issue. Tr. at 593:24-594:1, 597:7-9, 622:5-7, 633:4-6, 640:8-10, 707:14-708:3, 729:17-22, 741:6-14, 754:19-23, 866:11-15, 877:10-13, 880:2-6, 883:8-12, 887:15-20, 892:14-18, 998:25-999:5.

32.    Motorola also presented testimony from Dr. Rangan, who relied on his experience leading software and hardware teams that worked on similar types of technology to the Misappropriated Trade Secrets, to establish the staff months necessary to develop the Misappropriated Trade Secrets. Tr. at 1926:3-1928:13 (Dr. Rangan testifying that his determination of the development times for Motorola's trade secrets was based on trial and deposition testimony from Motorola's senior engineers who "were deeply involved in the DMR development" about the "head count and staff months for each asserted trade secret[]," consideration of Motorola's "source code and all the design documents as well for the asserted trade secrets to try to assess the development effort," and application of his own experience leading software and hardware teams).

33.    The following are the staff months to develop each Misappropriated Trade Secret:

| Trade Secret | Staff Months to Develop | Citation |
|---|---|---|
| DMR Source Code | 87 engineers 9,468 staff months | Tr. at 593:24-595:10; PDX-4.6 |
| DMR Mobile Source Code | 80 engineers 3,600 staff months | Tr. at 595:11-609:14; PDX-4.8 |
| DMR Software Architecture | 80 engineers 5,478 staff months | Tr. at 622:1-12; PDX-4.15 |
| Operating System Architecture | 5 engineers 294 staff months | Tr. at 632:24-634:5; PDX-4.19 |
| VRIS | 17 engineers 600 staff months | Tr. at 639:25-641:11; PDX-4.23 |
| Digital Signal Processing Framework | 25 engineers 900 staff months | Tr. at 707:13-708:16; PDX-5.4 |
| Noise Suppression | 2 engineers 7 staff months | Tr. at 707:13-708:16; PDX-5.4 |
| Squelch | 4 engineers 20 staff moths | Tr. at 707:13-708:16; PDX-5.4 |
| Carrier Detection | 2 engineers 8 staff months | Tr. at 707:13-708:16; PDX-5.4 |

| DSP Code | 25 engineers 3000 staff months | Tr. at 707:13-708:16; PDX-5.4 |
| Testing and Benchmarking | 12 engineers 720 staff months | Tr. at 729:17-730:4; PDX-5.7 |
| Hardware Abstraction Layer | 15 engineers 376 staff months | Tr. at 741:3-14; PDX-5.11 |
| L1 Timer, Framer, and Frame Scheduler | 8 engineers 72 staff months | Tr. at 741:3-14; PDX-5.11 |
| Hardware | 75 engineers 2,700 staff months | Tr. at 754:19-23; PDX-5.14 |
| Ergonomic Layer | 20 engineers 1,584 staff months | Tr. at 866:11-867:3; PDX-6.6 |
| Application Layer | 40 engineers 2,700 staff months | Tr. at 877:9-25; PDX-6.9 |
| VOX | 4 engineers 36 staff months | Tr. at 880:2-10; PDX-6.12 |
| DMR Protocol Stack | 42 engineers 1,512 staff months | Tr. at 883:8-884:2; PDX-6.15 |
| Connectivity | 4 engineers 65 staff months | Tr. at 887:15-24; PDX-6.18 |
| XCMP | 15 engineers 720 staff months | Tr. at 892:14-893:3; PDX-6.21 |
| Repeater | 20 engineers 3,248 staff months | Tr. at 998:25-999:5; PDX-7.4 |

34.     Based on Motorola's costs per engineer, Mr. Malackowski determined that Motorola spent

$117.8 million to develop the Misappropriated Trade Secrets. Tr. at 2155:15-2156:9; PTX-2070.8

($6,391 Motorola cost per head). To arrive at the $117.8 million, Mr. Malackowski only included

development times for the following trade secrets to avoid double counting: Connectivity, XCMP,

Software, DMR Protocol Stack, Hardware, Testing and Benchmarking, and Repeater Functionality.

Tr. at 2189:9-20 (Mr. Malackowski explaining that the remaining trade secrets "are simply

subcomponents or a subset, parts of the whole [accounted for by these seven trade secrets] as

described"); *see also* Tr. at 1946:24-1948:17.

35.     Motorola also presented evidence that it would have taken Hytera at least as long as Motorola

to develop the misappropriated trade secrets. Tr. at 1950:13-1951:7 (Dr. Rangan: "It's my view that

[Hytera] would actually have never conceived of these or implemented these trade secrets in any

commercially reasonable period of time, but even if they were to, the time for Motorola took to

11

**A79**

develop these trade secrets would be an absolute minimum or baseline for that time.").

36.     Motorola's estimates for the development of the Misappropriated Trade Secrets were conservative, and were based on the work of highly skilled engineers. *Id.* at 1948:18-1949:21. Prior to the arrival of G.S. Kok, Y.T. Kok, and Sam Chia, Hytera did not have engineers with comparable skills to those at Motorola because they lacked DMR experience and the ability to recruit similar levels of talent. *Id.* at 1949:22-1950:20.

37.     Hytera's attempts to dispute this evidence regarding the amount of time that it took to develop the Misappropriated Trade Secrets were not credible. For example, Hytera's expert, Barbara Frederiksen-Cross, testified that it would take Hytera between 1.7 and 6.4 months to rewrite the misappropriated source code contained in the DSP, RFhal, and RAF libraries Hytera misappropriated. Tr. at 3972:3-7, 3973:23-3974:9. But the methodology she used to calculate Hytera's rewrite time is not reliable and has been referred to as "malpractice" in the relevant field. PTX-2370.552 (The expert whom Barbara Frederiksen-Cross relied on, Capers Jones, wrote "LOC metrics became less and less useful until sometime around 1985 they started to become actually harmful. . . . [I]t is fair to say that in many situations usage of LOC metrics can be viewed as professional malpractice. . . ."); Tr. at 4133:6-4134:2, 4137:24-4138:23, 4139:12-16 ("Q. In -- despite the -- despite the concerns and problems that the expert you're relying on is saying applies to the metrics you used, you still presented your testimony to the jury, fair? A. That is correct, yes.") (Barbara Frederiksen-Cross); *see also* Tr. at 5074:1-20 (Dr. Wicker explaining that merely counting lines of code "fails to take into account the importance of the source code, how the code is used ... and does not accurately reflect what happened in this case."); Tr. at 5076:4-5080:23 (Dr. Wicker explaining that Hytera radios "simply would not function").

38.     Dr. Aron's reliance on 7,920 staff months was similarly not credible. Although Dr. Aron testified that the 7,920 staff months was Dr. Grimmett's opinion, Tr. at 4864:7-16, all Mr. Grimmett said was that a Motorola document supposedly suggested that the entire MotoTRBO project would take "7,900 or so staff months." *Id.* at 4559:17-4560:6. Mr. Malackowski explained that the Motorola document Dr. Aron referred to (DTX-4715) was incomplete with respect to development times for the Misappropriated Trade Secrets because it included only a portion of the

12

**A80**

work that went into those trade secrets. *Id.* at 2331:12-2332:8.

39.    Thus, just as he did to calculate Motorola's R&D costs, Mr. Malackowski used Motorola's estimated staff months for developing seven non-overlapping trade secrets in order to ensure there was no overlap in his calculations of Hytera's avoided R&D costs. Tr. at 2188:18-2189:20; PTX-2070.1.

### b. Mr. Malackowski Used Reliable Data to Determine the Cost Per Engineer in China

40.    To calculate Hytera's avoided R&D costs, Mr. Malackowski multiplied Hytera's average monthly engineering costs by the estimated staff months required to develop each of the trade secrets. Tr. at 2184:25-2185:10. Because Mr. Malackowski found that Hytera's financial records were incomplete and inaccurate, Tr. at 2258:20-2259:1, he used Motorola's engineering costs for engineers located in China to estimate Hytera's engineering costs, which Mr. Malackowski testified would represent the same cost to Hytera because it was a competitive market. Tr. at 2186:20-2188:13 (Mr. Malackowski testifying that he "used the Chengdu, China figures, which at the bottom [of PTX-2070.8] are $3,992 per month per engineer.").

41.    Hytera, however, asserts that the amount of avoided R&D should be calculated using Hytera's engineering costs, instead of Motorola's. Dkt. 954 at 6; Tr. at 4858:4-4864:16 (Dr. Aron using Hytera's engineering cost of $1,638 in 2010); DTX-4715; DTX-5607. As Mr. Malackowski explained, however, Hytera's data were not credible. Specifically, Mr. Malackowski testified that Hytera's labor rates in China "varie[d] in unexplainable ways on a year-by-year, hour-by-hour basis," e.g., "a secretary [was paid] $5 an hour, []an engineer [was paid] less than that, and then two years later [he] would see huge differences." Tr. at 2258:10-2260:10 (explaining costs increased by 70% one year and then decreased again). "Cherry-picking" Hytera's 2010 engineering costs, as Dr. Aron did, was thus not a fair reflection of Hytera's engineering costs. *Id.* at 2262:2-18.

42.    Thus, using the time it took Motorola to develop the seven, non-overlapping trade secrets and

Motorola's cost-per engineer in China, Mr. Malackowski concluded that Hytera avoided spending at least the following in R&D by misappropriating the 21 trade secrets.

*Motorola Solutions, Inc., and Motorola Solutions Malaysia Sdn. Bhd. v. Hytera Communications Corporation Ltd., Hytera America, Inc., and Hytera Communications America (West), Inc.*
SUMMARY OF MOTOROLA DEVELOPMENT COST AND HYTERA AVOIDED COSTS DUE TO TRADE SECRETS
Appendix 7.0
Updated October 30, 2019

| Trade Secret [1] | Motorola's Estimated Development Cost [2] | Hytera's Development Cost Savings [3] |
|---|---|---|
| Connectivity | $415,434 | $259,478 |
| DMR Protocol Stack | 9,663,630 | 6,035,852 |
| XCMP | 4,601,728 | 2,874,215 |
| Repeaters | 20,758,908 | 12,965,903 |
| Product Testing/Benchmarking | 4,601,728 | 2,874,215 |
| Hardware | 17,256,481 | 10,778,306 |
| DMR Source Code/Software | 60,512,728 | 37,795,928 |
| **Total** | **$117,810,638** | **$73,583,897** |

Notes:
[1] To avoid double counting, I have included only trade secrets that are not whole or partial subsets of other trade secrets. I have included trade secrets in this appendix based on my review of deposition testimony of Motorola witnesses.

[2] Appendix 7.2
[3] Appendix 7.1.

PTX-2070.1; Tr. at 2184:25-2189:15.

43.     Hytera avoided spending this $73,583,897 million in R&D after the enactment of the DTSA on May 11, 2016. As Mr. Malackowski explained, Hytera avoided spending this R&D "with each and every [accused] product. There is no product that can be brought to the market in this case without the benefits of that research and development. So it relates to each and every product at the time that product is introduced," including "products released in February 2017 and January 2019." Tr. at 5364:22-5365:6.

44.     In addition, Hytera continued to launch new products using Motorola's trade secrets and copyrighted source code after this lawsuit was filed. Tr. at 5364:16-5365:6; DDX-22.12 (Dr. Aron's slide showing three accused products launching in January 2019). These products were sold in the United States after the DTSA's enactment, meaning Hytera avoided spending the $73.6 million in the United States. PTX-2070, PTX-2071, PTX-2226, DTX-4057.

### c. The Amount of Hytera's Avoided R&D Would Not Equate to a Perpetual License

45.     Hytera asserts that an award of $73.6 million amounts to a perpetual license. Dkt. 954 at

6. Hytera, however, agreed that the jury should not be instructed to award a reasonable royalty,

nor did Hytera present any evidence that its avoided R&D would, in fact, constitute a royalty,

perpetual or otherwise.

46.     Accordingly, the Court finds that the evidence supports $73.6 million for Hytera's avoided

research and development costs for Hytera's trade secret misappropriation under the DTSA.

47.     As discussed further below, however, although this figure is supported, an award of the

avoided research and development and Hytera's profits would constitute double recovery.

### C.     Hytera Earned $135.8 Million in Profits from Its Misappropriation

48.     Hytera began selling DMR radios that contained or were created with the Misappropriated

Trade Secrets in 2010. Tr. at 204:19-20, 2020:22-2021:4, 2395:3-4, 5138:15-5140:8.

49.     Without the benefit of the Misappropriated Trade Secrets, Hytera could not have made the

sales and profits on its DMR products at issue in this case. *See* Section II.A., *supra*; *see also* Tr. at

4717:20-4719:8 (Mr. Grimmett agreeing that ROSAL specification contains "utmostly necessary"

technology), 4090:23-4091:7 (Ms. Frederiksen-Cross testifying that "but for the Motorola code that

was stolen," the libraries Hytera claims to have independently written "would not work"), 5075:2-

5076:12 (Dr. Wicker explaining that without Motorola's source code, Hytera's DMR radios "simply

would not function."). Thus, Hytera's profits on its DMR radios are a direct result of Hytera's theft.

50.     Mr. Malackowski identified a causal nexus between Hytera's trade secret misappropriation and

gross revenues for DMR radios based on the amount Hytera spent on R&D to launch their first DMR

product. Tr. at 2156:2-24 ("I was looking here for the nexus of my damage claim, which is basically

whether or not there was a relationship between the trade secrets and copyright at issue and the

profits that I seek for both companies. Hytera benefited from the use of Motorola trade secrets and

copyrights, and they were able to reduce their own R&D expenses accordingly.").

51.    Hytera stole the Misappropriated Trade Secrets from Motorola's COMPASS system and ClearCase system, respectively, servers for which are located in the United States and are accessible at Motorola's facilities, including its Schaumburg office. Tr. at 209:22–210:11, 211:2– 14, 373:21– 24, 379:21–380:5, 380:18–21, 396:20–25, 443:16–21, 521:18–20, 989:17–19, 997:10–998:2, 1001:2–20, 1009:15–1010:21, 5150:5–12.

52.    Hytera committed acts in furtherance of its misappropriation in the United States by advertising, promoting, and marketing products embodying the Misappropriated Trade Secrets in the United States, including at numerous trade shows. For example, Qi Yin, the "Director of Presales Support and Post-Sales Service for the Americas at Hytera," stated that his "responsibilities span initial client development through service after a sale of products and/or systems and include learning and understanding customers' technical requirements," including for Hytera's customers in the U.S. Dkt. 916 ¶¶ 3-5, 7. And Hytera's trial witnesses acknowledged that Hytera attended the IWCE trade show in the United States to advertise and promote its DMR products that benefit from its misappropriation. Tr. at 3310:3-15 (Xu Hailin: Hytera launched DMR radios in the United States); *id.* at 3460:15-17 (Andrew Yuan: "in America ... the most important event is the IWCE [conference]"); *id.* at 3528:21-3529:25 (Andrew Yuan prepares "talking points for Hytera's employees who are at this trade show"); *id.* at 3231:8-16 (Jim Luo: IWCE in the U.S. is where "all the companies, such as Motorola ... or Hytera, would distribute information about their companies, including their products as well."); Dkt. 834 at 21-22 ("Plaintiffs have introduced evidence in this case sufficient to support a finding that 'use' of the alleged trade secrets has occurred domestically. Specifically, it has been undisputed throughout trial that Defendants have advertised, promoted, and marketed products embodying the allegedly stolen trade secrets domestically at numerous trade shows. This constitutes 'use.'").

53. Because Hytera committed acts in furtherance of its misappropriation in the United States after the DTSA's enactment, Motorola is entitled to damages based on Hytera's worldwide revenues for its DMR radios.

### a. Mr. Malackowski Properly Calculated Hytera's Profits From Its Misappropriation

54. From 2010 to June 2019, Mr. Malackowski identified Hytera's revenue for the accused DMR portable radios as $532,025,673, with mobile radios adding "another 111 million" dollars; for accused DMR repeaters as $91,166,965; and for DMR accessories as $53,202,567. Tr. at 2191:14-2193:13; 2195:8-12; PDX-10.25; PTX-2071, PTX-2226, DTX-4057.

55. Dr. Aron did not dispute the revenues Mr. Malackowski presented for the accused Hytera products. Tr. 4958:23-4959:2; PTX-2226.

56. In determining the amount of Hytera's profits, Mr. Malackowski deducted costs that would vary with production of additional radios, i.e., costs of goods sold, patent royalties, sales department, and asset impairment. *Id.* at 2196:5-2197:12. Mr. Malackowski did not deduct costs associated with management or administration, legal fees, or research and development. *Id.*

57. Mr. Malackowski calculated Hytera's profits from its misappropriation of Motorola's trade secrets by multiplying Hytera's actual revenues for the accused products by Hytera's profit margin. Tr. at 2189:21-2190:7 (citing PDX-10.24, PTX-2071), Tr. at 2191:14-2192:18 (citing PDX-10.25). After deducting costs and expenses, Mr. Malackowski identified the amount of worldwide profits Hytera earned as a result of Hytera's trade secret misappropriation as $272 million. Tr. at 2195:13-2198:20, 5389:18-22 (referring to PDX 26.7). Adjusting the calculation for May 11, 2016 forward, the amount of Hytera's profits is $135.8 million.

58. Dr. Aron agreed with Mr. Malackowski's deductions in calculating Hytera's profit margins, except with respect to Hytera's research and development expenses. Tr. at 4826:25- 4827:8, 4838:4-4840:2.

59.    Mr. Malackowski explained that he did not deduct Hytera's research and development expenses because he found that data, which Hytera produced during fact discovery, to be unreliable. Tr. at 2196:5–2198:8; PDX-10.28. For example, Hytera's R&D data indicated that in 2014, Hytera spent $6 million in R&D to launch two radios, but in 2016, Hytera spent two-and-a- half times that amount ($17 million) to launch a single radio. *Id.* Mr. Malackowski further explained that data "was not specific to these products [at issue] and was not correlated or related to the introduction of these products in a way that they should be deducted." Tr. at 2197:7-2198:8; PDX-10.28; PTX-2352.

60.    As a result, Mr. Malackowski did not deduct Hytera's R&D costs from its revenues when determining the amount of profit Hytera earned from its trade secret misappropriation. Tr. at 5363:11-18 (Mr. Malackowski explaining that "the accounting standards specifically talk about the use of data and that that data must be reliable, and if it isn't, it shouldn't be used. So in my opinion, consistent with what I testified to last year, those deductions should not be made. They're not appropriate.").

61.    Hytera, however, contends that its profits should be reduced by the amount that it claims to have actually spent on R&D for its DMR radios and for its "legitimate contributions" to its DMR radios. Dkt. 954 at 7-9. Hytera's arguments are without merit and not supported by the facts.

