**Nos. 22-2370 & 22-2413**

# In the United States Court of Appeals for the Seventh Circuit

MOTOROLA SOLUTIONS, INC. AND
MOTOROLA SOLUTIONS MALAYSIA SDN. BHD.,

Plaintiffs-Appellees / Cross-Appellants,

v.

HYTERA COMMUNICATIONS CORPORATION LTD.,

Defendant-Appellant / Cross-Appellee.

Appeal from the U.S. District Court
for the Northern District of Illinois
Case No. 1:17-cv-01973 | The Honorable Charles R. Norgle Sr.
_____

## Combined Reply and Cross-Appeal Response for Hytera Communications Corporation Ltd.
_____

Boyd Cloern
        *Counsel of Record*
Alice E. Loughran
Mark C. Savignac
John William Toth
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, NW
Washington, DC 20036
(202) 429-3000
(202) 429-3902 (fax)
bcloern@steptoe.com

Attorneys for Defendant-Appellant
Hytera Communications Corporation Ltd.

## TABLE OF CONTENTS

**Page(s)**

Introduction.................................................................... 1

Argument ..................................................................... 3

I.  The district court erred in failing to apportion the award of
    Hytera's profits and awarding a commensurate royalty.......... 3

    A.  Hytera timely raised its apportionment arguments
        before the fact-finder.......................................................3

    B.  The district court erred as a matter of law in using a
        "but for" test for apportionment....................................11

    C.  Hytera satisfied its burden of showing entitlement to
        apportionment .............................................................19

    D.  The jury made no findings on lost profits (Motorola's
        Cross-Appeal) ..............................................................28

    E.  The district court repeated the same errors in
        calculating the royalty award ......................................31

II. The district court erred in awarding Hytera's profits from
    extraterritorial sales..............................................................31

    A.  This Court should reverse the district court's award
        of extraterritorial profits under the Copyright Act .........32

    B.  This Court should reverse the district court's award
        of extraterritorial profits under the DTSA ....................44

    C.  There is no legal basis to remand the state-law
        claim (Motorola's Cross-Appeal)....................................52

III. This Court should substantially reduce the punitive damages
    award ...................................................................................55

IV.   This Court should limit the copyright damages to the three years before the claims were added ........................................60

V.    The district court did not abuse its discretion in denying the permanent injunction (Motorola's Cross Appeal)...................63

    A.    Motorola ignores the district court's dispositive ruling that exceptional circumstances existed ..............63

    B.    The district court did not abuse its discretion in finding Motorola failed to prove irreparable harm .........66

Conclusion ....................................................................................71

Certificate of Compliance with Rule 32(a)

Certificate of Service

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*4 Pillar Dynasty LLC v. New York & Co., Inc.*,
  933 F.3d 202 (2d Cir. 2019) ....................................................5, 8

*Andreas v. Volkswagen of Am., Inc.*,
  336 F.3d 789 (8th Cir. 2003).....................................................25

*Arpin v. United States*,
  521 F.3d 769 (7th Cir. 2008).....................................................19

*Barry v. Moran*,
  661 F.3d 696 (1st Cir. 2011) .....................................................53

*Bd. of Trustees of Univ. of Ill. v. Organon Teknika Corp.*,
  614 F.3d 372 (7th Cir. 2010).....................................................54

*Binney & Smith v. Rose Art Indus., Inc.*,
  No. 94 C 6882, 1995 WL 103532 (N.D. Ill. Mar. 3,
  1995)..........................................................................................67

*Bucklew v. Hawkins, Ash, Baptie & Co., LLP.*,
  329 F.3d 923 (7th Cir. 2003)..............................................13, 14

*Caffey v. Cook*,
  409 F. Supp. 2d 484 (S.D.N.Y. 2006).......................................24

*Carnegie Mellon Univ. v. Marvell Tech. Grp., Ltd.*,
  No. CIV.A. 09-290, 2014 WL 183212 (W.D. Pa. Jan.
  14, 2014), *aff'd*, 807 F.3d 1283 (Fed. Cir. 2015) .........................5

*Cloutier v. GoJet Airlines, LLC*,
  996 F.3d 426 (7th Cir. 2021)....................................................35

*Cream Recs., Inc. v. Jos. Schlitz Brewing Co.*,
  754 F.2d 826 (9th Cir. 1985)....................................................27

*Data Gen. Corp. v. Grumman Sys. Support Corp.*,
  36 F.3d 1147 (1st Cir. 1994) ....................................16

*deFelice v. Am. Int'l Life Assur. Co. of New York*,
  112 F.3d 61 (2d Cir. 1997) ........................................5

*Epic Sys. v. Tata Consultancy Servs.*,
  980 F.3d 1117 (7th Cir. 2020)....................... 55, 56, 57, 59

*Golan v. Holder*,
  565 U.S. 302 (2012) ................................................43

*Harper & Row Publishers, Inc. v. Nation Enterprises*,
  471 U.S. 539 (1985) ................................................14

*Hentosh v. Herman M. Finch Univ. of Health Scis.*,
  167 F.3d 1170 (7th Cir. 1999).....................................64

*In re Hytera Commc'ns. Am. (West) Inc., et al.*,
  Case No. 8:20-bk-11507-ES, Dkt. 111 (C.D. Ca.
  Bankr. July 14, 2020) ..............................................68

*IMAPizza, LLC v. At Pizza Ltd.*,
  965 F.3d 871 (D.C. Cir. 2020) ................................ 37, 38, 40, 42

*Impression Prods., Inc. v. Lexmark Int'l, Inc.*,
  581 U.S. 360 (2017) ................................................36

*Int'l Fin. Servs. Corp. v. Chromas Techs. Canada, Inc.*,
  356 F.3d 731 (7th Cir. 2004)................................4, 19

*James v. Eli*,
  889 F.3d 320 (7th Cir. 2018)......................................70

*John G. Danielson, Inc. v. Winchester-Conant Properties,
  Inc.*,
  322 F.3d 26 (1st Cir. 2003) .................................. 15, 17, 18, 28

*John v. Quality Loan Serv. Corp.*,
  857 F. App'x 943 (9th Cir. 2021) ................................53

*Kelley v. Everglades Drainage Dist.*,
　　319 U.S. 415 (1943) .................................................................18

*Kellogg Brown & Root Servs., Inc. v. United States ex rel.*
　　*Carter*,
　　575 U.S. 650 (2015) ...................................................... 44, 45, 46

*Konor Enters. v. Eagle Publ'n, Inc.*,
　　878 F.2d 138 (4th Cir. 1989) ...................................................14

*L.A. Printex Indus., Inc. v. Target Corp.*,
　　No. CV064641DSFAJWX, 2008 WL 11342964 (C.D.
　　Cal. Aug. 11, 2008) .................................................................26

*Leigh v. Engle*,
　　727 F.2d 113 (7th Cir. 1984) .............................................21, 22

*Liebhart v. SPX Corp.*,
　　998 F.3d 772 (7th Cir. 2021) ...................................................63

*McDavid Knee Guard, Inc. v. Nike USA, Inc.*,
　　683 F. Supp. 2d 740 (N.D. Ill. 2010) .......................................66

*Morrison v. Nat'l Australia Bank Ltd.*,
　　561 U.S. 247 (2010) .................................................................48

*Neely v. Martin K. Eby Construction Co.*,
　　386 U.S. 317 (1967) .................................................................34

*Niemi v. Lasshofer*,
　　770 F.3d 1331 (10th Cir. 2014) ...............................................68

*OCI Wyoming, L.P. v. PacifiCorp*,
　　479 F.3d 1199 (10th Cir. 2007) .................................................4

*Orgel v. Clark Boardman Co.*,
　　301 F.2d 119 (2d Cir. 1962) ....................................................26

*Petrella v. Metro-Goldwyn-Mayer, Inc.*,
　　572 U.S. 663 (2014) .........................................................*passim*

*Price v. Marshall Erdman & Assocs., Inc.*,
   966 F.2d 320 (7th Cir. 1992) ....................................................4

*RJR Nabisco, Inc. v. European Cmty.*,
   579 U.S. 325 (2016) ....................................................43, 45, 48

*SCA Hygiene Prods. Aktiebolag v. First Quality Baby
   Prods., LLC,*
   580 U.S. 328 (2017) ...............................................................61

*Scaife v. Racine Cnty.*,
   238 F.3d 906 (7th Cir. 2001) ..................................................54

*Sheldon v. Metro-Goldwyn Pictures Corp.*,
   106 F.2d 45 (2d Cir. 1939) ........................................23, 24, 25

*Sheldon v. Metro-Goldwyn Pictures Corp.*,
   309 U.S. 390 (1940) .......................................................*passim*

*Sn. Ill. Riverboat Casino Cruises, Inc. v. Triangle Insulation
   & Sheet Metal Co.,*
   302 F.3d 667 (7th Cir. 2002) ..................................................54

*Sohm v. Scholastic Inc.*,
   959 F.3d 39 (2d Cir. 2020) ..........................................60, 61, 62

*Stenograph LLC v. Bossard Assocs., Inc.*,
   144 F.3d 96 (D.C. Cir. 1998) ..................................................42

*Stop Ill. Health Care Fraud, LLC v. Sayeed,*
   957 F.3d 743 (7th Cir. 2020) ..................................................18

*Sturgis Motorcycle Rally, Inc. v. Rushmore Photo & Gifts,
   Inc.,*
   908 F.3d 313 (8th Cir. 2018) ....................................................5

*Subafilms, Ltd. v. MGM-Pathe Commc'ns Co.,*
   24 F.3d 1088 (9th Cir. 1994) (en banc) ..................................43

*Superama Corp. v. Tokyo Broad. Sys. Television, Inc.*,
   830 F. App'x 821 (9th Cir. 2020) ..................................37, 40, 42

*Taylor v. Meirick,*
  712 F.2d 1112 (7th Cir. 1983) ...................................................26

*Thoroughbred Software Int'l, Inc. v. Dice Corp.,*
  488 F.3d 352 (6th Cir. 2007) ..................................................27

*United States v. Kok,*
  No. 1:20-cr-00688 (N.D. Ill. Dec. 1, 2020), Dkt. 78 ...................50

*USA Power, LLC v. PacifiCorp.,*
  372 P.3d 629 (Utah 2016) ......................................................56

*Versata Software, Inc. v. Internet Brands, In*c.,
  902 F. Supp. 2d 841 (E.D. Tex. 2012), *aff'd,* 550 F.
  App'x 897 (Fed. Cir. 2014) .....................................................14

*Walker v. Bd. of Regents of Univ. of Wis. Sys.,*
  410 F.3d 387 (7th Cir. 2005) ..................................................34

*Wallace v. McGlothan,*
  606 F.3d 410 (7th Cir. 2010) ....................................................8

*Wojan v. Gen. Motors Corp.,*
  851 F.2d 969 (7th Cir. 1988) ..................................................54

*Zegers v. Zegers, Inc.,*
  458 F.2d 726 (7th Cir. 1972) ..................................................31

**Statutes**

17 U.S.C. § 101 ..............................................................16, 37

17 U.S.C. § 106(1)................................................................37

17 U.S.C. § 504(b)................................................................24

17 U.S.C. § 507(b)................................................................60

18 U.S.C. § 1836(b)(3)(A)(i) ..................................................63

18 U.S.C. § 1836(b)(3)(A)(iii) ................................................64

18 U.S.C. § 1837.............................................................*passim*

28 U.S.C. § 1292(a)(1) ....................................................................65

Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836 *et seq.*.....*passim*

Copyright Act.............................................................................*passim*

Economic Espionage Act of 1996, Pub. L. 104-294 .................44, 45

Illinois Trade Secrets Act.........................................................52, 54

**Federal Rules of Civil Procedure**

Fed. R. Civ. P. 39(c)(1) ....................................................................33

Fed. R. Civ. P. 50 ........................................................................5, 34

Fed. R. Civ. P. 50(b) ........................................................7, 8, 9, 10