62.    At trial, Dr. Aron did not assert that the R&D data Hytera produced during fact discovery was reliable. Instead, Dr. Aron revised her own opinions at trial based on new, revised R&D data that Hytera produced mid-trial. Tr. at 5355:10-5356:3; DTX-5502. According to Dr. Aron, there was only one change to the R&D data produced during trial, that is, "It was a filtering down of the data that was originally produced. It's the same data, but it's a subset of the data." Tr. at 5012:6-12. Andrew Yuan, Hytera's VP of Sales and President of North and South America, testified that the R&D data was created and stored by Hytera in the ordinary course of business. Tr. at 3422:13- 21.

63.    Neither Dr. Aron's nor Mr. Yuan's testimony was credible. Although Dr. Aron asserted that

the "new" data was only a subset of the "old" data, Mr. Malackowski explained that was not the case. According to Mr. Malackowski, if the newly produced R&D data is "a subset of the [original] data, it should be less than what was originally produced. It's filtered away and you're just looking at part of it. That's not what happened," and instead, "It's not just data filtering. Somebody went in and changed the codes to attribute more R&D expense to the products to this litigation, and that change was made during the litigation." Tr. at 5356:16-5361:13; PDX-28 at 176; *compare* PTX-2352 at 24-25 *with* DTX-5502 at 27.

64.     Mr. Malackowski also explained that, contrary to Mr. Yuan's assertion, "it just cannot be possible that the data that was received during trial was prepared in normal course based upon records that happened 5 to 10 years ago and that are not a subset but now are greater than they ever were." Tr. at 5362:16-5363:10.

65.     Because Hytera's R&D data was not credible, it was appropriate for Mr. Malackowski not to deduct those purported expenditures in arriving at Hytera's profit margins.

66.     Dr. Aron also incorrectly asserted that Mr. Malackowski's "analysis overstates the unjust enrichment claim because it fails to deduct research and development expenses that were incurred by Hytera after the accused devices were introduced over a long period of time and that wouldn't have been incurred had those products not been introduced into the market." Tr. at 4827:1-8; *see also* Tr. at 4854:10-14 (Dr. Aron opining that "Mr. Malackowski's refusal to deduct these post-launch research and development expenses" "inflates or increases his [unjust enrichment] damages amount by $79.6 million."); Tr. at 4856:3-23.

67.     Hytera's R&D expenses are not accurate, and thus, should not be deducted. *See also* Tr. at 5447:10-18. In addition, Mr. Malackowski explained that Hytera used the substantial amount of R&D expenditures that it saved through its misappropriation to try to "leapfrog" Motorola in the market by developing additional DMR features to differentiate its products. Tr. at 2157:8-19 (Mr.

Malackowski explaining that "the one who takes the intellectual property without payment can then use whatever money they have, not to catch up, but to actually try to get ahead, to develop something that will differentiate themselves and leap ahead of the innovator.").

### b. Hytera's Attemot to Limit Disgorgement of Its Profits with a "Head Start" Period Fails

68.    Hytera asserts that its disgorgement must be limited to a head start period. Dkt. 954 at 6-7. Specifically, Hytera asserted that disgorgement should be limited to Hytera's profits from 2010 to 2014 because (i) all of the Misappropriated Trade Secrets other than Motorola's DMR Source Code, DSP Source Code, and Repeaters could have been developed in under four years; and (ii) the DMR Source Code, DSP Source Code, and Repeater trade secrets were supposedly invalid. *Id.*

69.    Hytera's head start argument fails because the Court concluded that none of the Misappropriated Trade Secrets, including DMR Source Code, DSP Source Code, and Repeater, were invalid as a matter of law. Dkt. 1088 at 7-9. Thus, Hytera still, to this day, could not have launched DMR radios comparable to Motorola's without the Misappropriated Trade Secrets, making the head start period is inapplicable. *See* Tr. at 593:24-595:10 (DMR Source Code trade secret took 87 engineers 9,468 staff months to develop), 707:13-708:16 (DSP Code trade secret took 25 engineers 3,000 staff months to develop), 998:25-999:5 (Repeater trade secret took 20 engineers 3,248 staff months to develop); PDX-10.30 (DMR Source Code, DSP Source Code, Repeaters took 108 calendar months to develop), Tr. at 2199:2-13.

70.    Hytera nonetheless contends that despite the Court's finding that the Misappropriated Trade Secrets were valid, "the Court must make an independent finding of what the head start period would have been and award no more than the equitable amount." Dkt. 954 at 7 n.1. Hytera cites no case law mandating such an analysis. Nonetheless, even if such an analysis were required, the evidence demonstrates that it was appropriate to award Hytera's profits through June 30, 2019.

71.     Hytera was incapable of developing a comparable DMR radio in any commercially reasonable time; to this day, Hytera still has not been able to develop a "comparable" DMR radio on its own. Dkt. 935-3 (Ex. 36) (Dr. Rangan slide: "Hytera Could Not Conceive Of Or Develop The Trade Secrets In A Commercially Reasonable Time"); Tr. at 1823:10–13 (testimony re same), 1950:21–1951:7 (Dr. Rangan: Hytera is still using Motorola's trade secrets "almost ten years" after Hytera's first DMR product release so "it would take at least ten years of time for them to develop these asserted trade secrets.").

72.     Motorola also presented evidence that even if Hytera could develop a comparable DMR radio in a certain period of time, that would be years from now. Tr. at 2016:22–2017:3 (Dr. Rangan: DSP source code trade secret and repeater took 23.5 years to develop), 2062:19-21 (Dr. Rangan: "Q. And your opinion is that what Hytera developed would never have worked? A. In any commercially reasonable time, no."), 1950:13-1951:7 (Dr. Rangan: "It's my view that [Hytera] would actually have never conceived of these or implemented these trade secrets in any commercially reasonable period of time, but even if they were to, the time for Motorola took to develop these trade secrets would be an absolute minimum or baseline for that time.").

73.     Hytera still has not released a DMR radio comparable to Motorola's that was not designed with the Misappropriated Trade Secrets almost four years after this case was filed, and nearly a year after the jury verdict. Tr. at 2480:10-12 ("[Q.] And you can't deny that Hytera . . . whether or not Hytera is currently using a single line of Motorola source code? [A.] I don't deny it. I know it as a fact.") (Pengfei Sun), 1950:21–1951:7 (Dr. Rangan: Hytera is currently still using Motorola's trade secrets "almost ten years" after Hytera's first DMR product release so "it would take at least ten years of time for them to develop these asserted trade secrets.").

74.     Hytera's experts attempted to argue that the Misappropriated Trade Secrets were not important to Hytera's development of DMR radios, and that without the misappropriation, Hytera

could have released its radios in six months, but those assertions were not credible.

75.    Mr. Grimmett claimed that Hytera used only a "very small amount" of Motorola's trade secrets to develop its DMR radios and that six months was "quite generous." Tr. 4282:23-4284:9. Yet Mr. Grimmett admitted that PTX-479, Hytera's ROSAL specification, describes "a standard and common operating system environment that is utmostly necessary," and is thus "important" and presumably "would provide a competitive advantage." Tr. at 4718:7-4719:8; PTX-479. Mr. Grimmett further admitted that this ROSAL specification was written by Y.T. Kok, and that he copied "a good amount" of its contents from a Motorola confidential document. Tr. at 4719:9-17. While Mr. Grimmett further admitted that Hytera's Professor Sun sent an email in September 2009—after G.S. Kok, Y.T. Kok, Sam Chia, and Peiyi Huang joined Hytera but before Hytera launched its DMR product—declaring that Hytera's common platform architecture ("CPA"), which it stole from Motorola, "is very important to the standardization of Hytera's future products" (Tr. at 4720:4-4721:2; PTX-2205), Mr. Grimmett also acknowledged that just the day prior, he had "testified that the entire software architecture trade secret … did not provide any competitive advantage to Hytera" and "was generally known" (Tr. at 4721:9-23). And despite acknowledging that Hytera's Roger Zhang "is talking about having many problems" with "the transplanting of the protocol stack" in January 2007 (PTX-1984), prior to G.S. Kok, Y.T. Kok, Sam Chia, and Peiyi Huang joining Hytera, and is "still having many problems with the DMR protocol stack" a year and a half later in June 2008 (PTX-542), Mr. Grimmett stood by his testimony that "Motorola's protocol stack provides no competitive advantage to Hytera." Tr. at 4732:14-4734:5.

76.    Hytera's other technical expert, Ms. Frederiksen-Cross, confirmed that "but for the Motorola code that was stolen," the libraries Hytera claims to have independently written "would not work." Trial Tr. 4091:4-7.

77.    Dr. Aron's claim that Hytera would immediately catch up to its current level of sales

whenever it released a DMR radio was likewise not credible. Indeed, even Dr. Aron agreed that a late market entrant "may lose more sales if the late or delayed entry would have affected its ability to build its demand up." Tr. at 4880:19–4881:9. Dr. Aron also testified that as Hytera releases additional models, Hytera will customize those products for specific uses based on customer feedback. Tr. at 4853:19-23 ("As the company puts out additional models, . . . customers see customization of those products for their specific uses, so they will come back to Hytera, and the engineers will do customization on those products."). This was consistent with Mr. Malackowski's testimony. Tr. at 5375:2–21 (Malackowski: had Hytera "entered the market in 2014, [i]t would make no sense they could have obtained all the sales they actually did with the benefit of having started several years earlier."), 5375:22–5377:9 (Malackowski: in DMR market, "you build sales over time because you work with your customers to ramp up their need across their entire business. So you can't come in years later and pick up where you otherwise would have been.").

78.    The Court finds the evidence supports disgorgement of $135.8 million for Hytera's profits due to Hytera's trade secret misappropriation under the DTSA.

### D. Hytera's $135.8 Million Profits from Its Misappropriation Are the Proper Amount of Unjust Enrichment, the $73,583,897 Addition for Avoided Research and Development Constitutes Double Recovery

79.    Mr. Malackowski testified that, because all of the trade secrets were misappropriated, the full amount of Hytera's profits in addition to Hytera's avoided R&D should be awarded. Tr. at 2200:5–11; *see also* Tr. at 5353:3-14 (Mr. Malackowski testifying that "there are two components" to his unjust enrichment opinion: "There are the profits that Hytera actually made on the sales that are accused and it's the R&D that they saved that they did not have to spend because they misappropriated the trade secrets."); PDX-10.29-.32, PDX-26.7.

80.    Awarding both the amount of R&D that Hytera avoided spending through its

**A91**

misappropriation and Hytera's profits from sales of DMR radios developed with the misappropriated trade secrets constitutes double recovery, however. See Tr. 4856:3-22 (Dr. Aron explaining why Motorola's request for both Hytera's profits and avoided research and development amounts to double recovery).

81.     By force of the Court's reasoning in the October 19, 2020, the disgorgement of Hytera's profits is an equitable remedy, as the award is not a specific proxy for Motorola's actual losses.

82.     By force of the Court's reasoning in the October 19, 2020 Order, awarding Hytera's avoided costs and Hytera's profits is double recovery.

83.     The Court finds that $135.8 million should be awarded for Hytera's trade secret misappropriation under the DTSA. The disgorgement of Hytera's profits and the award of Hytera's avoided research and development would constitute double recovery, however.

84.     The proper award, then, is $272,117,268, when including the Copyright Act disgorgement, discussed below.

85.     Because the punitive damages in this case are a function of the compensatory damages under the DTSA, the punitive damages award must therefore also be reduced so as to adhere to the statutory provision of the DTSA. 18 U.S.C. 1836 (b)(3)(C) (stating that an award of exemplary damages may not exceed 2 times the amount of the compensatory award).

86.     Punitive damages, then, shall be reduced to $271.6 million.

## III.     THE COPYRIGHT INFRINGEMENT AWARD TO MOTOROLA IS PROPER

### A.     Hytera's Infringement

87.     Motorola holds certificates of copyright registration for the MotoTRBO program in its radios. PTX-1527, PTX-1528, PTX-1645, PTX-1659, Tr. at 200:22-202:23; Dkt. 895 at Instruction No. 3 ("The following are stipulated facts: … 9. The U.S. Copyright Office issued registration certificates relating to certain software associated with Motorola's DMR radio products at issue in this case.").

88.     Motorola witnesses testified that the content of Motorola's copyrights was original and creative. Tr. at 607:11-23, 862:18-864:9, 1437:7-12. Hytera presented no countervailing evidence.

89.     Hytera had access to Motorola's copyrighted source code, and copied thousands of lines of that copyrighted source code that was original to Motorola into its own products. Tr. at 874:19- 876:9, 1432:5-1436:8; PTX-2090 and PTX-2091 (Exhibits C and D to Dr. Wicker's report). Hytera concedes that it copied Motorola's copyrighted DMR source code. Tr. at 3781:14-21.

90.     The Court denied Hytera's motion for judgment as a matter of law or new trial with respect to Motorola's copyright infringement claim. Dkt. 1088 at 11-13.

**B.     Hytera's Profits**

91.     Hytera began selling DMR radios that contain Motorola's copyrighted DMR source code in 2010. Tr. 204:19-20, 2020:22-2021:4, 2395:3-4, 5138:15-5140:8.

92.     Dr. Wicker explained that none of Hytera's DMR radios would function without Motorola's copyrighted source code. Tr. at 5075:7-5076:12 (citing PDX-20.5) (Dr. Wicker describing three libraries "in extensive use in Hytera's radios" that Hytera acknowledges were taken from Motorola; explaining that Hytera radios "would not function" without stolen code), 5073:10- 25 (Dr. Wicker explaining that "all 3500 ... source code files" in Hytera's radios "are contaminated or were developed with knowledge and availability of Motorola source code"), 5080:3-23 (Dr. Wicker explaining that even source code "done by someone other than what [Mr. Grimmett] refers to as the Malaysian team" is "still making use of Motorola's code" by "calling on Motorola's library ... for its functionality.

93.     The copyrighted source code that Hytera copied was taken from Motorola's ClearCase system and brought over to Hytera. Tr. at 443:18–21, 5087:3-5088:13; PTX-2100.825; PTX- 1316.3. Dr. Stephen Wicker, Motorola's technical expert, explained that the main ClearCase server is in Illinois, and that server is mirrored in other locations. Tr. 5150:5-5151:3. As a result, the other ClearCase

servers "reflect[] material that is in Illinois" and "anything that happens on one of those other [ClearCase] sites goes to Illinois." *Id.*

94.     Because Hytera's copyright infringement in the United States is directly linked to its foreign sales of DMR radios, Motorola is entitled to Hytera's worldwide profits from its DMR radios.

95.     Mr. Malackowski identified a causal nexus between Hytera's copyright infringement and gross revenues for DMR radios based on the amount Hytera spent on R&D to launch their first DMR product. Tr. at 2156:2-24 ("I was looking here for the nexus of my damage claim, which is basically whether or not there was a relationship between the trade secrets and copyright at issue and the profits that I seek for both companies. Hytera benefited from use of the Motorola trade secrets and copyrights, and they were able to reduce their own R&D expense accordingly.").

96.     From 2010 to June 2019, Mr. Malackowski identified Hytera's revenue for the accused DMR portable radios as $532,025,673, with mobile radios adding "another 111 million" dollars; for accused DMR repeaters as $91,166,965; and for DMR accessories as $53,202,567. Tr. at 2191:14-2193:13; 2195:8-12; PDX-10.25; PTX-2071, PTX-2226, DTX-4057.

97.     Dr. Aron did not dispute the revenues Mr. Malackowski presented for the accused Hytera products. Tr. 4958:23-4959:2; PTX-2226.

98.     In determining the amount of Hytera's profits, Mr. Malackowski deducted costs that would vary with production of additional radios, i.e., costs of goods sold, patent royalties, sales department, and asset impairment. Tr. at 2196:5-2197:12. Mr. Malackowski did not deduct costs associated with management or administration, legal fees, or research and development. *Id.*

99.     Mr. Malackowski calculated Hytera's profits from its infringement of Motorola's copyrights by multiplying Hytera's actual revenues for the accused products by Hytera's profit margin. Tr. at 2189:21-2190:7 (citing PDX-10.24, PTX-2071), Tr. at 2191:14-2192:18 (citing PDX-10.25). After deducting costs and expenses, Mr. Malackowski identified the amount of worldwide profits Hytera

earned as a result of Hytera's copyright infringement as $272 million. Tr. at 2195:13-2198:20, 5389:18–22 (referring to PDX 26.7).

100.    Dr. Aron agreed with Mr. Malackowski's deductions in calculating Hytera's profit margins, except with respect to Hytera's research and development expenses. Tr. at 4826:25- 4827:8, 4838:4- 4840:2. For the reasons explained above, Mr. Malackowski properly concluded that Hytera's R&D expenses should not be deducted in calculating Hytera's profits.

101.    The Court finds that the evidence supports disgorgement of $136.3 million in Hytera's profits for Hytera's copyright infringement.

## IV.    HYTERA'S MOBILE RADIOS ARE PROPERLY INCLUDED IN THE DAMAGES AWARD FOR COPYRIGHT INFRINGEMENT AND TRADE SECRET MISAPPROPRIATION

102.    Motorola's technical expert, Dr. Wicker, testified that mobile radios use the same code as the accused devices and repeaters, and Hytera's interrogatory response confirming that fact was admitted without objection from Hytera's counsel. Tr. at 1428:5-13; 1431:14-21; 5124:2-20; DDX-14.10; PTX-1740. Hytera's expert, Barbara Frederiksen-Cross, agreed, testifying that Hytera's accused mobile devices include the same code as Hytera's accused devices and repeaters. Tr. at 3795:4–14 ("The way the code is organized is there is repeater specific code and then subscriber specific code, which includes the code that's used in both the mobile and handheld devices.").

103.    Motorola introduced testimony related to Hytera's mobile products, to which Hytera did not object. For example, Mr. Malackowski testified to the amount of Hytera's revenue from the accused mobile products, as well as the profit margin for Hytera's accused products, including mobiles. Tr. at 2191:23-2192:3; 2198:9-17; PTX-2071, PTX-2226, DTX-4057. Hytera did not object to any of this evidence when it was admitted. On rebuttal, Mr. Malackowski provided a sum of that information. Tr. at 5395:11-24.

104.    Hytera does not contend that Mr. Malackowski's calculations are inaccurate. Instead, Hytera's

27

**A95**

witnesses disputed in a conclusory manner that Hytera's DMR mobile radios were accused. Tr. at

2581:3-7 (Mr. Sun testifying that he understands mobiles are not at issue in the case); 3278:7-9 (Mr.