Fed. R. Civ. P. 52 .......................................................................*passim*

Fed. R. Civ. P. 52(a) ................................................................7, 18

Fed. R. Civ. P. 52(a)(1)..............................................................4, 19

Fed. R. Civ. P. 52(a)(3)....................................................................53

Fed. R. Civ. P. 52(b) ........................................................6, 7, 8

Fed. R. Civ. P. 59 .............................................................................7

Fed. R. Civ. P. 62 ...........................................................................68

**Other Authorities**

9 Arthur R. Miller, Fed. Prac. & Proc. Civ. § 2335 (4th ed. 2023 update) ...........................................................................4

9 James WM. Moore, Moore's Federal Practice, Civil § 52.31 (2023) ..........................................................................4

4 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright*, § 14.03[D][3] (Matthew Bender, Rev. Ed.) ...........14, 15

U.S. Constitution, Seventh Amendment ..................................33, 34

Uniform Trade Secrets Act § 2(b) ...................................................66

**GLOSSARY**

| Short Form | Description |
| --- | --- |
| A. | Appendix under Circuit Rule 30(a) |
| Copyright Act | Copyright Act, 17 U.S.C. § 101 *et seq.* |
| DMR | Digital Mobile Radio |
| DTSA | Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836 *et seq.* |
| Hytera | Defendant Hytera Communications Corp. Ltd. |
| Motorola | Plaintiffs Motorola Solutions, Inc. and Motorola Solutions Malaysia Sdn. Bhd. |
| Motorola Br. | Motorola's Combined Opening and Response Brief (filed on Feb. 13, 2023). |
| MA | Motorola Appendix under Circuit Rule 30(a) |
| MSA | Motorola's Separate Appendix (filed on Feb. 13, 2023). |
| Opening Br. | Hytera's Opening Brief on appeal |
| R. | Record number in the district court (PACER) |
| R&D | Research and development |
| SA | Hytera's Separate Appendix under Circuit Rule 30(b) |

| Tr. | Trial transcript |

## INTRODUCTION

Motorola spends much of its brief attempting to tar Hytera as a bad actor instead of defending the orders below. Motorola accuses Hytera of suborning perjury, concealing and destroying evidence, and violating court orders. These accusations are both wrong and irrelevant.

For example, one of Motorola's accusations arises from statements allegedly made in confidential mediation sessions in the U.S. According to Motorola's brief, Hytera betrayed an intent to "retreat to China" to avoid enforcement of any adverse judgment. (Motorola Br. 11.) Motorola cites findings that a United Kingdom court made in 2020. *Id.* (citing R.977-5). Motorola fails to disclose, however, that the U.K. appellate court reversed these findings in 2021 because the evidence to support them violated confidential mediation rules and the accuracy of those findings was hotly contested by Hytera.[1] As that court explained, Hytera's explanation of the context of these statements revealed no impropriety.[2] The U.K.

---

[1] *See Motorola Sols. Inc. v. Hytera Commc'ns Corp. Ltd.*, U.K. Court of Appeal (Civil Division), 2021 WL 00077130 (11 Jan. 2021).
[2] *See id.*

court also ordered Motorola to pay Hytera's attorney fees, an order Motorola has not complied with. Yet Motorola repeats its version of what was allegedly said in the confidential mediation statements—another violation of court mediation rules—without providing the full history or context.

Motorola's accusations simply highlight its lack of meritorious legal arguments on the discrete legal issues before this Court. As Hytera explained in its opening brief, the district court committed reversible errors on the issues of apportionment, the presumption against extraterritoriality, the three-year damages bar for copyright claims, and the constitutional limits on punitive damages. For the reasons given in Hytera's opening brief and below, this Court should reverse the damages award.

**ARGUMENT**

## I. The district court erred in failing to apportion the award of Hytera's profits and awarding a commensurate royalty

The district court adopted Motorola's position that apportionment was not appropriate because Hytera's DMR products would not work "but for" the stolen technology. On appeal, Motorola largely abandons the "but for" test. It now agrees with Hytera that apportionment is required if (1) Hytera's profits were not due entirely to Motorola's intellectual property and (2) Hytera offered a reasonable basis for estimating apportionment. (Opening Br. 25-26; Motorola Br. 31-32.) Because the district court applied the wrong test, this case must be remanded.

### A. Hytera timely raised its apportionment arguments before the fact-finder

Seeking to evade review, Motorola argues that Hytera somehow forfeited its apportionment challenge by failing to raise *to the jury* certain arguments about the proper apportionment methodology. (Motorola Br. 28-31.) But the district court was the fact-finder on the damages issues, and Hytera indisputably placed every single fact and argument it now relies on squarely before the district court.

3

(R.1096-1 at 34-73; R.1096-2 at 53-55, 75-76, 81, 90-94, 96-108, 120.)

1.    The district court ruled that the damages were equitable and thus subject to the court's independent review. (Opening Br. 12-13.) In these circumstances, the jury's verdict is advisory only, and the district court is required to make independent findings of fact and conclusions of law. *Int'l Fin. Servs. Corp. v. Chromas Techs. Canada, Inc.*, 356 F.3d 731, 735 (7th Cir. 2004); Fed. R. Civ. P. 52(a)(1). As the district court repeatedly stated, the jury's damages award was "advisory" only. (A35, A60, A63, A66, A71.)

Because the jury was not the fact-finder, the appellate court does not review the record before the jury. Its review is limited to the district court's findings, "as if there had been no verdict from an advisory jury." *OCI Wyoming, L.P. v. PacifiCorp*, 479 F.3d 1199, 1206 (10th Cir. 2007); 9 James WM. Moore, Moore's Federal Practice, Civil § 52.31 (2023); 9 Arthur R. Miller, Fed. Prac. & Proc. Civ. § 2335 (4th ed. 2023 update). Since the jury's recommendation is advisory only, it has no effect. *Price v. Marshall Erdman & Assocs., Inc.*, 966 F.2d 320, 324 (7th Cir. 1992).

Even if a party fails to present a specific argument to an advisory jury, the party preserves an issue for appeal by presenting that argument to the district court as the relevant fact-finder. *See Sturgis Motorcycle Rally, Inc. v. Rushmore Photo & Gifts, Inc.*, 908 F.3d 313, 343 (8th Cir. 2018) (no forfeiture of argument not submitted to jury on legal issues where presented in later submission to court on equitable issues); *deFelice v. Am. Int'l Life Assur. Co. of New York*, 112 F.3d 61, 67 (2d Cir. 1997) (no forfeiture of argument timely presented to court, even though not presented to advisory jury); *4 Pillar Dynasty LLC v. New York & Co., Inc.*, 933 F.3d 202, 209 n.6 (2d Cir. 2019) (no forfeiture of argument not made in Rule 50 motion where timely made on issues tried to the court); *Carnegie Mellon Univ. v. Marvell Tech. Grp., Ltd.*, No. CIV.A. 09-290, 2014 WL 183212, at *1 & n.2 (W.D. Pa. Jan. 14, 2014) (considering in Rule 52 proceeding evidence submitted after advisory jury rendered verdict), *aff'd*, 807 F.3d 1283 (Fed. Cir. 2015).[3]

---

[3] Motorola's cases are not on point. *See* Motorola Br. 29 (citing *Fleishman v. Cont'l Cas. Co.*, 698 F.3d 598, 608 (7th Cir. 2012) (concerning argument never presented to the district court at all)); Motorola Br. 30 (citing *United States v. Lewis*, 594 F.3d 1270, 1285

This is precisely what happened here. In fact, Motorola acknowledges that Hytera raised its apportionment methodology arguments before the district court when it was independently deciding the damages to be awarded to Motorola. (Motorola Br. 29.) As such, there is no forfeiture.

**2.**    This should be the end of the matter, but Motorola suggests Hytera raised untimely arguments in the Rule 52 proceedings. According to Motorola, Hytera filed a Rule 52(b) motion that did not raise the specific methodology arguments and only raised these arguments in response to Motorola's proposed findings of fact and conclusions of law. (Motorola Br. 29-31.) This argument conflates different Rule 52 briefs addressing different equitable issues—specifically, Hytera's affirmative defenses and Motorola's disgorgement damages. These Rule 52 briefs were submitted on completely different schedules.

Before trial, Motorola argued that Hytera's answer raised equitable defenses—laches, estoppel, abandonment, and waiver—for

---

(10th Cir. 2010) (concerning an appellate argument raised for the first time in a reply brief)).

the court to decide. (R.690:8; R.625:3.) Immediately following the jury verdict, the parties agreed to a Rule 52 briefing schedule for the submission of proposed findings of fact and conclusions of law on those equitable defenses. (R.943; R.946.) That schedule required Hytera to submit its Rule 52 proposed findings on the same date as its Rule 50(b) and Rule 59 motions. (R.943.) Thus, when Motorola's brief on appeal refers to Hytera's Rule 52(b) submission, it is citing Hytera's proposed findings of fact and conclusions of law on the affirmative defenses of laches, estoppel, abandonment, and waiver. *See* Motorola Br. 30, citing R.966.

Motorola's request for disgorgement damages followed a different track. Before and during the jury trial, Hytera argued that Motorola's request for disgorgement damages was an equitable remedy for the court to decide; Motorola disagreed. (R.690:8; R.690-8 at 64 nn.90-91 & 96 nn.186-187; R.930 at Tr. 5539:18-25, 5544:17-5545:3.) When the jury awarded equitable disgorgement damages at Motorola's request, Hytera renewed its arguments in its Rule 50(b) motion that disgorgement is an equitable remedy and that Rule 52(a) sets out the proper procedure for the court's independent review. (R.954:1; R.968:1-3.) In its order addressing Hytera's Rule

50(b) motion, the district court ultimately agreed with Hytera that it was the court's responsibility to make an independent determination on the disgorgement damages. (A35, A58-60, A63, A66; Motorola Br. 16 & n.2.)[4] The district court set out a staggered Rule 52 briefing schedule in which Motorola submitted its proposed findings first on the disgorgement issues, followed by Hytera's responsive submissions. (R.1094, R.1097; Motorola Br. 16.) Thus, on December 11, 2020, Hytera submitted its own proposed findings on the disgorgement issues (R.1096-1) and, in a separate document, its objections to Motorola's submission. (R.1096-2.) This was the *only* opportunity Hytera had to present these arguments to the proper finder of fact. (R.1094.)[5]

---

[4] Motorola complains that Hytera did not raise all of its methodology theories in its Rule 50(b) motion. (Motorola Br. 30.) But "Rule 50(b) … does not apply to 'cases … tried to the court with an advisory jury.'" *4 Pillar Dynasty*, 933 F.3d at 209 n.6 (quoting 9B Arthur R. Miller, Fed. Prac. & Proc. § 2523 (3d ed. 2018)). Thus, there is no forfeiture by failing to present the issue in a Rule 50(b) motion. *Id.* Motorola relies upon *Wallace v. McGlothan*, 606 F.3d 410 (7th Cir. 2010), but the jury's verdict was binding there. (Motorola Br. 30).

[5] This distinguishes Motorola's remaining case. Motorola Br. 30 (citing *Reinacher v. Alton & S. Ry. Co.*, No. 14-CV-01353-JPG-DGW, 2016 WL 6872653, at *1 (S.D. Ill. Nov. 22, 2016) (where a party moved to amend findings a district court had already made under Rule 52(b)).

Motorola complains that the district court's staggered briefing schedule did not allow for Motorola to file a reply brief. (Motorola Br. 30-31.) But this is irrelevant to whether Hytera presented its arguments in a timely manner in its Rule 52 submissions. In any event, Motorola did not ask for leave to file a reply brief, despite the district court's practice of routinely granting motions for leave to file even sur-replies. (R.55, R.251, R.1007, R.1077, R.1097, R.1156, R.1166, R.1182, R.1305.) Motorola did not object to the timeliness of Hytera's methodology arguments until now.