Luo testifying that he understands Motorola is not accusing mobile radios); 3408:22-24 (Mr. Yuan

testifying that "[a]ll of the mobiles was not accused"); 3426:21-25 (same); Dkt. 898. Hytera's

witness testimony is plainly contradicted by the facts, which unequivocally demonstrate that

Hytera's mobile radios include Hytera's DMR mobile radios and misappropriated trade secrets.

105.    Because Hytera's DMR mobile radios include Motorola's misappropriated trade secrets and

infringed copyrights (Tr. at 1428:5-13; 1430:17-1431:21 3795:4–14; DDX-14.10; PTX-1740), they

are properly included in the award.

## V.    THE REDUCED AWARD OF $272,117,268 IS NOT EXCESSIVE AND NO REMITTITUR SHOULD BE GRANTED

106.    The award of $345,761,165 must be reduced to avoid double recovery for Motorola.  The

award cannot contain a disgorgement of profits and the avoided research and development costs, as

outlined in the Court's October 19, 2020 Order and as further discussed below.

107.    The reduced award of $272,117,268 is not excessive.

108.    Hytera asserts that "there is no rational connection between the evidence in this case and award

of $345.8 million for trade secret misappropriation and copyright infringement." Dkt. 954 at 39-40.

In support, Hytera repeats arguments that that have been addressed above. *Id.* at 39 (Hytera arguing

damages should be limited to a head start period,); *id.* at 40 (Hytera arguing copyright damages should

be limited to U.S. only); *id.* (Hytera arguing compensatory damages should be limited to $73.6

million).

109.    Second, Hytera argues that the award is "monstrously excessive because it exceeds total

profits for all products—not just accused products." *Id.* at 39. Hytera's argument is misleading. As

Mr. Malackowski explained at trial, Hytera's claim that it made only $265 million in profits over a

9.5 year period ignored that Hytera used its $734 million in accused revenues "to make acquisitions

to enhance its competitive position." Tr. 5343:18–5344:3, 5348:25-5351:20; *see also* PTX-968. Even Hytera's expert did not deduct Hytera's expenditures in acquiring new companies to enhance its competitive position in calculating Hytera's ill-gotten profits. Tr. 4837:16–4840:14.

110.    Third, Hytera contends that the award of $345 million is not comparable to awards in similar cases. Dkt. 954 at 40. This is incorrect. Hytera sold the accused products for nearly ten years, continued to sell the accused products after they were sued, and made $734.1 million in revenue on those products. Tr. 2191:23-2192:7, 5344:1-3. Awards in trade secret cases with a similar breadth of theft have neared or exceeded the $345 million awarded in this case. *E.I. DuPont de Nemours & Co. v. Kolon Indus., Inc.*, No. 3:09-cv-58, 2012 WL 1202485, at *1 (E.D. Va. Apr. 10, 2012) ($919.9 million compensatory damages verdict in trade secret misappropriation case); *Syntel Sterling Best Shores Mauritius Ltd. v. TriZetto Grp., Inc.*, 328 F.R.D. 450, Dkt. 931 at 4 (S.D.N.Y. Oct. 27, 2020) (jury verdict form awarding $284 million compensatory damages for trade secret misappropriation).

## VI.    MOTOROLA SHOULD BE AWARDED $272,117,268 FOR HYTERA'S TRADE SECRET MISAPPROPRIATION AND COPYRIGHT INFRINGEMENT

111.    The Court finds that Motorola should be awarded $135.8 million for Hytera's profits due to Hytera's trade secret misappropriation under the DTSA, for the time period from May 11, 2016 to June 30, 2019.

112.    The Court finds that Motorola should be awarded $136.3 million in Hytera's profits for Hytera's copyright infringement, for the time period from 2010 to May 10, 2016.

113.    The total compensatory award, therefore, is $272,117,268, excluding punitive damages.

## CONCLUSIONS OF LAW

### I.    DAMAGES - BURDEN OF PROOF

1.    Motorola had the burden of proving whether Hytera caused the damage that Motorola is claiming by a preponderance of the evidence. *See Playwood Toys, v. Learning Curve Toys*, No. 94-cv-6884, 2000 WL 36740990 (N.D. Ill. Aug. 15, 2000), ECF No. 19 (Jury Instructions); Federal Civil Jury Instructions of the Seventh Circuit, Instruction No. 12.8.1

### II.    TRADE SECRET DAMAGES

2.    Under the DTSA, the Court may award the following for misappropriation of trade secrets: "(i)(I) damages for actual loss caused by the misappropriation of the trade secret; and (II) damages for any unjust enrichment caused by the misappropriation of the trade secret that is not addressed in computing damages for actual loss[.]" 18 U.S.C.A. § 1836(3)(B).

3.    "[T]he measure of unjust enrichment damages is the benefit conferred to the defendant." *Medmarc Cas. Ins. Co. v. Avent Am., Inc.*, 612 F.3d 607, 611 (7th Cir. 2010). "[I]n the trade secret misappropriation context, the proper measure of unjust enrichment damages is 'the total gains of [a defendant's] wrongdoing,'" which includes the defendant's profits from the misappropriation and the costs the defendant avoided incurring due to the misappropriation. *Steves & Sons, Inc. v. JELD-WEN, Inc.*, No. 3:16-CV-545, 2018 WL 2172502, at *6-7 (E.D. Va. May 10, 2018); *Syntel Sterling Best Shores Mauritius Ltd. v. TriZetto Grp.*, No. 15 CIV. 211 (LGS), 2020 WL 5822058.

4.    To establish the defendant's ill-gotten profits, "[t]he plaintiff has the burden of establishing the defendant's sales; the defendant has the burden of establishing any portion of the sales not attributable to the trade secret and any expenses to be deducted in determining net profits. *Cartel Asset Mgmt. v. Ocwen Fin. Corp.*, 249 F. App'x 63, 79 (10th Cir. 2007) (quoting

Comment (f) to the Restatement (Third) of Unfair Competition § 45 (1995)); *Peerless Indus.,*

*Inc. v. Crimson AV LLC*, No. 11-cv-1768, Jury Instructions at 45 (N.D. Ill. June 24, 2016) (Dkt.

610).

5.    Avoided costs are "the avoided costs that would have been incurred to achieve the same

result without access to those trade secrets." *Miller UK Ltd. v. Caterpillar, Inc.*, No. 10-CV-

03770, 2015 WL 10818831, at *13 (N.D. Ill. Nov. 1, 2015) (internal quotations omitted).

6.    Unjust enrichment for trade secret misappropriation is not limited to a head start period.

*RRK Holding Co. v. Sears, Roebuck & Co.*, 563 F. Supp. 2d 832, 836 (N.D. Ill. 2008) ("While

Illinois case law requires damages be limited to a head start period for injunctive relief, it has

not made such a requirement for monetary damages.").

7.    Rather, "[t]o prevent underenforcement and to remedy the defendant's increased market

share, therefore, it is equitable to grant ... monetary damages beyond [a] 'head start' period."

*Agilent Techs., Inc. v. Kirkland*, No. CIV.A. 3512-VCS, 2010 WL 610725, at *27 (Del. Ch.

Feb. 18, 2010); *see also Russo v. Ballard Med. Prods.*, 550 F.3d 1004, 1020 (10th Cir. 2008).

8.    Hytera's avoided R&D does not constitute a fully paid up royalty because there is no

evidence supporting that conclusion. *See Erfindergemeinschaft UroPep GbR v. Eli Lilly & Co.*,

No. 15-cv-1202, 2017 WL 3034655, at *2–3 (E.D. Tex. July 18, 2017) (rejecting argument

verdict was fully paid-up license where "parties did not argue to the jury (or the Court) that the

damages award would constitute compensation for a paid-up license").

9.    Notwithstanding Motorola's request to the jury for an award of Hytera's profits only,

this Court previously ruled that the jury's award "is properly characterized as a 'case-specific proxy for

. . . losses' that rendered the award a "legal remedy." Dkt. 1088 at 26.

10.    That ruling was based on the belief by the Court that the $135.8 award represented Motorola's

lost profits, not Hytera's profits.

11.     The Court's legal reasoning remains the same, but this factual inaccuracy must be corrected.

12.     *Texas Advanced Optoelectronic Sols., Inc. v. Renesas Elecs. Am., Inc.* ("*TAOS*"), 895 F.3d

1304, 1318–26 (Fed. Cir. 2018) instructs that "[i]n some cases, a plaintiff seeking disgorgement as a

remedy for trade secret misappropriation might prove that this measure of relief, though focused on the

defendant's gains, is good evidence of damages in the form of the plaintiff's losses or of a reasonable

royalty for use of the secret."

13.     Hytera's profits are not a proxy for Motorola's actual losses in this case. *See Fair Isaac*

*Corp. v. Fed. Ins. Co.*, 408 F. Supp. 3d 1019, 1031 (D. Minn. 2019), aff'd, 468 F. Supp. 3d 1110 (D.

Minn. 2020).

14.     Motorola may not recover both Hytera's profits and avoided R&D because this amounts

to impermissible double recovery.  If Motorola recovers Hytera's profits, then it is recovering the

amounts Hytera saved in research and development from the alleged misappropriation. *Salisbury*

*Laboratories, Inc. v. Merieux Laboratories, Inc.*, 908 F.2d 706 (11th Cir. 1990); *see also In re Mud*

*King Prods., Inc.*, 514 B.R. 496, 523–24 (Bankr. S.D. Tex. 2014) (rejecting trade secret owner's request

to recover both disgorgement of debtor's profits and "hypothetical development costs" because "no case

allows development costs where defendant's profits are shown"); *Hallmark Cards, Inc. v. Monitor*

*Clipper Partners, LLC*, No. 08-0840-CV-W-ODS, 2012 WL 3047308, at *3 n.4 (W.D. Mo. July 25,

2012) ("Most of the authorities cited indicate that the defendant's cost savings may be used to value

gain instead of, and not as well as, profits earned from the misappropriation. This is undoubtedly based

on the need to avoid double counting of gains.").

15.     The clear indication of Congress in amended Chapter 90 of Title 18 of the U.S. Code

was to extend the extraterritorial provisions of Section 1837 to Section 1836, meaning Section

1836 may have extraterritorial reach subject to the restrictions in Section 1837. Dkt. 834 at 15.

16.     18 U.S.C. § 1837 provides: "This chapter also applies to conduct occurring outside the

United States if— (1) the offender is a natural person who is a citizen or permanent resident

alien of the United States, or an organization organized under the laws of the United States or a State or political subdivision thereof; or (2) an act in furtherance of the offense was committed in the United States."

17.    The "offense," in context of the 18 U.S.C. § 1837(2), is the misappropriation of a trade secret. This is clear through the plain language of the statute. *See* 18 U.S.C. § 1836(b). As courts have recognized, misappropriation can occur through any of three actions: (1) acquisition, (2) disclosure, or (3) use. *Zaccari v. Apprio, Inc.*, 390 F. Supp. 3d 103, 112-13 (D.D.C. 2019) (the DTSA "permits plaintiffs to bring private causes of action if they 'own[] a trade secret that is misappropriated.' 18 U.S.C. § 1836(b)(1). Misappropriated means either '(A) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or (B) disclosure or use of a trade secret of another without express or implied consent by a person' who meets one of several conditions. 18 U.S.C. § 1839(5)(A)- (B). As some courts have put it, the DTSA thus authorizes suits alleging three theories of trade secret misappropriation: (1) acquisition, (2) disclosure, and (3) use. *See, e.g., AUA Private Equity Partners, LLC v. Soto*, No. 1:17-8035-GHW, 2018 WL 1684339, at *4 (S.D.N.Y. Apr. 5, 2018); *Camick v. Holladay*, 758 F. App'x 640, 645 (10th Cir. 2018).").

18.    "[M]arketing goods that embody the trade secret, employing the trade secret in manufacturing or production, relying on the trade secret to assist or accelerate research or development, or soliciting customers through the use of information that is a trade secret ... all constitute 'use.'" *Cognis Corp. v. CHEMCENTRAL Corp.*, 430 F. Supp. 2d 806, 812 (N.D. Ill. 2006).

19.    Section 1837 of the DTSA does not define what constitutes "an act in furtherance of the offense." In *Luminati Networks Ltd. v. BIScience Inc.*, No. 2:18-CV-00483-JRG, 2019 WL 2084426, at *9 (E.D. Tex. May 13, 2019), a Texas district court case analyzing Section 1837 wrote, "this language is not foreign to the common law but is regularly used in the area of

33

**A101**

federal conspiracy law." *Id.* (citing *Yates v. United States*, 354 U.S. 298, 334 (1957) ("[T]he overt act must be found...to have been in furtherance of a conspiracy. "); *Findlay v. McAllister*, 113 U.S 104, 114 (1885) ("[T]o sustain the action it must be shown not only that there was a conspiracy, but that there were tortious acts in furtherance of it.")

20.     "[W]here Congress borrows terms of art in which are accumulated the legal tradition and meaning of centuries of practice, it presumably knows and adopts ... the meaning its use will convey to the judicial mind unless otherwise instructed." *Morissette v. United States*, 342 U.S. 246, 263 (1952).

21.     As did the *Luminati* court, this Court looks to the established common law meaning of "in furtherance of" when interpreting the extraterritoriality provision of the DTSA. 18 U.S.C. § 1837(2). The Court agrees with *Luminati*'s analysis on this point: "Applied to the DTSA, *Yates* makes clear that the act in furtherance of the offense of trade secret misappropriation need not be the offense itself or any element of the offense, but it must 'manifest that the [offense] is at work' and is not simply 'a project in the minds of the' offenders or a 'fully completed operation.' [*Yates*, 354 U.S. at 334.] Put another way, an act that occurs before the operation is underway or after it is fully completed is not an act 'in furtherance of' the offense." 2019 WL 2084426, at *10.

22.     If Motorola has shown that Hytera has taken actions that "manifest that the offense is at work"—the offense being the misappropriation—then Section 1837 has been satisfied and the chapter (including Section 1836(b)) also applies to acts occurring outside the United States.

23.     Motorola introduced evidence in this case sufficient to support a finding that "use" of the trade secrets has occurred domestically. It was undisputed throughout trial that Hytera has advertised, promoted, and marketed products embodying the allegedly stolen trade secrets domestically at numerous trade shows and that as a result, Section 1837(2) was satisfied and

**A102**

the DTSA applied extraterritorially. *See* Dkt. 834 at 21–23; *Gen. Universal Sys., Inc. v. HAL, Inc.*, 500 F.3d 444, 450 (5th Cir. 2007); *Cognis Corp. v. CHEMCENTRAL Corp.*, 430 F. Supp. 2d 806, 812 (N.D. Ill. 2006).

24.    The DTSA applies to a "use"-based private cause of action even if the acquisition occurred before effective date of the statute or if the use began before the effective date. *See* Pub. L.114- 153, May 11, 2016 (18 U.S.C. § 1833 Note) ("The amendments made by this section shall apply with respect to any misappropriation of a trade secret ... for which any act occurs on or after the date of the enactment of this Act."). This broad language, coupled with the omission of the provision in the Uniform Trade Secret Act limiting such recovery, support the position that "use" in this case occurring after effective date serves as a proper basis for this action.

25.    Alternatively, the application of the DTSA and the ITSA in this case is domestic because Hytera's misappropriation occurred in the United States. 18 U.S.C. § 1839(5)(A) (defining misappropriation to include "acquisition"). The theft occurred in the United States when Hytera employees stole Motorola's trade secrets from the Compass and ClearCase systems because those systems are accessible at Motorola's Schaumburg office. *Flavorchem Corp. v. Mission Flavors & Fragrances, Inc.*, 939 F. Supp. 593, 597–98 (N.D. Ill. 1996) (finding that because trade secrets were copied in Illinois and injury occurred in Illinois, Illinois was the location of the tortious conduct); *Specht v. Google, Inc.*, 660 F. Supp. 2d 858, 866 (N.D. Ill. 2009) (because infringement "took place on the Internet" it "presumably occurr[ed] in Illinois"); *Strabala v. Zhang*, 318 F.R.D. 81, 111 (N.D. Ill. 2016) ("where the internet is concerned, a person's conduct may be expressly aimed at a specific person or entity in another forum that causes harm in that forum without having express knowledge as to the ... location of the ... entity being affected").

26.    This is sufficient to establish that Motorola's claim for misappropriation is based on

35

**A103**

conduct that occurred in this District. *See WesternGeco v. ION Geophysical Corp.*, 138 S. Ct. 2129, 2138 (2018) ("[T]he object[s] of the statute's solicitude[] can turn on the 'conduct,' 'parties,' or interests that it regulates or protects."); *IPOX Schuster, LLC v. Nikko Asset Mgmt. Co.*, 304 F. Supp. 3d 746, 759 (N.D. Ill. 2018) (ITSA applied domestically because "[defendant] used a conduit to request and receive information from [plaintiff], which is based in Illinois"). The fact that the acquisition occurred prior to the enactment of the DTSA does not preclude a domestic application of the statute based on that acquisition because the DTSA applies to continuing misappropriations, so long as "any act occurs on or after the date of the enactment of this Act." *See* Pub. L.114-153, May 11, 2016 (18 U.S.C. § 1833 Note).

27.     As a result, "any damage award flowing from ... domestic misappropriation would not run afoul of the presumption against the extraterritorial application of law." *See Turnkey Sols. Corp. v. Hewlett Packard Enter. Co.*, No. 15-cv-1541, 2017 WL 3425140, at *8 (D. Colo. Aug. 9, 2017) (denying summary judgment that plaintiff could not seek damages for extraterritorial sales under Colorado's UTSA); *see also Envtl. Def. Fund, Inc. v. Massey*, 986 F.2d 528, 531 (D.C. Cir. 1993) ("Even where the significant effects of the regulated conduct are felt outside U.S. borders, the statute itself does not present a problem of extraterritoriality, so long as the conduct which Congress seeks to regulate occurs largely within the United States.").

28.     Hytera's profits due to Hytera's trade secret misappropriation under the DTSA, for the time period from May 11, 2016 to June 30, 2019, is $135.8 million.

29.     The Court will award this disgorgement of Hytera's profits. "[B]y disgorging any net profits from the infringer, lost profit damages eliminate a major incentive to steal the copyright instead of fairly negotiating for its use with the owner." *McRoberts Software, Inc. v. Media 100, Inc.*, 329 F.3d 557, 568 (7th Cir. 2003).

## III. COPYRIGHT INFRINGEMENT DAMAGES

30.     Motorola's certificates of registration for the MotoTRBO program in its radios are

"prima facie evidence of the validity of the copyright," 17 U.S.C. § 410(c), including "both valid ownership of copyright and originality." *Associated Press v. Meltwater U.S. Holdings, Inc.*, 931 F. Supp. 2d 537, 549 (S.D.N.Y. 2013).