Motorola suggests that the district court expressly limited Hytera's submissions to the specific arguments raised in the Rule 50(b) motion. *See* Motorola Br. 29-30 (citing R.1089 and 1094). Not true. In the cited orders, the district court referred to Hytera's Rule 50(b) motion because that was the impetus for permitting submissions on equitable issues to the court in the first instance; those orders said nothing that would limit Hytera's arguments in its Rule 52 submissions.[6] And while the district court initially stated

---

[6] *See* R.1089:1 (directing the parties "to submit proposed findings of fact consistent with the Court's opinion addressing Hytera's Rule

that it "agree[d] with the amounts awarded" by the jury (A60), the court reversed itself in a subsequent order in light of Hytera's Rule 52 submission. (A67.)

Motorola goes so far as to claim that the district court itself found that Hytera's apportionment theories were "untimely" presented. (Motorola Br. 17.) Nowhere in the district court's order is there any finding that Hytera's apportionment theories were "untimely." The district court's orders reflect the exact opposite, stating that the court had taken into account Hytera's submission (which included the specific apportionment methodologies) before rendering the orders under review. *See* A67 ("[T]he Court has reviewed the hundreds of pages of submissions by the parties with respect to the findings of fact and conclusions of law relating to the disgorgement awards in this case.").

**3**.    Even if Hytera is held to the evidence and arguments it presented to the advisory jury, that record would still necessitate apportionment. Hytera presented evidence that the use of Motorola's

_____

50(b) motion"); R.1094:1 (same quoted language). In any event, Hytera did raise apportionment of both trade secret and copyright damages in its Rule 50(b) motion. (R.954:6-8.)

copyrights and trade secrets was limited (SA19, SA50, SA56-58, R.804 at Tr. 3782:4-7, 3824:15-3826:3, 4360:19-4364:18; PTX-263 (p. 5, row 38, column E)), that its own contributions drove demand (SA33-34, SA38-41, SA44; R.804 at Tr. 3392:6-3393:7, 3453:18-23, 3454:12-3456:7, 3469:13-3470:11; R.926 at Tr. 4892:24-4894:1, 4897:22-4898:3; DTX-3167.), and that it *was* able to enter the DMR market with a non-infringing radio. (DTX-4057; R.804 at Tr. 3408:7-18, 3502:19-3503:11.) Hytera submitted expert testimony and argument that the jury needed to apportion Hytera's profits for both claims in view of this evidence. (R.926 at Tr. 4830:5-17, 4834:1-19, 4948:10-20; R.931 at Tr. 5740:15-5741:3, 5874:4-25, 5875:21–25; DTX-4057; MSA647-648, 660-661.); *contra* Motorola Br. 28. Thus, Hytera's apportionment arguments were thoroughly grounded in the record before the advisory jury.

### B. The district court erred as a matter of law in using a "but for" test for apportionment

Motorola agrees that the district court (1) awarded Motorola "all [of] Hytera's profits" without apportionment based on (2) the reasoning that the accused products "would not function" without the Motorola copyrights and trade secrets. *See* Motorola Br. 30-32

(citing A93, A83.) As Hytera demonstrated, apportionment cannot turn on "but for" causation. (Opening Br. 36-39.) Hytera used a common-sense example to demonstrate the central flaw in this test: wheels are critical to a car's ability to function but they do not represent all of the car's value; if other portions of the car do not infringe, the plaintiff is not entitled to recover profits for the non-infringing portions. (*Id.* at 38.)

1.    Motorola seeks affirmance based on a different test than used by the district court. (Motorola Br. 35-36.) According to Motorola, a defendant is not entitled to *any* apportionment where its contributions are "commingled" with the infringing contributions. *See* Motorola Br. 36 (citing *Bucklew v. Hawkins, Ash, Baptie & Co., LLP.*, 329 F.3d 923, 933 (7th Cir. 2003)). This is certainly not the law, since most apportionment cases have mingling with the infringed material. *See Sheldon v. Metro-Goldwyn Pictures Corp.*, 309 U.S. 390, 405-09 (1940) ("*Sheldon II*") (affirming apportionment that credited factors mingled with the copyrighted storyline, such as scenery, costumes, marketing efforts, and artistic contributions by the director and producer).

Not surprisingly, *Bucklew* provides no support for Motorola's position. In *Bucklew*, the defendants copied plaintiff's spreadsheet program and bundled it with three other products. *See Bucklew*, 329 F.3d at 925-26, 933. Defendants there argued that "damages can *never be*" attributable to the infringement under the Copyright Act when the sold product itself does not infringe the copyright. *Id.* at 933 (emphasis added). The Court rejected this argument, explaining that a defendant could evade any recovery by bundling a non-infringing product with the infringing product. *Id.*[7] The Court went on to reject plaintiff's argument that it could recover profits for an unrelated, non-infringing product. *Id.* Plaintiff's theory was that defendants had gained inroads into the marketplace that they would not have otherwise enjoyed "but for" the infringement of plaintiff's copyright. *See id.* The Court found this argument had no factual basis. *See id.* After rejecting the extreme positions of both parties, the *Bucklew* Court remanded the case for the district court to apportion damages between the infringing form and the non-infringing forms.

---

[7] The Seventh Circuit gave an example where an infringer copies a "book verbatim" and then offers to sell the book for nothing but charges $25 for a bookmark that cost him 10 cents. *See id.*

13

*See id.* Courts must apportion between "the infringing and the noninfringing features of the defendant's work." *Id.* at 930. "[I]nfringer's profits that are due to features of his work that do not infringe; those profits belong to him and not the copyright owner." *Id.* at 932.

Other cases cited by Motorola are similarly irrelevant. *Harper & Row Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539, 567 (1985), simply holds that the accused infringer bears the burden of proof on apportionment. (Motorola Br. 36.) *Konor Enters. v. Eagle Publ'n, Inc.*, 878 F.2d 138 (4th Cir. 1989), stands for the unremarkable proposition that full disgorgement may be available where there is no evidence that other factors contributed to the products. *Id.* at 140; *see also Versata Software, Inc. v. Internet Brands, Inc*., 902 F. Supp. 2d 841, 856-57 (E.D. Tex. 2012) (same), *aff'd*, 550 F. App'x 897 (Fed. Cir. 2014). Here, by contrast, there are other contributing factors.

The case law overwhelmingly rejects Motorola's proposed "commingling" test. As the leading treatise on copyright explains, a defendant does not need to prove that the non-infringing elements are "wholly separate" or "completely free" of such infringement. 4 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright*,

14

§ 14.03[D][3] (Matthew Bender, Rev. Ed.).[8] "It is also wrong to state
… that apportionment is unavailable where the final product was
enhanced or allowed or undergirded by the copyright infringement."
*Id.*

The First Circuit rejected a similar argument in *John G.
Danielson, Inc. v. Winchester-Conant Properties, Inc.*, 322 F.3d 26, 49-
50 (1st Cir. 2003). In that case, the plaintiff architects were awarded
virtually all of a developer's profits for the construction of
condominium units based on infringing site plan design. In reversing,
the First Circuit held that the defendant developer "did not need to
prove that its noninfringing contributions to the development were
'wholly separate' from [the architect's] plans, as the first instruction
repeatedly said." *Id.* at 50 (explaining that the instruction was
"inconsistent" with *Sheldon*). The First Circuit also stated that "we
are unpersuaded by [the plaintiff architect's] argument that

---

[8] *Nimmer* explains it was "*formerly* the view that, if the infringing and
noninfringing elements could not readily be separated, then plaintiff
should recover all profits." *Id.* , § 14.03[D][1] (emphasis added). That
view has not survived following the Supreme Court's *Sheldon*
decision and the 1974 Copyright Act.

apportionment is not appropriate because the entire development was 'intertwined' with the infringed site plans." *Id.* n.13.

As the First Circuit has explained, courts frequently order apportionment in the context of infringing derivative works, which by definition are commingled with the infringed works from which they are derived. *See Data Gen. Corp. v. Grumman Sys. Support Corp.*, 36 F.3d 1147, 1176 (1st Cir. 1994) (apportionment "almost always available" in infringing derivate works cases); 17 U.S.C. § 101 (defining derivative works as "a work based upon one or more pre-existing works"). In *Abend v. MCA, Inc.*, for example, the Ninth Circuit remanded for apportionment where factors other than the underlying story—particularly the talent and popularity of Alfred Hitchcock, Jimmy Stewart, and Grace Kelly—"clearly contributed" to the success of the film Rear Window. 863 F.2d 1465, 1480 (9th Cir. 1988), *aff'd*, 495 U.S. 207 (1990).

Motorola contends that Hytera "conceded" away its position on the legal standard for apportionment in closing arguments to the advisory jury. (Motorola Br. 35-36.) But Motorola takes counsel's

16

arguments to the advisory jury completely of out-of-context.[9] There was no such concession. In any event, whatever may have been argued in closing to the advisory jury cannot be binding because the district court—not the advisory jury—was empowered to decide the equitable damages issues.

**2.** Unable to defend the district court's "but for" test or its alternative "commingling" test, Motorola tacitly agrees that the district court applied the wrong legal standard. Both parties now agree that apportionment is required when the defendant (1) provides credible evidence that its profits are not entirely attributable to its infringement or misappropriation, and (2) there is a reasonable basis for the approximation of such apportionment. (Opening Br. 25-26; Motorola Br. 31-32.) Apportionment is "ultimately a delicate exercise informed by considerations of fairness and public policy, as well as fact." *Danielson,* 322 F.3d at 50.

Because the district court applied the wrong legal standard on this pivotal issue—an error of law—the court made *no* findings that

---

[9] Counsel merely argued that full disgorgement was inappropriate where, as here, Hytera had entered the DMR market with non-infringing products. *See* MSA646:19-648:3.

Hytera had failed to meet its burden under the proper test. *See* Opening Br. 36; *see also Danielson,* 322 F.3d at 49-50 (reversing judgment due to the district court's faulty jury instructions on apportionment). Rule 52 requires the district court to state the facts "specially"—meaning that there must be findings, in such detail and exactness as the nature of the case permits, sufficient to support the court's ultimate conclusion. *Kelley v. Everglades Drainage Dist.*, 319 U.S. 415, 420-22 (1943); *see also Stop Ill. Health Care Fraud, LLC v. Sayeed*, 957 F.3d 743, 750 (7th Cir. 2020) ("the failure to address material and potentially dispositive evidence violates the command of Rule 52(a)") (cleaned up). Motorola asks for a "highly deferential" standard of review, citing appellate decisions where the jury was the binding fact-finder. (Motorola Br. 31.)[10] But "[w]hen a federal judge is the trier of fact, he, unlike a jury, is required to explain the grounds

---

[10]  Motorola claims that the district court made "specific finding[s] ... that Hytera's profits were due *entirely* to" the torts. Motorola Br. 32 (citing A83 ¶ 49; A93 ¶ 92). Motorola also states the district court found "Motorola's intellectual property [was] the *main* factor[] behind Hytera's success ...." Motorola Br. 37-38 (emphasis added). But the cited findings said no such thing. They all amounted only to findings of "but-for" causation.

of his decision." *Arpin v. United States*, 521 F.3d 769, 776 (7th Cir. 2008).

Accordingly, the district court's award of the entirety of Hytera's profits cannot be sustained.

## C.  Hytera satisfied its burden of showing entitlement to apportionment

Motorola offers findings that it believes the district court *could have* made, had it applied the correct legal standard. (Motorola Br. 33-35.) Motorola presents its own view of the facts but fails to account for Hytera's. That cannot satisfy the district court's obligations to make independent findings. *Int'l Fin. Servs.*, 356 F.3d at 735; Fed. R. Civ. P. 52(a)(1). In any event, Hytera satisfied its initial burden under the two-prong apportionment test—and none of Motorola's arguments show otherwise.