31.     The Copyright Act permits a plaintiff to recover "profits of the infringer that are attributable to the infringement." 17 U.S.C. § 504(b). To establish the infringer's profits, "the copyright owner is required to present proof only of the infringer's gross revenue, and the infringer is required to prove his or her deductible expenses and the elements of profit attributable to factors other than the copyrighted work." *Id.*; *see also* Dkt. 895 at Instruction No. 40.

32.     The Seventh Circuit has held that the continuing violation doctrine applies in copyright cases. *See Taylor v. Meirick*, 712 F.2d 1112, 1118-19 (7th Cir. 1983). As Judge Posner wrote, "When the final act of an unlawful course of conduct occurs within the statutory period, these purposes are adequately served, in balance with the plaintiff's interest in not having to bring successive suits, by requiring the plaintiff to sue within the statutory period but letting him reach back and get damages for the entire duration of the alleged violation." Dkt. 1088 at 12 (quoting *Taylor*, 712 F.2d at 1119).

33.     While "a plaintiff must show a causal nexus between the infringement and the gross revenues," *Bell v. Taylor*, 827 F.3d 699, 710 (7th Cir. 2016), "[t]he Seventh Circuit [requires] only a minimal connection between revenue and infringement in direct profit cases," *Bergt v. McDougal Littell*, 661 F. Supp. 2d 916, 927 (N.D. Ill. 2009). "Thus, all a plaintiff must do to meet his burden in the Seventh Circuit is provide a figure limited to the profit stream resulting from the infringement."

34.     The defendant "bear[s] the burden of proving the amount and reasonableness of all

deductions by a preponderance of the evidence." *Liu v. Price Waterhouse LLP*, No. 97 CV
3093, 2000 WL 1644585, at *5 (N.D. Ill. Oct. 30, 2000).

35.    "If an infringing act occurred within the United States, then the plaintiff may recover
for foreign violations that are directly linked to the domestic infringement." Dkt. 834 at 25-27;
*see also Tire Eng'g & Distrib., LLC v. Shandong Linglong Rubber Co.*, 682 F.3d 292, 307 (4th
Cir. 2012) ("Recovery of damages arising from overseas infringing uses [is] allowed [when]
the predicate act of infringement occurring within the United States enabled further
reproduction abroad."); *L.A. News Serv. v. Reuters Television Int'l, Ltd.*, 149 F.3d 987, 991–92
(9th Cir. 1998) (tracing the predicate act doctrine to Judge Learned Hand's opinion in *Sheldon
v. Metro–Goldwyn Pictures Corp.*, 106 F.2d 45 (2d Cir. 1939), *aff'd*, 309 U.S. 390 (1940));
*Update Art, Inc. v. Modiin Publ'g, Ltd.*, 843 F.2d 67, 73 (2d Cir. 1988).

36.    Hytera's profits from selling DMR radios that include Motorola's copyrighted works—
whether in the U.S. or outside the U.S.—are properly recoverable, including because Hytera
has promoted, advertised, marketed, and sold its DMR products containing Motorola's
copyrighted source code in the United States, including at trade shows. *See Sheldon v. Metro-
Goldwyn Pictures Corp.*, 106 F.2d 45, 52 (2d Cir. 1939) ("profits made from exhibiting the
infringing picture outside the United States" were available as damages because infringer made
negatives used to generate picture in U.S.), *aff'd*, 309 U.S. 390 (1940).

37.    Hytera's profits from its copyright infringement are $136.3 million. Tr. at 5389:18-22.

38.    Motorola is not entitled to a double recovery for the same wrongful conduct under both
its trade secret misappropriation and copyright claims. *Thermodyne Food Serv. Prods. v
McDonald's Corp.*, 940 F. Supp. 1300, 1310 (N.D. Ill. 1996).

39.    As discussed above, the recovery of Hytera's profits and Hytera's avoided costs constitutes a
double recovery.

**A106**

40.      The total award is comprised of $135.8 in disgorged profits under the DTSA, $136.3

million in disgorged profits under the Copyright Act, for a total of $272.177,259 million in

disgorged profits to be awarded to Motorola.

41.      Punitive damages are awarded only on the DTSA claim, and the Court follows the jury

in awarding the maximum--$271.6 million.

42.      The total award, then, shall be reduced to $543.7 million.

## V.      THE AWARD IS NOT EXCESSIVE AND NO REMITTITUR SHOULD BE GRANTED.

43.      In deciding whether to award a new trial on damages or remittitur, courts consider "[1]

whether the award is 'monstrously excessive,' [2] whether there is a rational connection

between the award and the evidence, and [3] whether the award is roughly comparable to

awards made in similar cases." *Gracia v. SigmaTron Int'l, Inc.*, 842 F.3d 1010, 1022 (7th Cir.

2016) (declining to remit damages award); *Riemer v. Ill. Dep't of Transp.*, 148 F.3d 800, 808

(7th Cir. 1998) (same). The first two factors "are really just two ways of describing the same

inquiry: whether the jury verdict was irrational." *Adams v. City of Chicago*, 798 F.3d 539, 543

(7th Cir. 2015). "In order to determine whether the jury's verdict was irrational, the district court

must review the trial record as a whole in the light most favorable to the verdict." *Id.*

44.      Courts in the context of copyright infringement have held that "[d]efendants cannot

limit the amount at issue in the underlying claim to the profits they received. . . ." *Owners Ins.

Co. v. Cruz Accessories*, No. 2:17-CV-2215-PMD, 2018 WL 902290, at *2 (D.S.C. Feb. 15,

2018).

IT IS SO ORDERED.

ENTER: _Charles R Norgle_

CHARLES RONALD NORGLE, Judge
United States District Court

DATE: January 8, 2021

39

**A107**

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| MOTOROLA SOLUTIONS, INC., et al., | |
| Plaintiffs, | |
| v. | Case No. 1:17-cv-01973 |
| HYTERA COMMUNICATIONS CORPORATION LTD., et al., | Hon. Charles R. Norgle |
| Defendants. | |

## ORDER

On the parties' submissions regarding a reasonable royalty, the Court concludes that a perpetual royalty of $80.32 per radio and $378.16 per repeater is reasonable and appropriate on Hytera's sales of its products, as specifically identified by Motorola, that incorporate Motorola's misappropriated trade secrets and infringed copyrights starting July 1, 2019. Hytera shall maintain the confidentiality of Motorola's misappropriated trade secrets and infringed copyrights. As agreed by the parties, procedures for Hytera's royalty payments on a quarterly basis for relevant sales in the preceding quarter, as well as for certification and audits of sales numbers, among other agreed terms, shall be consistent with the parties' long-standing DMR patent license agreement. However, Hytera's first payment shall include royalties due for its sales from July 1, 2019 through the relevant quarter. Additionally, as agreed by the parties, Hytera's royalty payments shall be made into an escrow account pending the parties' exhaustion of all appellate proceedings, unless and until the Court orders otherwise. The parties shall jointly file a proposed royalty agreement consistent with this order for the Court's review and approval by January 31, 2022.

## MEMORANDUM OPINION

After denying Motorola's request for a permanent injunction against Hytera, the Court granted Motorola's alternative request for a reasonable royalty. Dkt. 1097 at 6. At the time, the parties were mediating the royalty issue, so the Court allowed the parties time to negotiate. But the parties failed to reach an agreement, so the Court approved the parties' agreed proposal to submit briefs on the royalty issue. Dkt. 1112. The parties' proposal noted "the only supporting declarations would be from the parties' respective damages experts, and no hearing is requested." Dkt. 1105.

**A108**

The Court begins by noting the important areas of agreement between the parties. The parties agree that the procedures for Hytera's royalty payments should generally be consistent with the parties' long-standing DMR patent license agreement, including, among other things, quarterly payments for relevant sales in the preceding quarter as well as established procedures for certification and audits of sales numbers. The parties also agree that Hytera's royalty payments should be made into an escrow account pending the exhaustion of all appellate proceedings. The Court accepts and adopts those agreements.

But the parties disagree about everything else, including the Hytera products to which the royalty applies, the effective date of the royalty, the amount of the royalty per relevant radio and repeater, as well as additional terms that Motorola requests. As explained below, the Court finds that the royalty applies to Hytera's sales of the products specifically identified by Motorola beginning on July 1, 2019. Further, the Court concludes that a royalty of $80.32 per relevant radio and $378.16 per relevant repeater is reasonable and appropriate under the circumstances. The Court grants Motorola's unchallenged additional request that Hytera be required to maintain the confidentiality of Motorola's trade secrets and copyrights. But the Court rejects the remaining terms requested by Motorola, including that Hytera be required to participate in a quarantine and removal process and to provide notice to Motorola of alleged redesigns.

## I. BACKGROUND

As explained in the Court's prior orders, Motorola proved at trial that Hytera misappropriated 21 of Motorola's trade secrets and infringed Motorola's copyright in the source code of its MotoTRBO program to develop the Hytera products that implement international standards for two-way digital mobile radios ("DMR"). Dkt. 1100 at 3, 25. From 2010 through June 2019, Hytera's sales revenue from its products that incorporated Motorola's trade secrets and

**A109**

copyrighted source code totaled $787,395,205: $532,025,673 for portable radios, $111,000,000

for mobile radios, $91,166,965 for repeaters, and $53,202,567 for accessories. Id. at 17, 26. From

that revenue, Hytera profited $272,117,268. Id. at 17. The Court awarded those profits to Motorola

as disgorgement with Hytera's $136.3 million profit from 2010 through May 10, 2016 awarded on

Motorola's copyright claims and Hytera's $135.8 million profit from May 11, 2016 through June

30, 2019 awarded on Motorola's trade secrets claims. Id. at 17, 29, 36, 38-39. The Court also

awarded punitive damages of $271.6 million against Hytera on Motorola's trade secrets claims,

which was consistent with the jury's verdict. Id. at 39. As a result, the Court's final monetary

award to Motorola against Hytera totals $543.7 million. Ibid.

     In addition to the monetary judgment for Hytera's profits on its sales of its relevant

products between 2010 and June 2019, Motorola moved the Court to permanently enjoin Hytera

from selling its DMR products that resulted from Hytera's misappropriation of Motorola's trade

secrets and infringement of Motorola's copyrights, which the Court denied. Dkt. 1097 at 2-6.

Instead, the Court granted Motorola's alternative request for a reasonable royalty on Hytera's sales

of those DMR products. Id. at 6. The Court allowed the parties to attempt to negotiate the amount

of the royalty, in mediation or otherwise, or else to propose a plan for the Court to make that

determination. Ibid. The parties did not successfully resolve the issue on their own, so the Court

accepted the parties' agreed proposal to submit briefs on the issue with declarations from the

parties' respective damages experts, and to forego a hearing on the matter. Dkt. 1105.

## II. LEGAL STANDARD

     Both the Defend Trade Secrets Act and the Copyright Act permit courts to award a

reasonable royalty as an alternative to an injunction. 18 U.S.C. § 1836(b)(3)(A)(iii) (ongoing

reasonable royalty for trade secret misappropriation allowed "in exceptional circumstances that

render an injunction inequitable, that conditions future use of the trade secret upon payment of a reasonable royalty for no longer than the period of time for which such use could have been prohibited"); Petrella v. Metro-Goldwyn-Mayer, Inc., 572 U.S. 663, 687-88 (2014) (equitable remedies available under the Copyright Act include ongoing reasonable royalty). But caselaw on how to determine a reasonable royalty for misappropriated trade secrets or infringed copyrights is scarce. The parties understandably rely largely on well-trodden caselaw from the patent infringement context, starting with the seminal decision in Georgia-Pacific Corp. v. U.S. Plywood Corp., 318 F. Supp. 1116 (S.D.N.Y. 1970).

Indeed, other courts have adopted that approach to determine reasonable royalties in other contexts based on the similarity of torts involving intellectual property, whether patents or, as here, trade secrets and copyrights. See Bianco v. Globus Med., Inc., 53 F. Supp. 3d 929, 932 (E.D. Tex. 2014) (adopting patent law analysis for reasonable royalty on state law trade secret misappropriation claim); RKI, Inc. v. Grimes, 200 F. Supp. 2d 916, 926-27 (N.D. Ill. 2002) (same); see also Aqua Shield v. Inter Pool Cover Team, 774 F.3d 766, 771 n.1 (Fed. Cir. 2014) (reasonable royalty under copyright law uses similar analysis as reasonable royalty under patent law).

A reasonable royalty may be calculated using a variety of methods, including methods based on an established royalty, Versata Software, Inc. v. SAP Am., Inc., 717 F.3d 1255, 1267 (Fed. Cir. 2013), on hypothetical negotiations between the parties, ibid., and on an analytical approach, Lucent Techs., Inc. v. Gateway, Inc., 580 F.3d 1301, 1324 (Fed. Cir. 2009). See also Apple Inc. v. Motorola, Inc., 757 F.3d 1286, 1315 (Fed. Cir. 2014) (listing examples of other possible methods). Because of the stringent criteria for an established royalty, "few courts have actually found an established royalty." Mobil Oil Corp. v. Amoco Chemicals Corp., 915 F. Supp. 1333, 1342 (D. Del. 1994); see also Kerr and Troxel, Calculating IP Damages § 5:12 (Westlaw

Oct. 2021 update) ("Today, an established royalty (using the limited definition developed by the courts) very rarely is adopted as the basis for an award."). And neither party asserts that an established royalty is a proper method to determine a reasonable royalty in this case.

The analytic method "focuses on the infringer's projections of profit for the infringing product" as well as the infringer's usual or acceptable net profit. Lucent Techs., 580 F.3d at 1324. However, the most common method by far is the hypothetical negotiation approach. Id. at 1324-25. "The hypothetical negotiation tries, as best as possible, to recreate the *ex ante* licensing negotiation scenario and to describe the resulting agreement." Id. at 1325. "Though this analysis necessarily involves an element of approximation and uncertainty," any reasonable royalty still "must be supported by relevant evidence in the record." Unisplay, S.A. v. American Electronic Sign Co., Inc., 69 F.3d 512, 517 (Fed. Cir. 1995); see also Apple, 757 F.3d at 1315 ("estimating a 'reasonable royalty' is not an exact science").

## III. ANALYSIS

As mentioned at the outset, the Court accepts and adopts the parties' agreement on several issues, including provisions for Hytera's royalty payments generally consistent with the parties' long-standing DMR patent license agreement and that Hytera's royalty payments should be made into an escrow account pending the exhaustion of all appellate proceedings. As to the disputed issues, the Court first finds that the royalties due to Motorola from Hytera apply to all Hytera products specifically identified by Motorola in its submissions. Second, the Court concludes that the royalties apply to Hytera's sales of those products starting July 1, 2019. Third, based on the submissions of the parties and their experts, the Court finds that an ongoing royalty of $80.32 per radio and $378.16 per repeater is reasonable and appropriate under the circumstances. Finally, the Court accepts Motorola's request that Hytera be required to maintain the confidentiality of

Motorola's trade secrets and copyrights, but rejects the remaining terms requested by Motorola, including that Hytera be required to participate in a quarantine and removal process and to provide notice to Motorola of alleged redesigns.

**A. The royalties apply to all Hytera products identified by Motorola.**

In its response to Motorola's royalty submission, Hytera argues that Motorola improperly requests royalties on sales of Hytera products that were neither adjudicated nor at issue at trial. Hytera summarily claims that none of those products were included in Motorola's prior expert reports and were not the basis of the jury's damages award and, as such, cannot be the basis for any ongoing royalty. Hytera does not support its assertions with any citations to the record in this case. Motorola does not dispute that the products Hytera identifies did not factor into the jury's damages award (or the Court's ultimate disgorgement award). But Motorola notes that the Defend Trade Secrets Act allows for reasonable royalties on Hytera's ongoing use of Motorola's trade secrets and does not limit the royalty to products for which Motorola was compensated for Hytera's past sales. 18 U.S.C. § 1836(b)(3)(A)(iii). Motorola also notes that Hytera agreed that four of the products that it argues should not be subject to a royalty would be subject to an injunction if the Court had granted Motorola's request for one. Most importantly, Motorola argues that the products subject to this dispute were, in fact, adjudicated at trial, citing to the transcript of the trial as well as numerous trial exhibits. The Court agrees with Motorola and notes that the Court has previously rejected a similar argument by Hytera that its mobile radios were improperly included in the disgorgement award. See Dkt. 1100 at 27-28 (agreeing with Motorola that Hytera's mobile radios, as opposed to portable radios, were proven at trial to incorporate Motorola's trade secrets and copyrights and, therefore, were properly included in disgorgement award).

6

**A113**

The parties also disagree as to the propriety of Motorola's definitions of its trade secrets and copyrighted works in connection with Motorola's identification of the Hytera products that should be subject to the ongoing royalty, but the Court concludes that dispute is immaterial. It is enough that Motorola has specifically identified the Hytera products to which the ongoing royalty applies. As a result, the Court concludes that the ongoing royalty applies to the Hytera products that Motorola specifically identifies in its submission. See Dkt. 1118-3 (Motorola's list of "Accused Products").

**B. The royalties apply to Hytera's sales of its relevant products starting July 1, 2019.**

The parties also dispute the start date of Hytera's royalty payment responsibilities. Motorola argues that Hytera's royalty obligations should begin on July 1, 2019 because the jury's verdict and the Court's ultimate disgorgement award was based on Hytera's sales and profits through June 30, 2019, and because the Court denied Motorola's request for supplemental damages. Hytera retorts that Motorola's position is inconsistent with the Defend Trade Secrets Act's allowance of a reasonable royalty for "*future* use" of Motorola's trade secrets, which according to Hytera disallows past uses. Instead, according to Hytera, the start date for Hytera's obligation to pay royalties should be December 17, 2020, the date on which the Court denied Motorola's request for a permanent injunction. Motorola also offers alternative start dates of November 6, 2019, the first day of trial, or February 14, 2020, the date the Court denied Motorola's request for a temporary restraining order immediately following the jury's verdict.

Hytera's assertion that the start date of its royalty obligations should be the date that the Court denied Motorola's request for a permanent injunction is derived from caselaw applying the Patent Act, for which Hytera cites as examples Presidio Components Inc. v. American Technical Ceramics Corp., No. 08-CV-335-IEG (NLS), 2010 WL 3070370, at *5 (S.D. Cal. Aug. 5, 2010),

**A114**

and Amado v. Microsoft Corp., No. SA CV 03-242 DOC (ANx), 2008 WL 8641264, at *12 (C.D. Cal. Dec. 4, 2008) ("Amado II"). But the Court previously denied Motorola's request for supplemental damages, accepting Hytera's argument that, unlike the Patent Act, the Defend Trade Secrets Act and the Copyright Act do not allow for supplemental damages. Dkt. 1101 at 1. The Court cannot now accept Hytera's position that the start date of its royalty obligation must start as of the date that the Court denied Motorola's request for an injunction. That rule makes sense in the patent context where supplemental damages are allowed and routinely awarded. In patent cases, post-verdict supplemental damages for continued infringement are calculated consistent with the damages award in the jury verdict. Presidio Components, 2010 WL 3070370, at *2. And the availability of supplemental damages in patent cases ensures a patent holder is compensated for continued infringement that occurs between the verdict and the imposition of a reasonable royalty as of the date a permanent injunction is denied. Amado II, 2008 WL 8641264, at *12.