**1**.    As to the first prong, Hytera demonstrated that its profits were attributable in part to factors other than Motorola's copyrights and trade secrets. (Opening Br. 26-30.) It is undisputed that Hytera manufactures and sells non-infringing commercial DMR products. (*Id.* at 8, 26; SA66-67; R.929 at Tr. 5420:8-20.) For the accused professional-tier DMR products, the former employees directly copied

only a portion of the Motorola code—not all of it. (Opening Br. 26-27.) Even apart from the source code, the accused products include Hytera's proprietary features, its customer service and good will, and its dealers' network—all which are important draws for its customers. (*Id.* at 27-30)

**a.**    Motorola says it is "nonsense" that "the evidence was undisputed that at most 10% of the files in Hytera's software included indicia of *direct copying* from Motorola's intellectual property." Motorola Br. 34 (emphasis added). Yet it acknowledges that "[t]hose numbers refer to estimates of how much code was copied *verbatim,*" as opposed to code that benefitted from Motorola's trade secrets, without direct copying. (Motorola Br. 33-34.) The evidence *is* undisputed regarding directly copied code; Motorola's expert's unbowdlerized testimony speaks for itself:

> Q. Okay. Now, do you — but you haven't — you haven't disagreed with that four percent number for the directly copied code, correct?
>
> A. No.
>
> Q. Okay.
>
> A. Again, lines of code that have literally been copied over as opposed to code that was used and studied in the creation of code.

(R.927 at Tr. 5141:20-5142:2.)

> Q. So out of the — there's 350 files [of about 3,500] with directly copied information, according to your opinion—
>
> A. Yes.

(R.927 at Tr. 5145:10-12.)

Significantly, the district court made no finding that Hytera had copied 100% of Motorola's code. And Motorola's expert conceded there was "no question" that Hytera could have built (and did build) a DMR radio without Motorola's intellectual property. (SA66-67.) Motorola thus concedes that Hytera made *some* contributions to the accused radios. Motorola disputes the *significance* of those contributions—an issue for the fact-finder in deciding the amount of apportionment. *See Leigh v. Engle*, 727 F.2d 113, 138 (7th Cir. 1984).

Motorola claims that other portions of Hytera's code were "contaminated"—meaning that it was developed with knowledge of Motorola's source code. (Motorola Br. 34.) But there was considerable evidence the "contamination" was quite limited. (R.921 at Tr. 3782:4-7, 3824:15-3826:3; SA71-72; R.927 at Tr. 5146:1-

5148:4.)[11] Motorola's expert erroneously described Hytera's code as "contaminated" merely because it was developed with "availability of Motorola source code," without regard to whether Motorola's code was used or even referenced in the development, much less whether that availability had any nexus to Hytera's profits. (MSA516:25.) Motorola states that "the court … credited that evidence," but it cites no such finding. (Motorola Br. 34.) There is none. *See* R.1100.

Motorola argues that Hytera's quantification of the direct copying "assumes that all lines of code are created equal." (Motorola Br. 34.) But Motorola distorts the record. Hytera pointed out in its opening brief that there was affirmative evidence that the quantification of infringing or misappropriated materials meaningfully approximated their importance. *See* Opening Br. 33-34. Indeed, as Hytera demonstrated, Motorola's *own* witnesses cited the volume of files and lines of code to indicate the significance of the

---

[11] Indeed, the former Motorola employees expressly rejected a plan to use all of Motorola's code and elected to use only a targeted, limited portion of it. (PTX-263 (p. 5, row 38, column E); R.923 at Tr. 4360:19-4364:18; SA56-58.) Motorola's expert conceded that he had identified only a single file in Hytera's code that purportedly reflected "contamination" other than direct copying. (SA71-72.)

code they testified constituted Motorola's trade secrets. *See id.* (citing R.784 at Tr. 359; R.786 at Tr. 607, 675; R.787 at Tr. 794-95, 814; R.788 at Tr. 1011-12; R.789 at Tr. 1246). Motorola offers *no* response. Moreover, the record includes an article published by Motorola engineers applying the quantification methodology that Motorola now disparages. *See* R.923 at Tr. 4206:20-4209:24 (discussing DTX-5603).

**b.** As to Hytera's contributions to the accused products beyond the source code, Motorola has very little to say. It argues that the final damages award accounted for some of Hytera's actual costs.[12] It further argues that Hytera's R&D costs were rejected due to credibility challenges to the underlying data. *See* Motorola Br. 33. But apportionment is not about Hytera's costs. It is about apportioning Hytera's *profits*. The profits reflect the overall value of the product to the customer. *See* Opening Br. 30-31 (collecting cases). This turns on consumer perceptions and their resulting

---

[12] The deducted costs were the cost of goods sold, patent royalties, asset impairment, and sales costs. (A85.) Costs associated with management or administration, legal fees, and R&D were not deducted. *Id.*

willingness to pay. *Sheldon v. Metro-Goldwyn Pictures Corp.*, 106 F.2d 45, 50 (2d Cir. 1939) ("*Sheldon I*"). The *cost* of realizing that value has no bearing on apportionment. *Id.* ("[T]he cost of the other factors was by no means a measure of their relative drawing powers.").

In *Sheldon II*, for example, the Supreme Court conducted a distinct inquiry into the amount of "deductions allowed in the computation of the net profits" of the defendant versus apportionment of profits among the contributing factors. *Id.* at 409. Similarly, in *Twentieth Century-Fox Film Corp. v. Stonesifer*, the court deducted various "costs of production" in arriving at defendant's net profits and then further apportioned profits to account for the value contribution of the "infringer's labor and artistry ...." 140 F.2d 579, 583-84 (9th Cir. 1944). Indeed, Congress later codified cost deduction and profit apportionment as distinct inquiries in the 1976 Copyright Act. *See* 17 U.S.C. § 504(b) (separately referring to "deductible expenses" and "elements of profit attributable to" other factors). And courts have continued to apportion profits according to the value contribution of non-infringing components, even after deducting the costs attributable to the same components. *See Caffey v. Cook*, 409 F. Supp. 2d 484, 504-07 (S.D.N.Y. 2006) (deducting

defendants' costs including salaries to musicians and public relations expenses, then further apportioning profits to account for reputation and creativity attributable to same).

Motorola argues that "[t]here is no evidence anyway showing that Hytera's alleged additional features contributed to its profits…." (Motorola Br. 35.) To the contrary, Hytera offered *extensive* evidence to that effect. (R.1096–1 at ¶¶ 116-133 (citing R.986-6-R.986-11); SA33-34, SA38-41, SA44; R.804 at Tr. 3392:6-3393:7, 3453:18-23, 3454:12-3456:7, 3469:13-3470:11; R.926 at Tr. 4892:24-4894:1, 4897:22-4898:3; DTX-3167.) The district court failed to address it.

**2.**    As to the second prong—reasonable methods for apportionment—Motorola complains that Hytera's price differential methodology does not originate in expert testimony. (Motorola Br. 39.) But there is no such requirement. In *Sheldon I*, for example, the court apportioned "one fifth" of the defendant's profits to infringement without expert testimony justifying that figure, "even though it [was] really no more than a guess." 106 F.2d at 50-51; *see also Andreas v. Volkswagen of Am., Inc.*, 336 F.3d 789, 798 (8th Cir. 2003) (affirming 10% apportionment without any expert methodology). "Although the testimony of experts is often helpful" in

25

conducting apportionment, "it is at best little more than an educated guess, and not of such compelling force that it is an essential element in every case." *Orgel v. Clark Boardman Co.*, 301 F.2d 119, 121 (2d Cir. 1962); *see also L.A. Printex Indus., Inc. v. Target Corp.*, No. CV064641DSFAJWX, 2008 WL 11342964, at *3 (C.D. Cal. Aug. 11, 2008) ("There is no requirement that [the defendant] produce expert testimony in support of its apportionment claim.").

Motorola argues that Hytera's price differential methodology is flawed because it is based on the difference in price between its commercial- and professional-tier radios and "those markets are not interchangeable." Motorola Br. 39; *contra* R.926 Tr. at 4924:6-10, 4927:4-25, 4934:18-4936:4; DTX-4407. Leaving aside that the district court never made a finding about the competitive landscape, the competitive market definition bears on the extent of *Motorola's* lost sales, if any, not disgorgement. *See Taylor v. Meirick*, 712 F.2d 1112, 1120 (7th Cir. 1983). The question here is what drew consumers to *Hytera's* accused products. According to Motorola's own expert, Motorola's intellectual property conferred a quality boost to the products Hytera made on its own. (R.927 at Tr. 5124:25-5125:19.) Hytera's price-differential metric reasonably approximates

the value consumers attribute to that quality boost, compared to the rest of the device. The district court erred by failing to use that even as a starting point for the required apportionment.

Motorola argues that Hytera's quantification methodology (percentage of the copied code) is solely a copyright theory. (Motorola Br. 31, 40.) This is not true. Hytera offered extensive evidence and argument explaining why the quantum of direct copying estimated the extent and significance of trade secret use too. (Opening Br. 33-34.) And the district court apparently found the trade secrets added nothing beyond the copyright infringement, since it awarded 100% disgorgement even for the period where Motorola's trade secret claim was not available. (A97 ¶ 112.) Motorola offers no response to these arguments at all, and the district court made no attempt to use those facts as a springboard to apportionment either.

Hytera was not required to prove the proper apportionment with mathematical precision. *Sheldon II*, 309 U.S. at 408. All that was required was "evidence [that] suggests some division which may rationally be used as a springboard" to make a reasonable approximation. *Cream Recs., Inc. v. Jos. Schlitz Brewing Co.*, 754 F.2d 826, 829 (9th Cir. 1985) (quoting *Orgel*, 301 F.2d at 121);

27

*Thoroughbred Software Int'l, Inc. v. Dice Corp.*, 488 F.3d 352, 361 (6th Cir. 2007) (same); *Danielson*, 322 F.3d at 48 (same). Hytera did precisely that. The district court never considered any of the proffered springboards.

In short, Hytera satisfied its burden of showing entitlement to apportionment. The case should be remanded with instructions to apportion profits, using the methodologies offered in the record.

### D.     The jury made no findings on lost profits (Motorola's Cross-Appeal)

Motorola contends, as a contingent "part of its cross-appeal," that the jury's findings on lost profits provides an independent basis to affirm the trade secret damages. (Motorola Br. 40-41.) According to Motorola, the jury found that Motorola suffered $86.2 million in lost profits. (*Id.* at 41). Not true. The jury made *no finding* (express or implied) on lost profits.

The district court instructed the jury to award unjust enrichment damages "to the extent it exceeds Motorola's actual loss." (R.895:37.) And Motorola's counsel told the jury in closing arguments: "If you award Motorola all of the unjust enrichment that it's entitled to, then you don't have to worry about actual loss or lost

profits." (R.931 at Tr. 5706:19-24.) Motorola then asked the jury to award $345,761,156 in disgorgement damages. (R.931 at Tr. 5708; R.920 at Tr. 3715:15-17; R.1096-1:11.) The jury returned an award of $345,761,156 in compensatory damages. (R.898 at 4; A1, 3; R.933 at Tr. 5981:20.) Thus, the jury's damages award was precisely the sum Motorola advanced as *Hytera's* profits, and it far exceeded the $153.9 million that Motorola advanced as its own lost profits. (R.794 at Tr. 2204:15-20; R.929 at Tr. 5353:13-14.)[13] As instructed by the district court, the jury did not need to make a finding on Motorola's lost profits if it awarded disgorgement damages. The jury obliged. (R.898 at 4.)

The district court ultimately confirmed that the jury's damages verdict did "not reflect Motorola's actual losses" and was "not a specific proxy for Motorola's actual losses." (A72, A92.) Thus, the district court treated the jury's entire damages award as an advisory

---

[13] Motorola's argument for $86.2 million in lost profits on appeal concerns lost profits from May 2016 through June 2019, not the full damages period (2010 through June 2019). *See* Motorola Br. 41; Opening Br. 14.

on the equitable issue of disgorgement, a ruling Motorola does not challenge on appeal. (*Id.*; A67.)