But a necessary consequence of Hytera's previous argument that supplemental damages are not available under the Defend Trade Secrets Act or the Copyright Act, which the Court accepted, is that imposing a reasonable royalty only as of the date a permanent injunction is denied leaves unaddressed the broader concern identified in Amado II that a gap between post-verdict sales and the imposition of a reasonable royalty only on denial of a permanent injunction "would, in essence, grant [Hytera] a royalty free license." Ibid. Notably, Hytera does not advance a truly literal understanding of the Defend Trade Secrets Act's allowance of a reasonable royalty for its "future use" of Motorola's trade secrets, to start from the date the Court awards the reasonable royalty. And Hytera's reading of "future use" as starting on the date the Court denied Motorola's request for a permanent injunction is no more convincing, especially because of the concern identified in Amado II of avoiding gaps that effectively constitute royalty-free licenses.

**A115**

Accordingly, because the Court has concluded that supplemental damages are not available to Motorola, the Court finds that the reasonable royalties apply to Hytera's sales of its relevant products beginning July 1, 2019. As such, Hytera's first royalty payment shall include royalties due for its sales of relevant products from July 1, 2019 through the end of the relevant quarter, according to the terms that the parties have agreed to, which otherwise shall be consistent with the parties' long-standing DMR patent license agreement.

**C. An ongoing royalty of $80.32 per radio and $378.16 per repeater is reasonable and appropriate under the circumstances.**

Motorola proposes a royalty of $102 per relevant portable or mobile radio[1] and $473 per relevant repeater that is derived directly from the Court's $272 million award for disgorgement of Hytera's profits from its past sales through June 2019. The calculation of Motorola's proposed royalty rates is supported by the report of its expert, James E. Malackowski. And Motorola claims that its proposal is supported by several of the canonical Georgia-Pacific factors.

In response, Hytera first attacks the methodology of Motorola's proposal as flawed as a matter of law, logic, and economics. Hytera argues that the concept of a royalty is distinct from profits as a matter of law and that any royalty that equals or exceeds Hytera's profit cannot be reasonable. Separately, Hytera's expert, Dr. Debra J. Aron, also attacks Motorola's and Mr. Malackowski's methodology noting that unlike the Court's disgorgement award, a reasonable royalty in this case should be analyzed under a hypothetical negotiation scenario under which the parties participate voluntarily where the resulting royalty rate is agreeable to both parties and provides Hytera a reasonable profit. Hytera and Dr. Aron also note that Mr. Malackowski has previously provided an opinion on a reasonable royalty in his expert report before trial, though at

---

[1] Motorola clarifies in a footnote that the precise per-unit royalty under its theory is $106.18 per relevant portable radio and $102.46 per relevant mobile radio, but suggests a royalty of $102 per radio, whether portable or mobile, to simplify the royalty process.

trial Motorola did not elicit that opinion from Mr. Malackowski or otherwise seek a reasonable royalty as damages.[2] Nevertheless, Mr. Malackowski's prior reasonable royalty opinion was based not on Hytera's profits, but on Hytera's avoided research and development costs, which Mr. Malackowski calculated to total between $73.6 million and $117.8 million. According to Dr. Aron, that lump sum calculation translates to a royalty of about half of Motorola's current proposal, $51.51 per radio and $257.57 per repeater. At bottom, however, Dr. Aron opines that a reasonable ongoing royalty is $31.61 per radio and $200.84 per repeater, which is derived from the lost profits Motorola would expect to experience in the future because of Hytera's sales of those products.

From a high-level methodological standpoint, Hytera has the better argument, with one caveat. Contrary to Motorola's and Mr. Malackowski's proposal, royalties ought to be based on the fair market value of the relevant intellectual property and not solely on Hytera's past profits. See ECIMOS, LLC v. Carrier Corp., 971 F.3d 616, 639 (6th Cir. 2020). But ECIMOS also provides the caveat to Hytera having more properly framed the required methodology as a matter of law and economics. Contrary to Hytera's argument, a reasonable royalty does not inherently entitle Hytera to a reasonable profit. Rather, again, the relevant inquiry is the fair market value of the relevant intellectual property—courts have awarded licensing fees or royalties that "either matched or exceeded the infringer's profits." Ibid. (citing, as an example, Golight, Inc. v. Wal-Mart Stores, Inc., 355 F.3d 1327, 1338 (Fed. Cir. 2004)).

Nevertheless, Hytera's past or expected profits is a relevant factor to consider in determining a reasonable royalty. As the Court mentioned above, the analytic method "focuses on the infringer's projections of profit for the infringing product" as well as the infringer's usual or acceptable net profit, though neither party engages that method. Lucent Techs., 580 F.3d at 1324.

---

[2] By the same token, as the Court has noted previously, Hytera agreed that the jury should not be instructed to award a reasonable royalty, nor did Hytera present at trial any evidence on a reasonable royalty. See Dkt. 1100 at ¶ 45.

**A117**

So too may Motorola's and Hytera's past or expected profits be considered under at least four of the Georgia-Pacific factors. See Georgia-Pacific, 318 F. Supp. at 1120 (factors 8, 12, 13, and 15). But, importantly, under any method of determining a reasonable royalty, Motorola is not automatically entitled to Hytera's profits just as Hytera is not automatically entitled to a reasonable profit. Arctic Cat Inc. v. Bombardier Recreational Prods. Inc., 876 F.3d 1350, 1370 (Fed. Cir. 2017) (royalty rates "at or near the infringer's alleged profit margin" are permissible whereas limiting an ongoing royalty rate based on the infringer's profit margins may be clear error).

The parties and their experts each proceed with an analysis based on the hypothetical negotiation method, so the Court will too. The Court will first determine the date of the hypothetical negotiation then turn to the economic principles that govern the outcome of the negotiation, including the Georgia-Pacific factors, as well as the evidence submitted by the parties.

**1. The hypothetical negotiation should be set in January 2021.**

The parties disagree slightly about the date of the hypothetical negotiation. Motorola and Mr. Malackowski propose a date in the first quarter of 2020 after the jury reached its verdict. Hytera and Dr. Aron, on the other hand, suggest a date in January 2021 is more appropriate because that date would incorporate the Court's rulings on Motorola's ultimate monetary award and denial of Motorola's request for a permanent injunction, resulting changes in the parties' bargaining positions, as well as the most up-to-date information about the relevant market.

A pre-verdict award of a reasonable royalty for past conduct under the hypothetical negotiation method "tries, as best as possible, to recreate the *ex ante* licensing negotiation scenario and to describe the resulting agreement." Lucent Techs., 580 F.3d at 1325. "In other words, if infringement had not occurred, willing parties would have executed a license agreement specifying a certain royalty payment scheme." Ibid.

11

**A118**

As a result, "there should be only a single hypothetical negotiation date, not separate dates for separate acts of infringement . . . ." LaserDynamics, Inc. v. Quanta Computer, Inc., 694 F.3d 51, 76 (Fed. Cir. 2012). Particularly when a reasonable royalty is sought at trial as damages for past liability, the hypothetical negotiation approach is performed as if the parties had "successfully negotiated an agreement just before infringement began." Lucent Techs., 580 F.3d at 1324. "[T]he purpose of the hypothetical negotiation framework, which seeks to discern the value of the [intellectual property] to the parties in the marketplace when infringement began," supports that understanding because the analysis presumes "that the parties had full knowledge of the facts and circumstances surrounding the infringement at that time" of the first infringement. LaserDynamics, 694 F.3d at 76. Permitting a later date, for example the date on which the infringer received notice of the alleged infringement, to serve as the hypothetical negotiation date would skew the analysis because the hypothetical negotiation approach seeks "to pin down how the prospective infringement might have been avoided via an out-of-court business solution." Ibid.

But there may be significant differences between a royalty awarded for pre-verdict conduct and, as here, a royalty awarded for post-verdict conduct. Amado v. Microsoft Corp., 517 F.3d 1353, 1361-62 (Fed. Cir. 2008) (Amado I). In the pre-verdict context, liability is uncertain, and damages are calculated in the context of that uncertainty, whereas "the calculus is markedly different because of different economic factors are involved" after liability and a monetary award for past conduct have been determined. Amado I, 517 F.3d at 1362. See also Paice LLC v. Toyota Motor Corp., 504 F.3d 1293, 1317 (Fed. Cir. 2007) ("[P]re-suit and post-judgment acts of infringement are distinct, and may warrant different royalty rates given the change in the parties' legal relationship and other factors.") (Rader, J., concurring).

12

**A119**

Thus, courts may consider post-verdict conduct, particularly when setting ongoing royalties for post-verdict sales. See, e.g., XY, LLC v. Trans Ova Genetics, 890 F.3d 1282, 1297 (Fed. Cir. 2018) (by considering post-verdict changes in parties' bargaining positions and in economic circumstances, "an ongoing royalty effectively serves as a replacement for whatever reasonable royalty a later jury would have calculated in a suit to compensate" for future sales); Arctic Cat, 876 F.3d at 1370; ActiveVideo Networks, Inc. v. Verizon Communications, Inc., 694 F.3d 1312, 1342-43 (Fed. Cir. 2012) (district court may consider change in parties' bargaining position and the resulting change in economic circumstances resulting from a determination of liability); Bard Peripheral Vascular, Inc. v. W.L. Gore & Assocs., Inc., 670 F.3d 1171, 1193 (Fed. Cir. 2012) (ongoing royalty higher than reasonable royalty set by jury not an abuse of discretion based on post-verdict considerations).

Based on the appropriateness of post-verdict conduct when setting ongoing royalties for post-verdict sales, the Court agrees with Hytera and Dr. Aron that the date of the hypothetical negotiation should be set in January 2021, to allow consideration in the analysis of the Court's rulings on the ultimate monetary award in Motorola's favor, the Court's denial of Motorola's request for a permanent injunction, relevant post-verdict conduct, as well as changes in the parties' bargaining positions and the relevant market for DMR products.

Perhaps the starkest example of the propriety of a hypothetical negotiation date set in January 2021 is Dr. Aron's concession that the Court's January 2021 vacatur of the portion of Motorola's monetary award for Hytera's avoided research and development costs as duplicative of the Court's disgorgement award for Hytera's past profits fundamentally altered her opinion about an appropriate royalty. Dr. Aron explains that she previously opined that the monetary award for Hytera's avoided research and development costs effectively operated as a lump-sum perpetual

**A120**

royalty that rendered any ongoing royalty obligation inappropriate. Indeed, Dr. Aron also notes that Mr. Malackowski agreed with that conclusion at his deposition. As mentioned above, that conclusion is also consistent with Mr. Malackowski's prior opinion in his expert report before trial that a reasonable royalty ought to be based on Hytera's avoided research and development costs, though Motorola did not elicit that opinion or seek a reasonable royalty on that theory or otherwise at trial. However, with the monetary award for Hytera's avoided research and development costs vacated, Dr. Aron acknowledges that her prior opinion that no royalty is appropriate lacks a logical foundation and, as a result, has led Dr. Aron to opine that a reasonable ongoing royalty is $31.61 per radio and $200.84 per repeater, derived from the lost profits Motorola would expect to experience in the future because of Hytera's sales of its products subject to the royalty.

Though other post-verdict considerations related to the parties' bargaining positions and economic circumstances are relevant to the Court's ultimate determination of the amount of an ongoing reasonable royalty, the Court will address those considerations below in the context of the economic principles that govern the outcome of the hypothetical negotiation, including the Georgia-Pacific factors, as well as the expert opinion evidence submitted by the parties. It is enough at this point to conclude that the date of the hypothetical negotiation analysis should be set, as Hytera and Dr. Aron suggest, in January 2021.

**2. Based on the economic principles that govern the outcome of a hypothetical negotiation in January 2021, the Georgia-Pacific factors, and the expert opinion evidence submitted by the parties, an appropriate ongoing reasonable royalty is $80.32 per radio and $378.16 per repeater.**

The Court concluded, above, that Motorola's and Mr. Malackowski's calculation of a royalty based only on Hytera's past profits is inappropriate because a reasonable royalty should be based on the fair market value of the relevant intellectual property. ECIMOS, 971 F.3d at 639. Of course, past and expected future profits are relevant to the determination of fair market value, and

Dr. Aron explains the economic principles that govern the outcome of a hypothetical negotiation coherently and persuasively.

Under the mutually agreeable and voluntary negotiation that the hypothetical negotiation approach assumes, the resulting royalty ought to compensate the licensor, Motorola, for its opportunity cost—the profits it expects to lose due to competition from Hytera's sales of products subject to the royalty—while also allowing the licensee, Hytera, to viably sell those products by paying a royalty that is no greater than the incremental economic benefit of the relevant intellectual property. From those considerations, the upper and lower bounds of the "negotiating range" can be determined, with the lower bound corresponding to Motorola's minimum acceptable royalty generally defined by its expected lost profits and the upper bound corresponding to Hytera's maximum acceptable royalty generally defined by its expected profits from producing and selling the products subject to the royalty.

**a. Based on the Court's review of the parties' expert opinions, the negotiating ranges are between $50.70 and $80.32 per radio and between $200.84 and $378.16 per repeater.**

Since Mr. Malackowski's expert opinion eschews a careful independent analysis of the hypothetical negotiating ranges in favor of an analysis focused solely on Hytera's past profits, which the Court has rejected, the Court will determine the negotiating ranges by reviewing Dr. Aron's analysis and Mr. Malackowski's critiques of and proposed revisions to that analysis.

Dr. Aron acknowledges that the calculation of negotiating ranges in a post-verdict hypothetical negotiation is complicated by uncertainty of future prices, costs, and demand. A reasonable royalty as damages at trial that is based on a pre-suit hypothetical negotiation can rely on later data on prices, costs, and demand that are known at the time of the calculation—the so-called "book of wisdom" that justifies the premise that at the time of the hypothetical negotiation the parties were omniscient as to future data to which they would not have had access before the

sales occurred. Unlike that calculation, there is no "book of wisdom" on which the post-verdict hypothetical negotiation called for here can be based such that the expected future prices, costs, and demand must be inferred from past data.

### i. The upper bound of the negotiating ranges is Hytera's maximum willingness to pay based on its expected future profits of $80.32 per radio and $378.16 per repeater.

Dr. Aron calculated the high end of the negotiating ranges—Hytera's maximum willingness to pay—by estimating the profits Hytera would forgo by not selling the products subject to the royalty. In other words, Dr. Aron estimated Hytera's expected future profits from sales of products subject to the royalty by subtracting Hytera's expected costs from Hytera's expected revenue. Dr. Aron inferred Hytera's expected future revenue and costs by incorporating all available historical data. Though Dr. Aron noted that the adverse effects of the judgment against Hytera and increased competition in the DMR market may depress its ability to charge the same prices going forward, Dr. Aron did not account for those factors in determining Hytera's expected future revenue. Rather, Dr. Aron downplayed the impact of Hytera's decreased reputation because of the judgment in this case as speculative and incorporated the effect of increased competition into her analysis of the Georgia-Pacific factors. Ultimately, Dr. Aron concluded that Hytera's expected average incremental revenue for the Hytera products subject to the royalty is $313.41 per radio and $1,155.71 per repeater. Motorola and Mr. Malackowski do not dispute that calculation of Hytera's expected future revenues.

From those expected future revenues, Dr. Aron deducted the expected future costs of goods sold (labor and materials directly used to manufacture the products)—$129.31 per radio and $392.08 per repeater—as well as auxiliary costs like DMR patent royalties, selling costs, and asset impairment—$78.47 per radio and $290.45 per repeater. Like Dr. Aron's conclusion as to Hytera's expected future revenues, Motorola and Mr. Malackowski do not dispute those figures.

16

**A123**

However, Motorola and Mr. Malackowski do dispute Dr. Aron's deduction of Hytera's expected future management and research and development costs. Dr. Aron concluded that Hytera's expected future management costs are $25.31 per radio and $95.02 per repeater and that Hytera's expected future research and development costs are $36.11 per radio and $36.11 per repeater. By Dr. Aron's calculation, then, Hytera's expected future profit after deducting all identified costs is $44.21 per radio and $342.06 per repeater.

On a practical level, Motorola's and Mr. Malackowski's objection to deducting Hytera's management and research and development costs is straightforward: doing so departs from Dr. Aron's prior expert reports and testimony or else the Court's prior rulings. On management costs, neither Dr. Aron nor Mr. Malackowski included management expenses as a deductible cost in their pre-trial expert reports or in their trial testimony. Though Dr. Aron's pre-trial expert reports and trial testimony did not deduct management costs, Hytera and Dr. Aron note that at trial she testified that deducting incremental management costs from incremental revenues is appropriate to the extent they can be reasonably calculated. Specifically, Dr. Aron testified that while management costs are typically general expenses that are not incremental to the production of any particular product, some management costs may be incremental such that if the incremental management costs associated with particular products can be reasonably calculated, they may be properly deducted from relevant revenues to calculate incremental profits, just as when a company as a whole deducts all management costs from its total revenues when it calculates its total net profits. Dkt. 926 at 27 (Feb. 3, 2020 Trial Transcript at 4839:7-17, 4871:3-8).

Dr. Aron's calculation of Hytera's expected management costs that are incremental to the Hytera products subject to the royalty is based on a regression analysis of the relationship between Hytera's and Motorola's management costs and radio sales, controlling for the two companies'

**A124**

difference in scale and management cost time trends, leading to conservative results that deduct a lower portion of management costs, approximately 1%. Aside from invoking Dr. Aron's prior decision not to include a deduction for management costs at trial, neither Motorola nor Mr. Malackowski dispute the theory underlying Dr. Aron's deduction of incremental management costs or her methodology or calculations. Accordingly, the Court agrees that Dr. Aron's calculation of Hytera's expected future incremental management costs associated with the products subject to a royalty—$25.31 per radio and $95.02 per repeater—are properly deducted from Hytera's expected revenues to arrive at Hytera's expected future profits.