The district court did not "credit[] Motorola's calculations." (Motorola Br. 42.) Instead, the district court initially believed that the jury had awarded lost profits. (A72 ¶ 10, A59, A62, A67.) Hytera demonstrated in briefing that the district court had taken an incorrect view of the jury's award. (R.1096-1:3-13.) "With a cool head and a keen eye," the district court acknowledged its error and reversed itself. (A67.) The "correct view" of the jury's award, as the district court explained, was that it covered "Hytera's profits (not Motorola's actual losses)." (*Id.*) To be sure, there were numerous flaws in Motorola's lost profits analysis that a jury would need to resolve in the first instance. (R.926 at Tr. 4922:9-4944:13.) But because the jury never awarded lost profits, Hytera had no reason to challenge Motorola's calculation of lost profits in the post-trial motions or on appeal. *Contra* Motorola Br. 41-42.

Motorola's attempt to recast the jury's advisory verdict for disgorgement damages as one on lost profits should be rejected.

**E.    The district court repeated the same errors in calculating the royalty award**

As Hytera explained, the district court repeated the same errors in calculating the royalty rate, leaving Hytera with no prospect of making any profit. (Opening Br. 39-41.) Hytera thus does the work and takes the risk but gains nothing from it. As Judge (later Justice) Stevens explained, a licensee would not be willing to pay 100% of his profits in exchange for a license. *Zegers v. Zegers, Inc.,* 458 F.2d 726, 728 n.8 (7th Cir. 1972).

Motorola acknowledges that the district court set a royalty rate for ongoing sales based on a post-judgment hypothetical negotiation. (Motorola Br. 44.) Necessarily, all of the errors Hytera raises on appeal were premises of that hypothetical negotiation. To the extent the judgment is vacated so the district court can estimate the proper apportionment of Hytera's profits, that would necessarily affect the parties' bargaining positions and the resulting royalty rate. The district court's ordered royalty rate must be vacated too.

**II.   The district court erred in awarding Hytera's profits from extraterritorial sales**

The district court erred by awarding Motorola profits from Hytera's total worldwide sales of the accused products. As Hytera

31

explained, the Copyright Act and the DTSA do not authorize an award of extraterritorial damages in this case. (Opening Br. 41-62.)

### A. This Court should reverse the district court's award of extraterritorial profits under the Copyright Act

On extraterritoriality under the Copyright Act, Motorola's brief has narrowed the parties' dispute. Motorola accepts that it can recover profits from a foreign sale under the Copyright Act *only* if it proved at trial that the foreign sale was "enabled" by a complete "predicate act" of copyright infringement committed in the United States. (Motorola Br. 46, 49.) And Motorola does not even attempt to defend the district court's suggestion, refuted in the opening brief, that the award of foreign profits could be justified by Hytera's sales of infringing products in the United States (which did not "enable" any foreign sale) or its employees' participation in trade shows here (which neither enabled foreign sales nor constituted a complete act of copyright infringement). *See* Opening Br. 48-51.

Motorola's sole argument is that Hytera committed a domestic act of copyright infringement when certain former Motorola employees based in Malaysia downloaded copyrighted files from Motorola's U.S.-based servers onto their computers in Malaysia. *See*

Motorola Br. 46 ("At trial, Motorola identified just one type of predicate act of domestic copyright infringement: downloading source code from U.S. servers."). This argument fails for two independent reasons.

**1.**    As a factual matter, there is *no evidence* that the employees downloaded the files from U.S.-based servers as opposed to Motorola's servers located in Asia (including in Malaysia itself). *See* Opening Br. 44-45. Motorola tries to avert any inquiry on the issue by insisting that "[t]he jury necessarily found Hytera downloaded Motorola's copyrighted code from U.S. servers." (Motorola Br. 46.)

**a.**    For starters, the jury did not explicitly find that the former Motorola employees took the files from U.S.-based servers. The general verdict finding Hytera liable for copyright infringement did not require any such finding. The jury did *purport* to award Motorola copyright damages for foreign sales, which is apparently Motorola's basis for arguing that the jury found that the files were downloaded from U.S. servers. (Motorola Br. 47.) But the district court later ruled that the award of Hytera's profits is an equitable matter for the court rather than a legal one for the jury under the Seventh Amendment, meaning that the jury's award was advisory only and reviewed

33

independently by the court. (A35, A67; Fed. R. Civ. P. 39(c)(1).) Motorola admits as much (Br. 16 & n.2) and does not contest that ruling on appeal. So there was no valid jury award of extraterritorial profits and no valid jury finding underlying such an award.[14]

**b**.    Even if the jury had made a finding that the files were taken from U.S.-based servers, the Seventh Amendment allows courts to "re-examine" such findings "according to the rules of the common law." For example, a jury finding must be set aside under Rule 50 if the record contains insufficient evidence to support it. *See Walker v. Bd. of Regents of Univ. of Wis. Sys.*, 410 F.3d 387, 393 (7th Cir. 2005) ("a mere scintilla of supporting evidence will not suffice" to support a jury finding). This is consistent with the Seventh Amendment. *See Neely v. Martin K. Eby Construction Co.*, 386 U.S. 317, 319-22 (1967).

Hytera asked the district court to reject any award of foreign profits because the record does not support a finding that the files were taken from U.S. servers. *See* A56, A64; R.954:11; Motorola

---

[14] In *Miles v. Indiana*, by contrast, the district court had to determine the jury's basis for its liability verdict to determine the appropriate equitable remedy. 387 F.3d 591, 599-601 (7th Cir. 2004).

Br. 15 ("Hytera renewed its extraterritoriality … arguments."). There is no Seventh Amendment impediment to such a motion, and this Court reviews the district court's denial de novo. *Cloutier v. GoJet Airlines, LLC*, 996 F.3d 426, 439 (7th Cir. 2021).

**c.**     Motorola still has no evidence to support a finding that its former employees downloaded the files from U.S. servers. Rather, it effectively concedes that the downloads were from *Malaysia-based* servers but offers *attorney argument* that they should be *deemed* to be from U.S. servers because its expert said the foreign servers "mirror" the one in Illinois such that any file downloaded from the foreign servers "originated in the United States." (Motorola Br. 47.)

That is nonsense. Motorola *admits* that the question is whether the employees downloaded the files from U.S.-based servers or foreign ones. If they downloaded the files from foreign servers, then they performed *no* act even *arguably* in the United States—much less a complete act of copyright infringement—and the award of foreign profits must be reversed.

Whether the files "originated" in the United States is immaterial, just as it would be immaterial that a book bought and copied abroad was printed in the United States. A company that chooses to copy

35

material originating in the United States onto servers abroad necessarily assumes the risk that a foreign national will download the material from the foreign servers and will not be subject to U.S. copyright protections, which "do not have any extraterritorial application." *Impression Prods., Inc. v. Lexmark Int'l, Inc.*, 581 U.S. 360, 379 (2017). In other words, even on Motorola's account, this is not a case of a foreign national choosing to travel to the United States—or even hack into a U.S.-based server from abroad—and take a U.S. company's intellectual property. Rather, it is a case of an American company choosing to store its IP in a foreign location from which it was taken by foreign individuals. That plainly does not amount to an act in the United States by the former Motorola employees.

On Motorola's logic, if the Malaysia-based former Motorola employees had simply walked into the room in Malaysia where Motorola keeps its servers there and physically removed a server with copyrighted files on it, they would be liable under U.S. copyright law—even though that law has no extraterritorial application— simply because the files "originated in the United States." The same would be true if the employees removed from their office in Malaysia

a printed manual containing code written in the United States. That is not the law.

**2.** As a legal matter, even if the Malaysia-based former Motorola employees did download files from a Motorola server in the United States onto their computers in Malaysia, that would not constitute an act of copyright infringement *in the United States. See* Opening Br. 45-48. As Hytera explained, the D.C. and Ninth Circuits have held that a foreign entity that uses the internet to download a file from a U.S.-based server onto its computer abroad has *not* committed a domestic act of copyright infringement. *See IMAPizza, LLC v. At Pizza Ltd.*, 965 F.3d 871, 876-79 & n.2 (D.C. Cir. 2020); *Superama Corp. v. Tokyo Broad. Sys. Television, Inc.*, 830 F. App'x 821, 823-24 (9th Cir. 2020). This is because, under the Copyright Act's definitions, infringement occurs only when the infringer has created a "copy" of the file, where a "copy" is a "material object[] … in which a work is fixed," and a work is "fixed" only when it exists in a form "sufficiently *permanent or stable* to permit it to be perceived, reproduced, or otherwise communicated *for a period of more than transitory duration*." 17 U.S.C. §§ 101, 106(1) (emphases added); *see IMAPizza*, 965 F.3d at 876-79 & n.2.

37

**a.** Motorola has no response to *Superama* or the statutory text just discussed. As for *IMAPizza*, Motorola insists that the D.C. Circuit reached its holding only because the plaintiff "provide[d] no technical, legal, or other support … for the proposition that downloading a picture from a server located in the U.S. creates a copy of that picture in the U.S." 965 F.3d at 877. Motorola claims to have the "legal authority" and "sound technical understanding of computer downloads" that the *IMAPizza* plaintiff lacked.

It does not. Motorola offers *no* authority holding that downloading a file from a U.S.-based server onto a computer abroad entails an act of copyright infringement in the United States— whereas Hytera has pointed to two recent appellate decisions that squarely hold to the contrary.

The only "technical support" that Motorola offers for its position is unsupported *attorney argument* that, "as part of downloading a file from a server, a duplicate version of that file is created in memory for transmission across the Internet" and that "duplicate is sufficiently 'fixed'" because its content can be perceived or communicated "for a period of more than transitory duration." (Motorola Br. 48.) This attorney argument is wrong: There is nothing about transmitting a

file from one computer to another that requires the transmitting server to create a new embodiment of the file before transmitting it, and such an embodiment is not necessarily created in that scenario. And even if one were created, there is no reason to believe that it would persist for "more than transitory duration."

As the Second Circuit explained in *Cartoon Network LP v. CSC Holdings, Inc.*, the Copyright Act "imposes two distinct but related requirements: the work must be embodied in a medium …, and it must remain thus embodied 'for a period of more than transitory duration.'" 536 F.3d 121, 127 (2d Cir. 2008) (quoting 17 U.S.C. § 101). The Second Circuit went on to hold that, though the defendant's system embodied the plaintiff's work in its buffer (a form of computer memory), that embodiment lasted for no more than 1.2 seconds and therefore was too transitory to meet the statutory definition. *See* 536 F.3d at 129-30.

Similarly, in *CoStar Group Inc. v. LoopNet, Inc.*, the Fourth Circuit held that the "electronic infrastructure" by means of which the Internet transmits data between users "hardly 'copies' the information and data [being transmitted] in the sense that it fixes a copy in its system *of more than transitory duration*. Even if the

39

information and data are 'downloaded' onto the [infrastructure's] RAM or other component as part of the transmission function, that downloading is *a temporary, automatic response to the user's request*, and the entire system functions solely to transmit the user's data." 373 F.3d 544, 550-51 (4th Cir. 2004) (emphasis added). "While temporary electronic copies may be made in this transmission process, they would appear not to be 'fixed' in the sense that they are 'of more than transitory duration.'" *Id.* at 551.

Cases like *CoStar* and *Cartoon Network* strongly suggest that any embodiment of a file created on a U.S. server when a user downloads the file from the server would be too transitory to constitute a "copy" under the Act. Regardless, Motorola bears the burden, and it cannot carry that burden with mere attorney argument. It points to no case law, expert testimony, or other record evidence for its appellate attorneys' technical assertions about the inner workings of Motorola's servers. Nor is any support for those assertions to be found in the district court's findings of fact and conclusions of law. And if the point were so blindingly obvious that it could be established by attorney argument alone, then the D.C.

40

Circuit and Ninth Circuit surely would not have missed the point in *IMAPizza* and *Superama*.