On Dr. Aron's deduction of Hytera's expected future R&D costs, Motorola and Mr. Malackowski object to the reliability of the data on which Dr. Aron relies, as exemplified by the Court's prior findings and conclusions in support of its disgorgement award. Dr. Aron stands by her prior opinion that the data was reliable enough to use in calculating Hytera's past profits subject to disgorgement and is thus reliable enough to use in calculating Hytera's expected future profits. Nevertheless, accepting the Court's prior finding and conclusion that the data was not reliable for purposes of calculating Hytera's past profits, Dr. Aron also contends that the data is independently reliable enough to use in estimating future R&D costs which may appropriately be deducted from Hytera's expected future revenues.

According to Dr. Aron, Hytera's past R&D data is reliable enough to use in estimating Hytera's future R&D costs because calculating Hytera's past profits subject to disgorgement is conceptually different from calculating Hytera's expected future profits. While the two calculations are indeed conceptually different, they nevertheless proceed along the same practical path. Hytera's past profits subject to disgorgement were calculated by deducting relevant costs Hytera actually incurred (which would have appropriately included R&D costs based on reliable

18

**A125**

data if such reliable data existed) from Hytera's actual revenues. Hytera's expected future profits, from which the upper bounds of the parties' negotiating ranges for a hypothetical negotiation of a reasonable royalty are derived, are calculated in the same way: by deducting relevant costs (including expected future R&D costs based on reliable data if such data exists) from Hytera's expected future revenues. All of Dr. Aron's calculations of Hytera's expected future revenues and costs are derived from inferences based on past data, which, as Dr. Aron concedes inherently contain some level of uncertainty. But the Court finds that the increased uncertainty associated with using data on Hytera's past R&D costs, which the Court found to be unreliable, to infer Hytera's future R&D costs would be unreasonable.

That Dr. Aron performed validity checks benchmarking Hytera's unreliable data on past R&D costs to industry sources does not change the Court's conclusion. As the Court previously found, Dr. Aron did not suggest at trial that the data Hytera produced during fact discovery about its R&D costs was reliable. Dkt. 1100 at 18. Rather, at trial Dr. Aron revised her opinions based on new, revised data that Hytera produced during the trial. Ibid. And the Court found that the revised data on which Dr. Aron's opinions at trial were based was not just filtered or a subset of the original data but, instead, was significantly altered during the litigation to increase Hytera's R&D costs and, thus, was unreliable. Id. at 18-19. That Hytera's unreliable data comports with other industry sources does not make it reliable. The Court also notes that Dr. Aron does not, for example, provide an opinion that an industry standard rate of R&D costs as a percentage of revenues exists that can be used to calculate Hytera's expected future R&D costs independent of inferences from Hytera's past R&D costs. Rather, Dr. Aron's opinion as to Hytera's expected future R&D costs rely on Hytera's unreliable data on its past R&D costs.

Therefore, the Court agrees with Motorola and Mr. Malackowski that Dr. Aron's calculation of Hytera's expected future R&D costs based on unreliable data on Hytera's past R&D costs should not be deducted from Hytera's expected future revenues to calculate Hytera's expected future profits that serve as the upper bounds on the parties' hypothetical negotiating ranges. Accordingly, the Court concludes that the upper bounds on the parties' hypothetical negotiating ranges—Hytera's maximum willingness to pay, which is equivalent to Hytera's expected future incremental profits—are $80.32 per radio[3] and $378.16 per repeater.[4]

**ii. The lower bound of the negotiating ranges is Motorola's minimum willingness to accept based on its expected future lost profits of $50.70 per radio and $200.84 per repeater.**

Dr. Aron calculated the low end of the negotiating ranges—Motorola's minimum willingness to accept—by estimating Motorola's expected future lost profits because of Hytera's sales of products subject to the royalty. Dr. Aron inferred Motorola's expected future lost profits from Motorola's average marginal profit from 2010 through 2019. The approach Dr. Aron used is much like the approach Dr. Aron used to determine Hytera's expected future incremental profits with additional reductions based on respective market share and potential diversion to different Motorola products. But, as a starting point, Dr. Aron calculated Motorola's expected future incremental lost profits by subtracting Motorola's expected future incremental costs from its expected future incremental revenue.

Dr. Aron concluded that Motorola's expected future revenue for its mid- and professional-tier MotoTRBO products was between $349.45 and $451.75 per radio and between $1,474.41 and

---

[3] This figure is calculated by starting with Hytera's expected future marginal revenue per radio ($313.41) and then subtracting Hytera's expected future marginal costs of goods sold ($129.31), Hytera's expected future marginal auxiliary costs ($78.47), and Hytera's expected future marginal management costs ($25.31).

[4] Like the calculation for radios, this figure is calculated by starting with Hytera's expected future marginal revenue per repeater ($1,155.71) and then subtracting Hytera's expected future marginal costs of goods sold ($392.08), Hytera's expected future marginal auxiliary costs ($290.45), and Hytera's expected future marginal management costs ($95.02).

**A127**

$1,941.44 per repeater.[5] From those figures, Dr. Aron subtracted Motorola's costs of goods sold; sales, marketing, and management costs; and R&D costs. According to Dr. Aron, Motorola's costs of goods sold ranged from $158.91 to $188.09 per radio and from $774.02 to $909.79 per repeater; Motorola's incremental sales, marketing, and management costs ranged from $59.70 to $82.97 per radio and from $252.97 to $356.79 per repeater; and Motorola's incremental R&D costs was $26.88 per radio and per repeater. Subtracting those costs from Motorola's expected future revenues results in expected incremental profits between $103.96 and $153.81 per radio and between $420.54 and $647.97 per repeater.

From those expected future incremental profits, Dr. Aron made additionally reductions to account for two considerations relevant to Motorola's expected future incremental lost profits that were not relevant to Hytera's expected future incremental profits. First, whereas Hytera gains all the incremental profits from its sale of additional units, Hytera's sales of additional units does not always result in equally fewer sales by Motorola. Rather, according to Dr. Aron, Motorola's and Hytera's respective market shares imply that Motorola loses sales on only about three out of every four Hytera sales. In other words, for each Hytera sale Motorola only loses about 75% of its expected future profit per unit. Dr. Aron's calculations also accounted for the possibility that if Hytera did not sell its products subject to the royalty that a portion of Motorola's resulting increased sales would be diverted to lower-end non-DMR products. As a result, Dr. Aron concluded that Motorola's global average expected future incremental lost profits was $31.61 per radio and $200.84 per repeater.

---

[5] Unlike Dr. Aron's calculations of Hytera's expected future incremental profits, Dr. Aron's calculations of Motorola's expected future incremental lost profits initially distinguish between sales in the U.S. and sales outside the U.S. However, after accounting for market share and diversion, Dr. Aron ultimately provides figures based on global averages.

Motorola and Mr. Malackowski object to two aspects of Dr. Aron's analysis. On the front end, Mr. Malackowski disagrees with Dr. Aron's deduction of Motorola's management and R&D costs because neither he nor Dr. Aron deducted those expenses to calculate Motorola's incremental profits in their prior expert reports or at trial. But, as explained above, those deductions are theoretically sound, and Mr. Malackowski does not dispute Dr. Aron's calculations. So the Court rejects Motorola's and Mr. Malackowski's objections to deducting Motorola's management and R&D costs. Thus, before any further reductions for market share or diversion to arrive at Motorola's expected future incremental lost profits, Motorola's expected future incremental profits are consistent with Dr. Aron's calculations: between $103.96 and $153.81 per radio and between $420.54 and $647.97 per repeater.

Mr. Malackowski also disagrees with Dr. Aron's assumption that a portion of Motorola's resulting increased sales in the absence of Hytera's products subject to the royalty would be diverted to less-profitable and lower-end Motorola products. Mr. Malackowski opines that the Hytera products subject to the royalty are higher-end DMR products and that purchasers of those devices would be unlikely to purchase lower-end Motorola products in their absence. Mr. Malackowski notes that Dr. Aron agreed that lower-end devices and systems are often utilized in different settings than mid- and professional-tier products, with the former commonly used in commercial settings and the latter more commonly used in professional and industrial settings. The Court finds that concession renders unreasonable Dr. Aron's assumption that, in the absence of Hytera's products, more than three quarters of Motorola's increased U.S. sales and more than half of Motorola's increased sales outside the U.S. would be diverted from comparable to less-profitable and lower-end Motorola products. That is especially so because Dr. Aron's assumption is based only on the percentage of Motorola's past sales that were for its high end DMR products

comparable to the Hytera products subject to the royalty. Accordingly, the Court rejects Dr. Aron's opinion on that point and will not assume any diversion to lower-end products reduce Motorola's expected future incremental lost profits.

As acknowledged by Hytera in its surreply, the parties also dispute their respective market shares that form the basis for the assumption that for each U.S. sale of a Hytera product subject to the royalty, Motorola only loses about 75% of its expected future profit per unit. That number is closer to 40% for each sale outside the U.S. Dr. Aron pegs those numbers as 74.8% and 38.1%, respectively, whereas Mr. Malackowski uses 76.8% and 41.9%. While Motorola in its surreply reiterates Mr. Malackowski's rejection of Dr. Aron's assumption that Motorola's increased sales in the absence of Hytera products would be tempered by diversion to less-profitable and lower-tier Motorola products, Motorola does not explain or justify Mr. Malackowski's market share analysis, nor does Mr. Malackowski in either his expert report on the royalty issue or in his reply to Dr. Aron's expert report. Therefore, the Court adopts Dr. Aron's figures, the calculations of which she describes in detail in an exhibit to her expert report.

Unfortunately, though Hytera's surreply provides the Court with numerous alternative calculations, the calculations required based on the Court's conclusions are not included. However, the calculation required to derive Motorola's global average expected future lost profits is not outside the ability of the Court. For radios, the calculation requires multiplying Motorola's expected future incremental profits per unit for U.S. sales by Motorola's U.S. market share percentage and the number of units sold for U.S. sales, adding that to the same calculation using values relevant to sales outside the U.S., and then dividing that number by the total number of sales.[6] According to the Court's calculation, Motorola's global average expected future lost profits

---

[6] According to the relevant numbers provided by Dr. Aron, the Court's calculation looks like this: {[U.S. incremental profit ($153.81) * U.S. market share (74.8%) * U.S. sales (326,962)] + [Outside U.S. incremental profit ($103.96) *

is $50.70 per radio. The calculation for repeaters does not differ from Dr. Aron's calculation because, according to Dr. Aron's calculations, Motorola's lower-end repeaters are just as profitable as its higher-end repeaters. Thus, Motorola's global average expected future lost profits is $200.84 per repeater. As a result, the Court concludes that the lower bounds of the parties' hypothetical negotiating ranges—Motorola's minimum willingness to accept, which is equivalent to Motorola's global average expected future lost profits—are $50.70 per radio and $200.84 per repeater.

**b. After considering the Georgia-Pacific factors, the Court concludes that a royalty of $80.32 per radio and $378.16 per repeater is reasonable and appropriate.**

With the negotiating range for the parties' hypothetical negotiation now set between $50.70 and $80.32 per radio and between $200.84 and $378.16 per repeater, the Court proceeds to analyze the Georgia-Pacific factors as a guide to determine a reasonable royalty within that range. After all, "the proper application of the Georgia-Pacific methodology is to explain 'the effect each factor would have on a negotiated royalty.'" Sloan Valve Co. v. Zurn Indus., Inc., 33 F. Supp. 3d 984, 997 (N.D. Ill. 2014) (quoting Micro Chem., Inc. v. Lextron, 317 F.3d 1387, 1393 (Fed. Cir. 2003)). As the court in Sloan Valve noted, that view is also consistent with the Committee Comments to the Seventh Circuit's pattern jury instructions, which state as to patent damages in the form of a reasonable royalty, "'[t]ypically, patent damages experts will review each of the Georgia-Pacific factors and testify as to whether each factor supports a higher royalty rate, a lower rate or is neutral.'" Ibid. (quoting Seventh Circuit Civil Jury Instruction No. 11.4.4, n. 2).

The court in Georgia Pacific identified the following fifteen factors relevant to determine a reasonable royalty:

> 1. The royalties received by the patentee for the licensing of the patent in suit, proving or tending to prove an established royalty.

---

Outside U.S. market share (38.4%) * Outside U.S. sales (1,896,466)]} / [U.S. sales (326,962) + Outside U.S. sales (1,896,466)].

2. The rates paid by the licensee for the use of other patents comparable to the patent in suit.

3. The nature and scope of the license, as exclusive or non-exclusive; or as restricted or non-restricted in terms of territory or with respect to whom the manufactured product may be sold.

4. the licensor's established policy and marketing program to maintain his patent monopoly by not licensing other to use the invention or by granting licenses under special conditions designed to preserve that monopoly.

5. The commercial relationship between the licensor and licensee, such as, whether they are competitors in the same territory in the same line of business; or whether they are inventor and promoter.

6. The effect of selling the patented specialty in promoting sales of other products of the licensee; that existing value of the invention to the licensor as a generator of sales in his non-patented items; and the extent of such derivative or convoyed sales.

7. The duration of the patent and the terms of the license.

8. The established profitability of the product made under the patent; its commercial success; and its current popularity.

9. The utility and advantages of the patent property over the old modes or devices, if any, that had been used for working out similar results.

10. The nature of the patented invention; the character of the commercial embodiment of it as owned and produced by the licensor; and the benefits to those who have used the invention.

11. The extent to which the infringer has made use of the invention; and any evidence probative of the value of that use.

12. The portion of the profit or of the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions.

13. The portion of the realizable profit that should be credited to the invention as distinguished from non-patented elements, the manufacturing process, business risks, or significant features or improvements added by the infringer.

14. The opinion testimony of qualified experts.

15 The amount that a licensor (such as the patentee) and a licensee (such as the infringer) would have agreed upon (at the time the infringement began) if both had

**A132**

been reasonably and voluntarily trying to reach an agreement; that is, the amount which a prudent licensee—who desired, as a business proposition, to obtain a license to manufacture and sell a particular article embodying the patented invention—would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable by a prudent patentee who was willing to grant a license.

Georgia-Pacific, 318 F. Supp. at 1120.

The Court begins its consideration of those factors by briefly noting the factors it need not dwell on. Both Motorola, Hytera, and their respective experts agree that the first factor is neutral and inapplicable because Motorola has not licensed its trade secrets or copyrights such that there is no evidence supporting an established royalty. Additionally, the parties and their respective experts each incorporated consideration of the fourteenth factor, the opinion testimony of qualified experts, into the consideration of the other factors and, therefore, do not analyze the fourteenth factor independently. The Court will also not analyze the fifteenth factor as to whether it favors a higher royalty, a lower royalty, or is neutral because the fifteenth factor merely describes the hypothetical negotiation framework, which is the overarching analysis proposed by the parties and accepted by the Court to determine a reasonable and appropriate royalty.

But the Court must analyze the remaining factors because the parties present starkly different views on whether each of those factors supports a higher royalty, a lower royalty, or is neutral. Perhaps not surprisingly, neither party concedes any factor weighs against its interests. To wit, Motorola and Mr. Malackowski suggest that factors 2, 7, and 12 are neutral while the remaining factors (3, 4, 5, 6, 8, 9, 10, 11, and 13) favor a higher royalty. Conversely, Hytera and Dr. Aron claim that factors 3, 6, and 8 are neutral while the remaining factors (2, 4, 5, 7, 9, 10, 11, 12, and 13) favor a lower royalty. So the Court will analyze the parties' arguments on each of those factors in order, after which the Court will determine reasonable and appropriate royalties within the hypothetical negotiating ranges as determined above.

26

**A133**

**i. The second <u>Georgia-Pacific</u> factor is inapplicable and, therefore, weighs neutrally.**

On the second factor, which looks to the rates paid by Hytera for the use of other intellectual property comparable to Motorola's trade secrets and copyrights at issue in this case, Motorola and Mr. Malackowski insist that it is neutral because Hytera does not license any comparable intellectual property. Hytera and Dr. Aron point to Hytera's licenses to use Motorola's standard essential DMR patents for which Hytera pays Motorola a royalty of $3.00 per radio and $15 per repeater. They acknowledge that Motorola's standard essential DMR patents are not fully comparable to Motorola's trade secrets and copyrights because they are different types of intellectual property and because the patents, as standard essential ones, must be offered on fair, reasonable, and non-discriminatory terms. See <u>HTC Corp. v. Telefonaktiebolaget LM Ericsson</u>, 12 F.4th 476, 481 (5th Cir. 2021). As a result, they concede that the standard essential DMR patent royalty rates do not directly influence what royalty rate is reasonable and appropriate for Motorola's trade secrets and copyrights. But they insist that the standard essential DMR patent royalties favor a lower royalty as to Motorola's trade secrets and copyrights because Hytera's patent license is necessary for its products that complies with the DMR standard whereas Motorola's trade secrets and copyrights were not necessary to develop DMR compliant products, as evidenced by Hytera's and many other companies' development of DMR compliant products that did not rely on Motorola's trade secrets or copyrights.

However, the Court agrees with Motorola and Mr. Malackowski that this factor is neutral, particularly because, despite the fact that Hytera *could* have developed DMR compliant products without Motorola's trade secrets or copyrights, the Hytera products subject to the royalty were, in fact, developed with Motorola's trade secrets and copyrights. And, importantly, as the Court has previously explained, Motorola's trade secrets and copyrights were fundamental to Hytera's

27

**A134**

development of its products subject to the royalty—without Motorola's trade secrets and copyrights, those products would not function. See Dkt. 1100 at ¶ 49. Accordingly, the Court finds that Motorola's standard essential DMR patent is not comparable to Motorola's trade secrets or copyrights involved in this case and that the royalties Hytera pays for its DMR patent license are not relevant to the reasonableness of the royalties that Hytera must pay for its use of Motorola's trade secrets and copyrights at issue in this case.

**ii. The third Georgia-Pacific factor weighs neutrally because the hypothetical negotiating ranges incorporate information consistent with the nature and scope of the license and Motorola's arguments are more applicable to other factors.**

On the third factor, the nature and scope of Hytera's license to use Motorola's trade secrets and copyrights in the Hytera products subject to the royalty, Motorola and Mr. Malackowski contend that it favors a higher royalty because the license will be co-exclusive (with, aside from Motorola, only Hytera able to use Motorola's trade secrets and copyrights in its products subject to the royalty). Motorola and Mr. Malackowski argue that co-exclusive license is against Motorola's economic interests because Motorola has never licensed and, absent the circumstances of this case, would not license its trade secrets or copyrights to maintain its leading competitive position in the DMR market.