**b.**     Motorola does cite three cases. But they are inapposite—which is unsurprising, given that they include older decisions from the D.C. and Ninth Circuits, which have both *rejected* Motorola's position on downloads from U.S.-based servers. *NLFC, Inc. v. Devcom Mid-America, Inc.* just says that "[n]either party disputes that loading software into a computer constitutes the creation of a copy under the Copyright Act." 45 F.3d 231, 235 (7th Cir. 1995). That says nothing about whether a "duplicate version" of a file that is to be transmitted over the internet persists on the server that is sending the file "for a period of more than transitory duration"—or whether such a file even exists.

Hytera does not dispute that a person who downloads a file from a U.S. server onto his computer thereby creates a copy of the file *on his computer*. Hytera's point is that, if that computer is located abroad, that copy is created outside the United States, so there is no *domestic* infringement. *NLFC* contains nothing to support Motorola's position that downloading from a U.S. server onto a computer abroad

necessarily entails creating copy of the file *in the United States*—much less a *non-transitory* copy.

*MAI Systems Corp. v. Peak Computer, Inc.* holds that running a program on a computer entails copying the program from a storage medium (like a disk or hard drive) into CPU memory. 991 F.2d 511, 518 (9th Cir. 1993). That proposition is inapposite. The copy in *MAI* was not "transitory" because it persisted while the user used the program. *See also Cartoon Network*, 536 F.3d at 128 (distinguishing *MAI* on the ground that "the program [there] was embodied in the RAM for at least several minutes"). But that says nothing about whether a "duplicate version" of a file transmitted over the internet is created on the server that is sending the file and persists "for a period of more than transitory duration." *See also CoStar*, 373 F.3d at 551 (distinguishing running a program as in *MAI* from transmission over the Internet). Finally, *Stenograph LLC v. Bossard Assocs., Inc.*, 144 F.3d 96, 101-03 (D.C. Cir. 1998), simply followed *MAI*.

*IMAPizza* and *Superama* are better places to look for an answer than *MAI* and *Stenograph*. Indeed, the Ninth Circuit in *Superama* expressly rejected the plaintiff's argument that its earlier decision in *MAI* "establishes a rule that infringement occurs when a download

42

abroad automatically creates a copy of the material on a United States server." 830 F. App'x at 823.

**c.**  In the end, Motorola falls back on a policy argument, asserting that Hytera's position would allow a foreign entity to download movies from an American film studio's U.S.-based server and distribute them abroad with no repercussions under U.S. law. (Motorola Br. 49.) Such a policy argument is no basis to disregard the text of the statute, the relevant language of which—including the "non-transitory" requirement—predates the Internet and cannot have been intended to cover Motorola's hypothetical. Anyway, the presumption against extraterritoriality also has strong policy justifications. *See RJR Nabisco, Inc. v. European Cmty.*, 579 U.S. 325, 346-48 (2016). The U.S. government has chosen to address copyright protections abroad through agreements with other nations rather than by unilaterally extending U.S. law worldwide.[15] The Supreme

---

[15] *E.g., Golan v. Holder*, 565 U.S. 302, 306-14 (2012) (discussing U.S. membership in the Berne Convention for the Protection of Literary and Artistic Words); *Subafilms, Ltd. v. MGM-Pathe Commc'ns Co.*, 24 F.3d 1088, 1097-98 (9th Cir. 1994) (en banc) ("Extraterritorial application of American law would be contrary to the spirit of the Berne Convention ...."); *see id.* at 1095 n.10.

Court's extraterritoriality case law commands that courts respect that decision.

## B. This Court should reverse the district court's award of extraterritorial profits under the DTSA

Motorola contends that private civil claims under the DTSA can take advantage of the Economic Espionage Act provision authorizing extraterritorial reach for trade-secret "offenses" where an act in furtherance of the offense was committed in the United States. And it asserts that Hytera committed domestic acts in furtherance of its foreign sales by downloading trade secrets from Motorola's U.S.-based servers and by attending trade shows in the United States. Motorola's argument fails at every step.

**1.** It is undisputed that the award of foreign profits under the DTSA can stand only if 18 U.S.C. § 1837 applies to private civil claims under the DTSA. (Opening Br. 52-53.) But § 1837, which was enacted as part of the criminal Economic Espionage Act, applies only to "offenses." Motorola notes that the term "offense" is sometime used to encompass civil wrongs. But it does not dispute that the *most natural* usage of the term is in reference to crimes only. *See also Kellogg Brown & Root Servs., Inc. v. United States ex rel. Carter*, 575

U.S. 650, 658 (2015) ("The term 'offense' is most commonly used to refer to crimes."). Nor does Motorola dispute that that is the meaning Congress would have had in mind when it enacted § 1837 in 1996 as part of the Economic Espionage Act, a criminal law with no private right of action. Since the presumption requires a "clear indication" that Congress intended to reach extraterritorially, that is the end of the analysis: Congress gave no "clear indication" that it intended the term "offense," used in a criminal statute in Title 18, to have a broader-than-usual meaning and cover private claims as well. *See RJR Nabisco*, 579 U.S. at 335 ("When a statute gives no clear indication of an extraterritorial application, it has none." (quoting *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 255 (2010))).

More to the point, the Supreme Court held in *Kellogg* that the term "offense" *when used in Title 18* uniformly refers to crimes and does not encompass civil claims. That is dispositive here. Section 1837 was part of Title 18 in 2015, when the Supreme Court decided *Kellogg* and noted that, "[a]lthough the term appears hundreds of times in Title 18, neither respondent nor the Solicitor General … has been able to find a single provision of that title in which 'offense' is employed to denote a civil violation." 575 U.S. at 659. And when

45

Congress added the DTSA to Title 18 in 2016, it did so against the background of the Supreme Court's holding the year before that "offense" in Title 18 refers only to crimes. Had Congress intended for § 1837 to apply to the private civil claims created by the DTSA, it would have amended § 1837 so that it would not be limited to "offenses."[16]

Motorola insists that this Court disregard *Kellogg* because the Supreme Court there based its interpretation of the term "offense" in the Wartime Suspension of Limitations Act (WSLA) on the WSLA's statutory history as well as the proposition that the term "offense" in Title 18 refers only to crimes. (Motorola Br. 53-54.) But Hytera's point is simply that *Kellogg* establishes that the term "offense," when used in Title 18, refers only to crimes. That the Supreme Court gave additional reasons for its ultimate holding under the WSLA is beside the point. Anyway, § 1837's statutory history parallels the WSLA's in the relevant respect: Just as the earlier versions of the WSLA clearly

_____

[16] Like the Solicitor General in *Kellogg*, Motorola points to other provisions of the U.S. Code where Congress supposedly used "offense" to encompass civil violations—but not one of them is in Title 18. (Motorola Br. 53.)

used "offense" to mean "crime," the term "offense" in § 1837 clearly referred only to crimes when that section was enacted in 1996 because, until the DTSA was enacted in 2016, federal law did not provide for private trade secret claims.

Motorola also claims the DTSA shows Congress's intent to extend its private civil action for trade secret misappropriation worldwide because it states that "trade secret theft occurs in the United States *and around the world*" and causes harm "*wherever it occurs.*" Pub. L. No. 114-153, §§ 5(1) & 5(2), 130 Stat. 376, 384 (2016) (emphases added). But, even assuming that this sort of statement that a *problem* exists worldwide could ever provide a "clear indication" that a particular *remedy* extends worldwide, it cannot do so here. The DTSA did not *only* create a private right of action. Rather, DTSA § 2 enacts the private right of action—and says *nothing* about extraterritorial application—while DTSA § 4 creates a totally separate requirement for the Department of Justice to report to Congress about extraterritorial matters including "the theft of the trade secrets of United States companies occurring outside of the United States" and "progress made under trade agreements … against theft of trade secrets of United States companies outside of the United States." *Id.*

§ 4(b). Section 4 goes on to require DOJ to provide "[r]ecommendations of legislative and executive branch actions that may be undertaken to ... reduce the threat of and economic impact caused by the theft of the trade secrets of United States companies occurring outside of the United States." *Id.* § 4(b)(8).

Understood in context, DTSA § 5's statement that "the sense of Congress" is that "trade secret theft occurs ... around the world" and harms IP owners "wherever it occurs" connects to § 4's extensive provision for reporting and recommendations regarding extraterritorial trade secret theft, not to § 2's creation of a private right of action for misappropriation with no reference to extraterritoriality. In short, the language in § 5 does not provide the requisite "clear indication" that Congress intended for § 2's private right of action to apply worldwide.

The presumption against extraterritoriality can be rebutted only by a "clear indication of extraterritoriality," and any rebuttal of it must be "limit[ed] ... to its terms." *Morrison*, 561 U.S. at 265. While § 1837 gives a clear indication that Congress intended to rebut the presumption for certain *crimes*, it provides no clear indication that Congress intended to rebut it for private DTSA claims. *See also RJR*

48

*Nabisco*, 579 U.S. at 346-50 (rejecting proposition that "a private right of action must reach abroad because the underlying law governs conduct in foreign countries").[17]

**2.**     Even if § 1837 is extended to private DTSA claims, neither of the supposed "act[]s in furtherance" of the foreign sales that Motorola argues were committed "in the United States" supports the award of Hytera's foreign profits.

**a.**     Motorola asserts that the Malaysia-based former Motorola employees downloaded the trade secrets from Motorola's U.S.-based servers. As with the copyrighted code, though, this argument fails because there is zero record evidence to support it. At most, the parts

---

[17] In *dmarcian, Inc. v. dmarcian Europe BV*, 60 F.4th 119, 141-42 (4th Cir. 2023), the court mistakenly suggests that § 1837 is part of the DTSA. *Id.* The defendant there apparently accepted that § 1837 applies to DTSA claims (*see* Br. of Appellant, 2021 WL 5843110, at *53). As such, the panel's treatment of § 1837 as applying to a private DTSA claims carries no persuasive force. This is especially true considering that the court decided only that the plaintiff was *likely* to succeed, acknowledging that "the preliminary injunction may not be the final word on the merits of this internationally entwined case." 60 F.4th at 148. Similarly, the panel stated that the defendant's retrieval of trade secrets from the plaintiff's U.S.-based servers "is enough for establishing a domestic nexus" at the preliminary injunction stage under § 1837(2). *Id.* at 142. The panel offers no reasoning in support, and the defendant's brief there raised no contrary argument (*see* 2021 WL 5843110, at *53).

of the record that Motorola points to would support an inference that the trade secret files initially came from ("originated in") the United States, even if they resided on Malaysian servers when the former Motorola employees accessed them. That is plainly insufficient as a matter of law: Section 1837 asks whether the defendant committed an "act … in the United States," not whether the trade secrets originated in the United States.

Motorola resorts to arguing (Br. 50) that G.S. Kok's recent guilty plea states that he misappropriated confidential information "routed through" U.S. servers. That plea was not part of this record and is hearsay. Anyway, the plea actually states that the "proprietary and trade secret Motorola information … *was downloaded from Motorola's servers in Malaysia.*" Plea Agreement at 5, *United States v. Kok*, No. 1:20-cr-00688 Dkt. 78 (N.D. Ill. Dec. 1, 2020) (emphasis added).

Finally, Motorola fails to contest Hytera's point that the former Motorola employees did not commit a complete act of trade secret misappropriation in the United States even if the trade secrets were taken from U.S.-based servers, since they did not acquire the trade

secrets until those files arrived on their computers *in Malaysia*. (Opening Br. 61.)[18]

**b.**     Motorola also contends that the attendance of Hytera employees at trade shows in the United States was an independent act in furtherance of the foreign sales because some foreign buyers attended those trade shows and may have purchased Hytera products that were marketed there. (Motorola Br. 52.) But Motorola has no evidence that the Hytera employees' attendance at U.S. trade shows "further[ed]" *any* foreign sales. Nor did the district court find that they did. The only evidence that Motorola offers is that a Hytera witness testified that foreign buyers attend U.S. trade shows. That testimony cannot meet Motorola's burden to show that *any* (much less *all*) of the foreign sales for which it was awarded profits were "further[ed]" by any "act … committed in the United States" (or that future sales for which it was awarded royalties were). *See Petrella v.*

---

[18] Citing the trial transcript, Motorola misleadingly represents that one of its former employees "'downloaded literally thousands and thousands of documents' from Motorola's servers in the U.S." Motorola Br. 9 (quoting MSA576:19-21). As the internal quotation marks suggest, the assertion that the downloads were from "servers in the U.S." is not supported by the cited transcript.

*Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663, 671 (2014) (each sale "gives rise to a discrete 'claim'").

Motorola tries to shift the burden, asserting that "Hytera offers no evidence that any of the foreign sales for which the district court awarded damages had no connection to its promotional sales at those shows." (Motorola Br. 52.) But Motorola indisputably bears the burden. (Opening Br. 45 & n.15.)

## C.  There is no legal basis to remand the state-law claim (Motorola's Cross-Appeal)

As Motorola acknowledges, the district court held that the Illinois Trade Secrets Act (ITSA) does *not* reach outside Illinois and does *not* authorize an award of profits from sales made outside Illinois. (Motorola Br. 54; A31-34; R.884.) Motorola purports to appeal. Yet it does not argue that the district court erred, or ask this Court to hold that the ITSA actually does allow recovery of foreign profits. Instead, Motorola argues only that the Court should remand for the district court to again "consider" ITSA's geographical reach.

The only "error" that Motorola asserts is that the district court, in its *30-page written opinion,* wrote out its rationale for rejecting one of Motorola's ITSA arguments but supposedly not its reason for

rejecting another Motorola argument. Motorola does not contend that the district court should have *accepted* that argument, but merely that it erred by not spelling out its reasons and should therefore be ordered to do so.[19]

As a general matter, nothing requires a court to provide *any* explanation for its rulings on motions. *See* Fed. R. Civ. P. 52(a)(3) ("[t]he court is not required to state findings or conclusions when ruling on a motion"); *Barry v. Moran*, 661 F.3d 696, 702 n.9 (1st Cir. 2011). And certainly "[d]istrict courts are not required to state on the record their reasons for rejecting every *argument* made by a moving party in support of a motion." *John v. Quality Loan Serv. Corp.*, 857 F. App'x 943, 943 (9th Cir. 2021) (emphasis added). The notion that the district court's 30-page opinion here was inadequate is absurd.

This Court's role in reviewing the legal rulings of the district court is to decide whether the lower court's judgment was correct, not to critique the thoroughness of its opinion-writing. Thus, "litigants can't appeal from district judges' *opinion*; only their

---

[19] There is no basis for Motorola's unexplained assertion that the district court "misapprehended" the argument (Motorola Br. 21).

*judgments* are subject to appellate review." *Bd. of Trustees of Univ. of Ill. v. Organon Teknika Corp.*, 614 F.3d 372, 374 (7th Cir. 2010).

Of course, Motorola could have asked this Court to review the district court's judgment precluding extraterritorial damages under the ITSA and determine whether there was any error in that judgment. Yet Motorola chose not to do so. There is "no reason to remand the case because [Motorola] was given a full opportunity to make its argument on appeal." *Sn. Ill. Riverboat Casino Cruises, Inc. v. Triangle Insulation & Sheet Metal Co.*, 302 F.3d 667, 678 (7th Cir. 2002). Having chosen not to argue to this Court that the district court erred in rejecting application of ITSA to sales outside Illinois, Motorola has forfeited any such argument. *See Scaife v. Racine Cnty.*, 238 F.3d 906, 907-08 (7th Cir. 2001).[20]

---

[20] Motorola's one cited case, *Malec Holdings II Ltd. v. English*, dealt with a district court's denial of Rule 11 sanctions. 217 F. App'x 527, 529-30 (7th Cir. 2001). This Court has held that a court of appeals cannot itself impose Rule 11 sanctions and must instead review the district court's ruling for abuse of discretion. *See id.*; *Wojan v. Gen. Motors Corp.*, 851 F.2d 969, 974 (7th Cir. 1988). Thus, when the district court fails to explain its exercise of discretion, this Court may have an insufficient basis to evaluate whether there was an abuse, necessitating remand for a fuller explanation. The same reasoning is inapplicable to a district court's ruling on a legal issue like the extraterritorial reach of an Illinois statute.

**III.    This Court should substantially reduce the punitive damages award**

The U.S. Constitution prohibits punitive damages exceeding a 1:1 ratio where, as here, there is a substantial compensatory award based on the defendant's disgorged profits. *See* Opening Br. 21-22, 64-65 (citing *Epic Sys. v. Tata Consultancy Servs.*, 980 F.3d 1117, 1141-45 (7th Cir. 2020)).

Motorola gives short shrift to *Epic* and ignores the key component of its rationale. (Motorola Br. 61.) As *Epic* explains, the due process inquiry analyses the ratio of punitive damages to the harm inflicted *on the plaintiff*. 980 F.3d at 1142. "In most cases, the compensatory-damages award approximates the plaintiff's harm." *Id.* In such cases, identifying the ratio is straightforward: "we compare compensatory and punitive-damages award." *Id.* But the circumstances presented in *Epic Systems*—as well as in this case— are "unusual" because the plaintiff was awarded compensatory damages based on the *benefit* to the defendant. *See id.* "This award, then, does not reflect [plaintiff's] harm." *Id.* at 1143. Because the disgorgement award was substantial—$140 million—this Court

concluded that a 1:1 ratio to punitive damages is the maximum *constitutionally* permissible. *Id.* at 1144.

Motorola's main response is to assert that "the conduct in *Epic* was … less reprehensible than Hytera's conduct here." (Motorola Br. 61.) But the district court's award here—$135.8 million (R.1099)— already has a significant deterrent component. Motorola's whole theory for unjust enrichment damages was to strip Hytera of any and all potential benefit from its own misconduct and thereby deter similar misconduct in the future. (R.931 at Tr. 5706, 5708-09.) As Motorola's counsel argued in closing, Hytera "would just do it again and again and again and again because they get to keep at least some, if not all, if not most of the profits." (R.931 at Tr. 5709:16-18.) The Supreme Court of Utah recognized that a $90 million compensatory award for unjust enrichment was "sufficient to satisfy the policy" motivating "an award of exemplary damages—deterrence of future misappropriation." *USA Power, LLC v. PacifiCorp.*, 372 P.3d 629, 661 (Utah 2016). Given that the substantial compensatory damages award amply deters any similar conduct in the future, the district court's outlier award of $271.6 million in punitive damages cannot be justified. *See Epic*, 980 F.3d at 1143.

The misconduct of Hytera's former employees was undoubtedly serious, but there is less justification for a large punitive damages award in this case. In *Epic*, this Court described defendants' actions as a "repeated course of wrongful actions spanning multiple years." 980 F.3d at 1141. Despite knowing that it was improper, defendants' employees "still accessed and downloaded [plaintiff's] confidential information for years ...." *Id.* When a whistleblower tipped plaintiff off, defendant made "repeated, intentional" attempts to deceive plaintiff and throw off investigators. *Id.* at 1126, 1142. For example, a defendant manager instructed his employees to "hide the truth from investigators." *Id.* at 1142. The employees complied and "lied to investigators," and then continued to access the confidential information from plaintiff's userweb through other means. *Id.* After litigation was initiated, defendant "destroyed evidence" about additional downloaded documents that contained information helpful for plaintiff. *Id.* at 1131.

In this case, the former Motorolans downloaded the confidential documents and then went to work for Hytera. Motorola waited a decade to notify Hytera about the downloads and file this lawsuit. Hytera promptly retained U.S. counsel, Finnegan, to help conduct an

57

internal investigation. (R.803 at Tr. 3247.) While the former Motorola employees initially showed a willingness to work with Finnegan, they became less cooperative as the investigation progressed. (R.803 at Tr. 3247-48.) Hytera terminated their employment. (*Id.*) When Hytera learned that some of the former employees had deleted files from their laptops, Hytera worked with its vendor to have as many of those files forensically restored. (R.709 at Tr. 1481-82, 1485.) Hytera produced this information to Motorola in discovery.

Motorola claims that one of the former employees (G.S. Kok) admitted in a plea agreement to "provid[ing] 'materially false testimony' *while under oath in this case.*" (Motorola Br. 19, emphasis added) In reality, G.S. Kok testified in a deposition taken in a different case, where he was represented by separate counsel. *See* R.766-2 (copy of the deposition transcript taken in the ITC investigation). Motorola then played portions of that deposition to the jury in this case. (R.785 at Tr.568.) In the cited plea agreement, G.S. Kok admitted to "provid[ing] materially false testimony related to *his involvement* in the theft of trade secret information from Motorola …." Plea Agreement at 8, 1:20-cr-00688, Dkt. 78. Hytera did not suborn perjury in this case.

The district court discounted Hytera's R&D data but never found that Hytera had presented "fabricated evidence to the jury." (Motorola Br. 12, 33.) This issue arose out of a fairly routine discovery dispute. Hytera had produced business-unit-wide R&D data, which was broader than the accused products. Hytera then created a document that attributed codes to the accused products. (R.1096-1:23-26.) Hytera revised the codes to correct errors and applied differing filters based on the codes as Motorola added and subtracted accused products throughout the case. (R.1096-1:25-26.) Motorola's expert acknowledged that the business-unit-wide R&D data never changed, only the codes. (R.929 at Tr. 5444:17-23.) Yet, the district court threw the baby out with the bathwater and called the whole data set unreliable. (A86-87.) Hytera has already paid a heavy price because it was not permitted to reduce its own R&D costs from the disgorgement award. (*Id.*)

Motorola's failure to offer even one analogous case speaks volumes. As this Court explained in *Epic*, no party could point to "any comparable cases in which any court has upheld a 2:1 or higher ratio resulting in over $200 million in punitive damages." *Epic*, 980 F.3d at 1143-44. The same is true here. Motorola does not point to single

trade secret case with a substantial disgorgement damages and a 2:1 ratio resulting in over $200 million in punitive damages. The punitive damages award should be vacated.

## IV. This Court should limit the copyright damages to the three years before the claims were added

The district court erred in refusing to limit Motorola's damages to the three-year period before the claims were added to the case. (Opening Br. 67-71.) As Hytera explained, Congress enacted Section 507(b) of the Copyright Act "to render uniform and certain the time within which copyright claims could be pursued" and "to prevent the forum shopping invited by disparate state limitations periods." *Petrella*, 572 U.S. at 670. The Supreme Court clearly construed Section 507(b) to mean that "a successful plaintiff can gain retrospective relief *only* three years back from the time of suit." *Id.* at 677 (emphasis added). The Second Circuit held that this pronouncement must be followed even in cases where the discovery rule applies. *Sohm v. Scholastic Inc.*, 959 F.3d 39, 52 (2d Cir. 2020).

Motorola asks this Court to disregard these authorities and hold instead that the discovery rule overrides the Supreme Court's

construction of the Copyright Act. (Motorola Br. 62-64.) That invitation should be rejected.

Although Motorola argues that the Supreme Court did not really intend to limit damages to three years from time of suit (Motorola Br. 63), *Petrella* referred to the "three-year look-back limitations period" *eleven* times, consistently tying the limitation period for damages to the time a suit is filed. *Petrella*, 572 U.S. at 670, 672, 677. As Motorola notes, *Petrella* includes a single footnote recognizing, without further discussion or elaboration, that "nine Courts of Appeals have adopted … a 'discovery rule,' which starts the limitation period when 'the plaintiff discovers, with due diligence should have discovered, the injury the forms the basis for the claim.'" 572 U.S. at 670 n.4. The Court went out of its way to emphasize that it "ha[s] not passed on" the discovery rule's continued viability." *Id.*; *see also SCA Hygiene Prods. Aktiebolag v. First Quality Baby Prods., LLC*, 580 U.S. 328, 337-38 (2017) (reiterating that the *Petrella* Court "specifically noted" that it was not deciding this question).