Hytera and Dr. Aron, on the other hand, contend this factor is neutral because Dr. Aron's calculation of the hypothetical negotiating ranges incorporated information that is consistent with the terms of the license—beyond Motorola, only Hytera had access to Motorola's trade secrets and copyrights and Hytera's sales of the products subject to the royalty, from which Hytera's expected future profits and Motorola's expected future lost profits were inferred, were unrestricted. The Court agrees with Hytera and Dr. Aron that this factor weighs neutrally, in large part because Motorola's and Mr. Malackowski's arguments regarding Motorola's economic interests in

28

**A135**

maintaining its competitive position in the DMR market by not licensing its trade secrets or copyrights is not as relevant to the nature and scope of Hytera's license as it is to other factors, particularly the next one.

**iii. The fourth <u>Georgia-Pacific</u> factor weighs in favor of a higher royalty because absent the circumstances of this case Motorola would not have licensed its trade secrets or copyrights that were necessary to Hytera's development of its products subject to the royalty.**

On the fourth factor, related to Motorola's policies and efforts to maintain a monopoly on its trade secrets and copyrights, Motorola and Mr. Malackowski largely repeat their argument from the third factor, above. Motorola has never licensed its trade secrets or copyrights. It has never publicly disclosed its trade secrets. And the former Motorola employees from whom Hytera misappropriated Motorola's trade secrets were bound by non-disclosure agreements.

Hytera and Dr. Aron, by contrast, argue that Motorola's standard essential DMR patent, which established an industry standard at the expense of a monopoly, weighs in favor of a lower royalty. Though the reasoning is not perfectly clear, it appears to the Court that Hytera and Dr. Aron rely on the fact that Motorola's trade secrets and copyrights are not inherently necessary to the development of DMR compliant products whereas the patent license is indisputably necessary. But as the Court noted above, Motorola's trade secrets and copyrights were in fact necessary to Hytera's development of its products subject to the royalty. And the Court finds, as Motorola argues, that absent the circumstances of this case, Motorola would not have licensed its trade secrets or copyrights and, instead, implemented policies to prevent their disclosure or use, even if those policies were ultimately unsuccessful through no fault of Motorola's. Accordingly, the fourth factor weighs in favor of a higher royalty.

**A136**

### iv. The fifth Georgia-Pacific factor weighs in favor of a higher royalty because the parties are rigorous global competitors in the market for DMR products.

On the fifth factor, involving the commercial relationship between the parties, Motorola and Mr. Malackowski note that Motorola and Hytera are global competitors in the DMR market and other markets, including the market for analog radios. As Mr. Malackowski notes, Hytera's VPs of Sales have acknowledged that the DMR market in the U.S. is dominated by Motorola and Hytera and that Hytera plans to overcome Motorola to become the largest DMR provider. Mr. Malackowski suggests that those circumstances would decrease Motorola's willingness to license its trade secrets or copyrights to Hytera, weighing in favor of a higher royalty.

Hytera and Dr. Aron again argue that Motorola's expected future lost profits from increased competition from Hytera is accounted for in the calculation of the negotiating ranges. Dr. Aron explains that her calculation of Motorola's expected future lost profits assumed that the parties compete head-to-head for the same customers. But Dr. Aron contends that a lower royalty within the hypothetical negotiating range is justified because the parties' relevant products typically are not sold through the same dealers and distributors.

However, Dr. Aron concedes that Motorola and Hytera sell DMR products in many of the same geographic areas and are therefore direct competitors in various DMR markets worldwide. While it may well be true that the parties' relevant products are not typically sold through the same dealers and distributors, Dr. Aron does not justify her implication that the unavailability of both parties' DMR products through the same dealers and distributors reduces the parties' competition for the same customers in the geographic areas where both parties market and sell DMR products. Accordingly, the Court accepts Motorola's and Mr. Malackowski's argument that the parties' status as rigorous global competitors in the DMR market weighs in favor of a higher royalty.

30

**A137**

**v. The sixth <u>Georgia-Pacific</u> factor weighs in favor of a higher royalty because Hytera's sales of its products subject to the royalty promote substantial sales of other Hytera products.**

On the sixth factor, which the parties frame as only the effect of Hytera's sales of its products subject to the royalty in promoting sales of other products, Motorola and Mr. Malackowski note that Hytera's revenue from its past sales of accessories for its DMR radios totaled 10% of its revenue from its sales of DMR radios, which does not encompass other Hytera products like trunking systems and applications that are also used with Hytera's DMR products. Hytera and Dr. Aron counter that this factor should be viewed as neutral because Hytera's accessory sales are incorporated into the calculation of the hypothetical negotiating ranges, particularly the upper bounds of Hytera's maximum willingness to pay based on Hytera's expected future profits. Though it is true that the upper bounds of the hypothetical negotiating ranges incorporated Hytera's accessory sales, that does not render this factor neutral. Rather, as framed by the parties, Hytera's sales of DMR accessories and other DMR-related products are tied to Hytera's ability to sell its products subject to the royalty, which the Court concludes weighs in favor of a higher royalty.

**vi. The seventh <u>Georgia-Pacific</u> factor weighs neutrally because the duration of Motorola's rights in its trade secrets and the term of Hytera's license for which it must pay royalties is indefinite.**

On the seventh factor, the duration of Motorola's intellectual property rights and the term of the license, both parties acknowledge that unlike patents, Motorola's rights in its trade secrets do not expire. Both parties also agree that aside from a long-term license in exchange for a royalty, Hytera's alternatives include independently developing similar technology, or else licensing similar technology from another supplier. Motorola and Mr. Malackowski note that Hytera has not been able to independently develop a similar technology and so argues that this factor is neutral.

Hytera and Dr. Aron, on the other hand, contend that the availability of alternatives to using Motorola's trade secrets weighs in favor of a lower royalty because the calculation of the hypothetical negotiating ranges assumed that no customers would delay purchases until Hytera entered the market as opposed to diverting purchases to Motorola or other suppliers. Hytera and Dr. Aron also argue that emergence of a new wireless technology that would displace DMR technology is likely as new generations of wireless technology have been introduced approximately every decade. In other words, according to Hytera and Dr. Aron, though Motorola's trade secrets are protected indefinitely, they are practically useful only until the DMR standard is displaced.

While it is true that Motorola's trade secrets are only useful until the DMR standard is displaced, Hytera and Dr. Aron ignore that Hytera products subject to the royalty are DMR products. So, the long-term viability of Hytera's DMR products subject to the royalty are on the same footing as Motorola's trade secrets. As to the availability of alternatives to licensing Motorola's trade secrets in exchange for a royalty, the Court notes that Hytera and Dr. Aron do not quantify the costs to Hytera if it chose to pursue them (whether independent development or licensing from other providers). Thus, Hytera and Dr. Aron provide no basis for the Court to conclude that those alternatives would justify a lower royalty. Accordingly, the Court agrees with Motorola and Mr. Malackowski that the indefinite nature of the duration of Motorola's rights in its trade secrets as well as the term of the license for which Hytera must pay royalties weighs neutrally.

**A139**

**vii. The eighth <u>Georgia-Pacific</u> factor weighs in favor of a higher royalty because both parties' products that use Motorola's trade secrets and copyrights are unquestionably profitable, commercially successful, and popular.**

On the eighth factor, the established profitability, commercial success, and current popularity of the products using Motorola's trade secrets and copyrights, Motorola and Hytera agree that DMR technology is an established standard with significant market demand, with both Motorola's and Hytera's products that incorporate Motorola's trade secrets enjoying commercial success and popularity above all other market participants. Motorola and Mr. Malackowski note that Hytera's profits between 2010 and June 2019 on its products subject to the royalty totaled in the hundreds of millions of dollars, justifying a higher royalty.

Hytera and Dr. Aron view this factor as now weighing neutrally whereas at the time of Hytera's first misappropriation and infringement before 2010 this factor weighed in favor of a lower royalty because of Motorola's no-longer-existing incentives to promote the DMR standard. In other words, before 2010, the DMR standard was not widely adopted, Hytera was researching alternative digital radio technologies including dPMR, and Motorola thus had an incentive to promote adoption of the DMR standard that would have favored a lower royalty on a license for Motorola's trade secrets. Now that the DMR standard is widely adopted, Motorola does not have the same incentive to promote it by offering to license its trade secrets in exchange for a lower royalty and, by the same token, Hytera is locked in to the DMR standard.

The Court agrees with Hytera and Dr. Aron that Motorola's prior incentive to promote the DMR standard by licensing its trade secrets in exchange for a lower royalty rate has dissipated. Thus, at the very least, this factor weighs neutrally. But while Hytera and Dr. Aron again contend that the profitability, commercial success, and popularity of the parties' products that incorporate Motorola's trade secrets are factored into the calculation of the hypothetical negotiating ranges,

**A140**

the Court finds that does not dispel this factor in determining where an appropriate and reasonable royalty falls within those ranges. Rather, the Court finds that the unquestioned profitability, commercial success, and popularity of the relevant products weighs in favor of a higher royalty.

**viii. The ninth <u>Georgia-Pacific</u> factor weighs in favor of a higher royalty because Motorola's trade secrets are critical to the functionality of Hytera's products subject to the royalty.**

On the ninth factor, the utility and advantages of Motorola's trade secrets over old modes or devices, Motorola and Mr. Malackowski insist that Motorola's trade secrets are critical to the functionality of Hytera's products subject to the royalty and, as a result, Hytera's revenue and profits from those products are attributable to Motorola's trade secrets, thereby supporting a higher royalty.

Hytera and Dr. Aron claim that this factor weighs in favor of a lower royalty because, while the calculation of the hypothetical negotiating ranges assumes Hytera's only alternative is not to produce the products subject to the royalty, Hytera has at least three other alternatives. One alternative that Dr. Aron identifies is Hytera's ability to sell other existing products not subject to the royalty, like Hytera's TETRA or commercial-tier DMR products, to some customers who otherwise would have purchased Hytera's products subject to the royalty. The other alternatives Dr. Aron identifies is to license and sell DMR products from other producers like JVC Kenwood or Tait rebranded under Hytera's name or else to purchase DMR chipsets from third parties like Sicomm, which would reduce Hytera's opportunity cost of not licensing Motorola's trade secrets.

What Hytera and Dr. Aron elide is that the identified alternatives do not influence the reasonableness or appropriateness of a royalty for a license on Motorola's trade secrets. As Motorola explains in reply, at most the identified alternatives are merely avenues to avoid needing to license and pay royalties to use Motorola's trade secrets altogether and would do nothing to exert pressure on Motorola to accept a lower royalty even if the alternatives reduce the royalty rate

Hytera would be willing to pay. More importantly, Hytera and Dr. Aron provide no indication that the potential alternatives are anything more than pure speculation. Rather, the alternatives are described only in the abstract without any discussion about their feasibility. In sum, the Court agrees with Motorola that its trade secrets are critical to the functionality of Hytera's products subject to the royalty, thereby weighing in favor of a higher royalty.

### ix. The tenth <u>Georgia-Pacific</u> factor weighs in favor of a higher royalty because the nature, character, and benefits of Motorola's trade secrets and copyrights are critical to the functionality of the Hytera products subject to the royalty.

Motorola and Mr. Malackowski analyze the tenth factor—the nature, character, and benefits of Motorola's trade secrets and copyrights—the same as the ninth factor, above, by invoking the critical functionality that Motorola's trade secrets and copyrights provide to Hytera's products subject to the royalty as justification for a higher royalty. Hytera and Dr. Aron, by contrast, note that calculation of the hypothetical negotiating ranges did not account for the fact that only a portion of Hytera's expected future profits or Motorola's expected future lost profits are attributable to Motorola's trade secrets and copyrights. Rather, some portions of Hytera's expected future profits and Motorola's expected future lost profits are attributable to factors other than Motorola's trade secrets and copyrights like, for example, current and future research and development and continued improvements, in-licensed third-party technologies, brand awareness, and distribution and marketing investments.

The Court finds that the arguments of Hytera and Dr. Aron misplaced. The hypothetical negotiating ranges under Dr. Aron's calculations are rightfully bounded by Hytera's expected future profits and Motorola's expected future lost profits because those values set the outer bounds of what Hytera is willing to pay and what Motorola is willing to accept in a hypothetical negotiation even if the value of Motorola's trade secrets and copyrights account for only a portion

**A142**

of Hytera's expected future profits and Motorola's expected future lost profits. And the value of Motorola's trade secrets and copyrights as only a portion of Hytera's expected future profits and Motorola's expected future lost profits does not relate to the nature, character, and benefits of Motorola's trade secrets and copyrights as such. Rather, as Motorola argues, the Court concludes that the nature, character, and benefits of Motorola's trade secrets and copyrights are critical to the functionality of the Hytera products subject to the royalty, thereby weighing in favor of a higher royalty.

**x. The eleventh <u>Georgia-Pacific</u> factor weighs in favor of a higher royalty because Hytera's use of Motorola's trade secrets and copyrights was critical to the functionality of the Hytera products into which they were incorporated and resulted in substantial revenue, profits, and market share.**

On the eleventh factor, the extent and value of Hytera's use of Motorola's trade secrets and copyrights, Motorola and Mr. Malackowski again point to Hytera's substantial revenue and profits from its sales of the Hytera products subject to the royalty and its resulting status as the second largest supplier of DMR products as favoring a higher royalty. Hytera and Dr. Aron contend that this factor favors a lower royalty because the hypothetical negotiating ranges do not reflect that only a portion of Hytera's expected future profits and Motorola's expected future lost profits are attributable to Motorola's trade secrets and copyrights. But the Court rejects that reasoning for the same reasons as above because it elides the purpose of the hypothetical negotiating ranges, which is merely to set the outer bounds of the parties' respective willingness to accept or pay. It also ignores the Court's repeated acceptance of Motorola's theory that its trade secrets and copyrights are critical to the functionality of the Hytera products subject to the royalty.

Hytera and Dr. Aron also note that the evidence at trial revealed that Hytera used only between four and ten percent of Motorola's relevant copyrighted source code, the value of which was minimal beyond the avoided labor costs associated with writing those portions of the code

36

**A143**

independently. Even accepting that the value of Hytera's use of portions of Motorola's copyrighted source code was limited to the avoided labor costs of writing them independently, the Court nevertheless concludes that those portions of Motorola's source code were nevertheless critical to the functionality of the Hytera products into which they were incorporated, which, along with Hytera's misappropriation of Motorola's trade secrets, allowed Hytera to reap substantial revenues, profits, and market share. This factor weighs in favor of a higher royalty.

**xi. The twelfth <u>Georgia-Pacific</u> factor weighs neutrally because there is no customary royalty or price to allow Hytera to use Motorola's trade secrets or copyrights.**

On the twelfth factor, the portion of the profit or of the selling price that is customary to allow for the use of Motorola's trade secrets and copyrights, Motorola and Hytera claim it weighs neutrally because Motorola had not previously licensed its trade secrets, much less to a direct competitor, and that situation is unlikely to occur because a business would subject itself to considerable economic harm by allowing a competitor to use its trade secrets. Hytera and Dr. Aron merely reference their arguments on the second factor, wherein they discussed Hytera's FRAND license of Motorola's standard essential DMR patent. For the reasons the Court explained in its analysis of the second factor, the Court concludes that Motorola's standard essential DMR patent is not comparable or analogous to Motorola's trade secrets or copyrights because Motorola choice to establish the DMR technology as an industry standard requires it to license the patent on fair, reasonable, and non-discriminatory terms whereas Motorola has no such obligation as to its trade secrets or copyrights. The Court agrees with Motorola and Mr. Malackowski that this factor weighs neutrally.

**A144**

**xii. The thirteenth <u>Georgia-Pacific</u> factor weighs in favor of a higher royalty because Hytera's profits from its sales of products subject to the royalty are attributable only to incorporation of Motorola's trade secrets and copyrights.**

On the thirteenth factor, the portion of the realizable profit that should be credited to Motorola's trade secrets and copyrights as distinguished from other aspects of the Hytera products subject to the royalty, Motorola and Mr. Malackowski claim it favors a higher royalty because the Hytera products subject to the royalty only function because they incorporate Motorola's trade secrets and copyrights. Hytera and Dr. Aron merely reference their arguments as to the eleventh factor and the Court rejects them for the same reasons. As Motorola and Mr. Malackowski note, the Court has previously concluded that Hytera could not have made the sales and profits on its products at issue in this case without Motorola's trade secrets and copyrights because without them the products would not function. Accordingly, the Court concludes this factor weighs in favor of a higher royalty.

* * *

To summarize, the Court concludes that factors 1, 2, 3, 7, 12, and 14 are neutral; factors 4, 5, 6, 8, 9, 10, 11, and 13 weigh in favor of a higher royalty; and no factors weigh in favor of a lower royalty. As a result, especially considering that several of the neutral factors are irrelevant or inapplicable in these circumstances, the Court finds that reasonable and appropriate royalties must fall on the higher end of the hypothetical negotiating ranges. Hytera gained substantial value from its misappropriation of Motorola's trade secrets and its infringement of Motorola's copyrights, so much so that Hytera's products that incorporated Motorola's trade secrets and copyrights simply would not function without them. The Hytera products subject to the royalty essentially have no value as DMR products separate from Motorola's trade secrets and copyrights. And Motorola has no other incentives to license the use of its trade secrets and copyrights to a

rigorous global competitor, which has been found liable for willful trade secret misappropriation and copyright infringement, especially where Motorola has been denied an injunction. Accordingly, the Court concludes that the upper bounds of the hypothetical negotiating ranges are reasonable and appropriate under the circumstances, $80.32 per radio and $378.16 per repeater.

**D. The Court grants Motorola's request that Hytera be required to maintain the confidentiality of Motorola's trade secrets and copyrights but denies Motorola's remaining requests.**

Motorola requests that three additional terms accompany the royalty: (1) that the license should bind Hytera's new U.S.-based entity, non-party Hytera U.S. Inc.; (2) the Court should require Hytera maintain the confidentiality of Motorola's trade secrets and copyrights and ultimately to quarantine and remove related documents from its possession; and (3) the Court should require Hytera to provide notice to Motorola of alleged redesigns.

On Motorola's successor-in-interest argument about Hytera U.S., Hytera makes three observations. First, Hytera U.S. is not a party to this case. Second, the bankruptcy court presiding over the bankruptcy proceedings of the U.S.-based Hytera Defendants (Hytera America, Inc. and Hytera Communications America (West), Inc.) has held that Hytera U.S. is not a successor-in-interest to the now-bankrupt U.S.-based Hytera Defendants, the assets of which Hytera U.S. purchased. And third, Hytera makes the sensible argument that there is no need to involve Hytera U.S. or any Hytera-related entity other than the China-based Hytera Defendant, Hytera Communications Corp. Ltd., because the parties' royalty agreement should follow the parties' existing DMR patent license, which requires the China-based Hytera to report sales by any Hytera entity to "unaffiliated third parties." While Hytera U.S. is not a successor-in-interest to the now-bankrupt U.S.-based Hytera Defendants, Hytera acknowledges that Hytera U.S. is a Hytera-affiliated entity such that the China-based Hytera will be obligated under the royalty license

**A146**

agreement for sales by Hytera U.S. The Court agrees with Hytera and concludes that the Court need not order Hytera U.S. bound by the royalty license agreement because the China-based Hytera must report Hytera U.S.'s sales of Hytera products subject to the royalty and pay the royalties due on those sales to Motorola.