In *Sohm*, the Second Circuit harmonized *Petrella*'s three-year lookback period for damages with the discovery rule. In that case, the district court denied defendants' motion for summary judgment on

plaintiff's copyright infringement claims, arguing that claims occurring more than three years prior to suit were barred. 959 F.3d at 42, 44.

The Second Circuit reversed. Although it acknowledged binding circuit precedent adopting the discovery rule, it recognized that the rule cannot override the Supreme Court's explicit direction in *Petrella* limiting damages to three years before suit was filed. Nor did the Second Circuit find an inconsistency between *Petrella* and the discovery rule, as they address different issues: "we must apply the discover rule to determine when a copyright infringement claim accrues, but a three-year lookback period from the time a suit is filed to determine the extent of the relief available." *Id.* at 52. The Second Circuit thus held that the district court "erred in allowing *Sohm* to recover damages more than three years prior to when he filed his copyright infringement suit." *Id.* at 51. "Despite not passing on the propriety of the discovery rule in *Petrella*, the Supreme Court explicitly delimited damages to the three years prior to the commencement of a copyright infringement action." *Id. Petrella* thus "explicitly disassociated the Copyright Act's statute of limitations from its time limit on damages." *Id.* Accordingly, as the Second

Circuit held, damages must be limited to three years before suit, even where the discovery rule extends the time period in which a plaintiff may bring a claim and seek other forms of relief. *Id.*

In no uncertain terms, *Petrella* interpreted the Copyright to contain a retrospective damages bar. Motorola's arguments ultimately boil down to the contention that the Supreme Court misinterpreted Section 506(b), and its construction is better; but this Court is bound by the Supreme Court's interpretation of the statute, not Motorola's.

## V.    The district court did not abuse its discretion in denying the permanent injunction (Motorola's Cross Appeal)

As part of its cross appeal, Motorola challenges the district court's order denying its motion for a permanent injunction. (Motorola Br. 23-28.) There is no abuse of discretion. *Liebhart v. SPX Corp.*, 998 F.3d 772, 779 (7th Cir. 2021).

### A.    Motorola ignores the district court's dispositive ruling that exceptional circumstances existed

Motorola fails to address—and therefore waives its right to challenge—the district court's dispositive ground for denying the permanent injunction motion.

As Motorola notes, the DTSA authorizes injunctions "to prevent any actual or threatened misappropriation," 18 U.S.C. § 1836(b)(3)(A)(i), and courts apply the four-factor test when assessing whether a permanent injunction would be appropriate and equitable. (Motorola Br. 23.) However, the DTSA includes a discretionary layer in the statute: "[In] exceptional circumstances that render an injunction inequitable," courts may "condition[] future use of the trade secret upon payment of a reasonable royalty …." 18 U.S.C. § 1836(b)(3)(A)(iii).

The district court held exactly that: "Here, *exceptional circumstances certainly do exist*. The potential scope, impact, and difficulties a worldwide injunction could cause, particularly during an ongoing pandemic, pose a large potential problem." (MA40 (emphasis added).) Accordingly, the district court ruled as a matter of discretion that "an injunction in this case would be inequitable" and that, therefore, "the path forward in this case is for the award of a reasonable royalty." *Id.* (cleaned up). Motorola waived any challenge to this dispositive ruling. *See Hentosh v. Herman M. Finch Univ. of Health Scis.,* 167 F.3d 1170, 1173 (7th Cir. 1999).

In any event, the district court's ruling was not an abuse of discretion. The district court issued its order denying the permanent injunction in December 2020.[21] As the district court noted, Motorola's request was filed and being considered in the midst of a global, once-in-a-century pandemic. (MA40.) The CDC had guidelines for social distancing and encouraged first responders the use of two-way radios to maintain those social distances. (R.1085.) Hytera submitted numerous declarations and letters detailing that its DMR systems are used by governmental entities around the world. (R. 986, Exs. 6-11.) Those governmental entities employ Hytera's systems not for convenience or comfort but rather to carry out their missions to protect public health and safety. (*Id.*) Any injunction would force these governmental entities to shut down their systems in the midst of a global pandemic, forcing them to purchase replacement systems—a lengthy and costly process. (*Id.*) Given that the requested injunction would cause significant hardship to innocent third parties

---

[21] Motorola had an immediate right to appeal at that time. 28 U.S.C. § 1292(a)(1). Yet, Motorola did not appeal the order until August 2022, after entry of the final judgment.

worldwide, the district court did not abuse its discretion in denying Motorola's motion.[22]

## B. The district court did not abuse its discretion in finding Motorola failed to prove irreparable harm

The district court also denied the injunction on a separate basis, finding that Motorola would not suffer irreparable harm. (MA37-38, 40.)

Motorola argues that it will "continue to be harmed in ways that are difficult to quantify and thus compensate with damages," including loss of market share and reputation. (Motorola Br. 23-24.) But these alleged harms can be remedied by monetary damages— and routinely are. *See McDavid Knee Guard, Inc. v. Nike USA, Inc.*, 683 F. Supp. 2d 740, 749 (N.D. Ill. 2010) (loss of market share did not support finding of irreparable harm because "any such losses

---

[22] The Uniform Trade Secrets Act ("UTSA"), which has been adopted by nearly every state and was a model for the DTSA at the federal level, contains a similar provision allowing a royalty in lieu of an injunction in "exceptional circumstances." UTSA § 2(b). The comments to the UTSA explain that exceptional circumstances can include, among other things, "the existence of an overriding public interest" based on the "reasonable reliance" and "good faith" use by others—for example, customers and dealers—who "would be prejudiced by a prohibitory injunction against future damaging use." *Id.* § 2 cmt.

could be recovered as money damages"); *Binney & Smith v. Rose Art Indus., Inc.*, No. 94 C 6882, 1995 WL 103532, at *13 (N.D. Ill. Mar. 3, 1995) ("Loss of sales, profits, and market share is traditionally not irreparable harm."). As the district court recognized, "Motorola has, throughout the trial, shown that it can quantify the market share that it has lost." (MA37-38.)

Motorola next argues that the district court should have granted the injunction motion when Hytera could not or would not pay any future judgment or a royalty. (Motorola Br. 24-27.) Motorola cites cases holding that courts can consider evidence that a defendant is actually unable to pay or has previously tried to avoid paying. (*Id.* at 24.) But Motorola cited no such evidence in its permanent injunction motion. (R.962.) In fact, Motorola has spent the past three years maintaining that Hytera *does* have the ability to pay. *See* Motorola Br. 27 ("[Hytera's] own public financial statements reveal that it has assets more than sufficient to cover its royalty obligations."). The district court agreed. (R.1348:3.) Motorola cannot have it both ways.

Motorola resorts to concocting an alleged "plan [by Hytera] to evade the judgment." (Motorola Br. 25.) For example, Motorola argues here that Hytera did not post a bond for the damages award. *See id.*

While the posting of a Rule 62 bond would have secured a stay, a supersedeas bond is not required. *See Niemi v. Lasshofer*, 770 F.3d 1331, 1343 (10th Cir. 2014). Given the "significant" issues pending on appeal, the district court refused to grant Motorola's motion to enforce the judgment—an order not challenged on appeal. (R.1348.)[23]

Motorola then invites this Court to engage in a hindsight exercise, asserting that Hytera's recent failure to pay the royalty order is proof of Hytera's inability to pay. *See* Motorola Br. 27. For starters, Hytera has *actually paid* the ongoing quarterly royalty payments into escrow. Ironically, while Motorola concedes that Hytera has made the quarterly royalty payments into escrow, it points to the relatively small amount of the payments. *See* Motorola Br. 26 ("Hytera has since made two subsequent royalty payments of less than $1 million each"). But those quarterly payments have been "small" for an

---

[23] Motorola also accuses the Hytera entities of nefarious motives because its U.S. entities declared bankruptcy following the verdict. (Motorola Br. 25.) But the bankruptcy court rejected the same arguments and approved the sale of the assets to a new entity under the court's supervision. *See In re Hytera Commc'ns. Am. (West) Inc., et al.*, Case No. 8:20-bk-11507-ES, Dkt. 111 (Bankr. C.D. Ca. July 14, 2020); *id.* Dkt. 494 (Bankr. C.D. Cal. May 19, 2021).

important reason: sales of the old accused products have dwindled because the products are now outdated, having been replaced by a new product line with more advanced, non-infringing technology. While a small percentage of Hytera users are still transitioning their DMR systems over to the non-infringing technology, Hytera expects that all users will be fully transitioned by March 31, 2024.

Motorola complains that Hytera has not put cash into escrow to cover the initial, lump-sum escrow payment of $49 million for the retroactive portion of the royalty—*i.e.*, covering royalty for sales from July 2019 through July 2022. But Hytera offered another form of security to cover that large payment: stock shares in a Canadian-based company. (R.1352; R.1382:8-10.) Motorola had touted these shares as a valuable asset that could be used to cover Hytera's payment obligations. (R.1286 at 14 & n.4.) An independent appraiser valued this asset at a value that exceeded the amount owed for the escrow payment by more than $4 million. (R. 1382-1, Ex. 10.) On August 1, 2022, Hytera asked the district court to accept this form of security in lieu of cash for the initial, lump sum payment. (R.1352.) That motion remains pending.

Even if Hytera had failed to honor the full extent of its royalty obligations, as Motorola incorrectly claims, what transpired *after* the district court's ruling is not properly before this Court. "[O]ur review is limited to the record at the time the decision was made; evidence unavailable at the time discretion was exercised cannot be used to demonstrate abuse of that discretion." *James v. Eli*, 889 F.3d 320, 328-29 (7th Cir. 2018) (cleaned up).

Finally, Motorola argues that the district court erred in denying its reconsideration motion. (Motorola Br. 28.) As the district court explained, while the initial appeal was dismissed as premature, Motorola filed a second cross appeal—the current appeal—shortly before filing its reconsideration motion. (MA43.) Accordingly, the district court correctly ruled that it lacked jurisdiction to adjudicate the reconsideration motion. *Id.* (citing *Griggs v. Provident Consumer Disc. Co.*, 459 U.S. 56, 58 (1982).

70

## CONCLUSION

The Court should reverse the damages award and remand with instructions to apportion profits, exclude extraterritorial profits, limit copyright damages to three years prior to the date the copyright claims were filed, and reduce DTSA punitive damages to a ratio of 1:1 or less. The Court should affirm the denial of a permanent injunction.

Respectfully submitted,

<u>/s/ Boyd Cloern</u>
Boyd Cloern
        *Counsel of Record*
Alice E. Loughran
Mark C. Savignac
John William Toth
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, NW
Washington, DC 20036
(202) 429-3000
(202) 429-3902 (fax)
bcloern@steptoe.com

*Attorneys for Hytera*
*Communications Corp. Ltd.*

May 1, 2023

**CERTIFICATE OF COMPLIANCE WITH RULE 32(a)**

I certify that this brief complies with the word limit imposed by Circuit Rule 28.1 because it contains 13,999 words, including the glossary but excluding material exempted by Federal Rule of Appellate Procedure 32(f).

I further certify that the brief complies with the typeface and type-style requirements of Federal Rule of Civil Procedure 32(a)(5) and (6) because it has been prepared in proportionally spaced, 14-point Bookman Old Style typeface using Microsoft Word 2019.

/s/  Boyd Cloern
Boyd Cloern
*Counsel of Record*
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, NW
Washington, DC 20036
(202) 429-3000
bcloern@steptoe.com

## CERTIFICATE OF SERVICE

I certify that on May 1, 2023, I caused a true and correct copy of the foregoing brief to be served via the Court's ECF system upon all counsel of record. I also certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

   /s/  Boyd Cloern
Boyd Cloern
*Counsel of Record*
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, NW
Washington, DC 20036
(202) 429-3000
bcloern@steptoe.com