On Motorola's request to require Hytera to keep Motorola's trade secrets and copyrights confidential and to engage in a quarantine and removal process, the Court notes that Hytera does not address the confidentiality aspect of Motorola's request. Accordingly, the Court concludes that Hytera must keep Motorola's trade secrets and copyrights confidential, and Hytera may only use them in conjunction with the products subject to the royalty. But the Court agrees with Hytera that a quarantine and removal process is unnecessary and inappropriate. Motorola requested similar relief in its motion for a permanent injunction and granting that relief here would transform the reasonable royalty into an injunction.

For similar reasons, the Court finds that Motorola's request that the Court require Hytera to provide notice to Motorola of alleged redesigns unnecessary and inappropriate. The Court finds that the notice requirement that Motorola requests would again transform the reasonable royalty into an injunction. And its absence, as Hytera concedes, would not leave Motorola without recourse. The terms of the royalty license, as the parties agree, shall comport with the payment and reporting procedures of the parties' DMR patent license, which include dispute resolution procedures. Further, Hytera acknowledges Motorola's ability to initiate contempt proceedings against Hytera for willful violations of court orders, including this one, provide Motorola an adequate remedy.

**A147**

## IV. CONCLUSION

The Court accepts and adopts the parties' agreement on several issues, including provisions for Hytera's royalty payments generally consistent with the parties' long-standing DMR patent license agreement and that Hytera's royalty payments should be made into an escrow account pending the exhaustion of all appellate proceedings. As to the disputed issues, the Court first finds that the royalties due to Motorola from Hytera apply to all Hytera products identified by Motorola in its submissions. Second, the Court concludes that the royalties apply to Hytera's sales of those products starting July 1, 2019. Third, based on the submissions of the parties and their experts, the Court finds that an ongoing royalty of $80.32 per radio and $378.16 per repeater is reasonable and appropriate under the circumstances. Finally, the Court accepts Motorola's request that Hytera be required to maintain the confidentiality of Motorola's trade secrets and copyrights, but rejects the remaining terms requested by Motorola, including that Hytera be required to participate in a quarantine and removal process and to provide notice to Motorola of alleged redesigns.

The parties shall jointly file a proposed royalty agreement consistent with this order for the Court's review and approval by January 31, 2022.

IT IS SO ORDERED.

ENTER:

CHARLES RONALD NORGLE, Judge
United States District Court

DATE: December 14, 2021

41

**A148**

# ORDER

WHEREAS, this Court denied Plaintiff Motorola Solutions, Inc. ("Motorola Solutions") and Motorola Solutions Malaysia SDN.BHD's (collectively with Motorola Solutions, "Motorola") motion for a permanent injunction prohibiting the continued sale of certain products by Hytera Communications Corporation Ltd. ("Hytera") (collectively with Motorola, the "Parties"); and

WHEREAS, on December 14, 2021, this Court's Order (Dkt. 1289) found that "an ongoing royalty of $80.32 per [terminal] radio and $378.16 per repeater is reasonable and appropriate under the circumstances," Dkt. 1289 (the "Royalty Order") at 41, and ordered the Parties to provide a joint submission on the license; and

WHEREAS, on February 24, 2022, the Parties submitted a proposed Royalty Agreement with disputed terms (Dkt. 1309), along with supplemental briefing in support of their respective positions (including Hytera's Motion for Reconsideration in Part) (Dkt. 1308-1318);

WHEREAS, on March 14, 2022, Motorola filed a Response to Hytera's Submission Regarding Terms of Ongoing Royalty (Dkt. 1330-1332); and

WHEREAS, on April 12, 2022, this Court denied Hytera's Motion for Reconsideration in Part, ruled on the various terms disputed by the Parties, and ordered the Parties to "submit to the Court an order with the terms of Hytera's royalty obligations in the form as proposed by the parties [1309] and including terms consistent with this order as to the disputed issues by April 19, 2022 for the Court's review, approval and entry;" and

WHEREAS, pursuant to the Court's April 12 Order, the Parties submitted a proposed Royalty Order on April 19, 2022 for the Court's review, approval and entry.

IT IS HEREBY ORDERED as follows:

1

1. **Definitions**

    1.1.   **"Affiliate"** of a party means any legal entity, more than fifty percent (50%) of whose outstanding shares or securities representing the right to vote for the election of directors or other managing authority are, or more than fifty percent (50%) if whose equity interest is, now or hereafter, owned or controlled, directly or indirectly by that party (but only so long as such ownership or control or equity interest exists).

    1.2.   **"Covered Products"** means the Hytera products that Motorola specifically identified in its submission. *See* Dkt. 1118-3 (Motorola's list of "Accused Products").

    1.3.   **"Covered Knock-Down Kit"** means a collection of substantially all of the parts required to assemble a Covered Product, whether such parts are completely disassembled or partially assembled, provided such collection includes the firmware for such Covered Product.

    1.4.   **"Court"** means the court assigned to the above-captioned matter or otherwise having jurisdiction to enforce or modify the terms of this order.

    1.5.   **"Covered Equipment Transaction"** shall mean the (i) manufacture of the Covered Products, (ii) use for purposes of evaluation, testing, and development in connection with the foregoing sub-section (i), or (iii) sale, lease, distribution or delivery (each item in this subsection (iii), a "Sale"), in each case with respect to (i) - (iii), of a Covered Product or a Covered Knock-Down Kit and further, in each case of (i) - (iii), not out of compliance with any U.S. law, including, for the avoidance of doubt, U.S. laws and regulations relating to economic sanctions and export controls (any of the foregoing instances of non-compliance, "U.S. Law Non-Compliance").

2. **Scope of License**

    2.1.   Subject to the terms and conditions of this Order, beginning on July 1, 2019, Hytera and its Affiliates shall have a limited, non-transferable, non-exclusive, non-sublicensable, royalty-bearing, license solely under Motorola's trade secrets and copyrights at issue in the above-captioned action, solely for Hytera and its Affiliates for Covered Equipment Transactions anywhere in the world, and conditioned on payment in accordance with the provisions contained herein.

    2.2.   None of Hytera's or its Affiliates' licensed activity hereunder will confer or otherwise result in Hytera or any of its Affiliates (i) obtaining any title, ownership right, or ownership interest in any Motorola intellectual property, (ii) a license to any Motorola intellectual property other than the Motorola trade secrets and copyrights at issue in the above-captioned action, or (iii) any activity occurring prior to July 1, 2019.

2.3. Notwithstanding anything to the contrary herein, for the avoidance of doubt, no license right is granted hereunder to any government entity or agency.

## 3. Confidentiality Obligations

3.1. Hytera must keep Motorola's trade secrets and copyrights at issue in the above-captioned action confidential and not publish, disseminate, or compromise the confidential nature of or disclose any portion of same. Hytera must require that its Affiliates who engage in any Covered Equipment Transaction execute an undertaking substantially identical to the template in Appendix A confirming their agreement to comply with these terms.

3.2. If Hytera becomes aware of any breach of Section 3.1, Hytera shall notify Motorola within three (3) days and immediately take steps to retrieve and protect the information that was published or disclosed, to the extent permitted by applicable laws. Hytera shall assist Motorola with reasonable action requested by Motorola in connection with the foregoing, including but not limited to cooperation with respect to investigations and undertaking any actions required by or with respect to Court orders, or orders of another court or administrative tribunal, to the extent allowed under applicable law.

## 4. Royalties

4.1. Hytera shall make payments to Motorola Solutions in the amount of $80.32 USD per terminal (portable or mobile) and $378.16 per repeater (subject to any revised rates ruled otherwise after the exhaustion of all pending appellate proceedings) on a particular unit's first Sale to an unaffiliated third party.

## 5. Payment and Reporting

5.1. Subject to Section 5.4, on January 21, April 20, July 21, and October 21 of every year, a responsible and duly authorized official of Hytera shall certify, for the preceding three-month period (e.g., on April 20, for the three-month period covering the preceding January, February, and March), in a written report by e-mail or fax to Motorola at the addresses below:

> Motorola Solutions, Inc.
> 500 West Monroe Street
> Chicago, IL 60661
> Attention: General Counsel, for Hytera License
> Email: bryan.potratz@motorolasolutions.com

reporting on:

5.1.1. The number of first Sales by Hytera and its Affiliate(s) to unaffiliated third parties anywhere in the world, including separate line items for terminal units and repeater units, or

3

5.1.2. That no Covered Products have been sold.

5.2. Reports pursuant to Section 5.1 shall follow the format of Appendix B.

5.3. Payments shall be due for the amounts reflected in these quarterly reports on each subsequent January 31, April 30, July 31, and October 31, and made into the Parties' agreed escrow account, pending exhaustion of all appellate proceedings, unless and until the Court orders otherwise.

5.4. On July 21, 2022, Hytera shall submit its first report pursuant to Section 5.1 and shall include all sales of Covered Products from July 1, 2019 through June 30, 2022.

5.5. On July 31, 2022, Hytera's first royalty payment for the amounts reflected in the July 21, 2022 report shall be paid into the escrow account.

5.6. Payments under Section 4.1 by Hytera made prior to entry of a final, non-appealable judgment in the above-captioned case, or prior to a mandate affirming the instant judgment issuing from an appeal in the above-captioned case, shall be made according to the payment terms herein and remitted by wire transfer to the following escrow account[2]:

Account Name:
Currency:                              US Dollars
Bank:
Bank Swift Code:
Bank ABA Routing Number:
Account to Credit:

Referencing "Hytera Court-Ordered Ongoing Royalty."

5.6.1. Amounts held in escrow shall be transferred only upon order of this Court.

5.7. Payments made under this license on or after entry of a final, non-appealable judgment in the above-captioned case shall be remitted by wire transfer in U.S. Dollars to [●].

5.8. Any payment hereunder which shall be delayed beyond the date required hereunder shall be subject to an interest charge of one percent (1%) per month on the unpaid balance, payable in United States currency, until paid.

## 6. **Records and Audit Rights**

6.1. Hytera shall keep clear and accurate inventory records (including electronic information) with respect to Covered Products sold. Such records shall be the

---

[2] Motorola will provide the account information in 5.6 and 5.7 Hytera after entry of the Order.

sales documentation Hytera creates and keeps in its ordinary course of business. These records shall be retained by Hytera for a period of at least seven (7) years from date of reporting and payment, notwithstanding the expiration or other termination of this Order. Hytera shall require its Affiliates who engage in any Covered Equipment Transaction to execute an undertaking substantially identical to the template in Appendix A agreeing to maintain records consistent with the requirements of this Section 6.

6.2. During the term of this Order, subject to the protocol outlined in Dkt. 1223,[3] Motorola shall have the right through an internationally recognized accounting firm and at its expense, to examine and audit at the location of the records kept pursuant to Section 6.1 or other agreed location, not more than once a year upon not less than ten (10) days prior written notice, and during normal business hours, all such records and such other records (including electronic information) and accounts (including electronic information) as may under common accounting practices contain information bearing upon the amount of royalty payable to Motorola Solutions under this Order.

6.2.1. Such internationally recognized accounting firm shall be bound in writing to maintain the confidentiality of and not disclose the contents of such records to any third party, except to the extent required by law or legal process.

6.2.2. Motorola shall be entitled to the results of the audit in a manner that informs Motorola of the accuracy of Hytera's reporting but does not disclose Hytera's or its Affiliates' confidential information, except to individuals authorized to view such information under the Protective Order in the above-captioned litigation.

6.3. Prompt adjustment shall be made by Hytera to compensate for any underpayments disclosed by such examination or audit, including the interest as set forth in Section 5.8. If the amount of such underpayment exceeds two percent (2%) of the due amount, then Hytera shall bear all external costs and expenses incurred in conducting such audit (including, but not limited to, the costs and expenses of the accounting firm). Further, if the amount of the underpayment:

6.3.1. exceeds five percent (5%) but is less than or equal to ten percent (10%) of the due amount, then Hytera shall pay Motorola Solutions an additional surcharge of ten percent (10%) of the underpayment;

---

[3] In its April 12, 2022 Order, the Court inadvertently overlooked the more recent Chinese law review protocol, agreed and entered by the Court in the context of the citation proceedings at Dkt. 1223, and instead identified the protocol adopted during discovery in the underlying case. *See* Dkt. 1338 at 19. The Court hereby clarifies that the more recent Chinese law protocol (Dkt. 1223) should be followed in connection with the audits described herein.

6.3.2. exceeds 10 percent (10%) but is less than or equal to twenty-five percent (25%) of the due amount, then Hytera shall pay Motorola Solutions an additional surcharge of twenty-five percent (25%) of the underpayment;

6.3.3. exceeds twenty-five percent (25%) but is less than or equal to fifty percent (50%) of the due amount, then Hytera shall pay Motorola Solutions an additional surcharge of fifty-percent (50%) of the underpayment;

6.3.4. exceeds fifty percent (50%) of the due amount, then Hytera shall pay Motorola Solutions an additional surcharge of one-hundred percent (100%) of the underpayment.

For the avoidance of doubt, the surcharge percentages set forth above shall apply to the entire amount of the audited underpayment, and not just the amount above the threshold. Total payment to Motorola Solutions will be computed by summing up the underpayments and any additional surcharges, and then applying the interest as set forth in Section 5.8. In the event that any overpayment during the audit period is identified and proven to the satisfaction of the auditor during the course of the audit, such overpayment may be credited against underpayments during the same period, but only up to the total amount of any such underpayments. Independent of any audit, a credit shall be available against future royalties for overpayments only if: (i) such overpayments are identified and fully explained in writing by Hytera within twelve (12) months after the due date of the payment that included such overpayment; and, (ii) Motorola is able to verify to its own satisfaction the existence and extent of such overpayment.

7. **Taxes**

7.1. Motorola Solutions shall bear all taxes imposed on it with respect to the payments made hereunder provided, however, that if so required by applicable law, Hytera shall withhold the amount of taxes levied on payments to be made by Hytera pursuant to this Order, and shall promptly make payment of the withheld amount to the appropriate tax authorities and shall transmit to Motorola Solutions official tax receipts or other evidence issued by those tax authorities sufficient to enable Motorola Solutions to support a claim for a corresponding tax credit.

8. **Term and Termination**

8.1. This license, including all rights and obligations provided herein, shall remain in effect unless and until terminated or modified by the Court.

9. **Dispute Resolution**

9.1. Motorola and Hytera shall meet and confer in good faith in an attempt to resolve any disputes that may arise hereunder. Motorola or Hytera may move the Court for resolution of any such disputes only after satisfaction of this meet-and-confer requirement.

6

10. **Change of Control**

   10.1. Subject to Section 10.2, the rights or privileges provided for hereunder may be assigned or transferred by either party only with the prior written consent of the other party, or with approval by the Court, and in all cases subject to the approval of any governmental authority as then may be required.

   10.2. Absent consent or approval under Section 10.1, in the event that Hytera subsequently comes under the ownership or control of another entity active in a material way in the field of land-mobile radio communications, all licenses granted herein shall thereafter be exercisable only in a manner that does not extend to the operations of the new controlling entity.

11. **Form of Notices**

   11.1. Except as otherwise specifically provided herein, all notices required or permitted hereunder shall be delivered to counsel of record in the above-captioned matter.

   11.2. The date of receipt of such a notice shall be the date for the commencement of the running of the period provided for in such notice, or the date at which such notice takes effect, as the case may be.

IT IS SO ORDERED.

ENTER:

CHARLES RONALD NORGLE, Judge
United States District Court

DATE: July 5, 2022

**Appendix A**

# Affiliate Undertaking Regarding Confidentiality and

# Record-Keeping[4]

WHEREAS the district court in *Motorola Solutions, Inc., v. Hytera Communications Corporation Ltd.*, Case No. 1:17-cv-01973 (N.D. Ill.), has ordered Hytera to pay an ongoing royalty for the sales of Covered Products, subject to certain conditions, including certain confidentiality obligations detailed in Section ___ of that order (the "Confidentiality Obligations") and certain Records and Audit Rights in Section ___ of that Order; and

WHEREAS Hytera desires to share information with _____ ("Receiving Affiliate") that may reflect Motorola trade secrets or copyrights subject to the Confidentiality Obligations or to engage in a Covered Equipment Transaction with Receiving Affiliate (the "Exchange");

In consideration for and as a condition of the Exchange, Hytera and Receiving Affiliate hereby agree as follows:

1. Receiving Affiliate agrees to comply with the Confidentiality Obligations applicable to Hytera, as if they applied to Affiliate. Affiliate further agrees to use any information subject to the Confidentiality Obligations in conjunction with the Covered Products.

2. Receiving Affiliate agrees to comply with the Records and Audit Rights obligations applicable to Hytera, as if they applied to Affiliate.

3. Nothing in this Affiliate Undertaking Regarding Confidentiality and Record-Keeping shall be construed as obligating Hytera to provide any Motorola trade secrets or copyrights nor as an admission that any information provided hereunder constitutes or reflects Motorola trade secrets or copyrights.

**Hytera Communications Co. Ltd.**        **Receiving Affiliate** _____

Name: _____              Name: _____

Title: _____              Title: _____

Signature: _____           Signature: _____

Date: _____              Date: _____

---

[4] Unless expressly defined herein, capitalized terms in this Affiliate Undertaking Regarding Confidentiality and Record-Keeping shall have the definitions for those terms provided in the royalty order of the district court in *Motorola Solutions, Inc., v. Hytera Communications Corporation Ltd.*, Case No. 1:17-cv-01973 (N.D. Ill.), a copy of which is appended hereto.

8

**Appendix B**
**Form Table for Covered Products Report**

**Country:**

| Hytera Selling Entity (e.g. Hytera or identity of Affiliate) | Product Model Number | Type Product (Portable, Mobile, or Repeater) | Number of Units Sold | Per Unit Royalty (or none, if applicable) | Identity of 3rd Party customer if as an OEM | Product Brand (e.g. of Hytera, Affiliate, or 3rd party) | Royalty Amount Total |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| | | | | | | | |

Royalty Amount Total for Country: _____

(The above information to be separately tabulated for each country around the world).

-----------------------------------------------------------------------------------------------------------------------------------------------------------------

**Total Number of units of Portable and mobile radios sold Worldwide:**_____

**Total Number of units of Repeaters sold Worldwide:**_____

**Worldwide Royalty Amount Total:**_____

9